UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

CITY OF DEARBORN HEIGHTS ACT 345
POLICE & FIRE RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

                              Plaintiff,

      vs.

CHICAGO BRIDGE & IRON COMPANY
N.V., PHILIP K. ASHERMAN, RONALD A.
BALLSCHMIEDE and WESTLEY S.
STOCKTON,

                        Defendants.

—————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based on, *inter alia*, the investigation of plaintiff's counsel. This investigation included, but was not limited to, a review and analysis of: (i) court records; (ii) the public filings of Chicago Bridge & Iron Company N.V. ("CB&I" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) CB&I's press releases; (v) independent media reports regarding CB&I, its stock price movement, pricing and volume data; (vi) consultation with relevant economic and accounting experts; and (vii) other publicly available material and data. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the defendants and/or are exclusively within their custody or control. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after further investigation and after a reasonable opportunity to conduct discovery.

## INTRODUCTION AND OVERVIEW

1.     Plaintiff brings this action individually and on behalf of all persons or entities who purchased the common stock of CB&I between October 29, 2013 and December 10, 2014, inclusive (the "Class Period"), and were damaged thereby. As alleged herein, plaintiff seeks to recover damages caused by defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.     CB&I was founded in 1889 in Chicago, Illinois. Prior to and around the beginning of the 20th century, CB&I's growth was propelled by the western expansion of the railroad system and the discovery of oil in the United States. In early 1996, Praxair, Inc. acquired CB&I Industries, Inc., then the parent company of CB&I, for the purpose of obtaining the parent's industrial gas operations. At that time, Praxair announced its intention to divest the remaining businesses of the parent, including CB&I. In 1997, CB&I was spun off by Praxair in an initial public offering.

3.     Between 2000 and 2012, CB&I completed a series of acquisitions that expanded the Company's capabilities and services. A critical acquisition – that of The Shaw Group, Inc. ("Shaw") (f/k/a Stone & Webster, Inc.) – was announced in July 2012 and completed in February 2013. Through the acquisition of Shaw, the Company would acquire purportedly high-value contracts to complete construction of new nuclear power plants in Waynesboro, Georgia and Jenkinsville, South Carolina (hereinafter referred to as the "Nuclear Projects").

4.     While conducting due diligence on the Shaw acquisition leading up to its February 2013 completion date, defendants became aware of the problems associated with the Nuclear Projects contracts. For instance, in November 2012, while the Shaw due diligence was ongoing, Georgia Power sued the contractors at the Georgia Nuclear Project construction site, alleging hundreds of millions of dollars in damages based in part on the findings of the Nuclear Regulatory Commission's ("NRC") ongoing investigation of Shaw.

5.     After the Shaw acquisition was completed in February 2013, defendants made illegitimate purchase price adjustments ("PPAs") to improve CB&I's publicly reported financial performance instead of taking charges to earnings to reflect that the Nuclear Project contracts had become further impaired due to construction delays and cost overruns that arose after the February 2013 completion of the Shaw acquisition. During the Class Period, defendants misstated the Company's reported income from operations, earnings per share and the goodwill balance sheet account for the Shaw acquisition. Defendants also made false and misleading statements about purported "progress on the [N]uclear [P]rojects" throughout the Class Period.

6.     Information related to the accuracy of defendants' accounting for the Nuclear Projects and how it purportedly impacted CB&I's past and future earnings quality first surfaced between June

10, 2014 and July 24, 2014.  Information and facts demonstrating that defendants' accounting for the Shaw acquisition was fraudulent, however, first surfaced during the summer of 2016.

7.      In early June 2014, information began entering the market suggesting it was unlikely that CB&I would be able to collect for work it did on the Nuclear Projects due to ongoing construction quality, as well as quality control issues, resulting in further delays and cost overruns. For example, on June 10, 2014, *SNL Generation Markets Week*, in an article entitled "Georgia Power continues to scrutinize contractors building new Vogtle nuke," reported that Georgia Power had refused to accept certain components for the new nuclear reactors and that CB&I and Westinghouse – the leaders of the contractor consortium – were liable for hundreds of millions of dollars in delays and cost overruns.  The article added that CB&I's

> Lake Charles facility also is making modules for the other reactor in the U.S., the expansion of the V.C. Summer nuclear plant owned by SCANA . . . , [and] that fabricating modules for the new Summer reactors "***remains the most significant challenge to meeting the project construction schedule***."

8.      On June 11, 2014, *SNL Power Daily*, in an article entitled "Slowdown in nuclear renaissance increases litigation risks," confirmed that the owners of the Nuclear Projects "have had conflicts with the contractors building the new reactors, Westinghouse and Chicago Bridge & Iron, NV, [with] ***over nearly $1 billion in disputed costs for each project***."

9.      On the morning of June 17, 2014, Prescience Point issued a 38-page report entitled "Acquisition Accounting Gone Nuclear."  Prescience Point's report concluded that defendants had misstated CB&I's previously reported balance sheet, income from operations and earnings per share through inappropriate acquisition accounting for the Shaw acquisition.

10.     On June 17, 2014, however, defendants panned and denied Prescience Point's accusations that the Company had been cooking its books to mask undisclosed liability.  In a Company press release issued on June 17, 2014, Philip K. Asherman ("Asherman"), the Company's

Chief Executive Officer ("CEO") and President, stated: "'CB&I's management team operates our company with the absolute highest integrity, and we take great issue with [these] erroneous claims.'" The Company further warned investors that Prescience Point holds "short positions in CB&I common stock and [Prescience Point] stand[s] to realize significant gains in the event that CB&I's stock price declines. CB&I believes that this conflict of interest should cause the report and its conclusions to be viewed skeptically."

11.     On June 17, 2014, as the market absorbed additional information concerning the Nuclear Projects – all disclosed by entities other than defendants – and the impact it might have on the quality of CB&I's past and projected financial performance, the Company's stock price dropped from a high of $74.46 per share to close at $68.26 per share, or more than 8%.

12.     On July 24, 2014, defendants conducted an investor and analyst conference call. During the call, Asherman was asked the following question by a Stephens Inc. analyst:

> I know the [10-Q's] not out yet, but I'm sure it will have some color in there that will enable us to at least analyze what the non-cash earnings impact was for the Shaw acquisition which will get a lot of airplay once we're all disconnected from this call. Is there any color you want to add around that for the quarter [and] the rest of the year?

Asherman responded:

> In think we can move on. But certainly, and I think if you look in the 10-Q, we [will provide] even greater detail on the acquisition accounting. Look at that [and] if you have any detailed questions after reading that . . . [I would be] happy to go through that with you again.

13.     After the July 24, 2014 conference call, CB&I filed its second quarter 2014 ("2Q14") Form 10-Q with the SEC. The Company's 2Q14 Form 10-Q, as promised by Asherman earlier, provided additional detail concerning how CB&I's accounting for Shaw and the Nuclear Projects affected certain balance sheet accounts, income from operations and earnings per share during the Class Period, as well as projected income from operations and earnings per share. Yet the Company

still failed to establish and account for an appropriate reserve reflecting its liability for Nuclear Project delays and cost overruns.

14.     On July 25, 2014, in response to defendants' further disclosures regarding how the Company was accounting for the progress of the Nuclear Projects, the Company's stock price dropped from $69.48 per share to $63.07 per share, or more than 9%.

15.     All told, between June 2014 and December 2014, in response to new information relating to the status of the Nuclear Projects and how liability for cost overruns and project delays might impact CB&I's previously reported and future financial performance, the Company's stock price declined by more than half – from over $83 per share to under $40 per share.

16.     Nearly a year later, on October 28, 2015, CB&I announced that it had sold Shaw to Westinghouse.  The next day, *Fortune* reported:

> **CB&I said it expected to report a loss of about $1 billion in connection with the "sale' in the third quarter.**
>
> **Why would you sell anything for a loss much less a company with rare engineering talent and a successful track record?**
>
> **There are at least two reasons.  The first is the V.C. Summer nuclear power plant under construction in Jenkinsville, South Carolina.  The second reason is the Vogtle nuclear power plant under construction in Waynesboro, Georgia.**
>
> In 2008, a consortium of companies led by CB&I began construction on the first new commercial nuclear power plants to be built in the U.S. for several decades.  The plants, located in Georgia and South Carolina, will feature AP1000 reactors from Westinghouse, which is majority owned by Toshiba.
>
> It did not take long for things to go sideways.  In Georgia, budget overruns, scheduling delays and other problems strained the relationship between the construction consortium and Georgia Power, a subsidiary of Atlanta-based Southern Company and a majority owners [sic] of the Vogtle plant.

17.     In exchange for Westinghouse's assurance that it would assume all liability associated with delays and cost overruns at the Nuclear Projects, CB&I transferred ownership of Shaw to Westinghouse for an up-front purchase price of $0.00.  As part of the October 27, 2015 purchase

agreement entered into between CB&I and Westinghouse, however, the purchase price was subject to a post-closing accounting true-up. According to documents filed with the Delaware Chancery Court during the summer of 2016, this accounting true-up worked as follows: If the net working capital of Shaw when transferred to Westinghouse fell below a "peg" of $1.17 billion, CB&I would owe Westinghouse the difference between $1.17 billion and the accounting true-up. If the net working capital of Shaw when transferred to Westinghouse was above the "peg," on the other hand, CB&I was entitled to certain amounts of money to be determined upon completion of the Nuclear Projects. This accounting true-up would be done according to the methodology that CB&I had applied, which purportedly complied with U.S. Generally Accepted Accounting Principles ("GAAP"), from the moment CB&I acquired Shaw (*i.e.,* the same accounting methodology utilized by defendants prior to and throughout the Class Period).

18. On April 28, 2016, Westinghouse delivered its post-closing accounting true-up to CB&I. Westinghouse claimed that CB&I owed it $2.1 billion, noting that the Company's accounting for liability it faced for the troubled Nuclear Projects was "'not [recorded] in accordance with GAAP'" and that CB&I "should have recorded a reserve liability of hundreds of millions of dollars for losses."

19. On July 21, 2016, in response to Westinghouse's $2.1 billion demand, CB&I filed a verified complaint with the Court of Chancery of the State of Delaware ("Verified Complaint"). CB&I's pleading requested that the court, *inter alia*, issue the following declaratory relief: (a) ordering that Westinghouse is barred from making a claim of $2.1 billion against CB&I; and (b) finding Westinghouse had no remedy for such a claim in any proceeding (including before an arbitrator). CB&I also alleged that Toshiba Corporation ("Toshiba"), which controls Westinghouse, was the entity seeking $2.1 billion from the Company as a result of CB&I's fraudulent accounting.

20.     On September 2, 2016, Westinghouse filed its opening brief in support of its motion to dismiss CB&I's Verified Complaint. *In that document, Westinghouse represented to the court that it had reviewed CB&I's past financial statements – particularly, how it was accounting for liabilities associated with the Nuclear Projects – and had concluded that CB&I had not accurately accounted for hundreds of millions of dollars of liabilities, in blatant violation of GAAP. Westinghouse further represented to the court that the terms of the October 2015 purchase agreement contemplated that it may require CB&I to make a payment – here, for $2.1 billion – to Westinghouse due to "'actual fraud.'"* Westinghouse further noted that CB&I "was expected to deliver to [Westinghouse] a company with at least the Target Net Working Capital Amount (to be determined in accordance with GAAP . . .) and [CB&I] agreed to make up the difference if it turned out that the actual Net Working Capital Amount fell short of that mark."

21.     On December 2, 2016, the Delaware Court of Chancery dismissed CB&I's Verified Complaint. Westinghouse's September 2016 statements offered in opposition to CB&I's Verified Complaint corroborated the allegations of accounting irregularities first raised by Prescience Point in June 2014. But Westinghouse's claims went further:  Asserting that CB&I's accounting was not only erroneous, but fraudulent as well.

22.     On February 12, 2017, *Bloomberg* published an article entitled "Toshiba's Nuclear Reactor Mess Winds Back to a Louisiana Swamp."  The article stated:

> *If you want to understand why Toshiba Corp. is about to report a multi-billion dollar write-down on its nuclear reactor business, the story begins and ends with a one-time pipe manufacturer with roots in the swamp country of Louisiana.*
>
> *The Shaw Group Inc., based in Baton Rouge, looms large in the complex tale of blown deadlines and budgets at four nuclear reactor projects in Georgia and South Carolina overseen by Westinghouse Electric Co., a Toshiba subsidiary.*
>
> *On Tuesday, Toshiba is expected to announce a massive write-down, perhaps as big as $6.1 billion, to cover cost overruns at Westinghouse, which now owns most of Shaw's assets.*  The loss may actually eclipse the $5.4 billion that

Toshiba paid for Westinghouse in 2006 and has forced the Japanese industrial conglomerate to put up for sale a significant stake in its prized flash-memory business.  Toshiba had to sell off other assets last year following a 2015 accounting scandal.

*       *       *

Just as problems began to surface, in July 2012 Shaw agreed to sell itself for $3.3 billion to Chicago Bridge & Iron Co., a much larger engineering firm that wanted in on the envisioned nuclear renaissance.  But three years later, with little progress to show for itself, CB&I decided to cut its losses.  It sold the bulk of Shaw's assets to Toshiba for $229 million, accepting the significantly lowered price in exchange for shedding liabilities related to the projects.

**But in April 2016, four months after the deal closed, Toshiba concluded [CB&I] had miscalculated and accused CB&I of inflating Shaw's assets by $2.2 billion, and asked to renegotiate.**  CB&I balked and sued Toshiba for breach of contract last July.  A preliminary decision in December ruled in favor of Toshiba's request to renegotiate. CB&I has appealed that ruling.  "We remain confident this issue will come to a resolution favorable to CB&I," said Gentry Brann, a spokeswoman for the company.  CB&I has argued that at least some of the reactor problems have been because of Westinghouse and its AP1000 designs.

## JURISDICTION AND VENUE

23.     This complaint asserts claims under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5 ("Rule 10b-5").

24.     This Court has subject matter jurisdiction over this action under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

25.     Venue is proper in this District under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), (c) and (d).  Many of the acts and transactions that constitute the alleged violations of the law, including the dissemination to the public of materially false and misleading statements of fact, occurred in this District where the Company's securities traded on the New York Stock Exchange ("NYSE").

26.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of national securities exchanges.

## THE PARTIES

**Plaintiff**

27.     Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System, as set forth in the accompanying certification, purchased CB&I stock during the Class Period and was damaged thereby.

**Defendants**

28.     Defendant CB&I provides a range of services, including conceptual design, technology, engineering, procurement, fabrication, modularization, construction, commissioning, maintenance, program management and environmental services, to customers in the energy infrastructure market throughout the world.  Currently, CB&I is a contractor responsible for the construction and commissioning of two nuclear power plants being built in Georgia and South Carolina.  CB&I trades on the NYSE, an efficient market, under the symbol "CBI."  CB&I, through its management, representatives and agents, made and is liable for, the misstatements and omissions set forth herein at ¶¶37-41, 48, 54-55.  CB&I maintains an office at 1251 Avenue of the Americas, Suite 750, New York, New York 10020.

29.     Defendant Asherman was, at all relevant times, the CEO and President of CB&I and served on the Company's Supervisory Board.  During the Class Period, Asherman used the instrumentalities of interstate commerce to make presentations to analysts and investors concerning CB&I's operations and financial results.  Asherman made, or had authority over the content and how

to communicate, the misstatements and omissions set forth herein at ¶¶37-41, 48, 54-55, and is liable for those misstatements and omissions.

30.     Defendant Ronald A. Ballschmiede ("Ballschmiede") was, at all relevant times, the Chief Financial Officer ("CFO") and Executive Vice President of CB&I.  During the Class Period, Ballschmiede used the instrumentalities of interstate commerce to make presentations to analysts and investors concerning CB&I's operations and financial results.  Ballschmiede made, or had authority over the content and how to communicate, the misstatements and omissions set forth herein at ¶¶37-41, 48, 54-55, and is liable for those misstatements and omissions.  On March 12, 2015, the Company announced that Ballschmiede had retired.

31.     Defendant Westley S. Stockton ("Stockton") was, at all relevant times, the Vice President and Corporate Controller and Chief Accounting Officer of CB&I.  During the Class Period, Stockton used the instrumentalities of interstate commerce to make presentations to analysts and investors concerning CB&I's operations and financial results.  Stockton made, or had authority over the content and how to communicate, the misstatements and omissions set forth herein at ¶¶37-41, 48, 54-55, and is liable for those misstatements and omissions.

32.     Defendants Asherman, Ballschmiede and Stockton are referred to herein, collectively, as the "Individual Defendants."

## BACKGROUND AND PRE-CLASS PERIOD EVENTS

33.     On July 30, 2012, *The Wall Street Journal* reported that CB&I had agreed to acquire Shaw for approximately $3.0 billion.  Asherman described Shaw as a "bolt on" acquisition that would provide CB&I better access to lucrative projects in the electric-power industry.  The Shaw acquisition would also entitle CB&I to construction and engineering contract revenue for the Nuclear Projects.

34.     On July 30, 2012, the Company held an analyst and investor call to discuss the Shaw acquisition.  Asherman and Ballschmiede participated in the call and assured investors that the Company had obtained direct knowledge of the purported value of the Nuclear Project contracts, as well as the status of Nuclear Projects, while conducting due diligence on the Shaw acquisition:

> [Asherman:]  We're there.  We are on the projects, Jamie.  We're working in both Vogel and Summer.  So, we have some pretty good insight into those projects and also the relationships that accompany those with both Southern Company, and also the provider with Toshiba.  So, we have an ongoing dialogue with those companies and we feel pretty confident about – .
>
> Jamie Cook – Credit Suisse – Analyst.  With the contract structure?
>
> [Asherman:]  Yes, absolutely.  Absolutely.

35.     Further, defendants assured investors that the ongoing NRC investigation and contractual disputes surrounding Nuclear Projects would have little to no financial impact on CB&I.  Specifically, on June 6, 2013, the Company participated in and presented at the Credit Suisse Engineering & Construction Conference.  During the conference, Asherman engaged in the following colloquy:

> [Cook:]    Analyst. Sure, and I'll just kick it off, because I assume we'll have a lot of questions back there.  Phil, why don't you just address the inevitable, which everyone is worried – talked about in terms of yesterday, the news that came out of Scana with regards to Unit 2 and the delay that they talked about.
>
> *       *       *
>
> [Asherman:]    Yes, that's all right. Good planning.  No, I think Scana gave a very balanced view of the project.  They are the licensee, so I think it's within their purview, certainly, to talk about schedule and cost adjustments. They gave a broad estimate in terms of potential cost impact.  But I think it's important to remember about these nuclear jobs – it's fundamentally different than other large capital projects.  These are not necessarily cost- and schedule-driven, per se; but they are quality and safety.  Not in the sense of industrial safety, but nuclear safety; nuclear safety and nuclear quality.
>
> That's a completely different set of drivers on these types of projects, and it's what we all want, right?  We want these nuclear jobs to be filled as safely and as reliabl[y] as possible.  And that's what drives – that's what drives these, and that's

- 11 -

not a bad thing.  So as we look for other opportunities to make these jobs more safe, more reliable, certainly the licensees are going to take an opportunity to invest in that.

We re-baseline the projects, so we're providing the data.  There's nothing we disagree with.  Certainly, they were very generous in their remarks to see the extension as well as the cost increase from a lot of different sources.  We see some real opportunity to improve schedule, for example, on the pre-assembly of the modules in Lake Charles, and working very hard with the licensees and all concerning the NRC to make that happen in the way it should happen.

So we're making progress.  The milestones that we talked about I think were great milestones on these projects.  So we have most of that backlog still in front of us.  So, we'll be analyzing the impacts as we go forward.  And I apologize, I'm losing my voice a little bit today.  But that's all right, that's all right, that's not a problem.  A lot of people see that as a benefit.

So, we'll see that going forward.  But, generally, there's nothing I disagree with at Scana.  We were part of that presentation.  We had our Chief Operating Officer and one of our chief development people with them as part of that presentation.  So we're all working hard on this, on both projects, to achieve the milestones.  The modules, just as an aside – I don't know if it was talked about – the modules that we do have scheduled for Scana for this year will be there on time.  We made a lot of good headway on changing some of the work processes, inspection protocol, in line with the NRC requirements.  And so we feel pretty confident and pretty good about the way they are heading.

As far as exposure to the Company – very minimal, that we see.  When they talk about cost and schedule, it's not necessarily defined itself in the contract or issues.  And we're in a consortium, so there is [sic] a lot of ways to look at that.  But we don't feel that there's anything different than what we talked about when we looked at the original project during the diligence, so we feel pretty comfortable.

[Cook:]   So no impact on guidance?

[Asherman:]   No impact on guidance.  I guess if that's what the question was, yes.  I should've just started there – no impact on guidance.  You could've saved me a lot of breath there; no impact on guidance and our financials going forward.

36.     As alleged herein, the Individual Defendants assured investors that they had knowledge of the status of the Nuclear Projects and how the Company was accounting for these projects, both as a result of the Shaw acquisition due diligence and their senior positions at CB&I. After the Shaw acquisition was completed in February 2013, however, the issues related to delays

and cost overruns for the Nuclear Projects persisted and became worse.  In order to conceal the material financial impact these post-acquisition problems had on the financial performance and outlook for CB&I, defendants perpetrated a deliberate and unlawful accounting fraud.

## DEFENDANTS' MATERIALLY MISLEADING STATEMENTS AND OMISSIONS AND CLASS PERIOD EVENTS

37.     On October 30, 2013, CB&I filed its 3Q13 Form 10-Q with the SEC.  Ballschmiede signed the Form 10-Q and Asherman and Ballschmiede certified the Form 10-Q pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002.  The 3Q13 Form 10-Q included the following statement concerning the Company's Liquidity and Capital Resources:

> The $725.9 million net change in our accounts receivable, accounts payable and net contracts in progress balances was due to progress on the nuclear projects (approximately $455.0 million), working capital requirements and timing of collections and payments for our large cost-reimbursable projects (approximately $135.0 million), and timing of collections and payments on our large fixed-price projects (approximately $30.0 million).

38.     The 3Q13 Form 10-Q included the following statement concerning the Company's goodwill:  "Of the [$2.8 billion] of estimated goodwill recorded in connection with the Shaw acquisition, approximately [$44 million] is deductible for tax purposes."  Between 2Q13 and 3Q13, CB&I increased the goodwill associated with the Shaw acquisition by $400 million, from $2.4 billion to $2.8 billion.  The 3Q13 Form 10-Q reported $202 million in income from operations and basic and diluted earnings per share of $1.10 and $1.08, respectively.

39.     On February 27, 2014, CB&I filed its 2013 Form 10-K with the SEC.  Asherman, Ballschmiede and Stockton signed the Form 10-K and Asherman and Ballschmiede certified the Form 10-K pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002.  The 2013 Form 10-K included the following statement concerning the Company's Liquidity and Capital Resources:

*       *       *

The $815.5 million net change in our Contract Capital balances was due primarily to progress on the nuclear projects (approximately $540.0 million) and working capital requirements and timing of collections and payments for our large cost-reimbursable projects (approximately $270.0 million).

40.     The 2013 Form 10-K included the following statement concerning the Company's goodwill: "Of the [$3.3 billion] of total goodwill recorded in connection with the Shaw acquisition, approximately [$44 million] is deductible for tax purposes and is associated with the remaining portion of goodwill previously deductible by Shaw."  Between the end of 3Q13 and fiscal year-end 2013, CB&I increased the goodwill associated with Shaw by another $500 million, from $2.8 billion to $3.3 billion.  The Company also reported $685 million in income from operations for fiscal 2013.

41.     On April 24, 2014, CB&I filed its 1Q14 Form 10-Q with the SEC.  Ballschmiede signed the Form 10-Q and Asherman and Ballschmiede certified the Form 10-Q pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002.  The 1Q14 Form 10-Q reported $3.3 billion in goodwill associated with the Shaw acquisition.  The 1Q14 Form 10-Q also reported $162 million in income from operations and basic and diluted earnings per share of $0.83 and $0.82, respectively.

42.     On June 10, 2014, *Generation Market Week* reported that there was approximately $900 million at dispute between the Georgia and South Carolina utilities and CB&I with respect to unapproved work orders at the Nuclear Projects.  According to the article, most, if not all, of the $900 million in dispute was due to CB&I welding quality control issues as determined by the NRC from an investigation that commenced in 2010.

43.     On June 11, 2014, *Power Daily* reported that Georgia Power was aggressively litigating its position that the construction contractors, particularly CB&I at the Georgia nuclear construction site, were responsible for cost overruns and that resolution of disputes between the parties would be increasingly difficult.

44.     Between June 10, 2014 and June 12, 2014, in response to information becoming public concerning CB&I and the associated cost overruns and delays at the Nuclear Projects, the price of CB&I's stock decreased from $83.30 per share to $76.72 per share, or almost 8%, on higher than average trading volume.

45.     On the morning of June 17, 2014, *Prescience Point*, in a report entitled "Acquisition Accounting Gone Nuclear," asserted, *inter alia*, that CB&I had improperly accounted for its goodwill during 2013 to cover losses associated with post-acquisition events, such as further construction delays and cost overruns with the Nuclear Projects.  On that day, the price of CB&I's stock dropped from a high of $74.46 per share  to $68.26 per share , or more than 8%, on higher than average trading volume.  But for defendants' vigorous denial of the content and implications of the Prescience Point report, the Company's stock price would have dropped even more.

46.     On July 24, 2014, defendants conducted an investor and analyst conference call from which the CFO, Ballschmiede, was absent.  During the call, Asherman was asked the following question by a Stephens Inc. analyst:

> I know the [10-Q's] not out yet, but I'm sure it will have some color in there that will enable us to at least analyze what the non-cash earnings impact was for the Shaw acquisition which will get a lot of airplay once we're all disconnected from this call. Is there any color you want to add around that for the quarter [and] the rest of the year?

Asherman responded:

> In think we can move on.  But certainly, and I think if you look in the 10-Q, we [will provide] even greater detail on the acquisition accounting.  Look at that [and] if you have any detailed questions after reading that . . . [I would be] happy to go through that with you again.

47.     On the evening of July 24, 2014, CB&I filed its 2Q14 Form 10-Q with the SEC. Ballschmiede signed the Form 10-Q and Asherman and Ballschmiede certified the Form 10-Q

pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002.  The 2Q14 Form 10-Q included the

following partial disclosure regarding how CB&I was accounting for the Nuclear Projects:

> *Operating Activities*—During the first six months of 2014, net cash used in operating activities was $374.4 million, primarily resulting from cash generated from earnings, offset by the net change in our accounts receivable, inventory, accounts payable and net contracts in progress account balances (collectively "Contract Capital") ($811.3 million, combined).  Our contracts in progress balances represent our cash position relative to revenue recognized on projects, with (i) costs and estimated earnings in excess of billings representing an asset reflective of future cash receipts, and (ii) billings in excess of costs and estimated earnings representing a liability reflective of future cash expenditures and non-cash earnings.

*        *        *

> Fluctuations in our Contract Capital balance, and its components, is not unusual in our business and is impacted by the size of our projects and changing mix of cost-reimbursable versus fixed-price backlog.  Our cost-reimbursable projects tend to have a greater working capital requirement ("cost and estimated earnings in excess of billings"), while our fixed-price projects are generally structured to be cash flow positive ("billings in excess of costs and estimated earnings").  Our Contract Capital is particularly impacted by the timing of new awards and related payments in advance of performing work, and the achievement of billing milestones on backlog as we complete certain phases of work.  Contract Capital is also impacted at period-end by the timing of accounts receivable collections and accounts payable payments for our large projects.

> The $811.3 million decline in our Contract Capital liability for the first six months of 2014 was primarily due to progress on our two large U.S. nuclear power projects, with the remaining change due primarily to working capital requirements and the timing of receivable collections and accounts payable payments for several large projects in our Engineering, Construction and Maintenance and Fabrication Services operating groups. The Contract Capital liability for the two nuclear projects, exclusive of the margin fair value liability discussed above, was approximately $800.0 million and $1.2 billion at June 30, 2014 and December 31, 2013, respectively, representing a decline of approximately $434.0 million during the period.  The Acquisition Closing Date Contract Capital liability, exclusive of the margin fair value liability, was related to significant advance payments received on the projects prior to the Acquisition and fair value adjustments related to cost to complete the projects.  This Contract Capital position has been impacted by the partial utilization of the pre-acquisition advance payments and timing of achievement of subsequent billing milestones.  This balance will continue to fluctuate prospectively based on the timing of future billings and collections and will ultimately decline as the projects progress. Although we anticipate additional decline for the nuclear power projects during the remainder of 2014, we expect the decline to be more than offset in the back half of the year by Contract Capital improvement

from advance payments on our recent large awards and anticipated future awards, and improvement in our Contract Capital position from certain projects in our backlog. We expect this improvement, combined with cash generated from earnings, to result in overall positive operating cash flows for the back half of the year. Further, we believe our anticipated future operating cash flows and capacity under our revolving and other credit facilities will be sufficient to finance our capital expenditures, settle our commitments and contingencies and address our working capital needs for the foreseeable future.

48.     The 2Q14 Form 10-Q reported $3.3 billion in goodwill associated with the Shaw acquisition. The 2Q14 Form 10-Q also reported $260 million in income from operations and basic and diluted earnings per share of $1.32 and $1.31, respectively.

49.     On July 25, 2014, in response to defendants' public disclosures, including those related to the Company's accounting for the Shaw acquisition, CB&I's stock price dropped 9% on heavy volume.

50.     On October 1, 2014, *The Acadiana Advocate*, in an article entitled "Nuclear plant parts supplier agrees to changes at Louisiana factory," noted CB&I, "[a] manufacturer making parts in Lake Charles for two nuclear plants in the Southeast has promised to better train its employees after investigators accused three workers of cheating on a qualification test four years ago." The article went on to note that CB&I and the NRC had reached a settlement regarding the alleged misconduct, including one welder "cheating by taking a qualification test for a co-worker. A test administrator allowed the test even though the authorities said the administrator was aware of the misconduct."

51.     On October 2, 2014, *The State* issued an article entitled "Contractors say it will cost $1 billion more to finish new nuclear reactors at V.C. Summer." The article noted that CB&I and Westinghouse had provided South Carolina utility officials with information suggesting that the project may cost an additional $1.2 billion to complete. The article also provided detail concerning

the scope of the project delay and suggested that CB&I could be responsible for hundreds of millions of dollars for delays and cost overruns:

> Cayce-based SCANA Corp., the parent company of the electric utility [stated] its construction and design consortium, primarily Chicago Bridge & Iron Co. and Westinghouse, informed them that the increased preliminary cost estimates are needed to support project delays announced in August associated with engineering problems, fabrication and procurement of components and construction issues.

> \*      \*      \*

> The CB&I and Westinghouse consortium told SCANA in August that they were undertaking a full re-baselining of the V.C. Summer plant's Unit 2 and Unit 3 new reactors due to projected delays that would move completion of the Unit 2 reactor back to late 2018 or early 2019 and Unit 3's completion back a year beyond that to at least late 2019.

> The $1.2 billion revised cost estimate issued by the engineering and construction consortium is in 2007 dollars, SCANA's announcement said, "and would be subject to escalation."

> \*      \*      \*

> If the increased costs are to be added to the total cost of the reactor, SCE&G and the consortium will have to negotiate whose responsibility those increased costs fall to – SCE&G and its ratepayers or the consortium, which has had multiple delays with fabrication and delivery.

52.     On October 3, 2014, *Associated Press* issued an article entitled "Price tag for SC nuclear plant could grow by $1B." The article noted that South Carolina utility officials had just concluded the cost of the V.C. Summer plant "could grow by more than $1 billion . . . in a blow to a nuclear industry hoping it can control construction spending."

53.     Between October 1, 2014 and October 10, 2014, as the market digested this firm-specific information regarding past and ongoing problems at the Nuclear Projects, the Company's stock price dropped from more than $57 per share to $49.38 per share, or more than 14%.

54.     On October 24, 2014, CB&I filed its 3Q14 Form 10-Q with the SEC. Ballschmiede signed the Form 10-Q and Asherman and Ballschmiede certified the Form 10-Q pursuant to §§302

and 906 of the Sarbanes-Oxley Act of 2002.  The 3Q14 Form 10-Q included the following statement

concerning the Company's Liquidity and Capital Resources:

> The $1.1 billion decline in our Contract Capital liability for the first nine months of 2014 was primarily due to progress on our two large U.S. nuclear projects, with the remaining change due primarily to working capital requirements and the timing of receivable collections and accounts payable payments for several large projects in our Engineering, Construction and Maintenance and Fabrication Services operating groups.

55.     The 3Q14 Form 10-Q reported $3.3 billion in goodwill associated with the Shaw

acquisition.  The 3Q14 Form 10-Q also reported $286 million in income from operations and basic

and diluted earnings per share of $1.50 and $1.48, respectively.

56.     On December 7, 2014, *Associated Press* issued an article entitled "State monitor

warns on Ga. nuclear plant costs."  The article stated:

> Public watchdogs are giving Southern Co. a between-the-lines warning that building a multibillion-dollar nuclear plant in Georgia without a detailed construction schedule could trigger financial penalties.

> That warning came in a report filed by a nuclear engineer and an analyst who work for state regulators and monitor the construction of two new reactors at Plant Vogtle in eastern Georgia.

> The Public Service Commission has warned for at least two years that Southern Co. subsidiary Georgia Power is relying on an outdated project schedule that contains almost no detail after December 2015, even though construction will continue for several more years.

> Nuclear engineer William Jacobs Jr. and financial analyst Steven Roetger said to build a complex, first-of-its-kind project without a schedule was unreasonable.

> "In fact it runs counter to any prudent project management, nuclear or otherwise," goes against the project's construction agreement and an industry group's own recommendations for construction, Jacobs and Roetger wrote in a semi-annual report.

> That keyword – "prudent" – was meant to catch the ears of Southern Co. executives.

By law, the Public Service Commission can prevent Georgia Power, a regulated monopoly, from billing its customers for any construction costs the commission decides are the result of "imprudence."

. . . [T]he commission's staffers are laying the legal groundwork that could be used in future arguments to prevent customers from paying some of Georgia Power's costs. . . .

. . . Regulators say utility executives are negotiating with Westinghouse Electric Co. and Chicago Bridge and Iron Co. to obtain a firm construction schedule and completion date.

57.     On December 10, 2014, *TradeFair Group*, in a report entitled "Construction Monitor: Longer Delays Are Likely for Vogtle Reactors," noted:

The two nuclear reactors under construction at Plant Vogtle will be delayed beyond their forecast commercial operation dates of December 2017 and 2018 . . . . The consortium building the project had originally projected the first of the two AP1000 reactors would be operational in April 2016. . . . A complete integrated project schedule (IPS) through the commercial date of each unit has not been provided to the oversight staff, the officials said. Meanwhile, Georgia Power Co. has not reaffirmed forecast commercial operation dates, saying only that it is working with contractors Westinghouse and Chicago Bridge & Iron to establish a more "detailed and comprehensive" integrated schedule date.

58.     Between December 7, 2014 and December 12, 2014, as the market digested this firm-specific information regarding past and ongoing problems at the Nuclear Projects, the Company's stock price dropped from $45.92 per share to $39.14 per share, or nearly 15%.

59.     Defendants' Class Period statements regarding "progress on the [N]uclear [P]rojects," goodwill, income from operations, and earnings per share, as set forth in ¶¶37-41, 48, 54-55, were false and misleading when made for the following reasons:

(a)     As alleged in further detail below at ¶¶64, 69, the Company's Class Period financial statements failed to disclose to investors that CB&I was responsible for hundreds of millions dollars of liability for cost overruns and delays associated with the Nuclear Projects. Throughout the Class Period, and in blatant violation of GAAP, the Company failed to establish and disclose a reserve of approximately $1.0 billion for this liability in its financial statements and take a

- 20 -

necessary charge to current earnings to reflect such a reserve. The Individual Defendants, moreover, failed to cause the Company to make such disclosures and report the necessary earnings charges throughout the Class Period.

(b)     On April 28, 2016, Westinghouse delivered to CB&I a post-closing accounting true-up as part of Westinghouse's acquisition of Shaw in late 2015. Westinghouse asserted that CB&I owed it $2.1 billion because the Company's accounting for the liability it faced for the troubled Nuclear Projects was "'not [recorded] in accordance with GAAP'" and CB&I "should have recorded a reserve liability of hundreds of millions of dollars for losses."

(c)     On September 2, 2016, Westinghouse represented to the Court of Chancery of the State of Delaware that it had reviewed CB&I's past financial statements – particularly, how it was accounting for liabilities associated with the Nuclear Projects – and had concluded that CB&I had not accurately accounted for hundreds of millions of dollars of liabilities, in blatant violation of GAAP. Westinghouse further contended that CB&I owed Westinghouse $2.1 billion for "actual fraud."

**LOSS CAUSATION/ECONOMIC LOSS**

60.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated the price of CB&I stock and operated as a fraud or deceit on Class Period purchasers of CB&I stock by misrepresenting and omitting material information regarding the true value of unapproved work orders. When defendants' prior misrepresentations and omissions became apparent to the market between on June 10, 2014 and December 10, 2014, as identified above at ¶¶42-45, 47, 49-53, 56-58, the Company's stock price fell significantly, as the prior artificial inflation came out of the price. As a result of their purchases of CB&I stock during the Class Period,

plaintiff and the other members of the Class (as defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

61.     Defendants' misleading statements and omissions, identified herein at ¶¶37-41, 48, 54-55, had the intended effect and caused CB&I stock to trade at artificially inflated prices during the Class Period.

62.     The declines in CB&I's stock price between June 10, 2014 and December 10, 2014 were the direct result of the nature and extent of defendants' prior misstatements and omissions being revealed to investors and the market.  The timing and magnitude of CB&I's stock price decline negates any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to defendants' fraudulent conduct.  Between June 10, 2014 and December 10, 2014, the NYSE composite remained relatively unchanged.  CB&I's stock price, over the same period, declined by approximately 50%.

## DEFENDANTS' VIOLATIONS OF GAAP DURING THE CLASS PERIOD

63.     In order to inflate the price of CB&I stock, defendants caused the Company to falsely report its results during the Class Period by making improper PPAs in connection with the Shaw acquisition and failing to record a reserve for a liability the Company had incurred.  The PPAs did not comply with GAAP, specifically Statement of Financial Accounting Standards No. 141 ("SFAS 141"), *Business Combinations* (now codified as Accounting Standards Codification 805 ("ASC 805")), because they were recorded as a means to hide hundreds of millions of dollars in losses associated with post-acquisition delays and cost overruns for the Nuclear Project contracts, and which defendants had direct knowledge of after the February 13, 2013 acquisition of Shaw and continued to have knowledge of throughout the Class Period.  The failure to record a reserve for cost overruns and delays that CB&I was responsible for also violated Statement of Financial Accounting

Standards No. 5, *Accounting for Contingencies* (now codified as Accounting Standards Codification 450 ("ASC 450")).

64.     Defendants' deliberate violations of GAAP had a material impact on the Company's Class Period financial results.  Had defendants utilized correct accounting treatment, current period expenses and liabilities during the Class Period would have been hundreds of millions of dollars higher than what CB&I actually reported to market participants.  For 3Q13, the failure to recognize a massive liability due to cost overruns, construction delays and quality control issues associated with the Nuclear Projects caused defendants to overstate CB&I's income from operations for 3Q13 by at least $400 million.  Specifically, the Company increased its goodwill for the Shaw acquisition by $400 million through improper PPAs instead of establishing a reserve for CB&I's liability due to cost overruns and delays at the Nuclear Projects and taking a corresponding charge to current earnings.  For 4Q13, the same failure to record a liability for the losses from the Nuclear Projects and improper PPAs to increase goodwill caused defendants to overstate CB&I's income from operations by at least $500 million and understate a reserve on its balance sheet.  For 1Q14 through 3Q14, the failure to record this liability in 3Q13 and 4Q13 caused defendants to overstate CB&I's income from operations by approximately $900 million during these three quarterly periods.  As demonstrated by documents filed with the Delaware Chancery Court by Westinghouse during the summer of 2016, moreover, defendants failed to comply with GAAP by failing to set aside a reserve of approximately $1.0 billion to address CB&I's liability.  These accounting failures allowed the Company during the Class Period to report positive income from operations and earnings per share, instead of losses.

65.     CB&I reported its false financial statements in its SEC filings and press releases.  The SEC filings represented that the financial information presented therein was a fair statement of

CB&I's financial results and that the results were prepared in accordance with GAAP.  These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of CB&I's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

66.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X [17 C.F.R. §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of the disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

67.     GAAP, as set forth in SFAS 141 (codified in ASC 805), requires that companies recognize, separately from goodwill, the identifiable assets acquired and liabilities assumed from the acquired company in a business combination at the acquisition date.  *See* ASC 805-20-25-1.  For twelve months following the acquisition date ("the measurement period"), a company may adjust amounts recorded for assets acquired and the liabilities assumed from the acquired company.  *See* ASC 805-10-25-14.  However, the relevant GAAP makes clear that adjustments to recorded amounts for the acquired company's assets and liabilities may be recorded, with a corresponding impact to goodwill, only where "new information is obtained about facts and circumstances that existed as of the acquisition date that, if known, would have resulted in the recognition of those assets and liabilities" as of the acquisition date.  *Id*.  Further, the acquirer shall consider all pertinent factors in

determining whether information obtained after the acquisition date should result in an adjustment to the provisional amounts recognized or whether that information results from events that occurred after the acquisition date.  *See* ASC 805-10-30-2.

68.     The recording of a liability was required of CB&I pursuant to ASC 450, which states a charge to income should be recorded when (a) information available before the financial statements are issued or are available to be issued indicates it is probable that an asset has been impaired or a liability has been incurred, and (b) the amount of loss can be reasonably estimated. ASC 450-20-25-2.

69.     Despite defendants' knowledge of the impaired value of the Nuclear Project contracts as of and after the February 13, 2013 acquisition completion date, as well as hundreds of millions of dollars in liability for post-acquisition delays and cost overruns, CB&I, in violation of GAAP, made improper PPA entries for the Shaw acquisition instead of setting up a reserve on its balance sheet for the liability.  CB&I, *inter alia*, made improper PPA entries in 3Q13 (over $400 million) and 4Q13 (over $500 million) to increase the liability side of its contracts in progress account,[1] which had the effect of improperly increasing goodwill by similar amounts.  By making these entries, defendants established deferred revenue of approximately a billion dollars that would be recognized on a percentage-of-completion basis over the next five to six years while CB&I completed the Nuclear Projects.  But the truth was defendants had incurred hundreds of millions of dollars in losses from the Nuclear Projects, which under GAAP required CB&I to record an expense on the income statement and a liability on CB&I's balance sheet.  Further, the goodwill increase that resulted from

---

[1]     The contracts in progress account is an account used in the accounting for construction contracts.  It is the net of an asset account (unbilled receivable) and a liability account (deferred revenue).

the improper PPA entries was immediately impaired as a result of the losses incurred on the Nuclear Projects.

70.     Yet defendants failed during the Class Period to record a liability and a corresponding expense for massive losses incurred on the Nuclear Project contracts that were CB&I's responsibility. As a result, CB&I's Class Period financial statements materially overstated income from operations and earnings per share in violation of GAAP.

71.     Due to defendants' accounting improprieties, CB&I presented its financial statements in a manner that violated GAAP, including the following fundamental accounting concepts:

(a)     The concept that financial reporting should provide information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity (FASB Statement of Financial Accounting Concepts No. 8, ¶OB2);

(b)     The concept that financial reporting should provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity. Financial reports also provide information about the effects of transactions and other events that change a reporting entity's economic resources and claims (FASB Statement of Financial Accounting Concepts No. 8, ¶OB12);

(c)     The concept that financial reporting should provide information of how well management has discharged its responsibilities to make efficient and effective use of the reporting entity's resources (FASB Statement of Financial Accounting Concepts No. 8, ¶OB16); and

(d)     The concept that financial reporting should be useful in that it must be relevant and faithfully represent what it purports to represent. The usefulness of financial

information is enhanced if it is comparable, verifiable, timely and understandable (FASB Statement of Financial Accounting Concepts No. 8, ¶QC4).

72.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information that, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

## ADDITIONAL SCIENTER ALLEGATIONS

73.     Prior to and throughout the Class Period, the Individual Defendants never claimed they were unable to answer a question from a market participant concerning the status of the Nuclear Projects or regarding CB&I's liabilities, or purported lack thereof, for delays and cost overruns. During this same time period, moreover, the Individual Defendants assured market participants that they were fully aware of how CBI accounted for its liabilities, or purported lack thereof, for delays and cost overruns at the Nuclear Projects.  For instance, on July 30, 2012, Asherman assured investors:

> [W]e're not going to provide any commentary around, obviously, Shaw's performance [and] their reporting on their performance for the year . . . but *I will say that we're very satisfied through very thorough and comprehensive due diligence that the nuclear plants, the nuclear projects are performing as we are expecting and that they are well on their way to resolving issues on projects they have reported as having cost challenges.  So, we're very comfortable with [CB&I's financial] forecast*.

74.     On June 6, 2013, Asherman again assured investors that delays and cost overruns at the Nuclear Projects would have no impact on CB&I's reported and future financial performance. For instance, Asherman noted:

> But generally, *there's nothing I disagree with at Scana.  We were part of that presentation.  We had our Chief Operating Officer and one of our chief development people with them as part of that presentation*.  So we're all working

- 27 -

hard on this, on both projects, to achieve the milestones.  The modules, just as an aside – I don't know if it was talked about – the modules that we do have scheduled for Scana for this year will be there on time.  We made a lot of good headway on changing some of the work processes, inspection protocol, in line with the NRC requirements.  And so we feel pretty confident and pretty good about the way they are heading.

> **As far as exposure to the Company – very minimal, that we see**.

> \*        \*        \*

> **No impact on [CBI's] guidance. . . .  I should have just started there – no impact on guidance.  You could've saved me a lot of breath there; no impact on guidance and our financials going forward**.

75.     On October 28, 2015, CB&I announced that it had sold Shaw to Westinghouse for expected future payments of $229 million.  CB&I, however, had actually transferred ownership of Shaw to Westinghouse for an up-front purchase price of $0.00 (subject to an accounting true-up) in exchange for Westinghouse's agreement to absorb any liabilities CB&I may face as a consequence of its responsibility for delays and cost overruns at the Nuclear Projects.

76.     Indeed, according to CB&I's July 21, 2016 Verified Complaint, an integral part of the Shaw transaction was that "'CB&I shall receive a full release from Westinghouse and each of the project owners for any and all liabilities related to the [Nuclear Projects] (past, present, and future) arising from or in any manner associated with the nuclear business being acquired by Westinghouse.'"  But CB&I refused to represent that its accounting for liability associated with the Shaw business was accurate and complied with GAAP **after** the deal was signed.   As admitted by CB&I in the Verified Complaint:

> For CB&I, these concessions – giving up the nuclear Business for an upfront purchase price of $0 . . . – were acceptable only in exchange for an unequivocal release from any further liabilities in connection with the projects.  **When Westinghouse pushed to expand CB&I indemnification of Westinghouse for breach of CB&I's contractual representations – such as the accuracy of the financial statements of the Business, and the absence of any material adverse changes between signing and Closing – CB&I refused.  The accuracy of those representations would serve as a condition to Closing, but once the sale closed**

- 28 -

*there would be no recourse.  While such a limit to ongoing indemnities was highly unusual, it was consistent with the purpose of this transaction which was intended to cut off CB&I's liability for the projects*.

77.     On April 28, 2016, pursuant to the terms of the purchase agreement, Westinghouse delivered its Shaw post-closing accounting true-up to CB&I.  Westinghouse claimed that CB&I owed it $2.1 billion, pointing out that the Company's accounting for liability it faced for the troubled Nuclear Projects prior to the transaction was "'***not [recorded] in accordance with GAAP***'" and **CB&I "should have recorded a reserve liability of hundreds of millions of dollars for losses."**

78.     In response to Westinghouse's $2.1 billion demand, on July 21, 2016, CB&I filed the Verified Complaint with the Delaware Chancery Court.  CB&I's pleading requested that the court, *inter alia*, issue the following declaratory relief in the Company's favor: (a) ordering that Westinghouse is barred from making a claim of $2.1 billion against CB&I; and (b) finding Westinghouse had no remedy for such a claim.

79.     On September 2, 2016, Westinghouse filed its opening brief in support of its motion to dismiss the Verified Complaint.  In that document, Westinghouse represented to the court that it had reviewed CB&I's past financial statements – particularly, how it was accounting for liabilities associated with the Nuclear Projects – and had concluded that CB&I had not accurately accounted for hundreds of millions of dollars of liabilities, in blatant violation of GAAP.  ***Westinghouse further represented to the court that the terms of the October 2015 purchase agreement contemplated that it may require CB&I to make a payment – here, for $2.1 billion – to Westinghouse due to "actual fraud"*** for overstating the value of Shaw's assets as a result of CB&I's GAAP violations.

80.     Westinghouse's motion also stated:

The subtext of the Complaint is unmistakable: CB&I is tremendously unhappy with [Westinghouse's] Net Working Capital Amount calculation, and fears that examination by the Independent Auditor of that calculation – including of

- 29 -

[Westinghouse's] application of [GAAP], as required under the Agreement – will confirm the accuracy of [Westinghouse's] positions. ***CB&I therefore strives, through this action, to stop the Independent Auditor process dead in its tracks, jettison [Westinghouse's] calculation . . . without it ever being evaluated by any accounting expert (or indeed, by anyone)*** . . . .

81. On February 12, 2017, *Bloomberg* published an article entitled "Toshiba's Nuclear Reactor Mess Winds Back to a Louisiana Swamp." The article stated:

> ***If you want to understand why Toshiba Corp. is about to report a multi-billion dollar write-down on its nuclear reactor business, the story begins and ends with a one-time pipe manufacturer with roots in the swamp country of Louisiana.***
>
> ***The Shaw Group Inc., based in Baton Rouge, looms large in the complex tale of blown deadlines and budgets at four nuclear reactor projects in Georgia and South Carolina overseen by Westinghouse Electric Co., a Toshiba subsidiary.***
>
> On Tuesday, Toshiba is expected to announce a massive write-down, perhaps as big as $6.1 billion, to cover cost overruns at Westinghouse, which now owns most of Shaw's assets. The loss may actually eclipse the $5.4 billion that Toshiba paid for Westinghouse in 2006 and has forced the Japanese industrial conglomerate to put up for sale a significant stake in its prized flash-memory business. Toshiba had to sell off other assets last year following a 2015 accounting scandal.
>
> *                    *                    *
>
> Just as problems began to surface, in July 2012 Shaw agreed to sell itself for $3.3 billion to Chicago Bridge & Iron Co., a much larger engineering firm that wanted in on the envisioned nuclear renaissance. But three years later, with little progress to show for itself, CB&I decided to cut its losses. It sold the bulk of Shaw's assets to Toshiba for $229 million, accepting the significantly lowered price in exchange for shedding liabilities related to the projects.
>
> But in April 2016, four months after the deal closed, ***Toshiba concluded [CB&I] had miscalculated and accused CB&I of inflating Shaw's assets by $2.2 billion***, and asked to renegotiate. CB&I balked and sued Toshiba for breach of contract last July. A preliminary decision in December ruled in favor of Toshiba's request to renegotiate. CB&I has appealed that ruling. "We remain confident this issue will come to a resolution favorable to CB&I," said Gentry Brann, a spokeswoman for the company. CB&I has argued that at least some of the reactor problems have been because of Westinghouse and its AP1000 designs.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

82.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was  duty to disclose.

83.     Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, the material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of CB&I's stock and without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased CB&I stock between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed.  As such, plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for CB&I's common stock and to a presumption of the reliance on defendants' materially misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of CB&I common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, present and former officers and directors of CB&I, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

85.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, CB&I common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can

- 31 -

only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  During the Class Period, there were reported transactions of more than 450 million shares of CB&I common stock.  Record owners and other members of the Class may be identified from records maintained by CB&I or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

86.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     Whether the Exchange Act was violated by defendants' acts and omissions as alleged herein;

(b)     Whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts concerning CB&I's financial results; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of such damages.

87.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages as a result of defendants' wrongful conduct.

88.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities and class action litigation.  Plaintiff has no interests which conflict with those of the Class.

89.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

90.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count I is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

91.     During the Class Period, CB&I, through its officers, management and agents, and the Individual Defendants made or were responsible for the statements specified in ¶¶37-41, 48, 54-55, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.     CB&I, the Individual Defendants and the Company's officers, management and agents directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (a) employed devices, schemes and artifices to defraud; (b) made misleading statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of CB&I common stock during the Class Period.  The defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

93. CB&I, the Individual Defendants and the Company's officers, management and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of CB&I common stock during the Class Period.

94. CB&I is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

95. CB&I, the Individual Defendants and the Company's officers, management and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about CB&I's financial results.

96. The allegations above establish a strong inference that CB&I, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true status of CB&I's financial results. By concealing these material facts from investors, CB&I's stock price was artificially inflated during the Class Period.

97. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. These defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for

the purpose and effect of concealing the truth about the true status of CB&I's financial results and artificially inflating the price of CB&I common stock.

98.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CB&I common stock.  Plaintiff and the Class would not have purchased CB&I common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and omissions.

99.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of CB&I common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

100.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count II is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

101.     The Individual Defendants acted as controlling persons of CB&I within the meaning of §20 of the Exchange Act.  By virtue of their high-level positions with the Company, participation in CB&I's acquisition of Shaw and awareness of the risks associated with the Nuclear Project contracts, as well as their intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the Company's decision making, including the content and dissemination of the various statements plaintiff contends are false and misleading.  CB&I controlled the Individual Defendants and all of its employees.

102.    Each of the Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

103.    As set forth above, defendants each violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of CB&I's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding plaintiff and the members of the Class damages, including interest thereon;

C.    Awarding plaintiff's reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 2, 2017          ROBBINS GELLER RUDMAN
                                                                                   & DOWD LLP
                                                          SAMUEL H. RUDMAN

                                                            */s/. Samuel H. Rudman*
                                                              SAMUEL H. RUDMAN

                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)
                                           srudman@rgrdlaw.com

                                           ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                           DAVID C. WALTON
                                           TRIG R. SMITH
                                           655 West Broadway, Suite 1900
                                           San Diego, CA  92101-8498
                                           Telephone:  619/231-1058
                                           619/231-7423 (fax)
                                           davew@rgrdlaw.com
                                           trigs@rgrdlaw.com

                                           VANOVERBEKE, MICHAUD &
                                           TIMMONY, P.C.
                                           THOMAS C. MICHAUD
                                           79 Alfred Street
                                           Detroit, MI  48201
                                           Telephone:  313/578-1200
                                           313/578-1201 (fax)

                                           Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE
RETIREMENT SYSTEM ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at
the direction of plaintiff's counsel or in order to participate in this private action or
any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period
in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in
a class action that was filed under the federal securities laws within the three-year
period prior to the date of this Certification except as detailed below:

*Kumar v. Santander Consumer USA Holdings Inc., et al.,* No. 3:14-cv-03746 (N.D. Tex.)
*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. The WhiteWave Foods Company, et al.,* No.
1:16-cv-02355 (D. Col.)

6.      The Plaintiff will not accept any payment for serving as a
representative party on behalf of the class beyond the Plaintiff's pro rata share of

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of March, 2017.

> CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM
>
> By: _____
>
> Its: _____

CHICAGO BRIDGE & IRON

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 02/10/2014 | 450 | $76.71 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 08/25/2014 | 1,105 | $64.20 |
| 08/26/2014 | 70 | $64.25 |