**KAHN SWICK & FOTI, LLC**
KIM E. MILLER (KM-6996)
250 Park Ave., Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

-and-

LEWIS S. KAHN
206 Covington St.
Madisonville, LA 70447
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Counsel for Lead Plaintiff ALSAR Partnership, Ltd.*
*and Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| _____ | **CASE NO. 1:17-CV-1580** |
| ) | |
| IN RE CHICAGO BRIDGE & IRON ) | Hon. Lorna Schofield |
| COMPANY N.V. SECURITIES LITIGATION ) | |
| ) | <u>JURY TRIAL DEMANDED</u> |
| _____ ) | |

## CONSOLIDATED AMENDED COMPLAINT FOR
## <u>VIOLATION OF FEDERAL SECURITIES LAW</u>

# TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ....................................................................1

II.    JURISDICTION AND VENUE ..................................................................9

III.   PARTIES .................................................................................................10

IV.    BACKGROUND .....................................................................................12

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ....................................37

VI.    DEFENDANTS CONTINUE TO MISLEAD THE MARKET AS THE TRUTH EMERGES ...............................................................................................48

VII.   POST CLASS PERIOD EVENTS CONFIRM FALSITY AND SCIENTER .................73

VIII.  ADDITIONAL SCIENTER ALLEGATIONS ...............................................77

IX.    LOSS CAUSATION / ECONOMIC LOSS ................................................80

X.     ADDITIONAL ALLEGATIONS CONCERNING DEFENDANTS' ACTIONABLE STATEMENTS AND OMISSIONS OF OPINION ........................................86

XI.    PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY........................88

XII.   CLASS ACTION ALLEGATIONS ............................................................89

XIII.  COUNT I: Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder.......................................................................91

XIV.   COUNT II: Violations of Section 20(a) of the Exchange Act Against Individual Defendants ...............................................................................................94

XV.    PRAYER FOR RELIEF ............................................................................96

XVI.   DEMAND FOR TRIAL BY JURY .............................................................97

Lead Plaintiff ALSAR Partnership Ltd. ("ALSAR" or "Lead Plaintiff"), together with additional Plaintiffs Ironworkers Locals 40, 361 & 417 Union Security Funds and Iron Workers Local 580 Joint Funds (collectively, "Plaintiffs") allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia,* the investigation of Plaintiffs' counsel. This investigation included, but was not limited to, a review and analysis of: (i) court records; (ii) public filings of Chicago Bridge & Iron Company N.V. ("CBI" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) CBI's press releases; (v) analyst reports and independent media reports regarding CBI, its stock price movement, pricing and volume data; (vi) other publicly available material and data; and (vii) interviews of persons with knowledge of the allegations contained herein, including former employees of CBI and relevant third parties. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by defendants and/or are exclusively within their custody or control. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after further investigation and after a reasonable opportunity to conduct discovery.

## I.       SUMMARY OF THE ACTION

1.       Plaintiffs bring this action individually and on behalf of all persons or entities who purchased the common stock of CBI between **October 30, 2013** and **June 23, 2015**, inclusive (the "Class Period"), and were damaged when the true facts were revealed, removing the artificial inflation from the price of the stock through a series of partial disclosures beginning on June 10, 2014 and ending with the final disclosure on June 23, 2015. Plaintiffs seek to recover damages caused by Defendants' violations of Sections l0(b) and 20(a) of the Securities Exchange Act of

1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder. Defendants are CBI, its Chief Executive Officer ("CEO") Philip Asherman, its Chief Financial Officer ("CFO") Ronald Ballschmiede, and its Chief Accounting Officer ("CAO") Westley S. Stockton (collectively with Asherman and Ballschmeide, "Individual Defendants")(collectively with Asherman, Ballschmeide and CBI, "Defendants").

2.      This case arises from Defendants' material misrepresentations and omissions regarding massive losses in CBI's nuclear business.  Shortly before the Class Period began, CBI purchased The Shaw Group, Inc. ("Shaw") for $3.3 billion in cash and stock (the "Shaw purchase").  Because Shaw's Stone & Webster subsidiary ("Stone & Webster") was a leading global fabricator of nuclear power plants, the Shaw purchase instantly made CBI a major force in that industry, where it previously lacked a foothold.

3.      At the time of the purchase, the nuclear industry in the United States was at a major inflection point.  After decades without any new reactors being built in the United States, two were under construction using a modular design called AP1000 developed by Westinghouse Electric Corporation ("Westinghouse"):Vogtle in Waynesboro, Georgia and V.C. Summer in Jenkinsville, South Carolina. Shaw's crown jewel, its Stone & Webster division, was the construction contractor and fabricator for both of these projects (the "Nuclear Projects").

4.      Following the Shaw purchase, the performance of CBI's nuclear business became central to both CBI's financial results and its business prospects.  CBI touted the Nuclear Projects as immediately accretive to earnings within the first year, while offering long-term benefits as the Nuclear Projects would be forerunners to the construction of additional nuclear projects once it was shown that modular construction of the Westinghouse AP1000 could be done in a timely and cost-efficient manner.

2

5.      However, the Nuclear Projects would prove to be enormous liabilities for CBI in both the short term and long term. Throughout the Class Period, the profitability of the Nuclear Projects deteriorated and schedules became increasingly delayed. Defendants did not timely or truthfully report to investors mounting problems impacting the value of the Nuclear Projects. Instead, Defendants: (1) falsely claimed that CBI was protected from liability arising from cost overruns on the Nuclear Projects when the Company was actually subject to substantial liability; (2) made materially false and misleading statements regarding the progress of the Nuclear Projects; (3) falsely asserted that delays in construction would have no effect on CBI's profitability; (4) hid fabrication defects and unsafe practices by CBI, including improper welding of critical nuclear modules; (5) failed to disclose a stop work order resulting from CBI's lack of safety compliance; (6) hid the fact that the Nuclear Projects had become so uneconomical for CBI that it was secretly considering giving away its share of the Nuclear Projects to cut off liability; and (7) boosted reported revenues, earnings, and assets by repeatedly violating Generally Accepted Accounting Principles ("GAAP") in multiple respects.

6.      After purchasing Shaw, Defendants were required to and did allocate the purchase price for the acquisition between assets (including goodwill) and liabilities acquired.  However, in the three quarters following the purchase (from April 1, 2013 to December 31, 2013), Defendants retroactively manipulated the Shaw purchase accounting by more than a billion dollars.  Most notably, they increased the liability for contracts in progress by $1.2 billion dollars, and thereby boosted goodwill by about $850 million[1], effectively creating a "cookie jar" reserve that would leak back into earnings as the Nuclear Projects were completed, so long as CBI did not have to

_____

[1] The contracts in progress adjustment increased goodwill on a dollar-for-dollar basis, but other adjustments, chiefly related to taxes, partially offset the impact.

3

recognize an impairment to goodwill:

| Allocation of Shaw Purchase Price (in millions of $) | Q1 2013 | Q2 2013 | Q3 2013 | Q4 2013 |
|---|---|---|---|---|
| Contracts in Progress | (1,117,786) | (1,121,164) | (1,779,871) | (2,317,471) |
| Goodwill | 2,449,147 | 2,446,701 | 2,826,450 | 3,296,530 |

Source: 1Q:13 Form 10-Q; 2Q:13 Form 10-Q; 3Q:13 Form 10-Q; 2013 Form 10-K.

7.      Indeed, CBI did not recognize any impairment to goodwill on the Nuclear Projects while the Company still owned them. Instead, the Company carried the overvalued assets on its books for over two years, and repeatedly asserted in SEC filings that there were no indications of impairment. Nevertheless, in October 2015, just a few months after the Class Period ended, the Company admitted that the Company would have to take an impairment of over $1 billion when CBI sold the Nuclear Projects.

8.      In addition to the inflated goodwill, in early June 2014, information began entering the market suggesting it was unlikely that CBI would be able to collect for additional, ongoing work on the Nuclear Projects due to problems with construction quality and compliance, resulting in further delays and cost overruns. Over the next 12 months, Defendants pushed back against claims by third parties that: (i) the Nuclear Projects were behind schedule; (ii) the Nuclear Projects were incurring cost overruns; (iii) the parties involved in the Nuclear Projects disagreed over liability for cost overruns; and (iv) delays would lead to additional costs for which CBI could be liable; and (v) the projects were improving. In various post-Class Period statements, Defendants would later confirm that (i) the projects were in fact up to three years behind schedule; (ii) CBI's disputed cost overruns from the projects amounted to upwards of $2.2 billion; (iii) the parties in the Nuclear Projects had fundamental disagreements over what types of overruns CBI was liable for; (iv) additional delays might lead to CBI becoming liable for damages,; and (v) CBI's

4

relationship with its partners was deteriorating to the point where CBI was seeking to exit from the Nuclear Projects.

9.      For example, on June 10, 2014, SNL Generation Markets Week, in an article entitled "Georgia Power continues to scrutinize contractors building new Vogtle nuke," reported that Georgia Power had refused to accept certain components fabricated for the new nuclear reactors, and that CBI and its consortium partner Westinghouse were liable for hundreds of millions of dollars in delays and cost overruns.  The article added that CBI's

> Lake Charles facility also is making modules for the other reactor in the U.S., the expansion of the V.C. Summer nuclear plant owned by SCANA . . . , [and] that fabricating modules for the new Summer reactors *"remains the most significant challenge to meeting the project construction schedule."*

(emphasis added) *See* M. Bandyk, "Georgia Power continues to scrutinize contractors building new Vogtle nuke," *SNL Generation Markets Week* (June 10, 2014).

10.      Another article the following day in SNL Power Daily further detailed CBI's potential liability for costs related to delays on the Nuclear Projects.  As a result of these partial disclosures, CBI shares dropped $6.58, or nearly 8%, between June 10, 2014 and June 12, 2014.

11.      On the morning of June 17, 2014, Prescience Point, a research firm issued a 38-page report on CBI entitled "Acquisition Accounting Gone Nuclear" (the "Prescience Point Report").  It concluded that Defendants had manipulated contract liabilities and goodwill through purchase price adjustments, lowering the quality of CBI's earnings and distorting its prospects.

12.      As the market absorbed the additional information concerning the Nuclear Projects and the impact it might have on CBI's financial performance, CBI's stock price dropped from a high of $74.46 per share to close at $68.26 per share, or more than 8%.

13.      To stem losses from the Prescience Point Report, Defendants issued a press release

that same day vigorously denying the accuracy of the Prescience Point Report and denying that it had masked undisclosed liability.  In the June 17, 2014 press release, then CBI CEO Defendant Philip Asherman ("Asherman") stated: "***CB&I's management team operates our company with the absolute highest integrity, and we take great issue with [these] erroneous claims.***" (emphasis added). The Company further discouraged investors from considering as true the information in the Prescience Point Report, warning that Prescience Point holds "short positions in CBI common stock and [Prescience Point] stand[s] to realize significant gains in the event that CBI's stock price declines. CBI believes that this conflict of interest should cause the report and its conclusions to be viewed skeptically." The Company also took the unusual step of providing an early update on its expected quarterly financial statements, declaring in the press release that "CB&I's second quarter financial results are scheduled to be released in late July 2014. The company is confirming today that it expects to report results within the ranges of its current guidance for the year."

14.     On July 24, 2014, after reporting better-than-expected noncash earnings for Q2:14, CFO Defendant Ballschmiede failed to participate in a conference call to discuss accounting details with investors.  Defendant Asherman referred analysts to the Form 10-Q report to be filed later that evening, which provided no proper basis for the Company's aggressive accounting decisions, and raised questions regarding its cash flow going forward.  Prescience Point explained on social media that the growing disparity between cash flows and reported earnings validated the firm's hypothesis, and that the Company's conference call was full of "deceptions" and left investors "with more questions than answers." *See* https://twitter.com/PresciencePoint.

15.     On July 25, 2014, in response to these public disclosures, CBI's stock price dropped 9% on heavy volume.

16.     Between October 1 and October 3, 2014, several articles were published

identifying growing disputes between CBI, Westinghouse and the owners of the Nuclear Projects for liability for the growing costs associated with project delays and change orders.  As the markets digested this information, CBI shares dropped more than 14% from October 1, 2014 to October 10, 2014.

17.     On October 23, 2014, Defendants held an earnings conference call after reporting earnings for Q3:14.  To encourage investors to ignore mounting problems in CBI's Nuclear Projects, Defendants CBI and Asherman falsely claimed that "the remaining cost impacts resulting from the U.S. nuclear project extension of schedules are recoverable under our contractual arrangements."   They further claimed everything was going according to schedule and that cash flow from the projects would "continue to improve":

> Now as far as Lake Charles, there's been a lot of discussion around that. Keep in mind that all the modules are pretty much on track....
>
> So, all those things are progressing well. We've hit some great milestones. ***We expect, certainly, our cash position to continue to improve through renegotiation of past change orders as well as resetting the milestones going forward*** to and getting to [indiscernible] (37:11).
>
> ***So, we're very positive about it.***

(Emphasis added). These falsely positive statements served their intended purpose – boosting CBI's stock price.  The following day, CBI shares rose $2.40, from $51.28 to $53.68.

18.     On November 21, 2014, right before the Thanksgiving holiday, experts from Georgia Power, one of the owners of the Vogtle plant, provided testimony to the Georgia Public Service Commission blaming construction delays on CBI and Westinghouse.  The testimony: (a) sharply criticized the "various stop work orders" including one at CBI's Lake Charles, Louisiana facility; (b) explained that CBI and Westinghouse had breached their obligation to provide an accurate and complete project schedule which "runs counter to any prudent project management;"

and (c) reiterated that Georgia Power intended to hold CBI and Westinghouse "accountable." Over the next five trading days, as the market digested the Public Service Commission testimony over the usually quiet holiday trading period, CBI stock dropped more than 17%.

19.     On an earnings conference call on February 24, 2015, Defendant Asherman again encouraged investors to ignore reports of delays and increased costs: "in response to the flurry of comments made recently by the licensees to their analysts and to the media, we find the negative narrative perpetuated about these important projects disappointing and in some cases misleading." Asherman also claimed that the increased costs would be recouped in "virtually every case":

> CB&I's role is to construct the projects as designed, and we are working diligently with the technology provider and the licensees to help mitigate time and cost that will be incurred as a result of additional changes in scope. ***In virtually every case, CB&I has contractual entitlement for these costs, regardless of the determination between Westinghouse and the licensees on the reasons for the design changes***, and we fully expect that the projects will continue under a re-baseline schedule.

(Emphasis added). Further, even if costs were upheld, Defendant Asherman claimed that the liability would only be $247 million, of which only half would be borne by CBI.

20.     On March 5, 2015, *The Atlanta Journal-Constitution* ran an article based on numerous interviews and review of more than 1,000 pages of testimony and documents indicating that the Vogtle contract – based on cost estimates generated in consultation with Westinghouse and CBI – did not leave room to cover overruns. The article noted that Georgia regulators have "yet to approve any cost overruns."

21.     After the market closed on April 23, 2015, CBI reported earnings of $1.21 for the 1Q:14 below expectations, and negative cash flow from operations. In a report issued later that evening, analysts at Macquarie stated that it would be unlikely for the Company to continue to

generate cash flow from operations due to "cash burn associated with the nuclear projects."  On this news, CBI shares traded down to $48.97 the following day, a drop of $2.13 from the prior close of $51.10, on heavy volume.

22.     After the close of trading on June 23, 2015, the last day of the Class Period, Macquarie published a report warning that delays by CBI could cause Georgia Power to lose $522 million in tax credits, bringing the overall cost of overruns to $2.5 billion, for which Macquarie opined "CB&I will be held partially responsible given execution in fabrication and construction." As a result, CBI shares dropped $1.03 when trading resumed the following day to close at $53, and dropped another $3.37 over the next three trading days.

23.     Four months later, on October 27, 2015, CBI announced it would take a $1 billion loss on the sale of its Stone & Webster unit to Westinghouse for nothing more than a release of liabilities, subject to adjustment for changes to net working capital after the target date of June 30, 2015 (to "true up" for any additional expenses that CBI may incur between that date and deal closing).  Had Defendants been honest from the start about the loss of value in Stone & Webster and the Nuclear Projects, investors could have avoided hundreds of millions of dollars of losses. Instead, Defendants maintained inflated stock prices throughout the Class Period by carrying materially inflated values for goodwill, improperly accounting for cost overruns, and falsely denying mounting claims that Defendants might be liable for additional costs stemming from cost overruns and construction delays.

## II.     JURISDICTION AND VENUE

24.     This complaint asserts claims under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule l0b-5, 17 C.F.R. §240.l0b-5 ("Rule l0b-5").

25.     This Court has subject matter jurisdiction over this action under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

26.     Venue is proper in this District under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §139 l(b), (c) and (d).  Many of the acts and transactions that constitute the alleged violations of the law, including the dissemination to the public of materially false and misleading statements of fact, occurred in this District where the Company's securities traded on the New York Stock Exchange ("NYSE").

27.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of national securities exchanges.

## III.   **THE PARTIES**

28.     Lead Plaintiff ALSAR Partnership Ltd., as set forth in its certification attached hereto as Exhibit A, purchased CBI stock during the Class Period and was damaged when the true facts were revealed in a series of partial disclosures, removing the artificial inflation from the price of the stock.

29.     Plaintiffs Ironworkers Locals 40, 361 & 417 Union Security Funds and Iron Workers Local 580 Joint Funds, as set forth in their certifications previously filed with the Court, purchased CBI stock during the Class Period and were damaged when the true facts were revealed in a series of partial disclosures, removing the artificial inflation from the price of the stock.

30.     Defendant CBI provides a range of services, including conceptual design,

10

technology, engineering, procurement, fabrication, modularization, construction, commissioning, maintenance, program management and environmental services, to customers in the energy infrastructure market throughout the world. Throughout the Class Period, CBI was a contractor responsible for the construction and commissioning of two nuclear power plants being built in Georgia and South Carolina. CBI trades on the NYSE, an efficient market, under the symbol "CBI." CBI, through its management, representatives and agents, made and is liable for, the misstatements and omissions set forth herein. CBI maintains an office at 1251 Avenue of the Americas, Suite 750, New York, New York 10020.

31.     Defendant Phillip Asherman ("Asherman") was, at all relevant times, the CEO and President of CBI and served on the Company's Supervisory Board. During the Class Period, Asherman used the instrumentalities of interstate commerce to make presentations to analysts and investors concerning CBI's operations and financial results. Asherman made, or had authority over the content and communication of, the material misstatements and omissions throughout the Class Period. Asherman personally certified the quarterly and annual financial statements filed with SEC.

32.     Defendant Ronald A. Ballschmiede ("Ballschmiede") was the CFO and Executive Vice President of CBI from the beginning of the Class Period until CBI announced "retirement", in a March 12, 2015 8-K Filing. In truth, Ballschmiede left CBI to pursue other opportunities.  Thereafter, he promptly joined Sterling Construction, Inc. as its Executive Vice President and CFO. Ballschmiede used the instrumentalities of interstate commerce to make presentations to analysts and investors concerning CBI's operations and financial results. Ballschmiede made, or had authority over the content and communication, of the material misstatements and omissions. Until his departure, Ballschmiede personally certified the

11

quarterly and annual financial statements filed with SEC.

33.     Defendant Westley S. Stockton ("Stockton") was the CAO of CBI throughout the Class Period.  Stockton made, or had authority over the content and communication, of the material misstatements and omissions throughout the Class Period.

## IV.     BACKGROUND

### CBI Purchases Shaw After Substantial Due Diligence

34.     CBI is a global engineering, procurement and construction ("EPC") company headquartered in The Hague, Netherlands, and focuses on the energy industry. Founded in 1889 in Chicago, Illinois and originally engaged in bridge design and construction, CBI shifted in the early twentieth century to focus on the fabrication of storage tanks for water and petroleum products, as well as vessels used in refineries.  In 1996, CBI was acquired by Praxair, which kept an industrial gas division but spun off the remainder of CBI.

35.     In July 2012, CBI agreed to purchase The Shaw Group for about $3 billion, including $1.9 billion in debt financing.  The sale closed in February 2013.  Shaw's subsidiary, Stone & Webster, had contracts to build the first nuclear power plants in the United States since Three Mile Island, one in Georgia (Vogtle) and one in South Carolina (V.C. Summer). Both plants were designed to contain two AP1000 nuclear reactors developed by Westinghouse. Westinghouse also participated in the construction and had predetermined responsibilities and costs pursuant to a contract that was signed between Westinghouse and Shaw.

36.     By acquiring Shaw, CBI instantly became a leader in the nuclear fabrication and construction business. Defendant Asherman described the purchase as "a highly compelling transaction that will create significant value for our shareholders." Indeed, CBI proclaimed in its November 19, 2012 Definitive Prospectus that it anticipated the Nuclear Projects to be accretive

to the Company's earnings per share within the first year. Additionally, there would be potential for additional future revenue, as CBI would be establishing itself as a forerunner in nuclear power plant construction, which CBI expected to be a growing industry.

37.     On July 30, 2012, the Company held an analyst and investor call to discuss the Shaw purchase. Defendants Asherman and Ballschmiede participated in the call and assured investors that the Company was able to confidently assess the value and status of Nuclear Projects, as a result of its due diligence during the Shaw number purchase:

> [Asherman:] We're there. We are on the projects, Jamie. We're working in both Vogtle and Summer. So, we have some pretty good insight into those projects and also the relationships that accompany those with both Southern Company, and also the provider with Toshiba. So, we have an ongoing dialogue with those companies and we feel pretty confident about - .
>
> Jamie Cook - Credit Suisse - Analyst. With the contract structure?
>
> [Asherman:] Yes, absolutely. Absolutely.

38.     Various confidential witnesses who were former employees of CBI, Shaw, and Westinghouse confirm the Individual Defendants' knowledge of Nuclear Project issues and problems from the outset and on an ongoing basis, through receipt of regular status reports and attendance at monthly meetings.

39.     For example, CW 1, who served as the director of financial operations for CBI Fabrication & Manufacturing from January 2015 until more than a year after the Class Period ended and as director of Americas financial operations for CBI Oil & Gas from January 2009 to December 2014, confirmed that numbers from the Company's large contracts were discussed at monthly executive meetings held by Defendant Asherman, and attended by Defendant Ballschmiede and Defendant Stockton.

40.     CW 2, a mechanical engineer who worked at Vogtle and Summer for Shaw and CBI from prior to the Class Period through June 2015, reported that the information was updated to a program called Sharepoint which allowed CBI executives to access it. CW 2 reported that he/she is 100% sure that the top executives at CBI, including Defendants Asherman and Ballschmiede, were aware of the cost overruns at V.C. Summer and Vogtle.

41.     CW 3 worked at Shaw prior to the merger and then continued working at CBI as a sourcing analyst and buyer at the V.C. Summer plant through June 2015, reported that "[executives at CBI] received monthly Excel reports and we did budgets in Sharepoint and that they had access to at all times."

42.     CW 3 further reported that the typical report provided a snapshot of where the project was at: how much had been budgeted originally, actual dollars spent to date, estimated time to complete, time behind schedule and total cost. "The numbers rolled up and made it all the way up to the CEO," reported CW 3, noting that, if Defendants Asherman and Ballschmiede weren't paying attention to the cost overruns then they were neglecting their duties.

43.     CW 2 also reported that he/she submitted weekly reports in the Company system. These reports detailed each project's status in regards to whether it was on schedule or behind schedule, budget information including cost overruns, and how much time was necessary to complete the project.

44.     CW 4, a senior project controls engineer for Westinghouse from 2009 until fall of 2012 who worked on both the Vogtle and V.C. Summer projects, prepared weekly and monthly progress reports for projects that he/she participated in. CW 4's work included such tasks as meeting with other engineers, resolving open items, drafting change orders, implementing change order proposals. These weekly and monthly reports, which contained details on cost overruns, were

shared with Shaw on a weekly and monthly basis. Per Defendants' own statements (*see* ¶37), Defendants were "working in Vogtle and Summer projects" and had access to such reports.

45.     Defendants made repeated assurances to investors in the months after the Shaw purchase was completed. For instance, Defendants told investors that an ongoing NRC investigation and contractual disputes surrounding Nuclear Projects would have little to no financial impact on CBI. Specifically, on June 6, 2013, the Company participated in and presented at the Credit Suisse Engineering & Construction Conference.  During the conference, CBI and Asherman assuaged analyst concerns regarding potential exposure:

> [Cook:]   …Phil, why don't you just address the inevitable, which everyone is worried - talked about in terms of yesterday, the news that came out of Scana with regards to Unit 2 and the delay that they talked about.
>
> *        *        *
>
> [Asherman:] Yes, that's all right. Good planning. No, I think Scana gave a very balanced view of the project. They are the licensee, so I think it's within their purview, certainly, to talk about schedule and cost adjustments.
>
> *        *        *
>
> **As far as exposure to the Company –  very minimal, that we see.** When they talk about cost and schedule, it's not necessarily defined itself in the contract or issues. And we're in a consortium, so there is [sic] a lot of ways to look at that. But we don't feel that there's anything different than what we talked about when we looked at the original project during the diligence, so we feel pretty comfortable.
>
> [Cook:]         **So no impact on guidance?**
>
> [Asherman:] **No impact on guidance.** I guess if that's what the question was, yes. I should've just started there -no impact on guidance. You could've saved me a lot of breath there; **no impact on guidance and our financials going forward.**

(Emphasis Added).

## **Defendants' Financial Statements Falsely Stated that CBI Complied with GAAP**

46.     CBI was required to prepare its financial statements in accordance with GAAP, and falsely stated that it did so in its Form 10-Q and Form 10-K filings during the Class Period.

GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X [17 C.F.R. §210.4-01(a)(l)] states that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of the disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

47.     Under GAAP, companies may not carry on their balance sheets goodwill that exceeds its fair value. Accounting Standards Codification ("ASC") 805-10-05-4 "requires that a business combination be accounted for by applying the acquisition method." ASC 805-20-30-1 describes the acquisition method, which requires the acquiring company to record the assets acquired and liabilities assumed at their respective fair market values as of the date of the acquisition. ASC 805-10-20 describes fair value as "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ASC 805-10-25-13 describes the scope of proper adjustments during the one-year measurement period following the acquisition period:

> If the initial accounting for a business combination is incomplete by the end of the reporting period in which the combination occurs, the acquirer shall report in its financial statements provisional amounts for the items for which the accounting is incomplete. During the measurement period, the acquirer shall retrospectively adjust the provisional amounts recognized at the acquisition date to reflect new information obtained about facts and circumstances that existed as of the acquisition date that, if known, would have affected the measurement of the amounts recognized as of that date.

In other words, purchase price allocation adjustments are appropriate to reflect "new information

obtained about facts and circumstances that existed as of the acquisition date."

48.     Pursuant to ASC 350-20-35-2, impairment must be recognized when "the carrying amount of goodwill exceeds its implied fair value." ASC 350-20-35 requires goodwill to be tested annually and during any quarter when an assessment of "qualitative factors" determines that "more likely than not (that is a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, including goodwill." The qualitative factors to be considered expressly include "[c]ost factors. . . that have a negative effect on earnings and cash flows," "a deterioration in the environment in which an entity operates," and "a regulatory or political development."  ASC 350-20-35-3C.

49.     During the Class Period, CBI violated GAAP in numerous respects, inflating its balance sheet by nearly a billion dollars and inflating operating results (pretax) by almost as much. These violations are reflected in the Company's materially false and misleading financial statements filed on Forms 10-K and 10-Q during the Class Period.  Among CBI's most egregious GAAP violations are the following as set forth in ¶¶ 50-98 below:

50.     In its Q3:13 Form 10-Q, filed with the SEC on October 30, 2013, CBI described its accounting for goodwill as follows:

> Goodwill is not amortized to earnings, but instead is reviewed for impairment at least annually, absent any indicators of impairment. We perform our annual impairment assessment during the fourth quarter of each year based upon balances as of the beginning of that year's fourth quarter. ***As part of our annual impairment assessment in the fourth quarter of 2012, we performed a qualitative assessment of goodwill to determine whether it was more likely than not that the fair value of a reporting unit was less than its carrying value. Based upon this qualitative assessment, a two-phase quantitative assessment was not required to be performed for any of our reporting units. If, based on future qualitative assessments, the two-phase quantitative assessment is deemed necessary, the first phase would screen for impairment, while the second phase, if necessary, would measure impairment. If required, the implied fair value of a reporting unit would be derived by estimating the unit's discounted future cash flows.***

17

(Emphasis Added).

But Defendants did not follow this policy. CBI did not recognize any impairment to goodwill on the Nuclear Projects while the Company still owned them. Instead, the Company carried the overvalued assets on its books for more than two years, and repeatedly asserted in SEC filings even while negotiating a quitclaim sale that there were no indications of impairment. Nevertheless, four months after the Class Period ended, in October 2015, the Company admitted that the Company would have to take an impairment and other noncash charges totaling over $1 billion when CBI sold the Nuclear Projects.[2] As a result, Defendants' Class Period SEC filings were materially false and misleading.

51.     During Q3:13 and Q4:13, CBI improperly booked $1.2 billion (pretax) in costs and losses from underperforming construction projects acquired from Shaw in Q1:13 as purchase price adjustments ("PPA").  Recording these amounts as PPAs meant that none of these costs or losses were recognized on the income statement, so net earnings and earnings per share were unaffected by the adjustments.  CBI's improper use of PPAs not only avoided loss recognition, but also resulted in the inflation of goodwill.

52.     Among the assets and liabilities acquired from Shaw was a line item described by CBI as "contracts in progress, net," a $2.3 billion liability, which Defendants misreported in multiple respects.  It was not until two years after the acquisition that CBI finally disclosed that contracts in progress, net, was actually comprised of five separate balances totaling tens of billions of dollars, which should have been reported without netting.  One of these five accounts – called

---

[2] The Company's 2015 10-K (filed Feb. 26, 2016) breaks down the charges as follows: "[a]s a result of the sale, during 2015, we recorded a non-cash pre-tax charge of approximately $1.5 billion (approximately $1.1 billion after tax) related to the impairment of goodwill (approximately $453.1 million) and intangible assets (approximately $79.1 million) and a loss on net assets sold (approximately $973.7 million)."

Margin fair value liability for acquired contracts, ("MFVL") – appears to have no support under GAAP.  The entire recorded amount of MFVL, $745 million was released over time into revenue, materially inflating Class Period results.

53.     CBI ultimately recorded $3.3 billion in goodwill from the Shaw acquisition, even though it only paid $2.2 billion, net of cash acquired.  This amount of goodwill was grossly inflated, as it meant that on paper, CBI received $1.1 billion more in Shaw goodwill than it paid for Shaw.  Thus, beginning in Q3:13, CBI's goodwill was impaired, meaning that its carrying value (reported value) was higher than its fair value.  According to GAAP, CBI was required to write down goodwill to its fair value, with a corresponding charge to expense on its income statement, but failed to do so.

54.     Even before the Shaw acquisition, CBI violated GAAP by recording "Unapproved change orders," but the total was just $47 million as of December 31, 2012.  Following the Shaw acquisition, as of December 31, 2013, unapproved change orders ballooned to $936 million, including $128 million that CBI described as "significantly past due."  Recording unapproved change orders, regardless of whether or not they are past due, violates GAAP because, *inter alia,* the substantial majority represents impermissible "gain contingencies."  CBI falsely said that collection on unapproved change orders was "probable," even though a significant portion of the recorded amount was, or soon would be, in litigation, as the owners had already refused responsibility.

### GAAP Violation – contracts in progress, net

55.     Following its February 13, 2013 acquisition of Shaw, CBI recorded the following purchase price adjustments to the fair value of contracts in progress, net, and to goodwill:

19

| Shaw – Purchase Price Adjustments (amounts in millions) | Q213 | Q313 | Q413 | Total |
|---|---|---|---|---|
| Contracts in progress, net | ($ 3) | ($659) | ($538) | ($1,200) |
| Goodwill | ($ 2) | $379 | $470 | $847 |

56.     As a result of these adjustments, the liability for contracts in progress, net, increased 107%, from $1.1 billion as of February 13, 2013 to $2.3 billion as of February 13, 2014, while Goodwill increased 35%, from $2.4 billion to $3.3 billion, both as of the same date. These were recorded as retroactive purchase price adjustments even though the price CBI paid for Shaw, and the assets and liabilities that CBI acquired, hadn't changed.

57.     What had changed was total expected costs to complete the contracts, due to the extent of delays and cost overruns. Under GAAP, CBI was required to account for these changes in its operating results, and was not allowed to treat them as purchase price adjustments.

58.     Significantly, under GAAP, the purchase price adjustments were all retroactive to February 13, 2013.  The fact the adjustments in Q3:13 and Q4:13 were hundreds of times larger than in Q2:13, the period immediately subsequent to the acquisition, is suspicious on its face, because the timing and the magnitude strongly suggest, as confirmed by other facts pled herein, that these adjustments related solely or primarily to changes in estimated costs required to complete the contracts ***subsequent*** to the acquisition date – thus, decidedly ***not*** purchase price adjustments.

59.     According to GAAP (ASC 805-10-30-2 through -3):

805-10-30-2 The acquirer shall consider all pertinent factors in determining whether information obtained after the acquisition date should result in an adjustment to the provisional amounts recognized or whether that information

20

results from events that occurred after the acquisition date. Pertinent factors include the time at which additional information is obtained and whether the acquirer can identify a reason for a change to provisional amounts.

805-10-30-3 Information that is obtained shortly after the acquisition date is more likely to reflect circumstances that existed at the acquisition date than is information obtained several months later….

*See also* ASC 805-10-55-16 ("During the measurement period, the acquirer recognizes adjustments to the provisional amounts needed to reflect new information obtained about ***facts and circumstances that existed as of the acquisition date*** that, if known, would have affected the measurement of the amounts recognized as of that date.") (Emphasis added); SEC Division of Corporate Finance, Financial Reporting Manual, §3250.1, ¶¶g-h, and SEC Accounting and Auditing Enforcement Releases No. 3548 and No. 3775.

60.    At the time of CBI's initial purchase price allocation, published in Defendants' 1Q:13 Form 10-Q on May 3, 2013, CBI's management had conducted extensive due diligence. At that time, having already completed due diligence on the deal, Defendants told investors that they believed the fair value of contracts in progress, net, was $1.1 billion.  CBI's sudden, massive adjustments in Q3:13 and Q4:13, many months after the single digit adjustment in Q2:13, were the result of disastrous operating activities subsequent to the acquisition.  GAAP required that they be accounted for as operating activities (expenses), but CBI failed to do so.

61.    By using purchase price adjustments, CBI's deceit transferred what would have been $1.2 billion (pretax) worth of expenses and losses into goodwill, which does not affect earnings.  This was the major reason that CBI's earnings quality deteriorated, and why its negative cash flow was not properly reflected by its net income.

62.    In order to help conceal its accounting fraud, CBI manipulated its disclosures concerning contracts in progress, net. For example, according to ASC 805, *Business*

*Combinations:*

805-20-50-4A          If the initial accounting for a business combination is incomplete … and the amounts recognized in the financial statements for the business combination thus have been determined only provisionally, the acquirer shall disclose the following information for each material business combination … to meet the objective in paragraph 805-10-50-5:

a.   The reasons why the initial accounting is incomplete

b.   The assets, liabilities, equity interests, or items of consideration for which the initial accounting is incomplete

c.   The nature and amount of any measurement period adjustments recognized during the reporting period in accordance with paragraph 805-10-25-17.

63.     Because CBI did not provide a basis establishing that the initial accounting was incomplete in its financial statements, or identify and disclose the specific assets and liabilities which would later be adjusted by hundreds of millions of dollars, CBI did not comply with ASC 805-20-50-4a.  Despite itself, CBI improperly recorded undisclosed purchase price adjustments. On a stand-alone basis, the $1.2 billion in adjustments to contracts in progress, net, increased goodwill, dollar for dollar.

64.     In its 2014 Form 10-K, filed February 25, 2015, more than two years after CBI completed its acquisition of Shaw, CBI disclosed for the first time the composition of contracts in progress, net:

|  | December 31, 2014 | | December 31, 2013 | |
| --- | --- | --- | --- | --- |
|  | Asset | Liability | Asset | Liability |
| Costs and estimated earnings on contracts in progress | $20,119,144 | $26,052,767 | $16,694,373 | $23,377,143 |
| Billings on contracts in progress | (19,344,800) | (27,479,495) | (16,127,655) | (25,422,746) |
| Margin fair value liability for acquired contracts | --- | (558,760) | --- | (674,648) |
| Contracts in progress, net | $774,644 | $(1,985,488) | $566,718 | $(2,720,251) |

65.     Because CBI previously disclosed only the "net" amount and did not provide the details required by GAAP, it prevented investors from understanding the enormous gross values of the contracts in progress acquired from Shaw, which were actually in the tens of billions of dollars.

### GAAP Violation – "Margin fair value liability for acquired contracts" (deferred revenue)

66.     In the table above, the component of contracts in progress, net, that CBI called "Margin fair value liability for acquired contracts," was part of the Shaw purchase price allocation, and was being amortized into revenue over the life of the contracts, which meant that it was deferred revenue, not contracts in progress.  As of the acquisition date, CBI valued it at $746 million.  CBI failed to make any disclosure of this balance in its Q1:13 and Q2:13 Form 10-Qs, but eventually disclosed the following: "Included in contracts in progress is a margin fair value adjustment of approximately $745,500[,000] associated with acquired long-term contracts that were less than fair value at the Acquisition Closing Date. This margin fair value adjustment will be included in revenue on a POC basis as the applicable projects progress over approximately five to six years."

67.     Recording a "margin fair value adjustment" for acquired contracts that were "less

than fair value" is not allowed under GAAP pursuant to ASC 805-20-30-1, since only *fair values* may be recorded in an acquisition. The fair value of deferred revenue is defined as the amount it will cost the acquirer to provide the services in question, not the amount paid for the services. The definition, therefore, excludes all margin (profit), which is why deferred revenue almost always goes down in an acquisition. There is nothing in GAAP to suggest that it was acceptable to book a "margin fair value adjustment" - actually deferred revenue disguised as contract liabilities -as part of the purchase price allocation. The $745 million in future revenue, therefore, was illusory.

68.     As a result of recording the margin fair value liability, during the Class Period, CBI improperly recognized the following amounts of phantom revenue for which CBI could not properly bill and was not paid:

| amounts in millions | Q313 | Q413 | Q114 | Q214 | Q314 | Q414 | Q115 |
|---|---|---|---|---|---|---|---|
| "Margin fair value" revenue | $21.5 | $24.6 | $27.5 | $33.8 | $33.5 | $21.1 | $32.0 |

## **GAAP Violation – Impaired goodwill**

69.     Goodwill is supposed to be equal to the difference between the amount paid for an acquisition, and the fair value of the net assets received. Theoretically, goodwill represents expectations of future "excess" earnings and cash flow capacity, beyond the fair value of net assets acquired. By the time Defendants were done making GAAP-prohibited purchase price adjustments in connection with its Shaw purchase, CBI had inflated goodwill to $3.3 billion, which was more than $1 billion higher than the net amount it paid for Shaw, $2.2 billion.

70.     Simple arithmetic shows that the $1.1 billion of goodwill in excess of the price CBI paid for Shaw meant that the acquired net assets were worth **negative** $1.1 billion (*i.e.*, CBI

paid $2.2 billion for $1.1 billion in net liabilities). Under GAAP, this suggested goodwill was impaired, which required CBI to immediately test goodwill for impairment, and if necessary, write it down to its fair value, with a corresponding charge to earnings.

71.     Goodwill is required to be tested for impairment at least annually, and more often when circumstances indicate that goodwill *might* be impaired. Throughout the Class Period, circumstances indicated that goodwill from the Shaw purchase was *likely* to be impaired, yet CBI failed to record any write down of goodwill until it actually gave Stone & Webster to Westinghouse for no payment. In conjunction with this "sale", CBI also recorded a $1 billion loss that, under GAAP, should have been largely or completely recorded much earlier than it was.

72.     GAAP provides fact specific examples of indicators of impairment directly applicable to CBI:

> ASC 350-20-35-3C In evaluating whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount, an entity shall assess relevant events and circumstances. Examples of such events and circumstances include the following:
>
> \*          \*          \*
>
> b. Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development
>
> c. Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows
>
> d. Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods

e.  Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation

f.  Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit

g.  If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

*See* ASC 350-20-35-3C, *Intangibles – Goodwill and Other, Goodwill, Subsequent Measurement, Recognition and Measurement of an Impairment Loss*.

73.  Also, "The examples included in paragraph 350-20-35-3C(a) through (g) are not all-inclusive…." ASC 350-20-35-3F. CBI ignored many obvious indicators of worsening conditions throughout the Class Period indicating that Shaw goodwill was impaired (meaning its carrying value exceeded its fair value) and required a write down, including the following:

- Q3:13 – Shaw goodwill was adjusted to $2.8 billion, about $600 million more than CBI paid for Shaw.
- Q4:13 – Shaw goodwill was adjusted to $3.3 billion, about $1.1 billion more than CBI paid for Shaw.
- Q1:14 – A stop work order was issued for nuclear fabrication due to "multiple adverse conditions impacting hardware."
- Q2:14 – CBI was unlikely to collect hundreds of millions for nuclear work due to ongoing problems with construction quality and compliance.  Also, CBI's stock price declined by 21%.
- Q3:14 – There were multiple negative articles about CBI's poor performance to date and expected cost inflation on nuclear projects.  Also, CBI's stock price declined by 15%, from $68.20 to $57.85.
- Q4:14 – Expert testimony by Georgia Power to the Georgia Public Service Commission blamed delays on CBI and Westinghouse, meaning that CBI could not recoup its costs.  Also, CBI's stock price declined by 27%, from $57.85 to $41.98.
- Q1:15 – CBI began negotiations to exit the nuclear business entirely.

**GAAP Violation – Unapproved change orders**

74.  CBI recorded a significant amount of unapproved change orders as assets and

26

revenue, which was not permissible under GAAP.  Despite Defendants' claims to the contrary, collection of a substantial portion of the amount recorded was not probable, because they were in dispute with the owner and/or Westinghouse.  Collection of disputed amounts is never "probable," which is an important part of basic revenue recognition criteria under GAAP. Further, given that no nuclear plants had been built in the United States for decades, CBI and Shaw did not have a sufficient history of collecting unapproved change orders for them to be considered probable, particularly as construction progressed to more complicated stages.

75.    During the Class Period, CBI recorded the following amounts for Unapproved change orders:

| Unapproved change orders (amounts in millions) | FY 2013 | FY 2014 | Q1 2015 |
|---|---|---|---|
| Included in project price | $936 | $1,310 | $1,304 |
| Revenue recognized | $173 | $239 | $55 |

2013 Form 10-K; 2014 Form 10-K; 1Q:15 Form 10-Q

76.    According to ASC 605-35-25-31, *Revenue Recognition, Construction-Type and Production-Type Contracts, Recognition, Claims*:

605-35-25-30 **Claims are** amounts in excess of the agreed contract price (or amounts not included in the original contract price) that a contractor seeks to collect from customers or others for customer-caused delays, errors in specifications and designs, contract terminations, ***change orders in dispute or unapproved as to both scope and price,*** or other causes of unanticipated additional costs.

605-35-25-31 ***Recognition of amounts*** of additional contract revenue ***relating to claims is appropriate only if it is probable*** that the claim will result in additional contract revenue and if the amount can be reliably estimated. ***Those two requirements are satisfied by the existence of all of the following conditions:***

a.    The contract or other evidence provides ***a legal basis for the claim***; or a legal opinion has been obtained, stating that under the circumstances there is a reasonable basis to support the claim.

27

b. ***Additional costs*** are caused by circumstances that were unforeseen at the contract date and ***are not the result of deficiencies in the contractor's performance.***

c. ***Costs associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed***.

d. ***The evidence supporting the claim is objective and verifiable***, not based on management's feel for the situation or on unsupported representations.

If the foregoing requirements are met, revenue from a claim should be recorded only to the extent that contract costs relating to the claim have been incurred. Costs attributable to claims should be treated as costs of contract performance as incurred. However, a practice such as recording revenues from claims only when the amounts have been received or awarded may be used.

(Emphasis added.)

77.     As an indication of how brazen Defendants' aggressive treatment of unapproved change orders was, as early as December 31, 2013, CBI disclosed it had accrued $839 million in unapproved and disputed change orders, just from the Georgia Nuclear Project.  CBI's 2013 Form 10-K, filed on February 27, 2014 stated:

We have unapproved change orders and claims with our customer for the Georgia Nuclear Project resulting from increased engineering, equipment supply, material and fabrication and construction costs resulting from regulatory-required design changes and delays in our customer's obtaining the combined operating license ("COL") for the project. Specifically, we have entered into a formal dispute resolution process on certain claims associated with the shield building, large structural modules and COL issuance delays. At December 31, 2013 , we had approximately $838,600 included in project price related to the unapproved change orders and claims. ***To the extent we are unsuccessful recovering these amounts from our customer, the amounts are contractually recoverable under the aforementioned WEC Obligations.*** Through December 31, 2013, approximately $85,200 had been recognized as revenue on a cumulative POC basis related to the amounts included in project price.

(Emphasis added)

78.     In addition to being barred by the construction accounting rules, CBI was also

28

prohibited from recording unapproved change orders by ASC 450, *Contingencies*.  According to ASC 450-30-20, a gain contingency is "An existing condition, situation, or set of circumstances involving uncertainty as to possible gain to an entity that will ultimately be resolved when one or more future events occur or fail to occur."  Further, "A contingency that might result in a gain usually should not be reflected in the financial statements because to do so might be to recognize revenue before its realization."  Unapproved change orders, even those not yet disputed or in litigation, are clearly gain contingencies.  CBI violated GAAP by recording gain contingencies in the form of unapproved change orders.

### CBI's Liability for Change Orders, Delays and Cost Overruns

79.     Whether CBI's long-term projects are profitable or not can depend upon whether CBI is able to recoup unanticipated costs which it bills to the contracting party as "change orders." A fixed price contract is one in which the total contract price is agreed to in advance and does not change, absent mutual agreement; thus unanticipated costs are a significant risk for the contractor (builder/fabricator).  In a cost plus contract, the owner typically agrees to pay the contractor for all costs, plus a markup agreed to in advance (owner bears risk of increased costs).  Even with a cost plus contract, however, the owner will typically not pay for work that is substandard or needs to be redone because of contractor error.  For this reason, under both fixed price and cost plus contracts, overruns and other unanticipated costs are generally reflected in change orders signed by affected parties.

80.     In this instance the Summer and Vogtle EPCs with South Carolina Electric & Gas ("SCE&G", a subsidiary of SCANA Corporation ("SCANA")/Santee Cooper (also known as the South Carolina Public Service Authority) and Southern Company/Georgia Power were largely fixed-price contracts. For instance, summer EPC was mixed, with 67% of the contracts being fixed

29

by the time that CBI was involved. In testimony before the South Carolina Public Service Commission on August 1, 2017, SCANA's CEO, Kevin Marsh, testified that:

> [In 2008], the Commission approved our plan and a cost forecast of $6.3 billion. That amount represented SCE&G's 55 percent share of the costs in future dollars. At the time, we had negotiated with Westinghouse Consortium to make approximately 52 percent of the costs of the construction contract fixed. That 52 percent includes cost categories where the base cost was fixed, but inflation or escalation applied…. In 2011, we negotiated an agreement with Westinghouse to fix approximately 67 percent of the costs of the units.

81.     In addition to CBI's limited contractual ability to recover cost overruns, its accounting for cost overruns was subject to GAAP.

82.     Recording unapproved change orders also violates ASC 450 (formerly SFAS No. 5) -- they are obviously "gain contingencies," based on the fact that collection was dependent on the outcome of litigation, which is inherently uncertain. Recording gain contingencies is never permitted under GAAP (even disclosure of gain contingencies is discouraged).

83.     However, during the Class Period, Defendants represented that cost overruns would not impact the Company as the contract terms on liability for cost overruns were "definitive," the Company was "protected," and profitability wouldn't be affected.  CBI's statement on the Company's ability to recover overruns simply claimed entitlement to certain estimated costs in excess of contractually stipulated amounts:

> We have consortium agreements (the "Consortium Agreements") with WEC under which we have contracted with two separate customers (the "Customer Contracts") for the construction of two nuclear power plants in Georgia (the "Georgia Nuclear Project") and South Carolina (collectively with the Georgia Nuclear Project, the "Nuclear Projects"). The Nuclear Projects are reflected within our Engineering, Construction and Maintenance operating group. Under the scope of work provided in each of the Consortium Agreements, WEC is primarily responsible for engineering and procurement activities associated with the nuclear island component of the Nuclear Projects, while we are responsible for engineering and procurement for the balance of plant and substantially all of the construction activities for the Nuclear Projects. The Customer Contracts provide WEC and us

30

contractual entitlement ("Customer Obligation") for recovery of certain estimated costs in excess of contractually stipulated amounts. ***In addition to the aforementioned protections for us under the Customer Contracts, the Consortium Agreements also provide contractual entitlement for us to recover from WEC ("WEC Obligation") certain estimated costs in excess of contractually stipulated amounts, to the extent not recoverable from our customers related to the Customer Obligation***.

(emphasis added) *See* Q3:2013 Form 10-Q.

84.     CBI's interpretation of its entitlement to recovery for "change orders" allowed management to materially inflate the financial results reported to investors.  So long as CBI management estimated that an "unapproved change order" was recoverable (either from the project owner or from Westinghouse), CBI adjusted the contract price to include the change order without any reserve to reflect the possibility that the change order might not actually be recovered.

85.     However, such a stance inevitably led to disagreements with the owners of the Nuclear Projects and Westinghouse over the scope that CBI was entitled to payment for certain cost overruns. SCANA's CEO testified before the South Carolina Public Service Commission on November 19, 2015, stating that:

> Some of the disputes — many of the disputes we've had to date have been because they interpreted a change in the field as a change in regulation or a change in law, yet nothing was changed in the written law or the written regulation, and that gave rise to a lot of disputes and a foundation for many of the disagreements we had. It also gave grounds to disagreements I think within the consortium on commercial issues between Westinghouse and CB&I as to who was going to pay for additional work that needed to be done to comply with those interpretations that were being applied in the field.
>
> *                *                *
>
> After the July [2015] hearing, we did continue our efforts to negotiate a settlement with the consortium that would have resulted in a reduction to the disputed costs. As those discussions continued, it was apparent there were disagreements within the consortium between Westinghouse and Chicago Bridge & Iron that were impeding our attempts to negotiate a settlement. We sensed a distinct lack of cooperation between the consortium partners.

*        *        *

CB&I further stated it was their belief that our negotiations had stalled and we were headed toward a path of litigation. They reiterated that the litigation process on Vogtle Plant had been very expensive, time-consuming, and distracting. CB&I expressed their belief that it would be in the best interest of all parties if they were to exit the project

86.     Two years later, SCANA's CEO clarified that cost overruns could be compensable from the owners of Summer but only for certain conditions: "[t]hrough subsequent negotiations, we settled claims by Westinghouse for **increased costs due to change in laws and regulations, regulatory delays, Fukushima costs, cybersecurity and physical security upgrades, and unanticipated site conditions.**" (Emphasis added).

87.     Indeed, the EPC contracts[3] for the construction of both Nuclear Projects specifically enumerated various bases for entitlement of the contractor to a change order. The Summer EPC lists the following as bases for change orders:

(a)     any addition to, deletion from, or modification of the Facility or any change in the Work, that is agreed by the Parties or that arises as a result of the issuance of the COL;

(b) an Uncontrollable Circumstance;

(c) a Change in Law;

(d) issuance of new ITAAC or revisions to ITAAC in existence as of the Effective Date;

(e) Contractor encountering conditions at or affecting the Site not made known to Contractor or are not evident or readily discernible upon Contractor's inspection of the Site as provided in Section 3.6(d) and/or encountering Hazardous Materials for which it is not responsible;

(f) the circumstances that entitle Contractor to a Change Order as provided for in Section 5.6;

---

[3] Both EPC Contracts have been made publicly available by Georgia and South Carolina agencies. *See* https://dms.psc.sc.gov/Attachments/Matter/6D166220-0CD4-E721-3CD3C64ACC60DA98; http://www.psc.state.ga.us/factsv2/Document.aspx?documentNumber=113519

(g) uncovering of the Work (unless the Work is found to be deficient) as provided for in Section 5.7(d);

(h) any breach of this Agreement by Owner of its obligations under this Agreement (including, without limitation, the obligations under Section 3.6) or delay or other demonstrable adverse impact on Contractor's or a Subcontractor's activities under this Agreement resulting from delay by Owner in giving any required approvals or in performing any of Owner's responsibilities under Section 3.6 (other than any delay for which Contractor is responsible) or interference by Owner or Owner's Personnel or Invitees (other than Contractor or its Subcontractors or their Personnel or Invitees);

(i) suspension of the Work pursuant to Article 22 except to the extent that it arises as a result of Contractor's act, omission or default;

(j) failure of Owner to issue the Full Notice to Proceed or Limited Notices to Proceed in time to support Contractor's required activities to maintain the Project Schedule as further described in Section 3.3;

(k) an instruction by Owner to Contractor to accelerate the performance of the Work accepted by Contractor; or

(l) any other event or circumstance specifically identified in this Agreement as constituting a Change or entitling Contractor to a Change Order.

88.     Notably, the contractual grounds for CBI's entitlement to a change order did not include defective goods, costs for uncovering CBI's deficient work, or suspension of work that arises as a result of CBI's act, omission or default. [4]

89.     Throughout the Class Period, Defendants were aware of increasing disputed billings for the Nuclear Projects, including disputed "change orders," and of reasons why recovery of the disputed costs was jeopardized. Each of the Defendants claimed to have knowledge of these cost disputes in SEC filings and investor conference calls, and confidential witnesses confirm that

---

[4] The Vogtle EPC contained similar provisions regarding CBI's entitlement to reimbursement for change orders, explicitly stating that "if the change is required so that the Work conforms to the Performance Standards, Contractor shall not be entitled to a Change Order". *See* http://www.psc.state.ga.us/factsv2/Document.aspx?documentNumber=113519

the disputed costs and fabrication problems were well-documented and shared with Defendants Asherman, Ballschmiede, and Stockton.

90.    At least three CWs who worked at the Vogtle and V.C. Summer plants reported that there were weekly reports that were filed by engineering teams into a company system where Defendants could and did access them. CW 1, who served as the director of financial operations for CBI Fabrication & Manufacturing from January 2015 until more than a year after the Class Period ended and as director of Americas financial operations for CBI Oil & Gas from 2009 through 2014, confirmed that numbers from the Company's large contracts were discussed at monthly meetings held by Defendant Asherman, and attended by Defendants Ballschmiede and Stockton.

91.    In addition to the way reports were shared and passed up the ladder to management, multiple CWs also reviewed reports that contained details on: (1) cost overruns that dated back to 2009 and only continued growing through 2015; (2) overruns and delays caused by CBI's inability to produce materials that conformed to specifications and/or regulations; (3) overruns and delays caused by CBI's failure to properly track and ship materials; (4) overruns and delays caused by CBI failure to properly store materials; and (5) delays caused by shutdowns due to CBI's failure to obey/follow rules, regulations and safety measures.

92.    Specifically, CW 4 witnessed that cost overruns at the Georgia and South Carolina plants were growing throughout 2009 – 2012. He described the problems as systemic company-wide problems: "the problems were not in the piping, [CW 4's division], they were with communications within the whole company." The company was also not attempting to control costs, according to CW 4, who said that "everyone was working like there was a blank check."

93.    CW 2 explained that many of the cost overruns related to internal issues at CBI.

34

According to CW 2, CBI's main fabricating facility in Lake Charles, Louisiana "had many, many things wrong with it." "The Lake Charles facility was the number one reason the projects went into cost overruns," she added. "We'd get our parts and do our last set up on site, have the module up on the crane then the entire piece of equipment would get there and not meet engineering specs. It would be welded improperly or the wrong dimension."  According to CW 2, the Lake Charles manufacturing facility wasn't producing just one defective piece a month – it was consistency making significant errors.  "As an engineer in charge of a lot of these projects I'd just say there was incompetence on a grand scale." CW 2 said.  Among other problems, CW 2 noted that there were substantial welding deficiencies in 100-foot tall modules constructed for the Nuclear Projects. According to CW 2, by 2015, the modules being manufactured at CBI's Lake Charles facility weren't usable, so the company began looking for another supplier.

94.     CW 3 confirmed Shaw's shoddy workmanship.  According to CW 3 "after the acquisition the quality of the work produced there deteriorated. Many parts that were supposed to be made to specification were completely misshapen. Pieces were welded together incorrectly in some case and in others the welding hadn't been done with the care nuclear plant construction demands.  Each defective module added additional costs to the project and pushed out the completion date, which added even more cost."

95.     CW 3 also witnessed procurement errors that contributed to the ballooning costs of the Nuclear Projects.  CW 3 explained that the projects didn't have an adequate procurement tracking system and there was often "no way to track procurement materials [in real time]."  CW 3 reported that parts would be lost, and personnel either had to delay a project while try looked for the old part or order a duplicate. This led to situations where CBI bought expensive parts multiple times when they needed just one. The made-to-spec parts weren't eligible for returns and many of

35

the parts were extremely expensive.  "The materials couldn't be tracked," CW 3 said. "Or they couldn't be located when we needed them."

96.    News reports also described the widespread issues regarding quality of materials produced by CBI. On October 8, 2013, it was reported that:

> The quality of product coming out of Lake Charles, which produces submodules for the CA20 auxiliary buildings planned for the Georgia and South Carolina projects, also has been a concern at the Vogtle site. Earlier this year, Vogtle's project monitor, William Jacobs, told Georgia state officials that Lake Charles "has not demonstrated the ability to fabricate high-quality CA20 submodules ... that meet the design requirements at a rate necessary to support the project schedule." According to Jacobs, an unspecified number of CA20 submodules were delivered to the Vogtle project with the wrong type of welds and had to be reworked on-site.

*See* http://www.enr.com/articles/12154-cb-i-plant-that-feeds-vogtle-project-faces-nrc-scrutiny.

97.    CBI had knowledge of the fabrication errors prior to the Class Period. A CBI employee informed the NRC that on May 23, 2011 he had been terminated, in part, for informing his superiors that steel rebar used in the Nuclear Projects failed to meet required specifications. As a result of this whistle-blower complaint and the NRC's investigation into the work environments at CBI from May 2011 - 2013, CBI agreed to a series of internal safety reforms, reflected in the order, "to improve its nuclear safety culture recognizing that efforts to date have not been fully effective." *See* Confirmatory Order of NRC dated September 16, 2013, available at https://www.nrc.gov/docs/ML1323/ML13233A432.pdf.

98.    Feedback that CBI received from these internal safety reforms indicated welding and other fabrication problems so serious that they required a shut-down of work for three months at the Lake Charles facility. According to a letter that CBI sent to the NRC:

> A self-imposed Stop Work Order (SWO) was initiated on January 13, 2014, as a result of ***systemic problems with production activities, the corrective action program and quality assurance program procedures. Prior to and during the SWO multiple adverse conditions impacting hardware were identified. These***

36

***programmatic issues affecting hardware were bound to welder qualification, the qualification and compliance of welding procedures, and documentation of fabrication activities.*** These types of deficiencies were addressed through the nonconformance and corrective action reporting processes. There are no additional programmatic issues that have been determined to impact hardware quality. There was and is a robust process for assessing hardware and documentation quality that has been effective in ensuring module quality at the time of shipment.

(emphasis added) *See* CBI Reply to Notice of Nonconformance dated April 17, 2014, available at https://www.nrc.gov/docs/ML1411/ML14113A410.pdf.

V.   **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD**

99.     On October 30, 2013, CBI filed its Q3:13 Form 10-Q with the SEC. Ballschmiede signed the Form 10-Q and Asherman and Ballschmiede certified the Form 10-Q pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002. The Q3:13 Form 10-Q reported Q3 revenues of $2.992 billion, and quarterly earnings of $117.7 million.  With respect to change orders, it stated that "[c]ontract revenue for our long-term contracts recognized under the POC method reflects the original contract price adjusted for approved change orders and estimated recoveries for incentive fees, unapproved change orders and claims" and that "recorded unapproved change orders and claims reflect our best estimate of recovery amounts."  The Q3:13 Form 10-Q indicated that no impairments to goodwill were recorded, and that "no indicators of goodwill impairment were identified."

100.     The statements identified in ¶ 99 above were materially false and misleading when made because: (a) rather than including their best estimate of recovery amounts for unapproved change orders on the Nuclear Projects, Defendants falsely claimed that they were entitled to full recovery of disputed change orders and took no reserve for uncollectable change orders; (b) by fully recognizing reimbursement from the unapproved change orders instead of taking a loss or

booking a reserve, CBI's reported revenues and earnings were materially artificially inflated; and

(c) there were indicators of impairment of goodwill, including increased regulatory scrutiny over

project delays and growing cost overruns.

101.    With respect to goodwill, CBI's Q3:13 Form 10-Q also stated:

As part of our annual impairment assessment in the fourth quarter of 2012, we performed a qualitative assessment of goodwill to determine whether it was more likely than not that the fair value of a reporting unit was less than its carrying value. Based upon this qualitative assessment, a two-phase quantitative assessment was not required to be performed for any of our reporting units. If, based on future qualitative assessments, the two-phase quantitative assessment is deemed necessary, the first phase would screen for impairment, while the second phase, if necessary, would measure impairment. If required, the implied fair value of a reporting unit would be derived by estimating the unit's discounted future cash flows. During the nine months ended September 30, 2013, no indicators of goodwill impairment were identified.

*               *               *

The excess of the purchase price over the preliminary estimated fair value of the net tangible and identifiable intangible assets acquired, totaling $2,826,450, was recorded as goodwill.

*               *               *

At September 30, 2013 and December 31, 2012, our goodwill balances were $3,754,344 and $926,711, respectively, attributable to the excess of the purchase price over the fair value of net assets acquired in connection with our acquisitions.

*               *               *

*During the nine months ended September 30, 2013, no indicators of goodwill impairment were identified and therefore no goodwill impairment charge was recorded*.

*               *               *

*Based upon our most recent annual goodwill impairment assessment during the fourth quarter of 2012, each of our reporting units had estimated fair values that were substantially in excess of their carrying values. During the nine months ended September 30, 2013, no indicators of goodwill impairment were identified and therefore no goodwill impairment charge was recorded. While our allocation*

*of goodwill to each reporting unit associated with the Shaw Acquisition has not been completed, we do not have any current indicators of impairment.*

\*          \*          \*

We noted no indicators of impairment during the nine months ended September 30, 2013.

(emphasis added)

102.    The foregoing statements were materially false and misleading when made because CBI's goodwill was, in fact, impaired, meaning that its carrying (reported) value was higher than its fair value. According to GAAP, CBI was required to write down goodwill to its fair value, with a corresponding charge to expense on its income statement, but failed to do so. Additionally, there were indicators of impairment at the time the statement was made. Further, declining cash flows provided an indicator of impairments. *See* ASC 350-20-35-3C(D). Simple arithmetic shows that the $1.1 billion of goodwill in excess of the price CBI paid for Shaw meant that the acquired net assets were worth *negative* $1.1 billion (*i.e.,* CBI paid $2.2 billion for $1.1 billion in net liabilities).  Under GAAP, this indicates goodwill may have been impaired, which required CBI to immediately test goodwill for impairment, and if necessary, write it down to its fair value, with a corresponding charge to earnings. Goodwill is required to be tested for impairment at least annually, and more often when circumstances indicate that goodwill *might* be impaired.  Throughout the Class Period, circumstances indicated that goodwill from the Shaw purchase was *likely* to be impaired, yet CBI failed to record any write down of goodwill until it actually gave Stone & Webster away to Westinghouse.

103.    With respect to GAAP, CBI's Q3:13 Form 10-Q stated:

The accompanying unaudited interim Condensed Consolidated Financial Statements ("Financial Statements") for CB&I have been prepared pursuant to the rules and regulations of the United States ("U.S.") Securities and Exchange

Commission (the "SEC") and in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

<div align="center">*          *          *</div>

The discussion and analysis of our financial condition and results of operations are based upon our Financial Statements, which have been prepared in accordance with U.S. GAAP….We continually evaluate our estimates based upon historical experience and various other assumptions that we believe to be reasonable under the circumstances.

104.  The foregoing statements were materially false and misleading when made because CBI's financial statements did not comply with GAAP because, *inter alia*, CBI's financial statements impermissibly recorded gain contingencies (*i.e.*, the unapproved change orders), accounted for cost overruns and construction delays with improper purchase accounting adjustments, and carried goodwill that far exceeded its fair value; all of which overstated earnings.

105.  CBI's Q3:13 Form 10-Q also stated that, while "[c]ontractual disputes normally involve claims relating to the timely completion of projects, performance of equipment or technologies, design or other engineering services or project construction services provided by us," CBI did "not believe that any of our pending contractual…claims and disputes will have a material adverse effect on our future results of operations, financial position or cash flow."

106.  The foregoing statements were materially false and misleading when made because CBI knew or was reckless in not knowing that its contractual dispute(s) with Westinghouse and the Nuclear Project owners regarding cost overruns and construction delays would have a material adverse effect on CBI's financial position.

107.  On February 25, 2014, CBI issued a press release announcing financial results for Q4:13 and fiscal year 2013. The February 25, 2014 press release stated that CBI had revenues of $3.0 billion and earnings of $196.8 million in Q4 2013, and Defendant Asherman touted in the

order a "relentless focus and commitment to safety." February 25, 2014 Form 8-K.

108.   The statements identified in ¶ 107 above were materially false and misleading when made because: (a) Defendants omitted that revenue and earnings had been artificially inflated by assuming full recovery of disputed change orders instead of taking a reserve for uncollectable change orders; (b) contrary to Asherman's boasts regarding safety, the NRC had recently warned CBI about deficiencies in its "safety culture;" and (c) safety deficiencies in the nuclear division involving unsafe welds of critical components, among others, had caused the Company to impose a stop-work order that was in effect at the time of the press release but not disclosed by CBI in its 8-K filing.

109.   Also on February 25, 2014, Defendants held an earnings call with investors.  On that call, Defendants CBI and Asherman stated: "In addition, the fabrication of modules, pipe spools and structural steel for the Vogtle and V.C. Summer nuclear power plants made good progress during the quarter."  This statement was materially false and misleading when made because it omitted mention of known problems with welds and other fabrication errors on modules for the Nuclear Projects, the costs of which to repair were chargeable to CBI.

110.   On February 27, 2014, CBI filed its 2013 Form 10-K with the SEC.  Defendants Asherman, Ballschmiede, and Stockton signed the Form 10-K and Asherman and Ballschmiede certified the Form 10-K pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002.  The 2013 Form 10-K repeated the misleading statements regarding revenue and earnings identified in ¶ 107. With regard to goodwill, the 2013 Form 10-K stated:

> We utilized an income approach (discounted cash flow method) to value our reporting units and test for impairment as we believe this is the most direct approach to incorporate the specific economic attributes and risk profiles of our reporting units into our valuation model. This is consistent with the methodology used for our annual impairment assessment in previous years. The discounted cash

flow methodology, which compares an estimate of a reporting unit's discounted future cash flows to its net book value, is based, to a large extent, on assumptions about future events, which may or may not occur as anticipated and such deviations could have a significant impact on the calculated estimated fair values of our reporting units. These assumptions include, but are not limited to, estimates of future growth rates, discount rates and terminal values for each reporting unit. ***Based upon this quantitative assessment, no impairment charge was necessary during 2013, as the fair value of each of the reporting units acquired in 2013 exceeded their respective net book value and the fair value of all other reporting units significantly exceeded their respective net book values.*** If, based on future assessments, our goodwill is deemed to be impaired; the impairment would result in a charge to earnings in the year of impairment, with a resulting decrease in our net worth.

(Emphasis added).

111.    The statements identified in ¶¶ 109-110 were materially false and misleading when made because: (a) they omitted that revenue and earnings had been artificially inflated by assuming full recovery of disputed change orders instead of taking a reserve for uncollectable change orders; and (b) the carrying value of goodwill acquired in the Shaw purchase, and in particular its crown jewel Stone & Webster division, exceeded its fair value and CBI nevertheless failed to take an impairment charge on goodwill.

112.    With specific respect to goodwill, CBI's 2013 Form 10-K also stated:

Our goodwill balance represents the excess of the purchase price over the fair value of net assets acquired as part of previous acquisitions, including the Shaw Acquisition. Net assets acquired include identifiable finite-lived intangible assets that were recorded at fair value based upon expected future recovery of the underlying assets.

At December 31, 2013, our goodwill balance was $4.2 billion (including approximately $3.3 billion related to the Shaw Acquisition) and was distributed among our four operating groups as follows: Engineering, Construction and Maintenance - $2.8 billion , Fabrication Services - $545.3 million, Technology - $428.7 million and Government Solutions - $483.8 million. Goodwill is not amortized to earnings, but instead is reviewed for impairment at least annually at our reporting unit level, absent any indicators of impairment…. We perform our annual impairment assessment during the fourth quarter of each year based upon balances as of the beginning of that year's fourth quarter. As part of our annual impairment assessment, in the fourth quarter of 2013, we performed a quantitative

42

assessment of goodwill for each of our reporting units. We utilized an income approach (discounted cash flow method) to value our reporting units and test for impairment as we believe this is the most direct approach to incorporate the specific economic attributes and risk profiles of our reporting units into our valuation model…. ***Based upon this quantitative assessment, no impairment charge was necessary during 2013, as the fair value of each of the reporting units acquired in 2013 exceeded their respective net book value and the fair value of all other reporting units significantly exceeded their respective net book values.***

\*              \*              \*

The aggregate purchase price for the Shaw Acquisition was allocated to the major categories of assets and liabilities acquired based upon their estimated fair values at the Acquisition Closing Date, which were based, in part, upon outside appraisals for certain assets, including specifically-identifiable intangible assets and property and equipment. The excess of the purchase price over the fair value of the net tangible and identifiable intangible assets acquired totaling $3.3 billion, was recorded as goodwill. Our final purchase price allocation, completed in the fourth quarter of 2013, resulted in adjustments to certain assets and liabilities, including the residual amount allocated to goodwill.

\*              \*              \*

Goodwill represents the excess of the purchase price over the fair value of the underlying acquired net tangible and intangible assets. The factors contributing to our goodwill balance include the acquired established workforce and estimated future cost savings and revenue synergies associated with our combined operations.

\*              \*              \*

At December 31, 2013 and 2012, our goodwill balances were $4,226,468 and $926,711, respectively, attributable to the excess of the purchase price over the fair value of net assets acquired in connection with our acquisitions.

\*              \*              \*

***As discussed in Note 2, as part of our annual impairment assessment, we performed a quantitative assessment of goodwill in the fourth quarter of 2013 by comparing an estimate of discounted future cash flows to the net book value of each applicable reporting unit. Based upon this quantitative assessment, no impairment charge was necessary during 2013 as the fair value of each of the reporting units acquired in 2013 exceeded their respective net book value and the fair value of all other reporting units significantly exceeded their respective net book values***

(Emphasis added).

43

113.     The foregoing statements were materially false and misleading when made because CBI's goodwill was, in fact, impaired, indicators of that impairment existed at that time, and its failure to write down that goodwill to its fair value when Defendants became aware of its potential impairment violated GAAP.

114.     With respect to GAAP, CBI's fiscal year 2013 Form 10-K stated:

These Consolidated Financial Statements ("Financial Statements") are prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and include all wholly-owned subsidiaries and those entities which we are required to consolidate, including those acquired as part of our acquisition of The Shaw Group, Inc. ("Shaw") (the "Shaw Acquisition" or "the Acquisition"), as further described in Note 4.

115.     The foregoing statements were materially false and misleading when made because CBI's financial statements did not comply with GAAP because, *inter alia*, CBI's financial statements impermissibly recorded gain contingencies (*i.e.*, the unapproved change orders), accounted for cost overruns and construction delays with improper purchase accounting adjustments, and carried goodwill that far exceeded its fair value, all of which overstated earnings.

116.     On April 23, 2014, CBI issued a press release announcing financial results for Q1:14. The April 23, 2014 press release stated that CBI had revenues of $2.9 billion and GAAP earnings of $89.0 in Q4:13. In the press release, Defendants CBI and Asherman boasted that CBI's "revenues and earnings remained solid." April 23, 2014 Form 8-K.

117.     The statements identified in ¶116 above were materially false and misleading when made because: (a) they omitted that revenue and earnings had been artificially inflated by assuming full recovery of disputed change orders instead of taking a reserve for uncollectable change orders; (b) they omitted that a stop work order had been issued covering large parts of Q1 2014 due to "multiple adverse conditions impacting hardware," including "welder qualification,

the qualification and compliance of welding procedures, and documentation of fabrication activities" and (c) they omitted that the liability for contracts in progress, net, obtained in the Shaw purchase, was understated by more than $1 billion.

118.    In a conference call also held on April 23, 2014, Defendants CBI and Asherman were directly confronted by an analyst regarding execution and cost recovery on the Nuclear Projects:

> MR. GABRIELSKI (Stephens): Okay. And then can you just give an update on where you are with the negotiations and execution on both of the nuclear projects at this point?
>
> MR. ASHERMAN: Well, the negotiations on the large claim that's been out there since the time we acquired Shaw is still being discussed. Westinghouse has the lead on that, so that's about all I can tell you on that. It's still on the table. We worked through some of the smaller issues related to us, which we settled earlier in the year and we reported, but that's still being negotiated.
>
> MR. GABRIELSKI (Stephens): Okay. Then just on your general thoughts around execution on both—sorry—and scheduling and how everything has progressed over the last few months, because it didn't get a lot of attention yet today.
>
> MR. ASHERMAN: On the nuclear jobs, Will?
>
> MR. GABRIELSKI (Stephens): Yes.
>
> MR. ASHERMAN: Yeah. ***Well, I think we made some good progress. I am very pleased with the milestone, as I mentioned, on the main module.*** I guess this is unlike an oil and gas job, where you have a lot of flexibility in the sequencing work when you use modules. You have to start with the nuclear island and work around that vertically. So getting this module in was a great milestone, so I think the progress is going to continue to pick up.
>
> Lake Charles has gone through some extensive NRC audits recently and I think passed those pretty well. ***There are still some issues that we're working through with Westinghouse relating to design changes, but it's all related to make these plans as safe and reliable as possible.*** So we are all working towards the same thing. So we are thinking that Scana is going to reach the similar milestone here very shortly, and we're going to continue to make progress and substantial progress on these jobs.

(emphasis added)

119.    The statements identified in ¶118 above were materially false and misleading when made because: (a) CBI's execution on the Nuclear Projects was so poor that it had to issue a stop work order related to improper welding and other fabrication issues; and (b) the statements omitted that CBI had been found deficient in the NRC's review of safety practices, including those designed to ensure that the welds on nuclear modules complied with specifications.

120.    On April 24, 2014, CBI filed its Q1:14 Form 10-Q with the SEC. Defendant Ballschmiede signed the Form 10-Q and Asherman and Ballschmiede certified the Form 10-Q pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002. The 1Q:14 Form 10-Q reported repeated the misrepresentations set forth in the April 23, 2014 press release identified in ¶ 116, and was materially false and misleading when made because: (a) they omitted that revenue and earnings had been artificially inflated by assuming full recovery of disputed change orders instead of taking a reserve for uncollectable change orders; (b) they omitted that a stop work order had been issued covering large parts of Q1 2014 due to "multiple adverse conditions impacting hardware," including "welder qualification, the qualification and compliance of welding procedures, and documentation of fabrication activities" and (c) they omitted that the liability for contracts in progress, net, obtained in the Shaw purchase, was understated by more than $1 billion.

121.    The Q1:14 Form 10-Q did not record any impairment to goodwill, and stated that "no indicators of goodwill impairment were identified."  These statements were materially false and misleading when made because the stop work order was an indicator of increased costs which required further evaluation of potential impairment of goodwill, and because the carrying value of goodwill acquired in the Shaw purchase exceeded its fair value.

122.    With respect to goodwill, CBI's Q1:14 10-Q also stated:

Goodwill is not amortized to earnings, but instead is reviewed for impairment at

least annually, absent any indicators of impairment….We perform our annual impairment assessment during the fourth quarter of each year based upon balances as of the beginning of that year's fourth quarter. As part of our annual impairment assessment in the fourth quarter of 2013, we performed a quantitative assessment of goodwill for each of our reporting units….Based upon this quantitative assessment, no impairment charge was necessary during 2013, as the fair value of each of the reporting units acquired in 2013 exceeded their respective net book value and the fair value of all other reporting units significantly exceeded their respective net book values. During the three months ended March 31, 2014, no indictors of goodwill impairment were identified. If, based on future assessments, our goodwill is deemed to be impaired, the impairment would result in a charge to earnings in the year of impairment.

<div align="center">*          *          *</div>

At March 31, 2014 and December 31, 2013, our goodwill balances were $4,225,687 and $4,226,468, respectively, attributable to the excess of the purchase price over the fair value of net assets acquired in connection with our acquisitions…. ***During the three months ended March 31, 2014, no indicators of goodwill impairment were identified and therefore no goodwill impairment charge was recorded.***

<div align="center">*          *          *</div>

At March 31, 2014, our goodwill balance was $4.2 billion, including $3.3 billion associated with the 2013 Shaw Acquisition.

 (emphasis added)

123.     The foregoing statements were materially false and misleading when made because CBI's goodwill was, in fact, impaired, indicators of that impairment existed at that time, and its failure to write down that goodwill to its fair value when Defendants became aware of its potential impairment violated GAAP.

124.     With respect to GAAP, CBI's Q1:14 Form 10-Q stated:

The accompanying unaudited interim Condensed Consolidated Financial Statements ("Financial Statements") for CB&I have been prepared pursuant to the rules and regulations of the United States ("U.S.") Securities and Exchange Commission (the "SEC") and in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

<div align="center">*          *          *</div>

The discussion and analysis of our financial condition and results of operations are based upon our Financial Statements, which have been prepared in accordance with U.S. GAAP….We continually evaluate our estimates based upon historical experience and various other assumptions that we believe to be reasonable under the circumstances.

125.    The foregoing statements were materially false and misleading when made because CBI's financial statements did not comply with GAAP because, *inter alia*, CBI's financial statements impermissibly recorded gain contingencies (*i.e.*, the unapproved change orders), accounted for cost overruns and construction delays with improper purchase accounting adjustments, and carried goodwill that far exceeded its fair value, all of which overstated earnings.

## VI.    DEFENDANTS CONTINUE TO MISLEAD THE MARKET AS THE TRUTH EMERGES

126.    On June 10, 2014, *Generation Market Week* reported about the stop work order in the Lake Charles, Louisiana facility described above in ¶ 98.  According to the article:

A Chicago Bridge & Iron Co. NV facility in Lake Charles, La., has run into problems as it plays a critical role building the first new nuclear reactors on U.S. soil in decades and the first of the specific Westinghouse Electric Co. LLC AP1000 design in the country. The Nuclear Regulatory Commission has accused CB&I of violating regulations by falsifying test results. In response, the company is working to improve its "nuclear safety culture" at the facility.

Problems with the contractors building the new reactors - a consortium led by CB&I and Westinghouse - have already been linked to potentially hundreds of millions of cost overruns for the project.

Georgia Power said it will not accept certain components for use at its proposed Vogtle nuclear reactors until it can verify their quality. While it has seen "significant improvements" at the facility since the stop work order was placed in 2013, Georgia Power officials said the order will remain in effect. Georgia Power owns 45.7% of the roughly $15 billion project.

*See* M. Bandyk, "Georgia Power continues to scrutinize contractors building new Vogtle nuke," *SNL Generation Markets Week* (June 10, 2014).  The *Generation Week* article further stated that there was approximately $900 million at dispute between the Georgia and South Carolina

utilities and CBI with respect to unapproved work orders at the Nuclear Projects, related in part to the welding quality control issues at issue in the NRC investigation.  *Id.*

127.     On June 11, 2014, *Power Daily* reported that Georgia Power was aggressively litigating its position that the construction contractors, particularly CBI at the Georgia nuclear construction site, were responsible for cost overruns and that resolution of disputes between the parties would be increasingly difficult.  *See* "Moody's: Slowdown in nuclear renaissance increases litigation risks," *SNL Power Daily* (June 11, 2014).  The article also cited a Moody's analyst for the proposition that, despite their rhetoric to investors, CBI and Westinghouse actually intended the Nuclear Projects to be unprofitable "loss leaders" intended to jump start implementation of the AP1000 modular reactor design and lead to future, hopefully more profitable work: "We believe these two projects were likely viewed to some degree as 'loss-leaders' by the contractors to help get the US AP1000 construction program off the ground."  *Id.*

128.     As a result of these disclosures, between June 10, 2014 and June 12, 2014, the price of CB&I's stock decreased from $83.30 per share to $76.72 per share, or almost 8%, on higher than average trading volume.

129.     On the morning of June 17, 2014, Prescience Point Research Group, a boutique research firm specializing in short-selling opportunities, issued a report on CBI entitled "Acquisition Accounting Gone Nuclear."  The Prescience Point Report asserted, *inter alia,* that:

- CBI had improperly accounted for its goodwill during 2013 to cover losses associated with post-acquisition events, such as further construction delays and cost overruns with the Nuclear Projects;

- CBI's purchase-price adjustments masked its credit risk;

- CBI executives, especially Asherman, enjoyed hefty bonuses as a result of the way they chose to account for the Shaw purchase; and

49

- Investors had been misled by CBI's touting of claimed success at the Nuclear Projects without adequate disclosure of fabrication problems that would likely lead to future impairments.

As a result of these additional partial disclosures, the price of CBI's stock dropped from a high of $74.46 per share to $68.26 per share on June 17, 2014, or more than 8%, on higher than average trading volume.

130.    On July 24, 2014, CBI issued a press release announcing Q2:14 financial results. The press release announced revenues of $3.3 billion and GAAP net income of $142.4 million, and quotes Defendant Asherman for the proposition that "We continued to advance major project key milestones at levels that delivered growth in revenue and income from operations."

131.    The foregoing statements were materially false and misleading when made because: (a) they omitted that revenue and earnings had been artificially inflated by assuming full recovery of disputed change orders instead of taking a reserve for uncollectable change orders; and (b) the major project key milestones for the Nuclear Projects would not have delivered the revenue and income growth Asherman touted had the Company taken an appropriate reserve for uncollectable change orders.

132.    Also on July 24, 2014, CB&I and Asherman held a conference call for investors. During the call, Will Gabrielski, a Stephens Inc. analyst, asked Asherman specifically to address the manipulation of purchase price allocation alleged in the *Prescience Point* report:

MR. GABRIELSKI (Stephens Inc.): Okay. And I know that Q—

MR. ASHERMAN: It should get better after that.

MR. GABRIELSKI (Stephens Inc.): I appreciate that. Thank you.

I know the Q is not out yet, but I'm sure it will have some color in there that will— enables us to at least analyze what the non-cash earnings, exact impact was from

the Shaw acquisition, which will get a lot of air play once we're all disconnected from this call. So is there any color you want to add around that for the quarter or for the rest of the year?

MR. ASHERMAN: State your question again?

MR. GABRIELSKI (Stephens Inc.): The non-cash earnings impact that results from the fair market value—fair market value adjustments that you made through the purchase price allocation process for the Shaw deal, I was just wondering if there was any—

MR. ASHERMAN: Well, we—

MR. GABRIELSKI (Stephens Inc.): I mean, this is like an opportunity for you guys to address that publicly, so I just wanted to bump it up here.

MR. ASHERMAN: Well, thank you, Will, and what I'll say publicly is, you know, we stand by—certainly behind our practices and our judgments made on that and the validity of our financial statements and our earlier statement that we made when that report, which we deemed was misleading and inaccurate, came out. We feel we've been very responsive to all the inquiries we've had, and certainly, there's been some comprehensive reports published by analysts, such as you and others, that we feel have been very thorough and again comprehensive, and I think that's been good.

I think we can move on, but certainly—and I think if you look in the 10-Q that we've provided even greater detail on the acquisition accounting. So look at that.

Later in the call, Asherman gave a misleading response to a direct question from an analyst regarding the impact of nuclear delays on CB&I's profitability:

MR. FISHER: Okay. And then last here, the schedule on the nuclear projects looks to be a bit more extended than it was previously, but I think you've got some protections in your contract for that. Can you just maybe clarify what that contract or the project extension timeframe means for CB&I's profitability?

MR. ASHERMAN: Well, *the profitability doesn't change*. I think we're talking about the Unit 2 on Vogtle, for example, is late 2017, early 2018, and there's a lot of activity that go to get that unit up and running, and then we have the second one. But we feel pretty confident that we're going – it really doesn't affect it. If we have to re-baseline and doing scheduled re-baselining or re-estimating that just moves things to the right and anything like that would be on the back of new regulatory requirements for these projects.

Again, I think the important thing, the prism that I think people need to look through on these nuclear jobs is it's really about building the safest and most reliable nuclear projects in the world, and that's what we're doing, that always doesn't lend itself to fast-track projects, but – and the quantities haven't changed much, but certainly the pace is affected by it.

*So it doesn't really affect your profitability, I guess. And we're well protected in the contract,* [ph] very prescribed (59:43), *and if there are changes*, [ph] I mean (59:45) *the contract is very definitive in terms of whose entitled to what*. So if I have given the opportunity I'd sign the same contract tomorrow on a new nuclear facility if given the opportunity.

(Emphasis added).

133.    The foregoing statements were materially false and misleading when made because: (a) CB&I had used aggressive adjustments to purchase price allocation, as outlined in the Prescience Point Report, to boost noncash earnings; (b) Asherman's claims about safety and reliability omitted that CB&I was under fire from project owners and its consortium partner for unsafe and unreliable fabrication practices, and in particular defective welds in AP1000 modules; and (c) CBI's profitability was impacted by the delays, which were caused in part by CB&I's defective fabrication.

134.    On the evening of July 24, 2014, CBI filed its Q2:14 Form 10-Q with the SEC. Ballschmiede signed the Form 10-Q and Asherman and Ballschmiede certified the Form  10-Q pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002.  The Form 10-Q did not outline the extent to which purchase price adjustments had been used to boost non-cash earnings, and again falsely stated that there were no indicators of impairment of goodwill.  Significantly, however, the Q2:14 Form 10-Q showed a growing disparity between cash flows and non-cash earnings, validating Prescience Point's hypothesis.  Prescience Point noted this on Twitter, indicating that the results confirmed CB&I was a "strong sell":



*See* https://twitter.com/PresciencePoint.

135.    As a result of these further disclosures, and CBI's inability to squarely address the problems raised in the Prescience Point Report, CBI shares dropped sharply the following day, from $69.48 to $63.07, on much higher than normal volume.

136.    With specific respect to goodwill, CBI's Q2:14 Form 10-Q also stated:

Goodwill is not amortized to earnings, but instead is reviewed for impairment at least annually at our reporting unit level, absent any indicators of impairment....

We perform our annual impairment assessment during the fourth quarter of each year based upon balances as of the beginning of that year's fourth quarter. As part of our annual impairment assessment, in the fourth quarter of 2013, we performed a quantitative assessment of goodwill for each of our reporting units… Based upon this quantitative assessment, no impairment charge was necessary during 2013, as the fair value of each of the reporting units acquired in 2013 exceeded its respective net book value and the fair value of all other reporting units significantly exceeded their respective net book values. During the six months ended June 30, 2014, no indicators of goodwill impairment were identified. If, based on future assessments, our goodwill is deemed to be impaired, the impairment would result in a charge to earnings in the year of impairment.

<p style="text-align:center;">*        *        *</p>

***At June 30, 2014 and December 31, 2013, our goodwill balances were $4,223,763 and $4,226,468 , respectively, attributable to the excess of the purchase price over the fair value of net assets acquired in connection with our acquisitions…. During the six months ended June 30, 2014, no indicators of goodwill impairment were identified and therefore no goodwill impairment charge was recorded.***

<p style="text-align:center;">*        *        *</p>

At June 30, 2014, our goodwill balance was $4.2 billion, including $3.3 billion associated with the 2013 Shaw Acquisition.

(emphasis added)

137.    The foregoing statements were materially false and misleading when made because CBI's goodwill was, in fact, impaired, meaning that its carrying (reported) value was higher than its fair value and there were indicators of impairment at the time the statement was made. Additionally, declining cash flows provided an indicator of impairments. *See* ASC 350-20-35-3C(D). According to GAAP, CBI was required to write down goodwill to its fair value, with a corresponding charge to expense on its income statement, but failed to do so. Simple arithmetic shows that the $1.1 billion of goodwill in excess of the price CBI paid for Shaw meant that the acquired net assets were worth ***negative*** $1.1 billion (i.e., CBI paid $2.2 billion for $1.1 billion in net liabilities).  Under GAAP, this suggested goodwill was impaired, which required CBI to

immediately test goodwill for impairment, and if necessary, write it down to its fair value, with a corresponding charge to earnings. Goodwill is required to be tested for impairment at least annually, and more often when circumstances indicate that goodwill *might* be impaired. Throughout the Class Period, circumstances indicated that goodwill from the Shaw purchase was *likely* to be impaired, yet CBI failed to record any write down of goodwill until it actually gave Shaw to Westinghouse for no payment and a $1 billion loss that, under GAAP, should have been largely or completely recorded much earlier than it was.

138.     With respect to GAAP, CBI's Q2:14 Form 10-Q stated:

The accompanying unaudited interim Condensed Consolidated Financial Statements ("Financial Statements") for CB&I have been prepared pursuant to the rules and regulations of the United States ("U.S.") Securities and Exchange Commission (the "SEC") and in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

*               *               *

The discussion and analysis of our financial condition and results of operations are based upon our Financial Statements, which have been prepared in accordance with U.S. GAAP….We continually evaluate our estimates based upon historical experience and various other assumptions that we believe to be reasonable under the circumstances.

139.     The foregoing statements were materially false and misleading when made because CBI's financial statements did not comply with GAAP because, *inter alia*, CBI's financial statements impermissibly recorded gain contingencies (*i.e.*, the unapproved change orders), accounted for cost overruns and construction delays with improper purchase accounting adjustments, and carried goodwill that far exceeded its fair value, all of which overstated earnings.

140.     On October 1, 2014, *The Associated Press* noted that CBI and the NRC had reached a settlement regarding the alleged misconduct, including one welder "cheating by taking

a qualification test for a co-worker. A test administrator allowed the test even though the authorities said the administrator was aware of the misconduct." *See, e.g., The Acadiana Advocate,* "Nuclear plant parts supplier agrees to changes at Louisiana factory" (Oct. 1, 2014), available at http://www.theadvocate.com/baton_rouge/news/business/article_183f530e-1d48-558d-9b3a-bfd28705eccc.html. "

141.    On October 2, 2014, South Carolina-based newspaper *The State* issued an article warning that the V.C. Summer project may cost an additional $1.2 billion to complete. *See* R. Burris, "Contractors say it will cost $1 billion more to finish new nuclear reactors at V.C. Summer," *The State* (Oct. 2, 2014), available at http://www.thestate.com/news/business/article13893275.html. The article also provided detail concerning the scope of the project delay and suggested that CBI could be responsible for hundreds of millions of dollars for delays and cost overruns:

> Cayce-based SCANA Corp., the parent company of the electric utility [stated] its construction and design consortium, primarily Chicago Bridge & Iron Co. and Westinghouse, informed them that the increased preliminary cost estimates are needed to support project delays announced in August associated with engineering problems, fabrication and procurement of components and construction issues.
>
> *          *          *
>
> The CB&I and Westinghouse consortium told SCANA in August that they were undertaking a full re-baselining of the V.C. Summer plant's Unit 2 and Unit 3 new reactors due to projected delays that would move completion of the Unit 2 reactor back to late 2018 or early 2019 and Unit 3's completion back a year beyond that to at least late 2019.
> The $1.2 billion revised cost estimate issued by the engineering and construction consortium is in 2007 dollars, SCANA's announcement said, "and would be subject to escalation."
>
> *          *          *
>
> **If the increased costs are to be added to the total cost of the reactor, SCE&G and the consortium will have to negotiate whose responsibility those**

56

*increased costs fall to – SCE&G and its ratepayers or the consortium, which has had multiple delays with fabrication and delivery.*

(emphasis added)

142.     On October 3, 2014, *Associated Press* issued an article confirming that South Carolina utility officials had just concluded the cost of the V.C. Summer plant "could grow by more than $1 billion…in a blow to a nuclear industry hoping it can control construction spending." *See, e.g.,* "Price tag for SC nuclear plant could grow by $1B," PowerSource (Oct. 3, 2014), available at http://powersource.post-gazette.com/powersource/latest-nuclear-power-generation/2014/10/02/Price-tag-for-SC-nuclear-plant-could-grow-by-1B/stories/201410020402.

143.     Between October 1, 2014 and October 10, 2014, as the market digested this firm-specific information regarding problems at the Nuclear Projects, the CBI's stock price dropped from more than $57 per share to $49.38 per share, or more than 14%.

144.     On October 23, 2014, CBI issued Q3:14 financial results and held a conference call with investors, in which Defendants CBI and Asherman attempted to stem losses in CBI share price by claiming that CBI's share of cost increases as a result of extensive Nuclear Project delays would only be $200 million:

> MR BALLSCHMIEDE: As Phil discussed earlier, the recent extensions of schedule on our nuclear projects has resulted in an increase in total estimated costs. ***CB&I recorded additional change order and claims in the third quarter totaling $200 million relating to the cost impact for the South Carolina nuclear project.***
>
> ***We believe the remaining cost impacts resulting from the U.S. nuclear project extension of schedules are recoverable under our contractual arrangements.*** These developments did not have a significant impact on our third quarter results.
>
> MR. NORFLEET: Perfect. That was very helpful. And just last question. Phil, can you just give us a little bit of an update on – obviously, you talked a little bit about the cost over-runs on the nuclear contracts in Q3, and what we incurred for that.

But obviously, we continue to hear some issues coming out of Lake Charles. Are we still on schedule in terms of delivering modules, and are they still utilizing that facility? And can you just give us any commentary around...

MR. ASHERMAN: Sure.

MR. NORFLEET: ...the dialog that you're having with trying to basically get some resolution to these cost over-runs, and who's going to bear the brunt of that?

MR. ASHERMAN: Yeah. Let's address the terminology first. ***There is additional costs that will be on that project***. ***Now that cost relates to the additional design and scope changes on the project, the new design for the shield build in front of us, and the extension of schedule as a result of those design changes***.

***So, that is cost of the work***. So, the contractual arrangement there, it has to be demonstrated obviously and we're going through that process now of why the projects will have additional cost. So, it's costs of the work that's been designed, so in my mind that's a little bit different from cost over-runs. So, we've maintained that our contractual position is very strong. Remember that the guarantor of this project is the technology provider, Toshiba, who has the delivery arm through Westinghouse. We are the fabricator and constructor and when we get a change in design, we are entitled to recovery under the contract, right? But, we'll go through that.

(emphasis added)

145.     The foregoing statements were materially false and misleading when made because: (a) the cost overruns were not just because of design changes, but also because of defective fabrication, including welding problems, caused by CBI; and (b) CBI had responsibility for at least part of the cost overruns, for which it had not recorded any reserve.

146.     On October 23, 2014, CBI also filed its Q3:14 Form 10-Q with the SEC. Ballschmiede signed the Form 10-Q, and Asherman and Ballschmiede certified the Form 10-Q pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002. The 2Q 2014 Form 10-Q did not record any impairment to goodwill, and stated that "no indicators of goodwill impairment were identified." These statements were materially false and misleading when made because they omitted that there were indicators of goodwill impairment with respect to the Shaw assets,

58

especially Stone & Webster.  In particular, the growing evidence of cost overruns, and of CBI's responsibility for those overruns, as well as the increased regulatory scrutiny CBI and Westinghouse were facing, were indicators that required further impairment analysis. Had the required analysis been faithfully conducted, it would necessarily have determined that the Shaw assets were impaired because the carrying value of goodwill exceeded its fair value.

147.    With specific respect to goodwill, CBI's Q3:14 Form 10-Q stated:

> Goodwill is not amortized to earnings, but instead is reviewed for impairment at least annually at our reporting unit level, absent any indicators of impairment…. We perform our annual impairment assessment during the fourth quarter of each year based upon balances as of the beginning of that year's fourth quarter. As part of our annual impairment assessment, in the fourth quarter of 2013, we performed a quantitative assessment of goodwill for each of our reporting units….Based upon this quantitative assessment, no impairment charge was necessary during 2013, as the fair value of each of the reporting units acquired in 2013 exceeded its respective net book value and the fair value of all other reporting units significantly exceeded their respective net book values. During the nine months ended September 30, 2014, no indicators of goodwill impairment were identified. If, based on future assessments, our goodwill is deemed to be impaired, the impairment would result in a charge to earnings in the year of impairment.

> *                    *                    *

> ***At September 30, 2014 and December 31, 2013, our goodwill balances were $4,202,943 and $4,226, respectively, attributable to the excess of the purchase price over the fair value of net assets acquired in 468 connection with our acquisitions….During the nine months ended September 30, 2014, no indicators of goodwill impairment were identified and therefore no goodwill impairment charge was recorded.***

> *                    *                    *

> At September 30, 2014, our goodwill balance was $4.2 billion, including $3.3 billion associated with the 2013 Shaw Acquisition.

148.    The foregoing statements were materially false and misleading when made because CBI's goodwill was, in fact, impaired, indicators of that impairment existed at that time, and its failure to write down that goodwill to its fair value when Defendants became aware of its

potential impairment violated GAAP.

149.    With respect to GAAP, CBI's Q3:14 Form 10-Q stated:

The accompanying unaudited interim Condensed Consolidated Financial Statements ("Financial Statements") for CB&I have been prepared pursuant to the rules and regulations of the United States ("U.S.") Securities and Exchange Commission (the "SEC") and in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

*               *               *

The discussion and analysis of our financial condition and results of operations are based upon our Financial Statements, which have been prepared in accordance with U.S. GAAP….We continually evaluate our estimates based upon historical experience and various other assumptions that we believe to be reasonable under the circumstances.

150.    The foregoing statements were materially false and misleading when made because CBI's financial statements did not comply with GAAP because, *inter alia*, CBI's financial statements impermissibly recorded gain contingencies (*i.e.*, the unapproved change orders), accounted for cost overruns and construction delays with improper purchase accounting adjustments, and carried goodwill that far exceeded its fair value, all of which overstated earnings..

151.    On November 11, 2014, Defendants CBI and Asherman held an "Investor Day" conference, wherein these Defendants declined to truthfully respond to investor questions about increased costs and decreasing prospects for the Nuclear Projects:

<Q>: Okay. Then just one follow-up around – obviously, CBI stock has been a little bit weaker this year and it feels like it's more a – I know I can, so I feel like it's been more a perception issue, in a sense, yes, you've had cash flow go out the door faste**r. *But maybe you can talk about the perception versus the reality of the contract terms of your nuclear contracts. Is there anything more you can give us with the relationships you have with the utilities and with Westinghouse. That's going to help us feel a little more comfortable that when all was said and done, CBI is not left holding the bag if these projects continue to sort of push out a little bit.***

60

**\<A - Philip K. Asherman\>**: All right. Well, you have to be judge of what's the perception and what's reality. But the reality is, and I firmly believe that and we believe as a company, this country needs nuclear power as part of its overall mix of energy sources. So we think the projects are very important. From the time we diligence those projects to the time that we close the transaction, we are committed to the fact that these are great projects, good challenge and a good approach.

Now, ***we understand that there's certainly been challenges with schedule driven by regulatory changes in the design***. But that's – I mean these changes are all about making these projects as safe and reliable as can be built.

***So we're very optimistic about it. Certainly those changes can drive and will drive some impact on schedule and some cost impact***. The contracts are very strong. There's been a lot of discussion in the media. The one thing that's different for us is that certainly with these regulated utilities, they have a public trust component of what they – of how they talk about the business in public. We have an equally strong obligation to our shareholders to make sure that we negotiate to the best advantage we can as a company and we feel very strong that we are in a good position when we get to that point. We're not at that point. ***We're at a point of building these projects, and we're very confident that they'll end as they're supposed to.***

**\<Q\>**: Okay. The CA-01, that's 2015 event. Out of Lake Charles is 2015. Is it right for investors to think that risk of further delays and cost overruns after that will significantly reduce?

**\<A - Philip K. Asherman\>**: I think there's another element of this that getting back to some of Jamie's questions too, when you look at the first installation, the first reactor, and all the trials and tribulations of a technology, a new methodology for construction, a lot of the cost and incremental schedule misses perhaps is because it was the first. When you look at the subsequent installations, the difference in the documentation and the drawings associated with that, you're talking about documentation on the first, something like this, you're talking about a book for the second one like this, if that makes any sense.

***So, if you take that logic to another step or other nuclear plants, you've got design done. You've got technology determined. You've got methodologies prescribed. So that economically becomes [indiscernible] (01:05:54) investment. We see that as we go further, and more economies of scale as we go forward in the job. So, that's – it's a big difference.***

(Emphasis added).

152.    The foregoing statements were materially false and misleading because: (a) the

Nuclear Projects were not progressing according to plan, and in fact had been severely impacted by defective fabrication processes by CBI, including processes compromising the welding critical to the safety of large modules used in the AP1000 design; and (b) the economics of the Nuclear Projects specifically and the Stone & Webster division generally had declined so significantly that it was questionable as to whether they had any value whatsoever.

153.    On November 21, 2014, Steven Roetger, an analyst at the the Georgia Public Service Commission, and William R. Jacobs, Vogtle's project manager and an expert in the construction, startup and operation of nuclear power plants for GDS Associates, Inc., provided testimony to the Georgia Public Service Commission regarding delays to the Vogtle plant.  The testimony warned, *inter alia*, that:

- There continued to be "various stop work orders" at the Lake Charles, Louisiana facility;

- CBI and Westinghouse were supposed to provide project owners with an updated integrated project schedule ("IPS") to manage the construction of the Vogtle nuclear plants, but had not;

- That a complete IPS was "imperative," especially because Vogtle "is the first nuclear construction in nearly 30 years, that this project uses many first of a kind construction techniques, that the licensing process 10 CFR Part 52 has never been used, and that the passive safety system design is also first of a kind."

- That CBI/Westinghouse's failure to provide a complete IPS was unreasonable and "runs counter to any prudent project management, nuclear or otherwise, the Engineering, Procurement, and Construction Agreement requirements, and the nuclear industry's own self-funded INPO Principles for Excellence in Nuclear Project Construction."

- Reiterated that Georgia Power intended to "***hold the consortium accountable for those schedules*** and methods and processes"

(emphasis in original).

*See*  Nov.  21,  2014  Testimony  of  Jacobs  and  Roetger,  available  at

http://www.psc.state.ga.us/factsv2/Document.aspx?documentNumber=155941.

154.   Over the next five trading days, as the market digested the Public Service Commission testimony, CBI stock dropped more than 17%, from $57.09 Nov. 21, 2014 to $47.13 on December 1, 2014.

155.   On the evening of January 29, 2015, The Southern Company ("Southern"), parent of Georgia Power, filed a Form 8-K with the SEC announcing that Vogtle was delayed by 18 months which would cause $720 million in additional costs ($40mm / month for each additional month). More specifically, the filing stated:

> Georgia Power has been notified by Westinghouse Electric Company LLC and CB&I / Stone & Webster, Inc. (collectively, the "Contractor") of the Contractor's revised forecast for completion of Plant Vogtle Units 3 and 4, **which would incrementally delay the previously disclosed estimated in-service dates by 18 months** (from the fourth quarter of 2017 to the second quarter of 2019 for Unit 3 and from the fourth quarter of 2018 to the second quarter of 2020 for Unit 4). Georgia Power has not agreed to any changes to the guaranteed substantial completion dates. Georgia Power does not believe that the Contractor's revised forecast reflects all efforts that may be possible to mitigate the Contractor's delay.
>
> In addition, Georgia Power believes that, pursuant to the engineering, procurement and construction agreement among Georgia Power, the other co-owners of Plant Vogtle Units 3 and 4, and the Contractor (the "EPC agreement"), **the Contractor is responsible for the Contractor's costs related to the Contractor's delay** (including any related construction and mitigation costs, which could be material) and that Georgia Power and the other co-owners are entitled to recover liquidated damages for the Contractor's delay beyond the guaranteed substantial completion dates of April 2016 and April 2017 for Plant Vogtle Units 3 and 4, respectively.
>
> Georgia Power would continue to incur its owner-related costs, including property taxes, oversight costs, compliance costs, and other operational readiness costs, of which Georgia Power estimates its capital cost increase to be approximately $10 million per month until Plant Vogtle Units 3 and 4 are placed in service. Georgia Power expects to further address the matters related to cost and schedule described herein in the next semi-annual construction monitoring report for Plant Vogtle Units 3 and 4, which is scheduled to be filed with the Georgia Public Service Commission on February 27, 2015. Prior to Plant Vogtle Units 3 and 4 being placed in service, Georgia Power would continue to incur financing costs of approximately $30 million per month.

(Emphasis added).

156.     CBI's stock fell substantially as the news reached the market the following day. On extremely heavy trading volume, CBI's stock dropped from a closing price of $38.47 per share on January 29, 2015 to $34.51 on January 30, 2015, a single day drop of over 10%.

157.     Then, on February 4, 2015, during Southern's fiscal year 2014 earnings call, Southern's CEO, Thomas Fanning, elaborated on the delay and costs:

> THOMAS FANNING: [L]ast week, we disclosed the receipt of a revised forecast for completion from our contractors that reflects an 18-month delay from the previous estimated in-service days. The process of reviewing the revised forecast for completion, the drivers for change and possible mitigation opportunities continues.
>
> *We have not agreed to any change to the guaranteed substantial completion dates, nor do we believe that all efforts to mitigate the contractor delays have been made. Based on our review thus far and considering the fixed and firm nature of our EPC contract, we believe the contractors are responsible for their costs associated with the delay and any costs to mitigate.* We will still be responsible for our share of the owners cost.
>
> For example, cost associated with oversight and operational readiness, which we estimate to be approximately $10 million per month. We will also continue to incur financing cost of approximately $30 million per month. *Our contract also provides for liquidated damages for each day the two units are late, and this stipulation should help mitigate the cost of any delay.*

(emphasis added)

158.     On February 4, 2015, shares of CBI fell over 6% on heavy trading, dropping from a closing price of $37.69 on February 3, 2015 to $35.29 at close on February 4, 2015.

159.     On February 24, 2015, in connection with a conference call held with investors to announce CBI's Q4:14 and fiscal year 2014 financial results, Defendants CBI and Asherman made additional materially misleading statements regarding the business prospects for the Nuclear Projects and Stone & Webster:

We look forward to accomplishing multiple key milestones this year, and our focus remains on construction of these nuclear power plants in a safe, reliable, and cost-efficient manner.

Now, we realize that our reluctance to publicly discuss contractual issues with these nuclear projects is frustrating to many of you, but in response to the flurry of comments made recently by the licensees to their analysts and to the media, we find the negative narrative perpetuated about these important projects disappointing and in some cases misleading. **CB&I's role is to construct the projects as designed, and we are working diligently with the technology provider and the licensees to help mitigate time and cost that will be incurred as a result of additional changes in scope. In virtually every case, CB&I has contractual entitlement for these costs,** regardless of the determination between Westinghouse and the licensees on the reasons for the design changes, and we fully expect that the projects will continue under a re-baseline schedule.

--

MR. MALLOY (Johnson Rice): I just wanted to go back to the nuclear projects, and at the end of the third quarter, I think it was about a billion dollars of unapproved change orders and claims, and it sounds like that is going to be going up based on some revisions to the schedule. Can you talk about how you think this gets settled out, the timing, and is it the potential that this lasts for years while the projects are getting constructed?

MR. ASHERMAN: Yeah. Well, I mean, obviously, you know this is the very first large capital projects that has had dispute in terms of claims on a few change orders. It's probably the first one of our experience that has been so public, but nevertheless, **we have been working with all the parties to resolve changes in scope and entitlements of change orders throughout the course of the year and have actually had some very good response in getting some traction on the settlements.** It is not a matter of just submitting a claim order, but as you know, in most contracts, there is a very explicit dispute resolution which you have to work through, and it does take time.

---

MR. KAPLOWITZ (Barclays Capital): Okay. Ron, that's helpful. Let me just ask sort of a big-picture question. Like rarely have I—I don't think I have ever seen a situation where two projects take, you know, an E&C's market cap down the way that we have seen, and I sense your guys' frustration. But, you know, how do we— like **everybody asks us about sort of of maximum liability, what could CBI be found guilty of, if anything, you know, and we're looking to management to give us more color around these projects. Is there anything that you could tell us additionally that can allay some of the fears that I think that investors have around—you know, because they're obviously big numbers that are associated with these delays. Is there anything more that you could say, guys, around that**?

MR. ASHERMAN: … getting back to your question, yeah, there are a couple of issues there. One, as Tom had framed, the liability, *I think he said it is somewhere around $247 million, which you can assume would be split in half by the two consortium partners as damages, as the limits of that damages*.

(Emphasis added).

160.    The foregoing statements were materially false and misleading when made because: (a) CBI's exposure to liability from change orders was actually growing and was not capped at half of $247 million, as Asherman falsely asserted; and (b) the statements omitted to disclose that the economics on the Nuclear Projects had become so disadvantageous that CBI had begun to consider jettisoning the Nuclear Projects and its entire Stone & Webster division for little or no consideration.

161.    On February 25, 2015, CBI filed its 2014 Form 10-K with the SEC.  Asherman, Ballschmiede and Stockton signed the Form 10-K and Asherman and Ballschmiede certified the Form 10-K pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002.  With respect to goodwill, the 2014 Form 10-K stated, *inter alia*, that "no impairment charge was necessary during 2014 as the fair value of each of our reporting units exceeded their respective net book values" and that no indicators of goodwill impairment had been identified in 2014.  These statements were materially false and misleading when made because: (a) the assets comprising the overwhelming majority of CBI's goodwill – the Nuclear Project fabrication business of Stone & Webster – had a carrying value that exceeded its fair value; and (b) there were extensive indicators of goodwill impairment, including cost overruns, a 3-month stop work order due to fabrication defects in the Stone & Webster unit, and increased regulatory scrutiny of the costs and delays of the Nuclear Projects.

162.    With specific respect to goodwill, CBI's fiscal year 2014 Form 10-K stated:

Our goodwill balance represents the excess of the purchase price over the fair value of net assets acquired as part of previous acquisitions, including the Shaw Acquisition. Net assets acquired include identifiable finite-lived intangible assets that were recorded at fair value based upon expected future recovery of the underlying assets.

At December 31, 2014 , our goodwill balance was $4.2 billion and was distributed among our four operating groups as follows: Engineering, Construction and Maintenance - $2.7 billion , Fabrication Services - $545.4 million , Technology - $426.0 million and Environmental Solutions - $478.1 million. Goodwill is not amortized to earnings, but instead is reviewed for impairment at least annually at a reporting unit level, absent any indicators of impairment….We perform our annual impairment assessment during the fourth quarter of each year based upon balances as of October 1. As part of our annual impairment assessment, in the fourth quarter of 2014, we performed a quantitative assessment of goodwill for each of our reporting units. ***Based upon this quantitative assessment, the fair value of each of our reporting units exceeded their respective net book values, and accordingly, no impairment charge was necessary during 2014***…. If, based on future assessments, our goodwill is deemed to be impaired, the impairment would result in a charge to earnings in the year of impairment.

<div align="center">*      *      *</div>

At December 31, 2014, our goodwill balance was $4.2 billion and was distributed among our four operating groups as follows: Engineering, Construction and Maintenance - $2.7 billion, Fabrication Services - $545.4 million , Technology - $426.0 million and Environmental Solutions - $478.1 million.

<div align="center">*      *      *</div>

At December 31, 2014 and 2013, our goodwill balances were $4,195,231 and $4,226,468 , respectively, attributable to the excess of the purchase price over the fair value of net assets acquired in connection with our acquisitions.

(emphasis added)

163.     The foregoing statements were materially false and misleading when made because CBI's goodwill was unquestionably worth far less than recorded, which is why CBI was considering walking away from the Stone & Webster business representing the bulk of recorded goodwill for little or no compensation beyond a release of liabilities.  Moreover, the Company had in fact identified extensive indicators of impairment, including work stoppages, declining

cash flows, and deteriorating industry conditions as Nuclear Project owners became recalcitrant in demands that CBI and Westinghouse retain responsibility for cost overruns.

164.    With respect to GAAP, CBI's fiscal year 2014 Form 10-K stated:

The accompanying unaudited interim Condensed Consolidated Financial Statements ("Financial Statements") for CB&I have been prepared pursuant to the rules and regulations of the United States ("U.S.") Securities and Exchange Commission (the "SEC") and in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

165.    The foregoing statements were materially false and misleading when made because CBI's financial statements did not comply with GAAP because, *inter alia*, CBI's financial statements impermissibly recorded gain contingencies (*i.e.*, the unapproved change orders), accounted for cost overruns and construction delays with improper purchase accounting adjustments, and carried goodwill that far exceeded its fair value, all of which overstated earnings.

166.    As CBI would admit in 2016, shortly after filing the 2014 10-K, it began to negotiate an exit to the Nuclear Projects and Stone & Webster.  As a result of these negotiations, Defendants had actual knowledge that the business no longer had any real value and had no reasonable basis to believe that it would receive any meaningful amount of cash for those assets. Instead, the talks centered around a structure similar to a quitclaim, where CBI would be able to walk away from the assets, but would receive little or nothing more in return.

167.    On March 9, 2015, *The Motley Fool* issued an article explaining that CBI was motivated to avoid booking losses for cost overruns because doing so might compromise its litigation position in litigation that had been pending since 2012 against Georgia Power:

The other reason is quite simply because the cost overruns related to the Shaw projects are not being recognized as losses. According to CBI, those are not really losses because contractually, they are entitled to be reimbursed for them, both by

the owner and, if not by the owner, then by their partner, Westinghouse Electric. In the meantime, costs are being incurred and cash is flowing out, while non-cash earnings are being booked as assets.

This kind of accounting is far from conservative -- the cookie jar reserves especially are inexcusable -- but *when it comes to the recognition of losses, one must remember that CBI is in the middle of legal disputes with both the contractees and Westinghouse; and it is difficult to lay a claim to money that is being simultaneously written off in one's own reports. Doing this may be conservative accounting but it would weaken CBI's argument and boost the morale of its legal foes*.

(emphasis added) "The Chicago Bridge and Iron Merger with Shaw: A Marriage of Unequals," *The Motley Fool* (March 9, 2015).

168.    On April 21, 2015, the NRC proposed a fine against CBI for trying to cover-up an accident at Lake Charles involving a part for the V.C. Summer plant. An NRC official responsible for construction oversight, Michael Cheok, said the employees engaged in deliberate misconduct. He accused the firm's managers and workers in a Dec. 14 letter of "placing production and schedule concerns ahead of safety and quality." An article reporting on the incident further noted that:

> CBI's plant in Lake Charles has struggled to meet the nuclear industry's strict quality rules and the production deadlines for the two nuclear plants under construction. The utility companies who own those nuclear plants have all announced significant delays and cost overruns.

169.    On April 24, 2015, CBI filed its Q1:15 Form 10-Q with the SEC. Defendant Ballschmiede signed the Form 10-Q, and Defendants Asherman and Ballschmiede certified the Form 10-Q pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002. As in previous periodic reports, no impairments to goodwill were recorded, and the Company stated that it had identified "no indicators of goodwill impairment." These statements were materially false when made because: (a) as was confirmed in the negotiations to offload Stone & Webster for little more than a walk away, the carrying value of goodwill for that business exceeded its fair value; and (b)

69

extensive indications of impairment to the fair value of those assets were evident, including growing change orders, delays and cost overruns.

170.     With specific respect to goodwill, CBI's Q1:15 Form 10-Q stated:

Goodwill is not amortized to earnings, but instead is reviewed for impairment at least annually at a reporting unit level, absent any indicators of impairment. We perform our annual impairment assessment during the fourth quarter of each year based upon balances as of October 1…. As part of our annual impairment assessment, in the fourth quarter of 2014, we performed a quantitative assessment of goodwill for each of the aforementioned reporting units. Based upon this quantitative assessment, the fair value of each of our seven reporting units exceeded their respective net book values, and accordingly, no impairment charge was necessary during 2014.

During the three months ended March 31, 2015, we realigned our four operating groups, which represent our reportable segments, as discussed further in Note 15, and in connection therewith, we realigned our reporting units…. In conjunction with the aforementioned realignment of our operating groups, we allocated goodwill among our new and realigned reporting units based on the relative fair value of the reporting units being realigned. As a result, we performed a quantitative assessment of goodwill for each of the reporting units impacted by our operating group realignment, which included Engineered Products, Technology, Facilities & Plant Services, and Federal Services. ***Based on this quantitative assessment, the fair value of each of the reporting units impacted by our operating group realignment exceeded their respective net book values, and accordingly, no impairment charge was necessary as a result of the realignment. Additionally, during the three months ended March 31, 2015, no indicators of goodwill impairment were identified for any of our reporting units.*** If, based on future assessments, our goodwill is deemed to be impaired; the impairment would result in a charge to earnings in the period of impairment.

\*                    \*                    \*

At March 31, 2015 and December 31, 2014, our goodwill balances were $4,169,756 and $4,195,231, respectively, attributable to the excess of the purchase price over the fair value of net assets acquired in connection with our acquisitions…. As discussed further in Note 2, in conjunction with the realignment of our operating groups during the three months ended March 31, 2015, we performed a quantitative assessment of goodwill for our realigned reporting units. Based on this quantitative assessment, no impairment charge was necessary as a result of the realignment. Additionally, during the three months ended March 31, 2015, no indicators of goodwill impairment were identified for any of our reporting units.

\*                    \*                    \*

70

At March 31, 2015, our goodwill balance was $4.2 billion. Goodwill is not amortized to earnings, but instead is reviewed for impairment at least annually at a reporting unit level, absent any indicators of impairment. We perform our annual impairment assessment during the fourth quarter of each year based upon balances as of October 1…. As part of our annual impairment assessment, in the fourth quarter of 2014, we performed a quantitative assessment of goodwill for each of the aforementioned reporting units. Based upon this quantitative assessment, the fair value of each of our seven reporting units exceeded their respective net book values, and accordingly, no impairment charge was necessary during 2014.

\*          \*          \*

[D]uring the first quarter 2015, no indicators of goodwill impairment were identified for any of our reporting units. If, based on future assessments, our goodwill is deemed to be impaired; the impairment would result in a charge to earnings in the period of impairment.

 (emphasis added)

171.    The foregoing statements were materially false and misleading when made and

misleading when made because CBI's goodwill was, in fact, impaired, indicators of that

impairment existed at that time, and its failure to write down that goodwill to its fair value when

Defendants became aware of its potential impairment violated GAAP. CBI's goodwill was

unquestionably worth far less than recorded, which is why CBI was considering walking away

from the Stone & Webster business representing the bulk of recorded goodwill for little or no

compensation beyond a release of liabilities.  Moreover, the Company had in fact identified

extensive indicators of impairment, including work stoppages, declining cash flows, and

deteriorating industry conditions as Nuclear Project owners became recalcitrant in demands that

CBI and Westinghouse retain responsibility for cost overruns.

172.    With respect to GAAP, CBI's Q1:15 Form 10-Q stated:

The accompanying unaudited interim Condensed Consolidated Financial Statements ("Financial Statements") for CB&I have been prepared pursuant to the rules and regulations of the United States ("U.S.") Securities and Exchange

Commission (the "SEC") and in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

<div align="center">*          *          *</div>

The discussion and analysis of our financial condition and results of operations are based upon our Financial Statements, which have been prepared in accordance with U.S. GAAP....We continually evaluate our estimates based upon historical experience and various other assumptions that we believe to be reasonable under the circumstances.

173.   The foregoing statements were materially false and misleading when made because CBI's financial statements did not comply with GAAP because, *inter alia*, CBI's financial statements impermissibly recorded gain contingencies (*i.e.*, the unapproved change orders), accounted for cost overruns and construction delays with improper purchase accounting adjustments, and carried goodwill that far exceeded its fair value, all of which overstated earnings.

174.   On May 15, 2015, SCANA, the majority owner of the V.C. Summer Nuclear Project, disclosed that it had sent CB&I and Westinghouse a letter "outlining certain steps SCE&G intends to take to withhold payment of invoiced amounts related to delay and performance factors."  *See* Quarterly Report to the South Carolina Office of Regulatory Staff Submitted by South Carolina Electric & Gas Company Pursuant to Public Service Commission Order No. 2009-104(A) for Q1 2015, available at https://www.scana.com/docs/librariesprovider15/pdfs/blra-status-reports/2015-q1-blra-report--public.pdf?sfvrsn=2.

175.   On June 23, 2015, after the markets closed, analyst Sameer Rathod of Macquarie published a report on CBI noting that continued delays by the consortium could cause Georgia Power Company to lose $522 million in production tax credits, which would boost the overall cost

overrun to about $2.5 billion.  The Macquarie report indicated that it was "unlikely" that CBI would escape liability for the overruns, stating "we… think CBI will be held partially responsible given execution in fabrication and construction."  That same day, online investing site Benzinga published an article addressing the Macquarie analyst report, entitled "Chicago Bridge & Iron Costs Are 'Nuclear,' Macquarie Warns."  *See* https://www.benzinga.com/analyst-ratings/analyst-color/15/06/5621460/chicago-bridge-iron-costs-are-nuclear-macquarie-warns.  On June 24, 2015, in response to the disclosure of this adverse information, CB&I shares dropped $1.03 from the prior day close of $54.03 to close at $53.00.  In the following three trading days, as the market continued to digest the diminishing prospects for CB&I, shares dropped further to $49.63

## VII.  POST-CLASS PERIOD EVENTS CONFIRM FALSITY AND SCIENTER

### The Sale of the Nuclear Projects to Westinghouse

176.    On October 27, 2015, CBI announced it would take a $1 billion loss on the sale of its Stone & Webster unit to Westinghouse for nothing more than a release of liabilities, subject to adjustment for changes to net working capital after the target date of June 30, 2015 (to "true up" for any additional expenses that CBI may incur between that date and deal closing).

177.    In testimony, SCE&G offered their explanation for CBI's departure and some color on the accounting issues involved:

> Now, from a CB&I perspective, if I've read their Form 10-Q properly, at the time they exited the contract, they took about a $1.2 billion after-tax loss, so that did have an impact, but that was not paid to us. So the losses, I'm assuming, were negotiated in their settlement with Westinghouse. And Westinghouse, likewise, took about a $1 billion charge through their financial statements, as a result of settling their agreements between the consortium. So looking at the size of those dollars, I think it was pretty clear that they had some very wide gaps that they could not fill in their relationship, which is probably what led to this.

178.    SCE&G also described CBI's departure from the project as "a great turn":

We were a little surprised when Westinghouse came to us to talk about CB&I exiting the project. I don't think we were totally surprised; that's something that could happen, just based on their poor relationship. I see the addition of Fluor as a huge benefit to the team and the project going forward….The attitude on the ground is better. I think the whole team is feeling better about our ability to work as a team, and that's what was really suffering, from my perspective, not just between the consortium partners but, because they were having so many disputes, it was difficult for them to work closely with us to try to resolve issues. And I see that changing. It certainly hasn't changed completely, because we've got to get Westinghouse – we've got to get Fluor on the ground, on the project, and we can't do that completely until this agreement is fully effective in the 45 days Steve talked about. But I think it's a great turn.

179.    The sale of the Nuclear Projects to Westinghouse supports Plaintiffs' allegations that (1) CBI materially inflated its goodwill by hundreds of millions of dollars during the Class Period; (2) there were upwards to $2.2 billion in disputed liabilities between CBI and Westinghouse (to say nothing of disputed overruns with the Nuclear Projects' owners); and (3) the relationship between CBI and its construction partners was "poor," "really suffering," and "difficult for them to work closely…to try to resolve disputes."

180.    On April 28, 2016, in accordance with the sales contract between Westinghouse and CBI, Westinghouse delivered its post-closing accounting true-up to Westinghouse. Westinghouse claimed that CBI owed it $2.1 billion, noting that the Company's accounting for liability it faced for the troubled Nuclear Projects was "not [recorded] in accordance with GAAP" and that CBI "should have recorded a reserve liability of hundreds of millions of dollars for losses."

181.    On July 21, 2016, in response to Westinghouse's $2.1 billion demand, CBI filed a verified complaint with the Court of Chancery of the State of Delaware seeking declaratory relief that Westinghouse be barred from making a claim for $2.1 billion. In that lawsuit CBI admitted that, as early as February 2015, CBI began negotiating a "quitclaim" deal that would let it walk away from the Nuclear Projects and Stone & Webster:

74

> *Over the next few months, CB&I and Westinghouse, as well as Toshiba, as Westinghouse's parent company, began discussing a potential resolution of the emerging disagreement over Westinghouse's financial responsibility for delay costs not covered by the owners. These discussions quickly expanded beyond a resolution of CB&I and S&W's claims for recovery to encompass a proposal for CB&I to transfer the Business to Westinghouse.* For Westinghouse, such a proposal held out the opportunity to resolve at one time, with both CB&I and the plant owners, all of the disputes over the billions of dollars in additional costs incurred, and to level-set the AP1000 projects — and, with it, Westinghouse's nuclear business — going forward. For CB&I, the proposal promised a clean break from construction projects based on Westinghouse's problematic nuclear plant design.

> *Both parties described this as essentially a quitclaim sale. The parties agreed on an outline of a deal under which CB&I would carve out and transfer the Business to Westinghouse for no upfront consideration, in exchange for a complete release for CB&I from Westinghouse and the owners from all claims, liabilities or obligations related to AP1000 projects.*

(Emphasis added).

182.    In response, Westinghouse represented to the court that it had reviewed CBI's past financial statements particularly, how it accounted for liabilities associated with the Nuclear Projects and had concluded that CBI had not accurately accounted for hundreds of millions of dollars of liabilities, in violation of GAAP, and sought the appointment of an independent auditor to revalue the deal from scratch. The Delaware Supreme Court ruled that Westinghouse had waived its right to pursue such claims in its purchase agreement.

### The Bankruptcy of Westinghouse and the uncertain future of the Nuclear Projects

183.    On February 14, 2017, Toshiba President and CEO Satoshi Tsunakawa gave a presentation to investors that provided a provisional forecast of Toshiba's 3Q:16 financial results, as well as an outline of Toshiba's losses related to WEC's Nuclear Projects. In his presentation, Tsunakawa revealed that the projected additional cost to complete both the Vogtle and V.C. Summer Nuclear Projects amounted to approximately $6,100,000,000.00. Toshiba also estimated

that its provisional operating loss of $495,295,7100.00, was largely attributable to a $6,479,161,500.00 impairment to goodwill relating to WEC's Nuclear Projects.

184.    In the April 11, 2017 presentation by Toshiba EVP Masayoshi Hirata presenting Toshiba's final financial results for 3Q:16, Toshiba revealed that its actual impairment to goodwill relating to the Nuclear Projects increased to $107,286,693,414.00, such that its operating loss amounted to $86,281,497,927.00. In explaining its accounted losses relating to the Nuclear Projects, Toshiba noted that, at the time of its acquisition of Stone & Webster in October of 2015, its primary focus was on avoiding further cost overruns and accelerating construction delays that had persisted since January of 2012, and perhaps even as far back as 2011. After the acquisition was completed, however, WEC learned that its cost estimates had to be revised (by $6.1 billion) and that its Net Working Capital calculation materially differed from that of CBI. The cost overruns and construction delays referenced by Hirata and Toshiba evidence significant overruns and delays dating back to at least January of 2012.

185.    On March 31, 2017, Westinghouse filed for Chapter 11 bankruptcy as a result of the costly problems at the Nuclear Projects. Toshiba declared in the filing that the nuclear business had already lost $6 billion and was facing additional losses of up to another $4 billion.

186.    At the time of the bankruptcy filing, Westinghouse informed the owners of the V.C. Summer plant that it intended to use the provisions of the Bankruptcy Code to reject its obligations to complete the V.C. Summer plant pursuant to its contracts, and would instead pay approximately $1.2 billion in satisfaction of all claims for damages associated with Westinghouse's anticipated rejection of its contractual duties.

187.    On August 1, 2017, SCE&G filed a Petition for a Prudency Determination with the South Carolina Public Service Commission, seeking formal ratification of its decision to abandon

construction of the V.C. Summer Nuclear Project. SCE&G argued that, "[a]fter a careful review and assessment of the relevant data by its evaluation team and leadership, SCE&G determined that the…forecasted cost schedule for completion of the Units would be approximately $8.8 billion" to SCE&G alone. In a press release published a day prior, SCE&G stated that, in light of V.C. Summer co-owner Santee Cooper's decision to abandon the project, it had "concluded that it would not be in the best interest of its customers and other stakeholders to continue the construction project." In its own July 31, 2017 press release, Santee Cooper stated that its "analysis shows the project would not be finished until 2024, four years after the most recent completion date provided by Westinghouse, and would end up costing Santee Cooper customers a total of $11.4 billion." Santee Cooper CEO Lonnie Carter stated that that projected cost to complete the project was approximately "75 percent more than originally planned," or roughly $25 billion in total. Both SCE&G and Santee Cooper recognized that cost overruns and construction delays were the culprit for their abandonment of the project. "The schedule delays increased the protected interest cost 143 percent over the original plan."

188.    The bankruptcy of Westinghouse, and the underlying cost overruns and construction delays, further support Plaintiff's allegations of Defendants' scienter and falsity during the Class Period because they evidence significant overruns and delays dating back to CBI's work on the Nuclear Projects prior to and throughout the Class Period.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

189.    Defendants acted with scienter in that each Defendant knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and, knowingly

or recklessly disregarded, and/or substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants participated in the fraudulent scheme alleged by virtue of their receipt of information reflecting the true facts regarding CBI, their control over the Company's alleged materially misleading misstatements, and/or their associations with the Company, which make them privy to confidential proprietary information concerning CBI and the Company's business and operations. Prior to and throughout the Class Period, Defendants conducted extensive due diligence, as a result of which they claimed to have knowledge and confidence about the Nuclear Project contracts.

190.    On July 30, 2012, CBI and Asherman boasted of their extensive due diligence on the Nuclear Projects during a conference call:

> MR. ASHERMAN: We're there. We are on the projects, Jamie. We're working in both Vogel and Summer. So, we have some pretty good insight into those projects and also the relationships that accompany those with both Southern Company, and also the provider with Toshiba. So, we have an ongoing dialogue with those companies and we feel pretty confident about - .
>
> MR. COOK (Credit Suisse): With the contract structure?
>
> MR. ASHERMAN: Yes, absolutely. Absolutely.

191.    Defendants similarly claimed to have fully evaluated CBI's exposure to liability for delays and cost overruns. For instance, on July 30, 2012, Asherman assured investors:

> …I will say that we're very satisfied through very thorough and comprehensive due diligence that the nuclear plants, the nuclear projects are performing as we are expecting and that they are well on their way to resolving issues on projects they have reported as ha1ving cost challenges. ***So, we're very comfortable with [CBI's] financial] forecast.***

(Emphasis added).

192.    While conducting due diligence on Shaw in late 2012 and early 2013, Defendants became aware that the licensee for the Vogtle project, Georgia Power, sued the contractors at the

Georgia Nuclear Project construction site, alleging hundreds of millions of dollars in damages based on cost overruns that Stone & Webster and Westinghouse had tried to improperly pass off as "change orders" that could be recouped from the licensee.

193. On June 6, 2013, Defendant Asherman again assured investors that delays and cost overruns at the Nuclear Projects would have no impact on CBI's reported and future financial performance: "As far as exposure to the Company -- very minimal, that we see…. ***no impact on guidance and our financials going forward***." (emphasis added)

194. On April 9, 2015, CBI represented to a federal court in a sealed filing that it ***had already completed an estimation of future damages*** as a result of Vogtle delays. This assertion, though made in a sealed brief, was repeated by the United States District Court for the Southern District of Georgia in a public order. *See Georgia Power, et al. v. Westinghouse Elec. Co. LLC and Stone & Webster, Inc.*, No. CV 1:12-167, Order dated May 13, 2015 (S.D. Ga.). In addition to claiming in this lawsuit to have knowledge of the implication of the Vogtle delays, the lawsuit and a similar dispute also provided Defendants motive to mislead investors. As described in the *Motley Fool* article referenced in ¶ 167, candid disclosure "would weaken CBI's argument and boost the morale of its legal foes."

195. In a lawsuit CBI filed in the State of Delaware Court of Chancery, *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. et al.*, No. 12585-VCL (Del. Ch. Jul. 21, 2016), CBI admitted that it had started shortly after February 2015 to negotiate a sale of Stone & Webster for nothing more than its value as of June 30, 2015, adjusted only to true up additional expenditures after that point, revealing that Defendants understood there was no value to CBI's nuclear fabrication business or its role in the Nuclear Projects at the same time they touted that business to investors.

79

196.     The Individual Defendants were also motivated to misrepresent the true condition of CBI throughout the Class Period for their own financial gain.  The Individual Defendants stock sales during the Class Period were suspicious in timing and amounts.

197.     During the Class Period, Defendant Ballschmiede sold 64,528 shares of common stock for total proceeds of *$3,654,475.00*.  In a single transaction on March 16, 2015, Defendant Ballschmiede sold over *20%* of his stock holdings in CBI for proceeds of $2,005,520.16.  Defendant Ballschmiede hasn't sold a single share of stock since.

198.     During the Class Period, Defendant Asherman sold 75,000 shares at approximately $81 per share for total proceeds of about $6,000,000.00.  Although Defendant Asherman traded pursuant to a 10b5-1 plan prior to and during the Class Period, Defendant Asherman did not sell a single share of stock during the period of partial disclosures (from June 10, 2014  to June 23, 2015) and then sold approximately half of his holdings the following summer for total proceeds of approximately $11,500,00.00.

199.     Further, Defendant Asherman's total compensation skyrocketed during the Class Period:

        2011    -    $8,712,425
        2012    -    $9,224,778
        2013    -    $14,705,258
        2014    -    $14,278,840
        2015    -    $20,172,142

From 2013 through 2015, Asherman's stock awards under the Company's Long-Term Incentive Plan ("LTIP"), which makes up the majority of Asherman's compensation, increased dramatically. The performance measure for stock awards under the LTIP is earnings per share. Because the Company artificially inflated its earnings by fully recognizing the reimbursement form unapproved change orders instead of taking a loss or booking a reserve, Asherman was able to reap millions

of dollars in LTIP stock compensation through the Company's fraud. Furthermore, Defendant Asherman received a $2,000,000 bonus in 2013 directly tied to the "successful integration of the Shaw acquisition."

200.     During the Class Period, Defendant Stockton sold over 20,000 shares of common stock for total proceeds of over $1,500,000.

## IX.   <u>LOSS CAUSATION / ECONOMIC LOSS</u>

201.     During the Class Period, Defendants deceived the market through a course of conduct that artificially inflated the price of CBI's common stock and operated as a fraud on Class Period purchasers of CBI stock by misrepresenting losses in the Company's nuclear business. Specifically, Defendants maintained inflated stock prices throughout the Class Period by carrying inflated values for goodwill, improperly accounting for cost overruns, and falsely denying mounting claims that Defendants would be responsible for additional costs related to the Company's Nuclear Projects. Ultimately, however, as Defendants' prior misrepresentations and fraudulent conduct came to be revealed to investors through a series of revelatory events between June 10, 2014 and June 23, 2015 the value of CBI common stock declined precipitously – evidence that the prior artificial inflation in the price of CBI's stock was eradicated. As a result of their purchases of CBI common stock during the Class Period at artificially inflated prices, Lead Plaintiff, Additional Plaintiffs, and other members of the Class suffered economic losses when the truth regarding CBI's nuclear business and accounting obfuscations was revealed and the artificial inflation was removed from price of the Company's stock, *i.e.*, damages under the federal securities laws.

202.     Multiple disclosures revealed to the market in piecemeal fashion the false and misleading nature of Defendants' statements and omissions. On June 10, 2014, *Generation Market*

*Week* reported about the three-month stop work order in CBI's Lake Charles, Louisiana facility, issues with production quality, significant cost overruns, and nearly a billion dollars of unapproved work orders in dispute between the Georgia and South Carolina utilities and CBI.

203.    The following week, on June 17, 2014, Prescience Point Research Group issued a report on CBI entitled "Acquisition Accounting Gone Nuclear," in which the firm asserted, among other things, that: (i) CBI had improperly accounted for its goodwill during 2013 to cover losses associated with post-acquisition events, such as further construction delays and cost overruns with the Nuclear Projects; (ii) CBI's purchase-price adjustments masked its credit risk; (iii) CBI executives, especially Asherman, enjoyed hefty bonuses as a result of the way they chose to account for the Shaw purchase; and (iv) investors had been misled by CBI's misrepresentations of claimed success at the Nuclear Projects without adequate disclosure of fabrication problems that would likely lead to future impairments.   Immediately upon the revelation of the previously undisclosed facts published in the June 17, 2014 Prescience Point report, CBI's stock once again fell precipitously on very heavy trading volume, from a closing price of $73.58 per share on June 16, 2014 to $68.26 on June 17, 2014.   The single day drop of $5.32 per share represented a loss of over 7% of the Company's total market capitalization.

204.    After the market closed on July 24, 2014, CBI filed its 2Q:14 Form 10-Q with the SEC. While the Company's quarterly financial report continued to mislead investors by falsely stating that there were no indicators of goodwill impairment and by failing to outline the extent to which purchase price adjustments had been used to boost non-cash earnings, Defendants' 2Q:14 Form 10-Q revealed data showing a growing disparity between cash flows and non-cash earnings. In response to the filing, Prescience Point released a series of messages on Twitter pointing out that "the disconnect between earnings and cash flow is WIDENING" and that CBI's "deceptions

continue." The revelation of these previously undisclosed facts removed another layer of artificial inflation built into CBI's stock through Defendants' misrepresentations and omissions. CBI's stock price dropped over 9% from $69.48 at close on July 24, 2017, to close at $63.07 on the following trading day on high trading volume.

205. The artificial inflation in CBI's stock price continued to erode as news articles published in the beginning of October 2014 revealed additional problems with CBI's Nuclear Projects. On October 1, 2014, an article by *The Associated Press* discussed that CBI, "[a] manufacturer making parts in Lake Charles for two nuclear plants in the Southeast has promised to better train its employees after investigators accused three workers of cheating on a qualification test four years ago." The article also noted that CBI and the NRC had reached a settlement regarding the alleged misconduct, including one welder "cheating by taking a qualification test for a co-worker. A test administrator allowed the test even though the authorities said the administrator was aware of the misconduct." In response to the article's revelations, CBI's share price fell from $57.85 on September 30, 2014 to close at $56.08 on October 1, 2014.

206. The next day, on October 2, 2014, South Carolina-based newspaper *The State* issued an article warning that the V.C. Summer project may cost an additional $1.2 billion to complete. The article provided detail concerning the scope of the project delay and suggested that CBI could be responsible for hundreds of millions of dollars for delays and cost overruns. CBI's stock again fell as these previously undisclosed facts reached the market. Specifically, CBI's closing stock price declined from $56.08 on October 1, 2014 to $54.67 on October 2, 2014, on high trading volume.

207. Further details emerged the following month as Steven Roetger and William R. Jacobs provided testimony to the Georgia Public Service Commission on November 21, 2014

regarding delays to the Vogtle plant. Their testimony revealed, *inter alia*, that: (i) there continued to be "various stop work orders" at the Lake Charles facility; (ii) CBI and Westinghouse had not provided project owners with an updated project schedule for the construction of the Vogtle nuclear plants as they were supposed to; (iii) their failure to do so was unreasonable and "runs counter to any prudent project management, nuclear or otherwise"; and (iv) Georgia Power intended to "**hold the consortium accountable for those schedules** and methods and processes" (emphasis in original). CBI's stock fell immediately in response to the revelations, dropping from $57.09 on November 21, 2014 to close at $54.26 on the next trading day. Indeed, CBI's stock continued to fall over the next several trading days as the market digested the Public Service Commission testimony, in total dropping more than 17%, from November 21, 2014 to December 1, 2014, when the stock closed at $47.13.

208.    Then, on January 29, 2015, previously undisclosed facts were revealed in a Southern Company filing that construction on the Vogtle nuclear plants was delayed by 18 months which would cause $720 million in additional costs ($40mm / month for each additional month). CBI's stock fell substantially as the news reached the market the following day. On extremely heavy trading volume, CBI's stock dropped from a closing price of $38.47 per share on January 29, 2015 to $34.51 on January 30, 2015, a single day drop of over 10%.

209.    A few days later on February 4, 2015, when the CEO of Southern Company elaborated on the potential for an additional 18 month delay and related costs, CBI's stock continued to decline as the market responded to the news.  Specifically, CBI's stock suffered an intraday decline of over 6% that day, falling from $37.29 at open to $35.29 at close.

210.    On April 23, 2015 CBI reported its first quarter 2015 financial results.  Reporting on the results, analyst Macquarie Research noted "[t]he smoking gun" of the financial report was

the Company's struggling cash flow "due to cash burn associated with the nuclear contacts."  The report also noted that "management removed free cash flow from their compensation metrics," explaining that "this could be viewed negatively, given the focus investors have on FCF in light of the large cash drag from nuclear jobs."  Moreover, the analyst discussed the timeline of nuclear projects and CBI's involvement with those delays, and the analyst's opinion that "CB&I will be responsible for part of the cost overrun."

211.    In response to the revelations contained within CBI's financial results and the Macquarie report, CBI's share price fell from $51.10 on April 23, 2015 to close at $48.97 on April 23, 2015 on heavy trading volume.

212.    Then, two months later on June 23, 2015 after markets had closed, Macquarie published another report on CBI noting that continued delays by the consortium could cause Georgia Power Company to lose $522 million in production tax credits, which would boost the overall cost overrun to about $2.5 billion.  The Macquarie report indicated that it was "unlikely" that CBI would escape liability for the overruns, stating "we…think CBI will be held partially responsible given execution in fabrication and construction." That same day, online investing site Benzinga published an article discussing the Macquarie analyst report, entitled "Chicago Bridge & Iron Costs Are 'Nuclear,' Macquarie Warns."

213.    On June 24, 2015, in response to the disclosure of the foregoing previously undisclosed adverse information, CBI shares dropped $1.03 from the prior day close of $54.03 to close at $53.00.  In the following three trading days, as the market continued to digest the revelatory disclosures for CBI, shares dropped to $49.63.

214.    Between June 10, 2014 and June 24, 2015 as the truth regarding CBI's nuclear business seeped into the market through a series of adverse partial disclosures, the artificial

inflation in CBI's stock price from Defendants' misrepresentations eroded. All told, CBI stock lost nearly half of its value as a result, dropping from over $83 on June 10, 2014 to under $50 at the end of June 2015. This precipitous decline in the price of CBI's stock was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of the price drop of CBI's stock negates any inference that the losses suffered by Lead Plaintiff, Additional Plaintiffs, and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

## X.   ADDITIONAL ALLEGATIONS CONCERNING DEFENDANTS' ACTIONABLE STATEMENTS AND OMISSIONS OF OPINION

215.   Defendants' opinion statements omitted material facts about Defendants' inquiry into or knowledge concerning their statements of opinion. The omitted facts show the statements made by Defendants lacked the basis for making those statements that a reasonable investor would expect, even if Defendants subjectively held those opinions, which they did not. A reasonable investor in CBI expects not just that Defendants believe the opinions publicly stated (however irrationally), but that they fairly align with the information in Defendants' possession at the time.

216.   Class members' expectations about the degree of certainty underlying an opinion is the function of the specificity of the opinion itself and the speaker's special knowledge that is unavailable to Class members. For statement of opinion, the proper analysis is what a reasonable person would naturally understand a statement to convey beyond its literal meaning. For opinion statements, this means considering the foundation investors would expect an issuer to have before making the statement. Where, as here, Defendants omitted material facts about their inquiry into or knowledge concerning their statements of opinion, and those facts conflict with what a

reasonable investor would take from the statements themselves, the omissions create liability. Defendants knew at the time they made these statements of opinion particular facts the omission of which made the opinions at issue misleading to a reasonable person reading the statement fairly and in context.

217.    Defendants' choice of accounting treatments are statements of opinion. Indeed, Defendants themselves note in their 2013 form 10-K that "The preparation of our Financial Statements in conformity with U.S. GAAP requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenue and expenses and related disclosures of contingent assets and liabilities. We believe the most significant estimates and judgments are associated with revenue recognition for our contracts, including the recognition of incentive fees and unapproved change orders and claims; determination of fair value with respect to acquired tangible and intangible net assets; recoverability assessments that must be periodically performed with respect to long-lived tangible assets, goodwill and other intangible assets; valuation of deferred tax assets and financial instruments; the determination of liabilities related to self-insurance programs and income taxes; and consolidation determinations with respect to our partnering arrangements. If the underlying estimates and assumptions upon which our Financial Statements are based change in the future, actual amounts may differ from those included in the accompanying Financial Statements." Defendants' accounting treatments impermissibly recorded gain contingencies (*i.e.*, the unapproved change orders), accounted for cost overruns and construction delays with improper purchase accounting adjustments, and carried goodwill that far exceeded its fair value, all of which overstated earnings. Those opinions imply that Defendants had a basis in fact to utilize the particular treatment and that Defendants were not in possession of facts that rebutted the opinion.

218.    In truth, Defendants had no reasonable basis for these opinions and possessed facts that rebutted them, including but not limited to: prior to completing the purchase of Shaw and its subsidiary Stone & Webster, Defendants conducted extensive due diligence and became aware of the myriad issues plaguing the Nuclear Projects; according to CW 1, the Company's large contracts were discussed at monthly executive meetings held by Defendant Asherman and attended by Defendant Ballschmiede and Defendant Stockton, such that Defendants would have been well-aware of the significant cost overruns and construction delays associated with the Nuclear Projects; according to CW 2, Defendants all had access to detailed information regarding the Nuclear Projects via a program called Sharepoint, such that Defendants would have known about the significant cost overruns and construction delays associated with the Nuclear Projects; according to CW 2 and CW 3, Defendants were provided with weekly and monthly update reports on the Nuclear Projects that contained such information as how much had been budgeted originally, actual dollars spent to date, estimated time to complete, time behind schedule and total cost; and, finally, Defendants' sold CBI's Stone & Webster unit to Westinghouse for no upfront consideration, but instead took a $1 billion loss on the sale for nothing more than a release of liabilities to Westinghouse and the Nuclear Project owners, thereby demonstrating that CBI materially inflated its goodwill by hundreds of millions of dollars.

## XI.    PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

219.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly materially false and misleading statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CBI who knew that those statements were false when made.

## XII.   CLASS ACTION ALLEGATIONS

220.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CBI common stock during the Class Period (the "Class"); and were damaged upon the revelation of the true facts.  Excluded from the Class are Defendants herein, present and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

221.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CBI's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CBI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

222.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

223.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

224.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;
- Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CBI, including the business prospects of CBI and the Nuclear Projects, and CBI's liability for cost overruns;
- Whether the Individual Defendants caused CBI to issue materially false and misleading financial statements during the Class Period;
- Whether Defendants acted knowingly or recklessly in issuing false and misleading statements to investors;
- Whether the prices of CBI's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

225.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

226.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- CBI's common stock is traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and members of the Class purchased, acquired and/or sold CBI common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

227.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XIII. <u>COUNT I: Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder</u>

228.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

229.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

230.     Plaintiffs assert Section 10(b) and Rule 10b-5(a), (b) and (c) claims against all Defendants.

231.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of common stock.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CBI common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire CBI common stock and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set

92

forth herein.

232.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CBI common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CBI's finances and business prospects.

233.     As established by the facts alleged above in ¶¶ 176-200, as well as by virtue of their positions at CBI, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Additional information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

234.     CBI is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondeat superior.*

235.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

CBI.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CBI's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CBI common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning CBI's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired CBI common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

236.    During the Class Period, CBI common stock were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CBI common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of CBI common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of CBI common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

237.    By reason of the conduct alleged herein, Defendants knowingly or recklessly,

directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

238.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

239.     This action was filed within two years of discovery of Plaintiffs' claims, including discovery of the facts necessary to allege that Defendants acted with scienter, and within five years of the purchase on which such claims are based.

## XIV.  COUNT II: Violations of Section 20(a) of the Exchange Act Against Individual Defendants

240.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

241.     During the Class Period, the Individual Defendants directed the daily operation and management of CBI, and directed the financial disclosures and statements to investors regarding, *inter alia*, CBI's business operations, exposure to liability from the Nuclear Projects, and prospects for Stone & Webster.

242.     As described above, the Individual Defendants knew the adverse non-public information about CBI alleged herein.

243.     As officers and, in the case of Defendant Asherman, directors, of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CBI's financial condition and prospects, and to correct promptly any public

statements issued by CBI which had become materially false or misleading.

244.      Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CBI disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CBI to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CBI within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CBI common stock.

245.      Each of the Individual Defendants, therefore, acted as a controlling person of CBI, and by reason of the above conduct, is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CBI.

## XV.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives and Lead Counsel as Class Counsel pursuant to Rule 23(g);

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## XVI.   **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: August 14, 2017

Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

 /s/ Kim E. Miller
Kim E. Miller (KM-6996)
250 Park Ave., Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

-and-

Lewis S. Kahn
Matthew Woodard
206 Covington St.
Madisonville, LA 70447
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Counsel for Lead Plaintiff ALSAR
Partnership, Ltd.
and Lead Counsel for the Class*

**POMERANTZ LLP**
Patrick V. Dahlstrom
Joshua B. Silverman
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184

 /s/ Jeremy A. Lieberman
Jeremy A. Lieberman
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044

*Counsel for Additional Plaintiffs Iron
Workers Local 40, 361 & 417 – Union
Security Funds and Iron Workers Local 580
– Joint Funds*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on August 14, 2017.

/s/ Kim E. Miller

Kim E. Miller