UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_5/24/2018__

-----------------------------------------------------------X
                                                           :
                                                           :
                                                           :
IN RE CHICAGO BRIDGE & IRON COMPAY     :          17 Civ. 1580 (LGS)
N.V. SECURITIES LITIGATION                       :
                                                           :          **OPINION AND ORDER**
                                                           :
                                                           :
-----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

       Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System,

individually and on behalf of all other persons similarly situated, bring this putative class action

against Defendants Chicago Bridge & Iron Company N.V. ("CBI"), Philip K. Asherman, Ronald

A. Ballschmiede and Westley S. Stockton, alleging violation of §10(b) and § 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act").  The case arises from Defendants'

alleged misrepresentations and omissions in CBI's financial statements and elsewhere regarding

losses in CBI's construction of two nuclear plants.  Defendants move to dismiss the Consolidated

Amended Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the following reasons, the motion is denied.

I.     **BACKGROUND**

       The following facts are taken from the Complaint and accepted as true for the purposes of

this motion.  *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

       A.     **Background**

       Defendant CBI is a global engineering, procurement and construction ("EPC") company

headquartered in the Hague, Netherlands.  CBI provides conceptual design, technology,

engineering, procurement and other services, to customers in the energy infrastructure market

worldwide.  At all relevant times, Defendant Asherman was CBI's Chief Executive Officer ("CEO"), Defendant Ballschmiede was its Chief Financial Officer ("CFO") and Defendant Stockton was its Chief Accounting Officer (collectively, the "Individual Defendants").

In July 2012, CBI agreed to purchase the Shaw Group ("Shaw") for approximately $3.3 billion ($2.2 billion net of cash acquired), funded in part with $1.9 billion in debt financing. This sale closed in February 2013.

Shaw's subsidiary, Stone & Webster, had contracted to build a nuclear power plant in Waynesboro, Georgia ("Vogtle Plant") and Jenkinsville, South Carolina ("V.C. Summer Plant") (collectively, the "Nuclear Projects").   Both plants were to include AP1000 nuclear reactors developed by Westinghouse Electric Corporation ("Westinghouse").  These contracts (the "EPC Agreements") provided that Stone & Webster would receive a fixed price for its services.  Stone & Webster was entitled to a change order, resulting in additional compensation above the contract price, only in specified circumstances.

### B. Events during the Class Period

During the period from October 30, 2013, to June 23, 2015, inclusive (the "Class Period"), CBI allegedly made material misstatements and omissions about the Nuclear Projects' repeated delays, cost overruns and resulting deterioration in profitability.  CBI's main fabricating facility in Lake Charles, Louisiana (the "Lake Charles facility") was "the number one reason [the Nuclear Projects] went into cost overruns."  CBI's failure to track and ship materials properly resulted in additional cost overruns and delays.

From May 2011 to 2013, in response to a whistle-blower complaint that a part used in the Nuclear Projects did not meet specifications, the Nuclear Regulatory Commission ("NRC") conducted an investigation at the Lake Charles facility.  On September 16, 2013, the NRC issued

a Confirmatory Order, requiring CBI to adopt a series of internal safety reforms, to which CBI agreed. On January 13, 2014, CBI imposed a Stop Work Order at its Lake Charles facility for three months, due to "systematic problems with production activities, the corrective action program and quality assurance program procedures." CBI represented to NRC that, during the Stop Work period, it had identified and addressed "multiple adverse conditions," including "welder qualification, the qualification and compliance of welding procedures, and documentation of fabrication activities" at the Lake Charles facility.

Throughout the Class Period, the Vogtle and V.C. Summer Plants' owners disputed CBI's claim for change orders due to cost overruns and delays under the EPC Agreements, including through litigation. In May 2015, a Georgia court disclosed CBI's sealed statement that it had "completed an estimate of future damage as a result of Vogtle delays."

Various public news outlets reported the Nuclear Projects' delays, cost overruns and issues with the Lake Charles facility throughout the Class Period. On June 17, 2014, Prescience Point, a research firm, issued a report (the "Prescience Point Report") that concluded Defendants had manipulated contract liabilities and goodwill through purchase price adjustments, lowering the quality of CBI's earnings and distorting its prospects. In response to these reports, CBI issued a press release, held two earnings conferences and issued 10-K's and 10-Q's, disputing the reports' accuracy. For example, in a June 17, 2014, press release, Defendant Asherman stated that the CBI "management team operates our company with the absolute highest integrity, and we take great issue with [these] erroneous claims." In this press release, CBI discouraged investors from crediting the Prescience Point Report and warned that Prescience Point holds "short positions in CBI common stock and [Prescience Point] stand[s] to realize significant gains in the event that CBI's stock price declines."

## C. Events after the Class Period

On October 27, 2015, CBI announced that it would take a $1 billion loss on the sale of its Stone & Webster unit to Westinghouse in exchange for a release of liabilities. On April 28, 2016, pursuant to the sales contract, Westinghouse delivered its post-closing accounting "true up" to CBI. Westinghouse claimed that CBI owed $2.1 billion in disputed liabilities between CBI and Westinghouse, noting that CBI's accounting for liability it faced for the Nuclear Projects was "not recorded in accordance with [Generally Accepted Accounting Principles ("GAAP")]" and that CBI "should have recorded a reserve liability of hundreds of millions of dollars for losses."

On July 21, 2016, in response to Westinghouse's demand for $2.1 billion, CBI filed a complaint in the Delaware Chancery Court barring Westinghouse from making a claim for the $2.1 billion. In this lawsuit, CBI admitted that, as early as February 2015, CBI had begun negotiating a "quitclaim deal" that would relieve it from the liabilities associated with the Nuclear Projects. In June 2017, the Supreme Court of Delaware reversed the Court of Chancery and concluded that Westinghouse had waived its claim against CBI under the sale agreement. On March 31, 2017, Westinghouse filed for Chapter 11 bankruptcy as a result of the Nuclear Projects' liabilities.

## D. The Alleged Material Omissions and Misrepresentations

The Complaint alleges material omissions and misstatements made during the Class Period in violation of § 10(b) of the Exchange Act in: (1) Forms 10-Q and 10-K, (2) Forms 8-K and (3) conference calls with investors and analysts.

The Complaint's allegations of material omissions and misstatements principally fall into three categories. The first category is that CBI recorded unapproved change orders as assets and

revenue in the financial statements contained in its 10-Ks and 10-Qs in violation of GAAP (the "Change Order Statements"). CBI adjusted the contract price on its financial statements to include unapproved change orders, even though in many cases, recovery of those amounts was in dispute and not contractually warranted. For example, in its 10-K for the period ended December 31, 2013, CBI stated, "[c]ontract revenue for our long-term contracts . . . reflects the original contract price adjusted for [among other things] unapproved change orders and claims" and that "recorded unapproved change orders and claims reflect our best estimate of recovery amounts." In fiscal year 2013, CBI recorded approximately $936 million in the project price and recognized revenue of $173 million for unapproved changed orders.

The second category of alleged misstatements involved the overstatement of goodwill in CBI's financial statements contained its Forms 10-Q and 10-K (the "Goodwill Statements"). The overstatement resulted in part from CBI's improper recording of purchase price adjustments in the year following the Shaw acquisition. The Complaint alleges that CBI failed to record an impairment to goodwill to reflect that its carrying value was higher than its fair value, as required by GAAP. As a result, the assets on CBI's balance sheet were overstated throughout the Class Period, and the expenses on its income statement were understated for the periods when the goodwill should have been written down. For example, in its 10-Q for the period ended September 30, 2013, CBI recorded goodwill of approximately $3.75 billion and represented that it had conducted "a qualitative assessment of goodwill to determine whether it was more likely than not that the fair value of a reporting unit was less than its carrying value," and that "no indicators of goodwill impairment were identified and therefore no goodwill impairment charge was recorded." CBI recorded increasing amounts of goodwill and made substantially the same representation in all of its Forms 10-Q and 10-K during the Class Period.

The third category of alleged misstatements concerns the status of the Nuclear Projects and CBI's failure to disclose mounting problems and their impact on profitability during conference calls with investors and analysts (the "Progress Statements"). For example, on April 23, 2014, Defendants CBI and Asherman held a conference call where an analyst asked about "how everything has progressed [with respect to the Nuclear Projects]." Defendant Asherman responded, "[CBI] made some good progress. I am very pleased with the milestone, as I mentioned, on the main module" and that "Lake Charles has gone through some extensive [Nuclear Regulatory Commission] audits recently and I think passed those pretty well." Defendant Asherman did not discuss the January 2014 Stop Work Order during this conference call.

### E.     Scienter

The Complaint alleges scienter based on inferences from the facts summarized above. In addition, the Complaint relies on confidential witnesses ("CWs"). At least three CWs, who worked at the Vogtle and V.C. Summer Plants, including CW 2 who worked as a mechanical engineer, reported that engineering teams filed weekly reports in a company system called Sharepoint, where Defendants could and did access them. These reports detailed (1) cost overruns that dated back to 2009 and continued growing through 2015; (2) overruns and delays caused by the Lake Charles facility's failure to produce conforming materials for the Nuclear Projects; (3) overruns and delays because CBI could not properly track, ship and store materials; and (4) delays caused by the Stop Work Order at the Lake Charles facility.

CW 1, who served as the director of financial operations for CBI Fabrication & Manufacturing from January 2015 until approximately June 2016, and as director of Americas financial operations for CBI Oil & Gas from 2009 through 2014, confirmed that numbers from

CBI's large contracts were discussed at monthly meetings attended by all three Individual Defendants.

CW3, who worked at Shaw prior to its merger with CBI as a sourcing analyst and buyer at the V.C. Summer Plant through June 2015, reported that CBI executives received monthly Excel reports, reflecting the Nuclear Projects' budgets.

### F.    Reliance and Loss Causation

Plaintiffs purchased CBI stock during the Class Period.  Between June 10 and 12, 2014, following unfavorable media reports about safety code violations at the Vogtle and V.C. Summer Plants, cost overruns and unapproved work orders, CBI's stock price decreased from $83.30 to $76.72 per share.  Following the July 17, 2014, Prescience Point Report, CBI's stock price dropped from $74.46 to $68.26 per share.  Following news articles about project delays and cost overruns on the Nuclear Projects, between October 1 and 10, 2014, CBI's stock price dropped from $57.00 to $49.38 per share.  In each case, after further disclosures about delays and related costs, between January 29 and 30, 2015, CBI's stock price dropped from $38.47 to $34.51 per share; on February 4, 2015, CBI's stock price dropped from $37.29 per share to $35.29 per share; on April 23, 2015, CBI's stock price dropped from $51.10 to 48.97 per share; and between June 23 and 27, 2015, CBI's stock price dropped from $54.03 to $49.63 per share.

## II.    STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* (citing *Twombly,* 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016). "The Court . . . may consider a document that is attached to the complaint, incorporated by reference or integral to the complaint, provided there is no dispute regarding its authenticity, accuracy or relevance." *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 423–24 (S.D.N.Y. 2013) (citing *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

Plaintiff asserts claims under § 10(b) of the Exchange Act and its implementing rule, Rule 10b-5. That rule makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To allege a violation of § 10(b) and Rule 10b-5, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). "[T]he plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged

to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u(b)(2)(A).

The six elements of a claim under § 10(b) and its implementing rule, Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 804 (2011); *accord Ind. Pub. Ret. Sys. v. SAIC, Inc*., 818 F.3d 85, 93 (2d Cir. 2016).

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act ("PSLRA")] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. Allegations of fraud may be "too speculative even on a motion to dismiss," particularly when premised on "'distorted inferences and speculations.'" *Id.* at 104 (citing and quoting *Segal v. Gordon*, 467 F.2d 602, 606, 608 (2d Cir. 1972)).

"The PSLRA expanded on the Rule 9(b) standard, requiring that 'securities fraud complaints specify each misleading statement; that they set forth the facts on which [a] belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Anschutz Corp.*

*v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).

The Complaint also asserts a claim under § 20(a) of the Exchange Act. To state a claim under § 20(a), the complaint must sufficiently plead "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays P.L.C.,* 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted). If the Complaint does not allege a primary violation, then the § 20(a) claim must be dismissed.

## III.   DISCUSSION

The issues on this motion are whether the Section 10(b) claim is time barred and whether the Complaint sufficiently pleads two of the six elements of securities fraud – a material misrepresentation or omission, and scienter.

### A.    Statute of Limitations

Because the statute of limitations is an affirmative defense, Defendants carry the burden of showing that Plaintiffs failed to plead timely claims. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("The lapse of a limitations period is an affirmative defense that a defendant must plead and prove." (citing Fed. R. Civ. P. 8(c)(1))). Dismissal based on an affirmative defense at the complaint stage is warranted only if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Id.* (emphasis and internal quotation marks omitted); *accord Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014).

A private right of action under Section 10(b) and 10b-5 may be brought not later than the earlier of two years after the discovery of the facts constituting the violation or five years after the violation. 28 U.S.C.A. § 1658(b). "'Discovery' in this context is stricter than inquiry notice, and occurs when 'a reasonably diligent plaintiff would have sufficient information . . . to adequately plead [its claim] in a complaint.'" *Charles Schwab Corp. v Bank of Am. Corp.*, 883 F.3d 68, 94 (2d Cir, 2018) (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).

The Complaint on its face, taking all inferences in Plaintiff's favor, does not reveal precisely when Plaintiff would have discovered sufficiently detailed information as to every element of its securities fraud claim to satisfy the heightened pleading standard under the PSLRA and Rule 9(b); nor does the Complaint show as a matter of law that all of such facts could been discovered with reasonable diligence before March 2, 2015, two years before the initial complaint was filed. Although there were many news reports of delays and accounting irregularities, Defendants countered those statements throughout the Class Period both explicitly with denials and implicitly by adhering to the same accounting practices. Only with the "quit claim" sale to Westinghouse in October 2015, for no cash consideration and only the release of liabilities, did it become clear to outsiders that the Company's accounting for the Nuclear Projects significantly overstated their value on the CBI financial statements and that senior executives involved with both the sale and the financial statements must have known that fact.

B.    **Section 10(b) Violation**

1. **Material Omissions and Misrepresentations**

As noted above, the first element of a Rule 10b-5 violation is that the defendant made an omission or misstatement of material fact. "[Section] 10(b) and Rule 10b-5 do not create an

affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Sircusano*, 563 U.S. 27, 44 (2011) (internal quotation mark omitted) (quoting Rule 10b-5, 17 C.F.R. § 240.10b-5(b)). A statement or omission is materially misleading when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" to the market. *Id.* at 38 (internal quotation marks omitted).

The PSLRA provides a safe harbor for forward looking statements. *See* 15 U.S.C. § 78u-5(c). While forward looking statements are not actionable so long as they are accompanied by "meaningful cautionary language," a forward looking statement may nonetheless be actionable if made with "actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (describing 15 U.S.C. § 78u-5(c)).

"Financial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate . . .." 17 C.F.R. § 210.4-01. Though "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim[,] . . . where such allegations are coupled with evidence of corresponding fraudulent intent," the allegations might be sufficient to state a claim. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*, 135 S. Ct 1318 (2015), the Supreme Court held that an opinion statement is actionable if (1) the speaker did not hold the belief she professed, (2) the supporting fact[s] she supplied were untrue, or (3) the stated opinion,

though sincerely held and otherwise true as a matter of fact, omitted information whose omission made the stated opinion misleading to a reasonable investor. *Id.* at 1327, 1333.

A statement of fact is objectively verifiable, but a statement of opinion is not. *Axar Master Fund, Ltd. v Bedford*, No. 17 Civ. 0426, 2018 WL 1547093, at *8 (S.D.N.Y. Mar. 29, 2018) (citing *Tongue v. Sanofi*, 816 F.3d 199, 210–11 (2d Cir. 2016)). Because "[i]t is well-settled that GAAP provisions are subject to interpretation and tolerate a range of reasonable treatments, leaving the choice among alternatives to the management," *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) (citing *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979)), *aff'd*, 649 F. App'x 7 (2d Cir. 2016), where there is no objective standard for an accounting decision, that decision should be construed as a statement of opinion and be analyzed under *Omnicare*. *See, e.g., Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (determining adequacy of loan loss reserves "is not a matter of objective fact" but is "inherently subjective"); *In re Deutsche Bank AG Sec. Litig.*, No. 09 Civ. 1714, 2016 WL 4083429, at *23 (S.D.N.Y. Jul. 25, 2016) (finding that the defendants' failure to disclose the company's exposure to subprime and nonprime residential mortgage markets, in violation of GAAP, is not actionable because the plaintiffs failed to meet the *Omnicare* standard).

### a. The Change Order Statements

ASC § 605-35-25-31 states, "Recognition of additional contract revenue relating to claims [based on disputed or unapproved change orders] is appropriate only if it is *probable* that the claim will result in additional contract revenue and if the amount can't be reliably estimated." (emphasis added). The same ASC provides that those two requirements are satisfied "by the existence of all of the following conditions: (a) [t]he contract or other evidence provides a legal basis for the claim . . .; (b) [a]dditional costs are caused by circumstances that were unforeseen . .

13

. and are not the result of deficiencies in the contractor's performance; (c) [c]osts associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed; (d) [t]he evidence supporting the claim is objective and verifiable . . . ." *Id.* At least the first two of these conditions -- legal basis, foreseeability and deficient performance -- require subjective judgments and are therefore assessed under the *Omnicare* standard for opinions.

In its Forms 10-K and 10-Q filed during the Class Period, CBI reported significant amounts of unapproved change orders as assets and revenues, by recording them as contract price adjustments. CBI thus implicitly represented that collecting on these change orders was "probable," and CBI explicitly stated that "recorded unapproved change orders and claims reflect our best estimate of recovery amounts." The Complaint adequately alleges that these statements of opinion were false and that Defendants knew that they were false. The Complaint alleges that CBI knew that its claim for the unapproved change orders was disputed and the subject of litigation, and that CBI lacked a legal basis for the claims, which were the result of deficiencies in CBI's performance. The EPC Agreements provided that CBI was not entitled to recover if the change orders were a result of CBI's failure to comply with NRC standards or failure to produce requisite manufacturing parts. The Nuclear Projects' cost overruns and delays allegedly were due to the Lake Charles facility's failure to produce necessary parts, CBI's Stop Work Order and CBI's inability to properly track and store the manufactured parts.[1]

---

[1] CBI had consortium agreements with Westinghouse, under which Westinghouse was obligated to cover some of the cost overruns. Westinghouse and CBI disputed the scope of Westinghouse's responsibility for the cost overruns. In a February 25, 2014, conference, Defendant Asherman acknowledged the dispute surrounding the unapproved change orders and asserted that CBI would be responsible for at most half of the cost overruns and that Westinghouse would be responsible for the remaining half.

CBI's argument that Plaintiff's allegations are "nothing more than disagreement with [Defendants'] accounting judgment" is rejected. CBI reliance on *N. Collier Fire Control and Rescue Dist. Firefighter Pension Plan and Plymouth Cty. Ret. Assoc. v. MDC Partners, Inc.*, No. 15 Civ. 6034, 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016), for this proposition is inapposite. In *MDC*, the plaintiff alleged that the defendants should have recorded a goodwill impairment because the firm's revenues had declined and a significant client had departed; in effect, the defendants had made a judgment and prediction about an uncertain outcome given these events. *Id.* at *10–11. Unlike the present case, the plaintiff in *MDC* did not allege objective facts that would weigh heavily, if not overwhelmingly, against the outcome that the defendants had predicted. *See id.*

That CBI's accounting drew no objection from its auditors does not change the analysis. The issue on this motion is whether the Complaint states a claim against Defendants, and not what the non-party auditors may have known or believed that caused them to approve the financial statements as being prepared in accordance with GAAP.

### b. The Goodwill Statements

Under SFAS No. 141, goodwill is "an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized." Business Combinations, SFAS No. 141 ¶ 3j (Fin. Accounting Standards Bd. 2007). "[I]t is well-settled in the Second Circuit that goodwill estimates are opinion statements because they depend on management's determination of the fair value of the assets acquired and liabilities assumed, which are not matters of objective fact and will vary depending on the particular methodology and assumptions used." *MDC*, 2016 WL 5794774, at *20 (internal quotation marks omitted); *accord Fait*, 655 F.3d at 110–11. Where an omission is

based on an accounting write down's timing, it is not sufficient to simply allege the write down should have occurred earlier; instead, the complaint must include factual allegations from which a reader could infer Defendants intentionally or recklessly failed to take write downs when they should have. *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (citing *S. Cherry St., L.L.C. v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009)); *accord In re Forcefield Energy Sec. Litig.*, No. 15 Civ. 3020, 2017 WL 1319802, at *13 (S.D.N.Y. Mar. 29, 2017).

Here, the Complaint includes factual allegations that raise an inference that Defendants intentionally or recklessly failed to write down their goodwill accounting. GAAP requires a company to assess goodwill at least annually and whenever "an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." Goodwill and Other Intangible Assets, SFAS No. 142 ¶ 28 (Fin. Accounting Standards Bd. 2001); *see City of Omaha v. CBS Corp.*, No. 08 Civ. 10816, 2010 WL 1029290 at *7 (S.D.N.Y. Mar. 16, 2010), *aff'd sub nom. City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64 (2d Cir. 2012). The Complaint alleges that goodwill was not written down until the sale to Westinghouse, despite known delays, cost overruns, growing liability disputes and CBI's contemplation and eventual execution of a quitclaim deed to relieve itself of liabilities associated with Shaw. These allegations are sufficient to survive a motion to dismiss.

### c. The Progress Statements

The Complaint adequately pleads misstatements and material omission as to the Nuclear Projects' progress. Throughout the Class Period, Defendants represented to investors in conference calls that the Nuclear Projects were meeting its milestones without delay. For example, on April 23, 2014, Defendants CBI and Asherman stated that, "[CBI] made some good

16

progress. I am very pleased with the milestone, as I mentioned, on the main module" and that "Lake Charles has gone through some extensive [Nuclear Regulatory Commission] audits recently and I think passed those pretty well." However, on January 13, 2014, CBI had instituted a Stop Work Order for three months, due to "systematic problems with production activities, the corrective action program and quality assurance program procedures" in its Lake Charles facility. In this Stop Work Order, CBI admitted that that "multiple adverse conditions" had been identified, such as "[the] welder qualification, the qualification and compliance of welding procedures, and documentation of fabrication activities [at the Lake Charles facility]." Failure to disclose the three-month long Stop Work Order makes Asherman's and CBI's statement misleading as to the status of the Nuclear Projects. *See Omnicare*, 135 S. Ct. at 1329 ("If a registration statement omits material facts about the issuer's inquiry into, or knowledge concerning, a statement of opinion, and if those facts conflict with what a reasonable investor, reading the statement fairly and in context, would take from the statement itself, then [that omission] creates liability.").

CBI's argument that the Progress Statements are mere puffery is unpersuasive. Though "[g]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,'" *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014), "there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts," *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010). Unlike in *UBS AG*, where the statements at issue contained qualifiers such as "aims to," "wants to" and "should," 752 F.3d at 183, the Progress Statements here definitively

claimed that CBI "continue[s] to make progress and substantial progress on [the Nuclear Projects]" despite reports of delays, NRC investigations and the three month Stop Work Order.

CBI's argument that the Progress Statements were forward looking statements protected under the PSLRA safe harbor is also unpersuasive. "[I]t is well recognized that even when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010). Here, the Progress Statements included both forward looking aspects -- that CBI does not believe that its pending contractual claims and disputes will have a materially adverse effect on its future results of operations -- and alleged misrepresentation of present fact -- that the Nuclear Projects were achieving important milestones and that CBI passed the NRC investigations successfully.

### 2. Scienter

The Complaint sufficiently pleads scienter as to each Defendant. The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "This standard requires courts take into account 'plausible opposing inferences.'" *Matrixx*, 563 U.S. at 48 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alterations and emphasis in original). In making this determination, a court must review "all the allegations holistically." *Tellabs*, 551 U.S. at 326. A plaintiff may satisfy the scienter requirement by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of

conscious misbehavior or recklessness." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (quoting *ATSI*, 493 F.3d at 99).

Conscious misbehavior "encompasses deliberate illegal behavior," *Novak*, 216 F.3d at 308, whereas recklessness includes "conscious recklessness" or "a state of mind approximating actual intent, and not merely a heightened form of negligence," *S. Cherry St.*, 573 F.3d at 109. A plaintiff adequately pleads recklessness where it alleges that the defendant: (1) knew facts or had access to information contradicting its public statements; or (2) failed to review or check information that it had a duty to monitor. *See Novak*, 216 F.3d at 308. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309). Furthermore, although GAAP violations do not independently sustain an inference of scienter, they may contribute to that inference. *See Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000); *accord Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009).

"To prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." *Teamsters Local 445*, 531 F.3d at 195.

### a. The Individual Defendants' Scienter

The Complaint's allegations of recklessness are sufficient to support an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The Complaint alleges that the Individual Defendants knew

facts or had access to information contradicting the Company's public statements in SEC filings that they signed or certified or in their own oral statements on behalf of the Company. First, the CEO, CFO and Chief Accounting Officer not only had access to the facts underlying the Company's financial reporting, they were responsible for it and attested to its accuracy by signing or certifying the Company's Forms 10-K and 10-Q.

Second, the CWs stated that the Individual Defendants had access to and accessed monthly reports that contained details on (1) cost overruns that dated back to 2009 and that continued growing through 2015; (2) overruns and delays caused by the Lake Charles facility's failure to produce conforming materials for the Nuclear Projects; (3) overruns and delays caused by CBI's inability to properly track and ship materials; (4) overruns and delays caused by CBI's inability to properly store materials; and (5) delays caused by the Stop Work Order on the Lake Charles facility. The Individual Defendants also participated in meetings where the cost overruns and delays associated with the Nuclear Projects were discussed. Defendants' failure to comply with GAAP in their SEC filings bolsters the inference of scienter. *See Rothman*, 220 F.3d at 98.

Third, the monthly reports on Sharepoint, the Stop Work Order, the NRC investigations, and the unapproved change orders in dispute with the Vogtle and V.C. Summers Plants' owners put the Individual Defendants on notice that many of the unapproved change orders should not have been accounted for as additional income or assets.

That some of the CW's lacked direct contact with the Individual Defendants does not undermine their evidence. CW2 and CW3 were not merely opining about facts as to which they had no personal knowledge. Instead they detailed the types of relevant information made available to senior executives via the Sharepoint system, and they confirmed that numbers from

the Company's large contracts were discussed at monthly meetings. These statements taken together are sufficient to raise a strong inference of scienter. *See, e.g., New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13 (2d Cir. 2011) (summary order) (finding that the confidential witness' statement that they "either provided information about rising inventory levels to [the defendants] directly or participated in meetings where they heard [the defendants] informed by others about the company's inventory management problems" raised strong inference of scienter.); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 369 (S.D.N.Y. 2012) (finding that the confidential witnesses' statement that they "told [the defendants] that the financial goals for IS & GS for 2009 were overstated and could not be achieved" and that the defendants had "a practice of submitting 'lowball' bids for contracts in an effort to close contracts, despite knowing that Lockheed Martin could not perform the work it bid on without large cost overruns" raised strong inference of scienter.).

### b. Corporate Scienter

Because the Complaint adequately alleges scienter as to the Individual Defendants, CBI's scienter is inferred from theirs. *See, e.g., Teamsters Local 445*, 531 F.3d at 195 ("[T]he most straightforward way to raise [an inference of requisite scienter] for a corporate defendant will be to plead it for an individual defendant.").

### B. Section 20(a) Violation

As the Court has denied Defendants' Motion to Dismiss Plaintiffs' § 10(b) claim, and Plaintiffs have otherwise adequately alleged a control person violation, Defendants' motion to dismiss Plaintiffs' Section 20(a) claim is denied.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED.  The Clerk of

Court is respectfully directed to close the motions at Docket Nos. 91 and 97.

Dated: May 24, 2018
        New York, New York


**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**