**BAKER BOTTS L.L.P.**

Brian C. Kerr
30 Rockefeller Plaza
New York, NY 10112-4498
Tel: (212) 408-2543
Fax: (212) 259-2543

David D. Sterling (*pro hac vice*)
Rebeca Aizpuru Huddle (*pro hac vice*)
Amy Pharr Hefley (*pro hac vice*)
One Shell Plaza
910 Louisiana
Houston, TX 77002
Telephone: (713) 229-1946
Fax: (713) 229-7946

*Counsel for Defendants*
*Chicago Bridge & Iron Company N.V.*
*Philip Asherman, and Westley Stockton*

**GREENBERG TRAURIG, LLP**

Robert A. Horowitz
MetLife Building
200 Park Avenue
New York, NY 10166
Tel: (212) 801-2194
Fax: (212) 224-6114

James R. Leahy (*pro hac vice*)
Nicole S. Bakare (*pro hac vice*)
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Tel: (713) 374-3500
Fax: (713) 754-3305

*Counsel for Defendant*
*Ronald A. Ballschmiede*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CHICAGO BRIDGE & IRON COMPANY N.V. SECURITIES LITIGATION | ) ) ) ) ) ) |

**CASE NO. 1:17-CV-1580**

Hon. Lorna Schofield

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.      Rule 23 establishes a demanding standard for class certification. ...................................... 2

II.     Individual issues concerning each class member's reliance will predominate. .................. 3

        A.      The Supreme Court-created fraud-on-the-market presumption is rebuttable
                by showing lack of price impact. ......................................................................... 3

        B.      Defendants have rebutted the fraud-on-the-market presumption because
                the alleged misstatements did not have price impact. ............................................ 6

                1.      The alleged misstatements did not cause front-end price impact. .............. 7

                2.      The alleged corrective disclosures show no evidence of price
                        impact. .................................................................................................... 10

III.    Plaintiffs do not satisfy the adequacy requirements of Rule 23(a)(4). ............................ 18

        A.      ALSAR and Ironworkers' failure to disclose their lead plaintiff/lead
                counsel arrangement raises serious concerns as to their adequacy. ...................... 19

        B.      ALSAR has failed to demonstrate its ability to be a class representative. ............ 21

        C.      The Ironworkers have failed to demonstrate their ability to be class
                representatives. ................................................................................................... 22

IV.     Plaintiffs do not satisfy the typicality requirements of Rule 23(a)(3). ............................ 24

        A.      ALSAR's clear conflict of interest subjects it to a unique defense. ..................... 24

        B.      The Ironworkers are subject to unique defenses concerning reliance. .................. 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)...................................................................................................2

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
    568 U.S. 455 (2013)...................................................................................................3

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,*
    597 F.3d 330 (5th Cir. 2010), *vacated on other grounds, Halliburton I,* 563
    U.S. 804 (2011)...........................................................................................................6

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.,*
    879 F.3d 474 (2d Cir. 2018)...............................................................................4, 5, 6

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
    222 F.3d 52 (2d Cir. 2000).................................................................................19, 24

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988)................................................................................................3, 4

*Ceglia v. Zuckerberg,*
    287 F.R.D. 152 (W.D.N.Y. 2012)..............................................................................5

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013).....................................................................................................2

*Conn. Bar Ass'n v. United States,*
    620 F.3d 81 (2d Cir. 2010).........................................................................................5

*Erica P. John Fund, Inc. v. Halliburton Co.,*
    309 F.R.D. 251 (N.D. Tex. 2015) ..............................................................................5

*Erica P. John Fund, Inc. v. Halliburton Co.,*
    563 U.S. 804 (2011)....................................................................................................3

*GAMCO Inv'rs, Inc. v. Vivendi, S.A.,*
    917 F. Supp. 2d 246 (S.D.N.Y. 2013) (Scheindlin, J.) ......................................24, 25

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    903 F.2d 176 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp
    v. Baker,* 137 S. Ct. 1702 (2017)............................................................................24

*Grae v. Corr. Corp. of Am.,*
    2019 WL 266674 (M.D. Tenn. Jan. 18, 2019)...........................................................5

*Grae v. Corr. Corp. of Am.*,
  2019 WL 1399600 (M.D. Tenn. Mar. 26, 2019) ....................................................5

*Greenberg v. Crossroads Sys., Inc.*,
  364 F.3d 657 (5th Cir. 2004) ....................................................................................6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)..............................................................................................3, 4

*Hansberry v. Lee*,
  311 U.S. 32 (1940)....................................................................................................22

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016) ....................................................................................4

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  265 F.R.D. 157 (S.D.N.Y. 2010), *vacated on other grounds*, 689 F.3d 229 (2d
  Cir. 2012) ............................................................................................................5, 14

*In re IMAX Sec. Litig.*,
  272 F.R.D. 138 (S.D.N.Y. 2010) ............................................................................24

*In re Intuitive Surgical Sec. Litig.*,
  2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ........................................................6

*In re Lloyd's Am. Trust Fund Litig.*,
  1998 WL 50211 (S.D.N.Y. Feb. 6, 1998)........................................................19, 23

*In re Monster Worldwide, Inc. Securities Litigation*,
  251 F.R.D. 132 (S.D.N.Y. 2008) ......................................................................19, 22

*In re Moody's Corp. Sec. Litig.*
  274 F.R.D. 480 (S.D.N.Y. 2011) ........................................................................5, 15

*In re NYSE Specialists Sec. Litig.*,
  240 F.R.D. 128 (S.D.N.Y. 2007) ............................................................................19

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)......................................................................................5

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  2017 WL 2062985 (S.D.N.Y. May 15, 2017) ........................................................4

*Kline v. Wolf*,
  702 F.2d 400 (2d Cir. 1983)....................................................................................19

*Levine v. Berg*,
  79 F.R.D. 95 (S.D.N.Y. 1978) ................................................................................23

*Phillips Petrol. Co. v. Shutts*,
   472 U.S. 797 (1985)..............................................................................................22

*Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*,
   2018 WL 1831850 (S.D.N.Y. Apr. 17, 2018).........................................................2

*Savino v. Computer Credit, Inc.*,
   164 F.3d 81 (2d Cir. 1998)...................................................................................19

*Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*,
   224 F.R.D. 353 (S.D.N.Y. 2004) .........................................................................23

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017), *cert. denied*, 138 S. Ct (2018) ..............................4, 5

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)...........................................................................................2, 3

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 23 ..........................................................2, 3, 18, 19, 24

Federal Rule of Evidence 301...............................................................................................4

## INTRODUCTION

The Supreme Court made clear that defendants in Section 10b-5 class actions may rebut the presumption of class-wide reliance by demonstrating the lack of price impact. Defendants have done that here, so the class cannot be certified.

Both Plaintiffs' and Defendants' experts agree that the vast majority of the alleged misrepresentations had no price reaction, and none of the few that did changed the market's perception or provided the market with any new understanding of CB&I's nuclear construction business or the Company's financial condition. Thus, there was no "front-end" price impact.

Likewise, there was no "back-end" price impact. Plaintiffs resort to reverse-engineering their supposed corrective disclosures from dates found by their expert to have had significant price reactions. But none of these ever-shifting disclosures had price impact; for some, the price reaction lacked statistical significance; for others, the supposedly corrective information had previously been disclosed to the market to no price reaction and, therefore, could not have price impact in an efficient market; for most, the supposedly "corrective" information was not corrective at all; and for some, the corrective information did not change the market's perception of CB&I. The absence of price impact is fatal to class certification.

Finally, neither ALSAR nor the Ironworkers is an appropriate class representative—but not for the usual reasons proposed class representatives are challenged. Here, unbeknownst to the Court, when ALSAR and Ironworkers (among others) were competing to be appointed sole lead plaintiff, they cut a secret deal so that if either was appointed lead, it would cut the other in on a 50/50 basis. That deal made a sham of the Court's PSLRA-required lead-plaintiff appointment process, and it is why when the Consolidated Amended Complaint ("Complaint") was filed, the Ironworkers appeared on it out of the ether as an "additional plaintiff" along with their counsel, Pomerantz. Dkt. 84 at 1, 97. Making the situation even more bizarre is that Pomerantz is

currently suing a company called Opko Health, Inc. in a 10b-5 class action, when Robert Fishel—who for all intents and purposes is ALSAR—is an Opko director and a defendant in multiple derivative suits arising out of the 10b-5 suits.

## ARGUMENT

I.    **Rule 23 establishes a demanding standard for class certification.**

A class may not be certified unless a party "'affirmatively demonstrate[s] his compliance' with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). A party seeking to certify a class must "prove . . . *in fact*" the "numerosity, commonality, typicality, and adequate representation" requirements of Rule 23(a). *Wal-Mart*, 564 U.S. at 349, 350 (emphasis in original).

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Here, Plaintiffs assert that class certification is appropriate only under Rule 23(b)(3), which allows for a class to be certified only if "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for the fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

The Supreme Court has described Rule 23(b)(3) as an "adventuresome innovation" that was "designed for situations in which class-action treatment is not as clearly called for" and that requires a "more demanding" showing than Rule 23(a). *Comcast*, 569 U.S. at 34 (internal quotation marks omitted). "Rule 23(b)(3)'s predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and requires that courts "weigh the prevalence of individual issues (i.e., those demanding evidence that varies among class members) against common issues (i.e., those susceptible to generalized class-wide proof")." *Royal*

*Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, 2018 WL 1831850, at *5 (S.D.N.Y. Apr. 17, 2018) (citations omitted) (denying certification under Rule 23(b)(3)). The court must engage in a "rigorous" class certification analysis that may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351.

## II.    Individual issues concerning each class member's reliance will predominate.

### A.    The Supreme Court-created fraud-on-the-market presumption is rebuttable by showing lack of price impact.

To prevail on a 10b-5 claim, a plaintiff must prove "reliance upon the misrepresentation or omission." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 461 (2013) (internal quotation marks omitted). In *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court "held that investors could satisfy this reliance requirement by invoking a presumption that the price of stock traded in an efficient market reflects all public, material information—including material misstatements." *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 263 (2014). To invoke this "fraud-on-the-market" presumption, plaintiffs must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* at 268.

Importantly, "*Basic* itself 'made clear that the presumption was just that, and could be rebutted by appropriate evidence.'" *Id.* at 279-80 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 811 (2011)). As the Second Circuit explained:

> The "fundamental premise" underlying the fraud-on-the-market theory is "that an investor presumptively relies on a misrepresentation" that "was reflected in the market price at the time of his transaction." *Halliburton I*, 563 U.S. at 813, 131 S. Ct. 2179. If defendants "sever[] the link" between the misrepresentation and the market price—by showing, for example, that the misrepresentation was not public, the shares did not trade in an efficient market, or "the misrepresentation in fact did not lead to a distortion of price"—both the theory and the presumption collapse. *Basic*, 485 U.S. at 248, 108 S. Ct. 978.

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 483-84 (2d Cir. 2018) (alterations and emphasis in original). Accordingly, "'[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance' because 'the basis for finding that the fraud had been transmitted through market price would be gone.'" *Halliburton II*, 573 U.S. at 281 (alterations in original) (quoting *Basic*, 485 U.S. at 248). The Second Circuit has held that "defendants must rebut the *Basic* presumption by disproving reliance by a preponderance of the evidence at the class certification stage." *Waggoner v. Barclays PLC*, 875 F.3d 79, 99 (2d Cir. 2017), *cert. denied*, 138 S. Ct, 1702 (2018).[1]

A defendant can rebut the presumption "by showing that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'" *Halliburton II*, 573 U.S. at 263-64. First, a defendant can rebut the presumption with direct "evidence of no 'front-end' price impact"—meaning when an alleged misrepresentation was made, it "had no discernable impact on [the] stock price." *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 779, 782 (8th Cir. 2016); *see also Halliburton II*, 573 U.S. at 279-80 (presumption rebuttable with "evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *4 (S.D.N.Y. May 15, 2017) (noting that a "defendant may rebut the presumption with evidence that the alleged misstatements were not associated with abnormal,

---

[1] In *Waggoner*, the Second Circuit held that Federal Rule of Evidence 301 does not apply to the *Basic* presumption and that defendants must rebut the presumption by a preponderance of the evidence. 875 F.3d at 102-03. However, Rule 301, by its terms, governs all "presumptions in civil cases" "unless a federal statute or these rules provide otherwise." Fed. R. Evid. 301. The fraud-on-the-market presumption is a creature of the courts and has never been incorporated into any federal statute or any other Federal Rule of Evidence, much less a statute or rule that dictates its application. Accordingly, Rule 301 by its express terms applies to the *Basic* presumption, meaning Defendants only bear the burden of production, not persuasion. Given the weight of the evidence presented by Defendants here, however, the burden of proof makes no difference in the outcome.

positive stock-price returns ('front-end price impact')").[2]

Second, a defendant can rebut the presumption with evidence of no "back-end" price impact—meaning there was no decrease in price following a claimed corrective disclosure. Back-end price impact can be disproved with "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff," *Waggoner*, 875 F.3d at 99 (internal quotation marks omitted), including evidence of the following:

- the alleged corrective disclosure caused no statistically significant price drop at the 95% confidence standard. *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269-80 (N.D. Tex. 2015) (denying certification for 5 corrective disclosures that did not cause statistically significant price drops at 95% level); *In re Moody's Corp. Sec. Litig.* 274 F.R.D. 480, 492-93, n.11 (S.D.N.Y. 2011) (presumption rebutted in part by showing "there is no period within the proposed class period ... where a corrective disclosure caused a statistically significant decline in the [stock] price" at 95% level); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 186 (S.D.N.Y. 2010) (presumption rebutted because "Dr. Finnerty's event study does not show a statistically significant price decrease on [2 alleged corrective disclosure dates], measured at the 5% level") (footnote omitted), *vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012).

- the information in the alleged corrective disclosure was previously disclosed without a statistically significant drop in the stock price. *See, e.g.*, *Grae v. Corr. Corp. of Am.*, 2019 WL 266674, at *8-9 (M.D. Tenn. Jan. 18, 2019) (explaining that "[a]n event can only serve the role of a corrective disclosure if it reveal[s] some [previously]-undisclosed fact with regard to the specific misrepresentations alleged" and holding presumption rebutted because information in alleged corrective disclosure was previously disclosed without statistically significant change in stock price), *on reconsideration* 2019 WL 1399600 (M.D. Tenn. Mar. 26, 2019) (granting certification based on new evidence); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (holding that alleged corrective disclosure did not establish price impact because information disclosed "was the subject of continuing media reports" before alleged corrective disclosure date and thus did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint").[3]

---

[2] The Second Circuit has recognized that a lack of front-end price impact alone may not rebut the *Basic* presumption when plaintiffs are proceeding on a "price maintenance theory." *See Waggoner*, 875 F.3d at 104. Plaintiffs' Motion does not argue that a price maintenance theory applies in this case, much less identify any alleged misrepresentations to which the theory would apply. Plaintiffs have therefore waived any such argument. *See Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived."); *Ceglia v. Zuckerberg*, 287 F.R.D. 152, 162 (W.D.N.Y. 2012) ("It is settled . . . that arguments raised for the first time in replying in further support of a motion are generally deemed waived.").

[3] In *Goldman Sachs*, the Second Circuit held that evidence that the market learned the "truth" before an alleged corrective disclosure, without any (statistically significant) accompanying drop in the stock price, was proper

- the alleged corrective disclosure was not, in fact, corrective because it did not reveal a previously concealed truth in an alleged misrepresentation. *See, e.g.*, *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *16 (N.D. Cal. Dec. 22, 2016) (presumption rebutted because alleged corrective disclosures were "not corrective of [the alleged] misrepresentations" and thus were not "a corrective disclosure at all"); *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.* ("*AMSF I*"), 597 F.3d 330, 336 (5th Cir. 2010) (explaining that unless stock price declined "because of the correction to a prior misleading statement, . . . there would be no inference raised that the original, allegedly false statement caused an inflation in the price to begin with"), *vacated on other grounds*, *Halliburton I*, 563 U.S. 804 (2011); *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004) (explaining that *Basic* presumption requires an "actual negative movement in stock price following the release of the alleged 'truth' of the earlier misrepresentation," and that "[t]o raise an inference through a decline in stock price that an earlier false, positive statement actually affected a stock's price, the plaintiffs must show that the false statement causing the increase was related to the statement causing the decrease").[4]

## B.    Defendants have rebutted the fraud-on-the-market presumption because the alleged misstatements did not have price impact.

Plaintiffs allege 16 misstatements and 15 corrective disclosures in support of their claims,

but none supports any link between an alleged misstatement and a price impact on CB&I's stock.

---

evidence of lack of price impact at the class certification stage and not an inappropriate "truth on the market" defense. 879 F.3d at 485-86. The court explained that "[i]f a defendant shows that an alleged misrepresentation did not, for whatever reason, actually affect the market price of defendant's stock, there is no grounding for any contention that the investor indirectly relied on that misrepresentation through his reliance on the integrity of the market price." *Id.* at 486 (internal quotation marks omitted). The court further explained that the "truth on the market" defense "attacks the timing of the plaintiffs' purchase of shares, not price impact," and is established by showing "that the market was already aware of the truth regarding defendants' misrepresentations at the time the class members purchased their shares." *Id.* at 485.

[4] Critically, this correctiveness inquiry is agnostic about the truth or falsity of the alleged misrepresentation. Because whether a statement is a misrepresentation (*i.e.*, false or misleading) has no bearing on whether it affected the market price, it is irrelevant to price impact. The correctiveness of a disclosure, however, is central to whether the resulting price decline is evidence that the earlier misrepresentation had price impact. *AMSF I*, 597 F.3d at 336 (explaining that unless stock price declined "because of the correction to a prior misleading statement[,] . . . there would be no inference raised that the original, allegedly false statement caused an inflation in the price to begin with"). Indeed, if courts did not consider whether the alleged corrective disclosure actually *corrected* an earlier alleged misrepresentation, plaintiffs could obtain class certification by pointing to any day in the class period on which there was a disclosure of company-specific information followed by a statistically significant stock-price drop. For example, after the FDA rejects approval for a new drug, a pharmaceutical company is sued for misrepresenting the likelihood of obtaining FDA approval. During the class period, the company lost a patent infringement suit that invalidated the patent on its blockbuster product, causing a statistically significant stock price drop. If in the motion for class certification the plaintiff labels that news a corrective disclosure of the likelihood of FDA approval of the new product, the court would have to certify a class. As another example, following the announcement of an earnings restatement, a retailer is sued for misrepresenting its financial results. During the class period, the retailer announced a merger, and the market reaction was highly negative. If courts did not consider correctiveness, all the plaintiff would have to do to certify a class is label the news of the merger a corrective disclosure of the misstated financial results in her class certification motion.

This lack of price impact is confirmed by the analysis of Defendants' expert, Lucy Allen.[5] *See* Ex. 1. Allen's analysis (like that of Plaintiffs' expert, Dr. Finnerty) shows that that no statistically significant price movement occurred after most of the alleged misstatements and corrective disclosures. Ex. 1 ¶ 28. Her analysis also confirms that the market neither changed its view of the subject matter of the alleged misstatements after they were made nor had a new understanding of the subject matter of the alleged misstatements after the alleged corrective disclosures. *Id.*

Notably, Allen's analysis demonstrates that Plaintiffs' Motion adopts new corrective disclosures never mentioned in the Complaint, in a transparent attempt to cherry pick statistically significant price reactions. *Id.* ¶ 30. The new alleged corrective disclosures do not correspond to the alleged misrepresentations, and in at least one instance, the alleged corrective disclosure on its face expressly contradicts Plaintiffs' argument that it relates to the Nuclear Projects. *See infra* 16. Further supporting the lack of price impact is the fact that there was *no market reaction* on the date of the last alleged corrective disclosure marking the end of the Class Period—when Plaintiffs claim the market became fully aware of the "truth" regarding CB&I's financial condition—and that CB&I's stock price *increased* when the Company announced the sale of its stake in the Nuclear Projects and the resulting write down of goodwill. Ex. 1 ¶¶ 33-36.

### 1. The alleged misstatements did not cause front-end price impact.

Plaintiffs allege that CB&I made 16 separate misrepresentations on 10 dates during the class period.[6] The Complaint lumps them into seven categories; Allen's Report groups them into four. *See* Compl. ¶ 5; Ex. 1 ¶ 39. Allen's Report establishes that that there was no price impact— thus "severing the link" between the alleged misrepresentation and the price—in several ways.

---

[5] Allen's report is attached as Exhibit 1 to the Declaration of Brian C. Kerr.

[6] Appendix C to the Allen Report individually summarizes the alleged misrepresentations. *See* Ex. 1, App. C.

Her event study, which was modestly different from Dr. Finnerty's, showed no statistically significant price reaction on 7 of the 10 dates (as did Dr. Finnerty's). Ex. 1 ¶ 42.[7] Allen also compared the alleged misrepresentations to prior public statements and analyzed commentary by market analysts to determine whether there was any evidence that any price increase was caused by the alleged misstatements. *Id.* ¶ 43. Allen analyzed the four categories of alleged misstatements and concluded that there was no price impact as to any alleged misrepresentation. *See id.* ¶¶ 56-109.

Category 1: Alleged misstatements related to CB&I's liability from cost overruns and the effect of delays with the Nuclear Projects on CB&I's stock price. *Id.* ¶¶ 56-74. Allen analyzed the market reaction following the alleged misstatements and the alleged corrective disclosures and determined that (a) most had no statistically significant price movement, and (b) there was no link between the alleged misstatements and any change in market analysts' opinions of whether CB&I would be liable for cost overruns, nor was there a link between the alleged misstatements and analysts' valuations of CB&I's stock. *Id.* ¶¶ 56-66. Allen also determined that neither the alleged misstatements nor the alleged corrective disclosures changed the market's perception about the effect of delays on CB&I's profitability. *Id.* ¶¶ 67-74. To the contrary, both before and during the alleged class period, CB&I disclosed—and the market understood—that

---

[7] Allen analyzed CB&I's stock price movement using both the event study methodology used by Plaintiffs' expert as well as an alternative event study methodology. Ex. 1 ¶ 26. The alternative event study model accounts for the fact that the volatility of CBI's stock changed substantially during the alleged Class Period, which Plaintiffs' expert noted in his report. *See* Finnerty Rpt. ¶ 56 & Ex. 7. The primary difference between the two models is that rather than using as the control period in the regression the entire alleged Class Period, over which there is a large change in the volatility of CB&I's stock price, Allen's model uses a shorter control period around each event. Ex. 1 ¶ 26. In addition, instead of using a modified Fama-French Three Factor Model, as Plaintiffs' expert did, Allen used a market model consistent with her standard practice. *Id.* Allen's study also makes a multiple comparison adjustment, which accounts for an issue that arises when a large number of price reactions are tested for statistical significance, since the more price reactions that are tested, the greater the probability of finding statistical significance simply due to chance. *Id.* ¶ 41. A standard and commonly accepted method to correct for the multiple comparisons problem is the Holm-Bonferroni adjustment. *Id.* The Holm-Bonferroni adjustment is based on the number of tests performed, so that the overall statistical significance takes into account the number of tests performed and adjusts the statistical threshold of individual tests accordingly. *Id.*

delays with the Nuclear Projects could affect CB&I's stock price. *Id.*

Category 2: Allegations that CB&I inflated its earnings and goodwill and violated GAAP. *Id.* ¶¶ 75-90. Allen determined that none of these alleged misstatements had price impact because the accounting treatment about which Plaintiffs complain was publicly disclosed, well understood by the market, never revised or restated, and had no effect on CB&I's cash flows. *Id.* In fact, Plaintiffs' argument on this issue fundamentally undermines their reliance on the *Basic* presumption in two ways. First, in an efficient market, the only information that affects a company's stock price is information that affects expectations of the discounted value of that company's future cash flows. *Id.* Indeed, Plaintiffs' expert made this point in a book he published. *Id.* Second, in an efficient market, only "new news" can have price impact; if news that is not new did, that is proof that the market was not efficient. *Id.* ¶¶ 29, 82.

Category 3: Allegations that CB&I misrepresented the progress of the Nuclear Projects and failed to disclose improper work practices and fabrication issues. *Id.* ¶¶ 91-103. Allen's analysis confirms that these alleged misrepresentations did not have price impact because (a) the market was aware of manufacturing issues at the Lake Charles facility before the alleged class period, and information about these issues continued to be reported to the market and commented on by analysts during the alleged class period, with no statistically significant reaction to CB&I's stock price, and (b) the alleged corrective disclosures did not provide the market with any new understanding of the progress of the Nuclear Projects at an earlier time or when the alleged misrepresentations were made. *Id.*

Category 4: Alleged misstatements regarding a 1Q14 stop work order and CB&I's plans to sell the Nuclear Projects. *Id.* ¶¶ 104-109. With respect to the alleged misstatements regarding the stop work order, Allen determined that there was no price impact because (a) there was no

statistically significant reaction in CB&I's stock price to the June 10, 2014 disclosure that Plaintiffs (incorrectly) claim revealed the stop work order, and (b) there was no statistically significant reaction in CB&I's stock price when the 1Q14 stop work order was actually disclosed on April 30, 2014. *Id.* ¶¶ 104-08. Regarding the alleged misstatements concerning CB&I's plans to sell its stake in the Nuclear Projects, Allen determined there was no price impact because CB&I's purported plans were not disclosed by any alleged corrective disclosure, and CB&I's stock actually increased when CB&I's sale of the Nuclear Projects was announced. *Id.* ¶ 109.

### 2.    The alleged corrective disclosures show no evidence of price impact.

Plaintiffs allege that CB&I's "misrepresentations and fraudulent conduct" were "revealed" through a series of 15 corrective disclosures between June 14, 2014 and June 23, 2015. Compl. ¶ 201. Allen analyzed each to determine whether there was a link between CB&I's stock price and the alleged misrepresentations. Ex. 1 ¶¶ 110-14. Allen's analysis shows that there is no evidence of price impact because the market's view of the alleged misrepresentations or CB&I's financial condition when the alleged misrepresentations were made did not change after any of the alleged corrective disclosures. In fact, after several of them, analysts did not even release reports on CB&I or discuss the allegedly corrective information. *Id.* In those instances when they did issue reports, analysts expressed the same opinions about the subject matter of Plaintiffs' allegations (*e.g.*, about CB&I's liability from cost overruns at the Nuclear Projects) after the alleged corrective disclosures as they had before, demonstrating that the alleged corrective disclosures did not change the market's perception about CB&I's prior statements and, thus, that the alleged misrepresentations did not have price impact when made. *Id.*

Allen also analyzed whether there was a statistically significant reaction to CB&I's stock following the corrective disclosures. *Id.* ¶¶ 113-14. Allen's event study shows that there was no statistically significant reaction in CB&I's stock price following 9 of the 15 alleged corrective

disclosures.[8] *Id.* ¶ 114. After making a multiple comparisons adjustment, Allen determined that there was no statistically significant reaction in CB&I's stock price following 12 of the 15 alleged corrective disclosures. *Id.* For the alleged corrective disclosures that were followed by significant reactions, Allen's analysis shows, based on an analysis of the market reaction (price reaction and analyst commentary or change in analysts' valuation) and Plaintiffs' claim of an efficient market, that the price reaction could not be economically attributed to the alleged misrepresentations and, therefore, that the alleged corrective disclosures provide no evidence of price impact. *Id.* ¶ 113. Lack of price impact as to each alleged corrective disclosure is briefly summarized as follows:

*SNL Generation Markets Week news article (June 10, 2014)*: Plaintiffs allege that this article disclosed that "Georgia Power had refused to accept certain components fabricated for the new nuclear reactors," "that CBI and its consortium partner Westinghouse were liable for hundreds of millions of dollars in delays and cost overruns," and that there was a "three-month stop work order in CBI's Lake Charles, Louisiana facility." Compl. ¶¶ 9, 202. Allen's analysis shows that this alleged corrective disclosure provides no evidence of price impact because (a) there was no statistically significant reaction in CB&I's stock price after the article's publication, (b) identical articles were published on June 4 and June 9, 2014, to no statistically significant price reaction, and (3) after the June 10 article's publication, there was no analyst commentary on the allegedly corrective information or change in analyst valuations of CB&I's stock. Ex. 1 ¶¶ 115-20.

*SNL Power Daily news article (June 11, 2014)*: Plaintiffs allege that this article

---

[8] Before adjusting for multiple comparisons, Allen's model shows statistically significant price reactions following 6 of the 15 alleged purported disclosures and Finnerty's model shows statistically significant price reactions following 7 of the 15 alleged disclosures. *See* Ex. 1 ¶ 114. After adjusting for multiple comparisons, Allen's model shows statistically significant price reactions following 3 of the alleged corrective disclosures and Finnerty's model shows statistically significant price reactions following 4 of the alleged disclosures. *Id.*

disclosed that "Georgia Power was aggressively litigating its position that the construction contractors, particularly CBI at the Georgia nuclear construction site [Vogtle], were responsible for cost overruns and that resolution of disputes between the parties would be increasingly difficult," and that a report by the credit ratings agency Moody's issued two days prior (on June 9) had stated that CBI and Westinghouse intended the Nuclear Projects to be "unprofitable 'loss leaders' intended to jump start implementation of the AP1000 modular reactor design and lead to future, hopefully more profitable work." Compl. ¶ 127. This alleged corrective disclosure provides no evidence of price impact because after the article's publication, there was (a) no statistically significant reaction in CB&I's stock price, and (b) no analyst commentary on the allegedly corrective information or change in analyst valuations of CBI's stock. Ex. 1 ¶¶ 121-24.

*Vertical Research Report (June 11, 2014)*: Plaintiffs argue that this new purported corrective disclosure (not mentioned in the Complaint) disclosed "concerns" related to CB&I's accounting for the Shaw acquisition, including that CB&I's contracts in progress had "deteriorated by a meaningful amount" and goodwill had "increased significantly" between 1Q13 and 4Q13. Finnerty Report, App. C ¶ 23. This report was corrective of nothing; it simply criticized CB&I's accounting treatment (which was never revised or restated) and remarked on the disparity between CB&I's earnings and cash flows, as made plain in CB&I's SEC filings. Ex. 1 ¶¶ 125-31. Beyond that, Allen's analysis shows that this alleged corrective disclosure provides no evidence of price impact because the allegedly corrective information was based entirely on previously disclosed, publicly available information, and, in an efficient market, only new news should affect a security's price. *Id.* ¶¶ 114-32. In addition, after making an adjustment for multiple comparisons, there was no statistically significant reaction in CB&I's stock price following the publication of the report using either expert's model. *Id.* ¶ 132.

***Prescience Point Report (June 17, 2014)***: Plaintiffs argue this short-seller's report disclosed that CBI had "improperly accounted for its goodwill," that "CBI's purchase price accounting masked its credit risk, and that "CBI failed to disclose its fabrication problems." Finnerty Report, Ex. 8. A naked accusation by a short seller of improper accounting can hardly be a "corrective" disclosure when the analyst community subsequently confirmed the propriety of the accounting and the accounting was never revised or restated. Ex. 1 ¶¶ 138-40. In addition to lack of correctiveness, Allen's analysis shows this alleged corrective disclosure provides no evidence of price impact because the allegedly corrective information regarding CBI's accounting and fabrication issues in the Prescience Point report was previously disclosed and known to the market. *Id.* ¶¶ 133-40. In fact, the report explicitly stated that all facts relied upon are based on publicly available information. *Id.* ¶ 134; *see also* Ex. 2, Decl. of Eiad Asbahi ¶ 5, Ex. A at 3. Further, although CB&I's stock price declined following the report, analysts attributed the price decline not to the allegedly corrective information about CB&I's goodwill or the divergence between CB&I's net income and cash flow, but to the market's concern over the suggestion that CB&I might be required to write down its goodwill immediately or restate its financials, which would affect the its liquidity position and require it to raise more capital. Ex. 1 ¶ 137.

***CB&I's 2Q14 Form 10-Q (July 24, 2014)***: Plaintiffs allege that CB&I's 2Q14 10-Q disclosed "a growing disparity between cash flows and non-cash earnings, validating Prescience Point's hypothesis." Compl. ¶ 134. This, too, was not "corrective," as CB&I never said that there would not be a growing disparity between cash flows and non-cash earnings. Moreover, Allen's analysis shows that this alleged corrective disclosure provides no evidence of price impact because before the 2Q14 10-Q, the market was aware of the divergence between CBI's cash flow

and earnings, and before CB&I's 2Q14 earnings announcement, analysts expected CB&I to announce negative cash flow for the quarter. Ex. 1 ¶¶ 141-47. Although CB&I's stock did decline after the 2Q14 10-Q was filed, analysts attributed the decline to lower-than-expected project margins and fewer-than-expected new project awards. *Id.* ¶ 146. Analysts also reiterated their belief that CB&I's accounting (and the divergence between its earnings and cash flow in particular) was permitted under GAAP. *Id.* ¶ 147.

***Associated Press news article (October 1, 2014)***: Plaintiffs allege this article disclosed that CB&I had "promised to better train its employees [at Lake Charles] after investigators accused three workers of cheating on a qualification test four years ago." Compl. ¶ 205. How this statement was corrective of anything is a mystery. In any event, Allen's analysis shows that this alleged corrective disclosure provides no evidence of price impact because after the article's publication, there was (a) no statistically significant reaction in CB&I's stock price, and (b) no analyst commentary on the allegedly corrective information or change in analyst valuations of CB&I's stock. Ex. 1 ¶¶ 148-51.

***SCANA press release (October 2, 2014)***: Plaintiffs argue this press release disclosed that "the V.C. Summer project may cost an additional $1.2 billion to complete and that CBI could be responsible for the project delay and cost overruns." Finnerty Report, Ex. 8. Once again, there was nothing "corrective" about this; the amount was new but not corrective news, and the SCANA position was old news. Ex. 1 ¶ 156. And Allen's analysis shows that the this alleged corrective disclosure provides no evidence of price impact because after the press release, there was (a) no statistically significant reaction in CB&I's stock price,[9] and (b) no change in analysts'

---

[9] Plaintiffs' expert found a statistically significant reaction to the SCANA press release only at the 10% level, *see* Mot. at 17, which courts routinely hold is not sufficient to show price impact. *See, e.g., In re Am. Int'l Grp. Sec. Litig.*, 265 F.R.D. at 186 (presumption rebutted because "Dr. Finnerty's event study does not show a statistically significant price decrease on [2 alleged corrective disclosure dates], measured at the 5% level") (footnote omitted);

views of whether CB&I would be liable for cost overruns. *Id.* ¶¶ 152-60.

*The State news article (October 2, 2014)*: Plaintiffs allege this article disclosed that "the V.C. Summer project may cost an additional 1.2 billion to complete" and that "CBI could be responsible for hundreds of millions of dollars for delays and cost overruns." Compl. ¶ 206. Again, this could not be considered "corrective" of anything, and Allen's analysis shows that this alleged corrective disclosure provides no evidence of price impact because after the article, there was (a) no statistically significant reaction in CB&I's stock price, and (b) no analyst commentary on the allegedly corrective information. Ex. 1 ¶¶ 161-64.

*Associated Press news article (October 3, 2014)*: Plaintiffs allege this article disclosed that "the costs for V.C. Summer "could grow by more than $1 billion . . . in a blow to a nuclear industry hoping it can control construction spending." Compl. ¶ 142. This too was not "corrective," and Allen's analysis shows that this alleged corrective disclosure provides no evidence of price impact because after the article's publication, there was (a) no statistically significant reaction in CB&I's stock price, and (b) no analyst commentary on the allegedly corrective information. Ex. 1 ¶¶ 165-68.

*Georgia Public Service Commission Testimony (November 21, 2014)*: Plaintiffs allege that testimony by experts from Georgia Power disclosed that there continued to be "various stop work orders" at the Lake Charles Facility, that CB&I and Westinghouse has not provided an updated construction schedule for Vogtle, and that Georgia Power intended to "hold the consortium accountable for those schedules and methods and processes." Compl. ¶ 153. Once again, there was nothing "corrective" about this information, and Allen's analysis shows that this

---

*In re Moody's Corp. Sec. Litig.* 274 F.R.D. at 493 n.11 (rejecting argument that price movement at 90% level establishes price impact because it is "below the conventional statistical measure of a 95% confidence level and therefore is not sufficient evidence of a link between the corrective disclosure and the price"). Finnerty's analysis also shows no statistical significance after the multiple comparisons adjustment. Ex. 1 ¶ 117.

alleged corrective disclosure provides no evidence of price impact because after the testimony, there was (a) no statistically significant reaction in CB&I's stock price, and (b) no analyst commentary on the allegedly corrective information. Ex. 1 ¶¶ 169-72.

*Investment Recommendation Downgrade by Goldman Sachs (November 24, 2014)*: Plaintiffs argue that this analyst report (which was never mentioned in the Complaint) downgraded CB&I's stock after testimony disclosed that "CBI's practices at Vogtle 'run[] counter to any prudent project management, nuclear or otherwise,'" Mot. at 18, which revealed the truth about the alleged misstatements. However, the purported disclosure bears no relation to the alleged misstatements and appears to have been selected solely because it was followed by a statistically significant price reaction. *See* Ex. 1 ¶¶ 173-77. Indeed, the Goldman Sachs report stated that the downgrade was because of a "significant deterioration in the global LNG award cycle" and a "challenging outlook for upstream oil & gas and government services," and even expressly stated that "Our call is not a view on CBI's outstanding litigation and customer negotiations around US nuclear projects." *Id.* ¶¶ 175-76.

*Southern Company Form 8-K (January 29, 2015)*: Plaintiffs allege that Southern Company's January 29, 2015 Form 8-K disclosed that "construction on the Vogtle nuclear plants was delayed by 18 months which would cause $720 million in additional costs." Compl. ¶ 208. This was not "corrective." And although CB&I's stock price declined following the January 29 announcement, Allen's analysis shows that market analysts expressed the same opinions about whether CB&I would be liable for cost overruns after the alleged corrective disclosure as they did before. In other words, the 8-K did not change analysts' perceptions about whether CB&I would be liable for cost overruns, which is contrary to a link between the alleged misrepresentations and CB&I's stock price and shows lack of price impact. Ex. 1 ¶¶ 178-82.

**Southern Company conference call (February 4, 2015)**: Plaintiffs allege the conference call "elaborated on the delay and costs" at Vogtle announced in Southern Company's January 29, 2015 8-K a few days earlier. Compl. ¶¶ 157, 209. This cannot be considered "corrective" of any alleged misrepresentation. Further, Allen's analysis shows that this alleged corrective disclosure provides no evidence of price impact because the purportedly corrective information was previously disclosed in Southern Company's 8-K, and, in an efficient market, news that has already been publicly disclosed should not impact the market or cause a statistically significant price reaction. Ex. 1 ¶¶ 183-85. Allen's analysis also shows that there was no analyst commentary on the allegedly corrective information or change in analyst valuations of CB&I's stock after the conference call, which shows no evidence of price impact of the alleged misrepresentations. *Id.* ¶ 186. Allen's analysis also showed no statistically significant decline in CB&I's stock price following Southern Company's conference call. *Id.* ¶ 187.

**Macquarie analyst report (April 23, 2015)**: Plaintiffs allege that this analyst report disclosed that that CB&I's cash flow generation was "struggling" due to "cash burn associated with the nuclear contracts," that "management removed free cash flow from their compensation metrics," and that Macquarie believed CB&I "will be responsible for part of the cost overrun." Compl. ¶ 210. Once more, there was nothing "corrective" about this information. In addition, the alleged disclosure provides no evidence of price impact because the allegedly corrective information in the report was already publicly disclosed by the same Macquarie analysts in prior reports on CB&I and, therefore, should not impact the market or cause a statistically significant price reaction in an efficient market. Ex. 1 ¶¶ 188-89. Finally, after adjusting for multiple comparisons, there was no statistically significant reaction in CB&I's stock price following the publication of the Macquarie analyst report using both event study models. *Id.* ¶ 190.

*Macquarie analyst report (June 23, 2015)*: Plaintiffs allege that this analyst report was the "final" corrective disclosure that revealed the truth about the alleged misrepresentations and removed the remaining artificial inflation in CB&I's stock price. Compl. ¶¶ 1, 175. Plaintiffs allege that the report disclosed that "continuing delays by the consortium could cause Georgia Power Company to lose $522 million in production tax credits, which would boost the overall cost overrun to $2.5 billion" and that the Macquarie analysts believed it was "'unlikely' that CB&I would escape liability for the cost overruns." *Id.* ¶ 212. Allen's analysis shows that there was no statistically significant reaction in CB&I's stock price after the report, which alone demonstrates the alleged misrepresentations did not have price impact. Ex. 1. ¶¶ 191-94. Allen's analysis also shows that the allegedly corrective information was already publicly disclosed by the same Macquarie analysts in prior reports and, therefore, should not cause a statistically significant price reaction if the market for CB&I stock was efficient. *Id.* ¶ 194.

## III.   Plaintiffs do not satisfy the adequacy requirements of Rule 23(a)(4).

Plaintiffs have failed to show by a preponderance of the evidence that they "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). To the contrary, discovery has revealed that the class representative/class counsel situation is beyond strange:

- ALSAR and the Ironworkers were among the shareholders seeking appointment to be sole lead plaintiff and, in that process, took potshots at each other.

- But unbeknownst to the Court (or anyone else), they had entered into a secret deal, whereby if either was appointed lead plaintiff, it would cut the other in on a 50/50 basis.

- As a result, after the Court appointed ALSAR as sole lead plaintiff (and Kahn Swick as sole lead counsel), the Ironworkers appeared in the Complaint as an "additional plaintiff" (along with their counsel, Pomerantz).

- On top of that, (a) the Ironworkers know remarkably little about this litigation, and they invested in CB&I through a money manager that describes its investment philosophy as "A Counterpoint to the Efficient Market Hypothesis"; and (b) ALSAR has developed a disabling conflict by virtue of its sole shareholder becoming a named defendant in numerous derivative suits over alleged 10b-5 violations by a company on whose board of

directors he serves—including a 10b-5 suit filed by Pomerantz.

Given these highly unusual circumstances, neither proposed class representative can meet its

Rule 23(a)(4) burden.[10]

>    **A.    ALSAR and the Ironworkers' failure to disclose their lead plaintiff/lead**
>    **counsel arrangement raises serious concerns as to their adequacy.**

ALSAR and the Ironworkers were two of six CB&I shareholders that sought and litigated

the appointment of lead plaintiff under the PSLRA. To that end, the Ironworkers submitted a

Joint Declaration to the Court that stated:

> Ironworkers did not choose to join with any other plaintiffs or plaintiff groups as
> we do not have any prior relationship with plaintiffs other than one another, and
> *do not believe that joining into a mega-group after filing our motion for*
> *appointment as lead plaintiff here would be appropriate or consistent with the*
> *PSLRA*. Having *one close-knit group* of plaintiffs with a relationship that pre-
> exists any relationship with litigation counsel (i.e., Pomerantz), as well as the
> assistance of our personal counsel (i.e., Colleran O'Hara), will assure greater
> oversight of counsel as required by courts in class actions than a mega-group of
> unrelated plaintiffs and multiple lead, liaison and other plaintiffs' counsel.
> Moreover, *having one law firm (Pomerantz) represent the class will reduce*
> *redundancy and costs to the class, which is in the best interests of the class*.

Dkt. 37-4, ¶ 12 (emphases added). Meanwhile, ALSAR told the Court that it should be *sole* lead

plaintiff and its counsel should be *sole* lead counsel and claimed that the Ironworkers were

"unsuitable" because they had "overstated" their losses, were an "improperly aggregated,

---

[10] The Rule 23(a)(4) adequacy inquiry addresses more than simply whether the interests of a purported class representative are "antagonistic" to those of the class. Courts also consider "the honesty and trustworthiness of the named plaintiff," *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (affirming denial of class certification); whether the lead plaintiff possesses "a minimum threshold of knowledge about the case which, considering the nature of the claim, is sufficient to make reasonable decisions at critical stages of the litigation," *In re Lloyd's Am. Trust Fund Litig.*, 1998 WL 50211, at *11 (S.D.N.Y. Feb. 6, 1998); and whether a proposed class representative "could become the focus of cross-examination and unique defenses at trial, to the detriment of the class," *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 144 (S.D.N.Y. 2007) (internal quotation marks omitted). As recognized in *In re Monster Worldwide, Inc. Securities Litigation*, "[a] class representative must not simply lend[] his name to a suit controlled entirely by the class attorney, as the class is entitled to an adequate representative, one who will check the otherwise unfettered discretion of counsel in prosecuting the suit." 251 F.R.D. 132, 135-36 (S.D.N.Y. 2008) (internal quotation marks omitted) (second alteration in original). Thus, class representation status may be denied "'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys,'" *Id.* at 135 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000)), or where there are serious concerns about a plaintiff's credibility, diligence, and integrity. *See Kline v. Wolf*, 702 F.2d 400, 402-03 (2d Cir. 1983) (denying certification due to such concerns).

lawyer-driven group," and had submitted inaccurate data to the Court that raised "questions as to whether the proposed class representative and its counsel are adequate to represent the putative Class in this litigation." *See* Dkt. 50 at 2, 7-9.

On June 13, 2017, the Court held a conference and ruled on the competing motions, appointing ALSAR as sole lead plaintiff and Kahn Swick as sole lead counsel. Dkt. 68. But what both ALSAR and the Ironworkers failed to tell the Court was that a week *before* appearing for that conference, ALSAR and the Ironworkers had already agreed to jointly prosecute this case on an equal basis if either was appointed lead. Specifically, their agreement states:

> This writing will confirm our agreement relating to the prosecution of the [CBI] putative class action securities litigation. As we discussed, our firms, Kahn Swick & Foti, LLC, ("KSF") and Pomerantz LLP ("Pomerantz"), and our respective clients Alsar Limited Partnership ("Alsar") and Ironworkers Locals 40, 361, 417, 580 ("Ironworkers"), agree that in the event any of our respective clients (including a subset or single member of Ironworkers) is appointed lead plaintiff and the selection as lead counsel of KSF or Pomerantz is approved by the Court, KSF and Pomerantz will split any attorney fee awarded by the Court 50/50. In the event local counsel must be retained, any fee to local counsel will come off the top.

Ex. 3, Agreement, dated June 8, 2017.[11] The PSLRA authorizes the Court, not those vying for lead plaintiff status, to select the appropriate lead plaintiff and counsel. ALSAR and the Ironworkers' decision that they should be *de facto* co-lead plaintiffs and have another set of *de facto* co-lead counsel—despite having argued that the opposite was appropriate—and their failure to disclose their arrangement to the Court (then or since) raises serious questions about their ability to fulfill their obligations as class representatives and creates a potential appearance of impropriety.[12] Their motion to be certified as class representatives should be denied.

---

[11] Although Plaintiffs may claim that the Court is aware of the arrangement by virtue of the two sets of plaintiffs and law firms appearing on the Consolidated Amended Complaint and filings thereafter, the fact remains that neither ALSAR nor the Ironworkers has ever informed the Court of their agreement.

[12] The relevant excerpts of Plaintiffs' testimony about the hidden fee arrangement are attached to the accompanying Kerr Declaration. *See* Ex.4, Sabbagh Dep. 166:13-167:4, 167:9-25, 169:15-170:11; Ex. 5, Doherty Dep. 174:10-12, 174:15-175:5, 180:6-181:7; Ex. 6, Fishel Dep. 252:16-17, 252:20-22.

### B.      ALSAR has failed to demonstrate its ability to be a class representative.

This Court placed its confidence in ALSAR to be the lead plaintiff on behalf of CB&I shareholders, but ALSAR has not demonstrated an ability to adequately serve the interests of the proposed class. As Plaintiffs acknowledge, a proposed representative cannot adequately protect the class if its interests are antagonistic to or in conflict with the objectives of those being represented. *See* Mot. at 8-9. ALSAR is fundamentally conflicted in carrying out its fiduciary duties in this case.

ALSAR's sole shareholder is Dr. Robert Fishel. Since April 2018, Dr. Fishel has been a director of a public company, Opko. Opko and its CEO Philip Frost were among the defendants accused of participating in a "pump and dump" scheme in a civil enforcement action brought by the SEC in September 2019. *See SEC v. Honig*, 1:18-cv-08175-ER (S.D.N.Y.). Opko and Frost settled the action in January 2019, agreeing to monetary penalties and a series of governance changes. *Id*. at Dkt. 77-78. When the SEC action was announced in September 2018, however, Opko's share price fell, and numerous class actions followed, asserting 10b-5 claims based on numerous alleged false and misleading statements during the September 26, 2013—September 7, 2018 period.[13] Although Dr. Fishel is not a defendant in the 10b-5 cases, he and Opko's other directors are named defendants in various derivative suits arising out of the 10b-5 suits,[14] accusing them of breaching their fiduciary duties to Opko's shareholders by failing to disclose

---

[13] Southern District of Florida: *Steinberg v. OPKO Health, Inc. et al.*, 1:18-cv-23786-JEM, filed 9/14/18; *Brennan v. OPKO Health, Inc. et al.*, Case No. 1:18-cv-23924- KMW, filed 9/21/18 (filed by Pomerantz); *Adsport, Inc. v. OPKO Health, Inc. et al.*, Case No. 1:19-cv-20003-CMA, transferred to the S.D. of Fla. from the SDNY on 12/26/18; *In re OPKO Health, Inc. Sec. Litig.*, Case No. 1:19-cv-20502-JLK, transferred to the S.D. of Fla. from the D.N.J. on 2/7/19.

[14] Southern District of Florida: *Yu v. Frost, et al.*, Case No. 1:18-cv-24060-KMW; *Demetriades v. Frost et al.*, Case No. 1:18-cv-24583-KMW; *Lee v. Frost et al.*, Case No. 1:18-cv-24765-UU; *Sobieski v. Frost, et al.*, Case No. 1:18-cv-25293-FAM; and *Wendt v. Frost, et al.*, Case No. 1:18-cv-25485-KMW. Florida State Court: *Lipsius v. Frost et al.*, Case No. 2018-032843-CA-44 (Fla. 11th Jud. Cir. Ct.); *Alexander v. Frost et al.*, Case No. 2018-037190-CA- 44 (Fla. 11th Jud. Cir. Ct.); *Davydov v. Frost et al.*, Case No. 2019-2399-CA-44 (Fla. 11th Jud. Cir. Ct.). Delaware Chancery Court: *In re OPKO Health, Inc.*, Consolidated Case No. 2018-0740-SF, four other derivative actions were consolidated into *Tunick v. Frost et al.*, Case No. 2018-0740.

Opko and Frost's illegal pump and dump schemes, causing Opko's public statements to be materially false and misleading, and subjecting Opko to substantial liability in the SEC and securities class actions. When confronted with these facts at his deposition, Dr. Fishel challenged the merits of the claims against Opko, repeatedly calling them "frivolous," even though one of those suits was filed by *Pomerantz*—the very firm that Dr. Fishel agreed should act as an undisclosed equal lead counsel in this case and that is continuing to act on behalf of the proposed class today. Ex. 6, Fishel Dep. 295:5-298:8.

This disabling conflict is not hypothetical or speculative. The competing actions are already impacting Dr. Fishel's ability to represent both sets of shareholders, with his separate and competing fiduciary duties and economic incentives, as evidenced by his testimony under oath that Pomerantz filed a frivolous action against Opko. Nor is the conflict inconsequential. If the Court were to certify a class represented by a party vulnerable to legitimate challenge, then absent class members might collaterally attack the judgment on inadequate representation grounds should the case later be resolved by settlement or otherwise. Due process requires eliminating the risk of such attack by denying ALSAR class representative status.[15]

### C. The Ironworkers have failed to demonstrate their ability to be class representatives.

Courts also reject a proposed class representative who "has no interest in, genuine knowledge of, and/or meaningful involvement in [the] case and is simply the willing pawn of counsel." *Monster*, 251 F.R.D. at 136. The Ironworkers fit that standard to a tee.

A plaintiff who is unfamiliar with significant events in the case—like the existence of

---

[15] *See Hansberry v. Lee*, 311 U.S. 32, 41-42 (1940) (class action judgments are only valid when "the interests of those not joined are of the same class as the interests of those who are, and where it is considered that the latter fairly represent the former in the prosecution of the litigation"); *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985) (identifying as one of three basic due process elements for the class device that the named plaintiff "at all times adequately represent the interests of the absent class members").

motion to dismiss or motion for class certification—cannot be a class representative.[16] Here, the Fund Administrator of IW 40, Brian Sabbagh, testified that: (i) the stock in the case is "Chicago Bar and Iron"; (ii) there are no other defendants besides CB&I; (iii) he does not know whether the price of CB&I stock increased or decreased during the relevant period; (iv) he is not aware that Plaintiffs hired an expert to analyze CB&I's stock price; (v) he has no idea to what extent the funds may have lost money on their CB&I investments from 2013-2015; (vi) he does not know if the Court ever appointed a lead plaintiff or lead counsel; (vii) he does not know if an amended complaint was filed; (viii) he does not have any understanding of what class certification is; (ix) he does not know if Plaintiffs filed a motion for class certification; and (x) he believes that defendant Ballschmiede was part of ALSAR.[17]

Similarly, the Fund Administrator of IW 580, Patrick Doherty, testified that: (i) he does not know who the individual defendants are; (ii) he is not aware of any public statement by CB&I from 2013-2015; (iii) he does not know if IW 580 invested in CB&I during the relevant period; (iii) he first became aware that CB&I allegedly "misled some investors" in February 2019, when preparing for his deposition; (iv) he does not know if IW 580 acquired CB&I stock from 2013-2015 (except for assuming so since he was being deposed); (v) he has no idea how CB&I stock performed from 2013-2015, including whether it went up or down; (vi) he does not know that he ever saw the complaint; (vii) he only learned within the last six months that IW 580 was not a lead plaintiff; (viii) he only learned that another law firm was lead counsel when preparing for his deposition; (ix) he believes IW 580 is already a class representative, which he

---

[16] *See In re Lloyd's*, 1998 WL 50211, at *12 (deeming inadequate plaintiff unfamiliar with case events like motion to dismiss, insurance policy terms, and dealings with Lloyds); *Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356-57 (S.D.N.Y. 2004) (denying certification to plaintiffs unfamiliar with facts and nature of case); *Levine v. Berg*, 79 F.R.D. 95, 97-98 (S.D.N.Y. 1978) (denying certification where "only aid that plaintiff can render counsel is her willingness to act on behalf of a class and bear whatever costs such action might entail").

[17] Ex. 4, Sabbagh Dep. 12:13-17, 14:21-23, 21:19-22:3, 22:4-24, 29:3-6, 33:18-34:6, 35:8-12, 38:20-22, 38:23-39:6, 144:8-10.

claims to have learned in the last month; (x) he does not know if court approval is required to be a class representative; and (xi) he does not know if a motion to dismiss was filed.[18]

## IV.   Plaintiffs do not satisfy the typicality requirements of Rule 23(a)(3).

To satisfy Rule 23(a)(3)'s typicality requirement, plaintiffs must show "that [their] claims are typical of the claims of the class, and that [they are] 'not subject to any unique defenses which threaten to become the focus of the litigation.'"[19] ALSAR and the Ironworkers are subject to unique defenses and should not be class representatives.

### A.   ALSAR's clear conflict of interest subjects it to a unique defense.

As discussed above, ALSAR has a disabling conflict of interest given Dr. Fishel's two competing and conflicting sets of fiduciary duties to two sets of shareholders. *See supra* III.B. That conflict subjects him to a unique defense that would become the focus of the litigation.

### B.   The Ironworkers are subject to unique defenses concerning reliance.

Where, as here, a plaintiff is subject to unique defenses concerning its reliance, class certification is properly denied. *See Baffa,* 222 F.3d at 59-60 (plaintiff subject to unique defenses concerning reliance). The presumption of reliance is specifically rebuttable as to the Ironworkers because they "did not rely on the market price of [the] securit[y] as an accurate measure of [its] intrinsic value." *GAMCO Inv'rs, Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 253 (S.D.N.Y. 2013) (Scheindlin, J.) (alterations in original) (internal quotation marks omitted). The caselaw in this

---

[18] Ex. 5, Doherty Dep. 16:18-17:2, 41:22-42:14, 43:11-44:24, 46:4-47:12, 53:10-54:6, 55:15-58:13, 60:6-17, 61:2-18, 64:18-66:3, 92:3-5. The Ironworkers have also completely failed in their role to oversee counsel. Ex. 4, Sabbagh Dep. 43:9-12, 43:13-16, 46:23-47:2, 47:10-14, 48:7-10, 48:11-20, 48:21-23, 48:24-49:5; Ex. 5, Doherty Dep. 80:8-11, 149:20-150:9, 153:25-154:13. This lack of involvement bears out ALSAR's argument at the outset of this litigation that the Ironworkers are "lawyer-driven" and only cobbled together to aggregate their losses for purposes of securing a lead plaintiff role. Dkt. 50 at 2, 7, 9, 10, 11, 15.

[19] *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009)); *see also Baffa*, 222 F.3d at 59-60. "Regardless of whether the issue is framed in terms of the typicality of the representative's claims or the adequacy of its representation there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp v. Baker*, 137 S. Ct. 1702 (2017).

Circuit makes clear that it is not enough for a plaintiff to have merely considered the market price of the security in question in their purchase decisions. Rather, to be entitled to the presumption, the plaintiff must have relied on the market price as "an accurate measure of [the security's] intrinsic value." *Id*. at 252-53 (quoting *Teamsters Local 445 Freight Div. Pension Fund*, 546 F.3d 196, 200 n.4 (2d Cir. 2008)).

During the relevant period, the Ironworkers relied on a financial advisor, MD Sass, to make decisions on behalf of the Ironworkers about what stocks to buy and sell, including CB&I stock. *See* Ex. 7, Barney Aff. ¶ 6. In making those purchasing decisions, MD Sass used a propriety valuation model and strategy. *Id*. MD Sass's founder and CEO, Martin Sass, has described the investment strategy as "**a counterpoint to the efficient market hypothesis,**" whereby MD Sass tries to "[u]nderstand the intrinsic value, understand the numbers and **don't worry about the market**." *Id*. ¶¶ 7-8 (emphases added). Thus, the market price of CB&I stock was not a factor in MD Sass's calculation of the company's private value and did not impact its purchases of CB&I stock on behalf of the Ironworkers. Because MD Sass's valuation is completely independent of market price, and is in fact a "counterpoint to the efficient market," MD Sass did not "rely on the market price of [CB&I] securities as an accurate measure of their intrinsic value," *GAMCO Inv'rs*, 917 F. Supp. 2d at 253, rebutting the presumption of reliance as to the Ironworkers' transactions.[20]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

---

[20] MD Sass was the sole advisor for IW 40's CB&I trades and the advisor for "most" of IW 580's CB&I trades, as we were advised by counsel in a March 1, 2019 email. IW 580 apparently had another financial advisor during the proposed class period, Fox Asset Management, but it is no longer in operation. Thus, while there may be some IW 580 trades not done by MD Sass, there are still more than enough reasons for denying IW 580's request to be a class representative. *See supra* III.A & III.C.

Respectfully submitted,

**BAKER BOTTS L.L.P.**

Brian C. Kerr
30 Rockefeller Plaza
New York, NY 10112-4498
Tel: (212) 408-2543
Fax: (212) 259-2543
brian.kerr@bakerbotts.com

By: /s/ *David D. Sterling*
    David D. Sterling (*pro hac vice*)
    Texas Bar No. 19170000
    Rebeca Aizpuru Huddle (*pro hac vice*)
    Texas Bar No. 24012197
    Amy Pharr Hefley (*pro hac vice*)
    Texas Bar No. 24046046
    One Shell Plaza
    910 Louisiana St.
    Houston, Texas 77002
    Tel: (713) 229-1946
    Fax: (713) 229-7946
    david.sterling@bakerbotts.com
    rebeca.huddle@bakerbotts.com
    amy.hefley@bakerbotts.com

**COUNSEL FOR DEFENDANTS
CHICAGO BRIDGE & IRON COMPANY N.V.,
PHILIP ASHERMAN, AND WESTLEY STOCKTON**

**GREENBERG TRAURIG, LLP**

By: _/s/ James R. Leahy (by permission)_
    Robert A. Horowitz
    MetLife Building
    200 Park Avenue
    New York, NY 10166
    Tel: (212) 801-2194
    Fax: (212) 224-6114
    horowitzr@gtlaw.com

    James R. Leahy _(pro hac vice)_
    Texas Bar No. 12089500
    Nicole S. Bakare (_pro hac vice_)
    Texas Bar No. 24056017
    1000 Louisiana Street, Suite 1700
    Houston, TX 77002
    Tel: (713) 374-3500
    Fax: (713) 754-3305
    leahyj@gtlaw.com
    bakaren@gtlaw.com

    **COUNSEL FOR DEFENDANT**
    **RONALD A. BALLSCHMIEDE**