UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X
:  
:  
:  
:  

IN RE CHICAGO BRIDGE & IRON     :       17 Civ. 1580 (LGS)
COMPANY N.V. SECURITIES LITIGATION   :

:             **OPINION AND ORDER**
:  
:  
:  

--------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/23/2020____

LORNA G. SCHOFIELD, District Judge:

        Plaintiffs ALSAR Ltd. Partnership ("ALSAR"), Ironworkers Local 40, 361 and 417

Union Security Funds and Iron Workers Local 580 Joint Funds ("Ironworkers"), individually and

on behalf of all other persons similarly situated, bring this putative class action against

Defendants Chicago Bridge & Iron Company Ns.V. ("CBI"), Philip K. Asherman, Ronald A.

Ballschmiede and Westley S. Stockton, alleging violations of §§ 10(b) and 20(a) of the Securities

Exchange Act of 1934. On February 4, 2019, Plaintiffs moved for class certification and

appointment of Class Representatives and Class Counsel pursuant to Federal Rule of Civil

Procedure 23. This Order addresses Special Master Scheindlin's Report and Recommendation

(the "Report"), dated October 16, 2019, recommending that the Court grant Plaintiffs' motion.[1]

For the reasons stated below, the Report is adopted except to the extent any of its reasoning is

inconsistent with what is stated below, and Plaintiffs' motion is granted.

---

[1] On December 7, 2018, the Court appointed retired United States District Judge Shira A.
Scheindlin to serve as a Special Master pursuant to Federal Rule of Civil Procedure 53(a)(1)(A)
and (a)(1)(C).

# I.    LEGAL STANDARDS

Pursuant to Federal Rule of Civil Procedure 53(f)(1), in acting on a master's order, the Court "may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53(f)(1). If a party raises objections to the master's report, "[t]he court must decide de novo all objections to conclusions of law made or recommended." Fed. R. Civ. P. 53(f)(4). Courts in this Circuit use a "clear error" standard to review a master's findings of fact and conclusions of law where no objection is raised, which is the same standard applied to a Magistrate Judge's report and recommendation in this context. *See, e.g., Seggos v. Datre*, No. 17 Civ. 2684, 2019 WL 3557688, at *2 (E.D.N.Y. Aug. 5, 2019) (applying clear error review to portions of a Special Master's Report to which no objections were made); *CA, Inc. v. New Relic, Inc.*, No. 12 Civ. 5468, 2015 WL 13753674, at *6 (E.D.N.Y. Sept. 28, 2015) (same).

Before granting a class certification motion, a court must ensure that the requirements of Federal Rule of Civil Procedure 23(a) and (b) have been met. Rule 23(a) has four prerequisites: numerosity, commonality, typicality and adequacy of representation. An additional implied requirement of Rule 23 is ascertainability, which requires that members of the proposed class be identifiable. *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). "If Rule 23(a) criteria are satisfied, an action may be maintained as a class action only if it also qualifies under at least one of the categories provided in Rule 23(b)." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 464 (2d Cir. 2013). Plaintiffs here are proceeding under Rule 23(b)(3), which requires that Plaintiffs prove that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

As Rule 23 is more than a "mere pleading standard," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), the party seeking certification must prove these requirements by a preponderance of the evidence. *In re Petrobras Sec.*, 862 F.3d at 260. A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *accord Gruber v. Gilbertson*, No. 16 Civ. 9727, 2019 WL 4439415, at *2 (S.D.N.Y. Sept. 17, 2019). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc.*, 564 U.S. at 351; *accord Marotto v. Kellogg Co.*, No. 18 Civ. 3545, 2019 WL 6798290, at *3 (S.D.N.Y. Dec. 5, 2019).

The Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions. *See Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 563 (2d Cir. 1968) ("[Rule 23] should be given a liberal rather than restrictive interpretation."); *accord Gruber*, 2019 WL 4439415, at *2. "[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968); *accord Gruber*, 2019 WL 4439415, at *2. "Courts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707, 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010) (citing *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)); *accord Gruber*, 2019 WL 4439415, at *2.

## II.    BACKGROUND

Familiarity with the factual and procedural background of the case is assumed.  The facts as stated in Special Master Scheindlin's Report and Recommendation are incorporated herein.

Plaintiffs moved to certify a class under Rule 23(b)(3).  In their opposition to class certification, Defendants did not challenge whether Plaintiffs had established Rule 23(a)'s numerosity, commonality and ascertainability requirements, or the superiority requirement of Rule 23(b).  Defendants did challenge the typicality and adequacy requirements of Rule 23(a), the predominance requirement of Rule 23(b) and the span of the Class Period.  The Special Master reviewed the parties' submissions and held an evidentiary hearing at which each party's respective expert testified and counsel presented oral argument.  In a comprehensive, 108-page Report, the Special Master recommended that the Court grant Plaintiffs' motion for class certification; appoint ALSAR and Ironworkers as Class Representatives; appoint the law firm of Kahn Swick & Foti as Class Counsel; and certify the Class for the period October 30, 2013, through and including June 23, 2015 (the "Class Period").

Defendants timely filed objections to the Report.  The Court reviews these objections de novo and evaluates the remainder of the Report's findings, to which Defendants did not object, for clear error.  *See* Fed. R. Civ. P. 53(f)(4); *Seggos*, 2019 WL 3557688, at *2.  For the reasons stated below, the Report is adopted except to the extent any of its reasoning is inconsistent with what is stated below, and Plaintiffs' motion is granted.

III. **DISCUSSION**

A. **Defendants' Objections**

1. **Rule 23(b)(3) Predominance of Common Issues**

Four of Defendants' five objections are related and challenge the Rule 23(b)(3) requirement of predominance. Defendants dispute whether Plaintiffs can prove reliance -- a critical element of their securities fraud claim -- on a class-wide basis. If not, individual inquiries about class members' reliance would defeat a finding of predominance.

Plaintiffs argue that they can show class-wide reliance without individual proof because reliance is presumed if the stock at issue was traded in an efficient market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-50 (1988) (holding that, if plaintiffs can show that the market for defendant's stock was efficient, plaintiffs are entitled to the rebuttable presumption that the market price reflects all public information, and that they therefore relied on defendant's misrepresentation(s) in trading the stock).[2] However, a defendant can rebut the *Basic* presumption by proving "that the misrepresentation did not in fact affect the stock price." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 279 (2014). That is Defendants' argument here.[3]

---

[2] As the Second Circuit noted in *Arkansas Teachers*, the *Basic* presumption "derives from the 'fraud-on-the-market' theory, which holds that 'the market price of shares traded on [a] well-developed market[] reflects all publicly available information, and, hence, any material misrepresentations.'" *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 483 (2d Cir. 2018) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)) (alterations in original). Accordingly, "[i]f defendants 'sever the link' between the misrepresentation and the market price . . . both the theory and the [*Basic*] presumption collapse." *Ark. Teachers Ret. Sys.*, 879 F.3d at 483 (quoting *Basic Inc.*, 485 U.S. at 248) (other internal quotation marks and alteration omitted).

[3] Defendants have conceded, for purposes of class certification, that the market trading CBI stock was efficient.

A defendant can show a lack of price impact in two principal ways. First, "[a] defendant may rebut the [*Basic*] presumption with evidence that the alleged misstatements were not associated with abnormal, positive stock-price returns," *i.e.*, the alleged misrepresentation had no statistically positive, "front-end" impact on stock. *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15 Civ. 1249, 2017 WL 2062985, at *4 (S.D.N.Y. May 15, 2017); *see Halliburton II*, 573 U.S. at 279-83. Second, a defendant can rebut the *Basic* presumption with evidence that the alleged misrepresentation was not associated with "negative price stock-returns," *i.e.*, there was no statistically negative, "back-end" impact on stock following a corrective disclosure. *Virtus Inv. Partners*, 2017 WL 2062985, at *4. A corrective disclosure occurs when the truth about an earlier allegedly fraudulent statement or omission is revealed to the market. *See id.* at *5.

Defendants suggest that the *Basic* presumption can be rebutted on the back-end in at least two other ways: (i) if they can show that the information in a back-end disclosure is not new, *see Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018), or (ii) if they can show that the information in a back-end disclosure was not actually corrective. *See In re Signet Jewelers Ltd. Secs. Litig.,* No. 16 Civ. 6728, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019). However, for class certification purposes, when Plaintiffs are able to show an alleged misrepresentation had a statistically significant front-end price impact, Defendants are not entitled to rely on these additional back-end arguments to rebut the *Basic* presumption. *See Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46-47 (S.D.N.Y. 2018) ("[B]ecause [d]efendants did not carry their burden of demonstrating the absence of price impact, [p]laintiffs are entitled to the [*Basic*] presumption.").

### a. Burden of Persuasion

As a threshold matter, Defendants argue that because Federal Rule of Evidence 301 governs presumptions in civil cases (unless a federal statute or Federal Rule of Evidence provides otherwise), and because the *Basic* presumption has never been incorporated into any federal statute or Rule, the Report erred in concluding that Defendants bear the burden of persuasion, rather than the burden of production, in rebutting the *Basic* presumption.

This objection is overruled as it is contrary (and Defendants admit as much) to binding Second Circuit precedent in *Waggoner v. Barclays PLC,* 875 F. 3d 79, 99-103 (2d Cir. 2017). The Report properly applied the *Waggoner* rule that a party opposing class certification bears the burden of persuasion when rebutting the *Basic* presumption and must demonstrate a complete lack of price impact by a preponderance of the evidence. *Id*. at 103; *see Ark. Teachers Ret. Sys.*, 879 F.3d at 485 ("Because the *Basic* presumption is a substantive doctrine of federal law that derives from the securities fraud statutes, [*Waggoner*] determined it altered the default rule and imposed a burden of persuasion on defendants seeking to rebut it.").

### b. 5% Statistical Significance Threshold

One of Defendants' arguments to rebut the *Basic* presumption was that one of seven alleged corrective disclosures ("CD #4") -- the October 2014 SCANA press release -- had no price impact because the parties' experts agreed that the disclosure did not have a statistically significant price reaction at the 5% level, which means there is no more than a 5% chance that the observed relationship is purely random. Defendants object that the Report erred in rejecting this argument and finding that Defendants had failed to prove lack of price impact as to the

October 2014 SCANA press release (CD #4).[4]  Defendants' expert had found a reaction at the

6.56% level for this event, and Plaintiffs' expert had found a reaction at the 8.44% level (*i.e.*, a

93.44% and 91.56% confidence level respectively).  Defendants argue that a 5% significance

level is the standard threshold used by experts and courts for identifying evidence of price impact

and should have been applied here to find that CD #4 had no price impact.

This objection is overruled.  Defendants are correct that a 5% significance level is the

typical measure of statistical significance used in this context, but it is not the exclusive measure.

*Compare Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81

(S.D.N.Y. 2015) ("In most scientific work, the level needed to obtain a statistically significant

result is set at a five percent level of significance."), *and In re Moody's Corp. Sec. Litig.*, 274

F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (same), *with Pirnik*, 327 F.R.D. at 46-47 (holding that

plaintiffs' expert's analysis with respect to certain disclosures -- finding price impact at a

statistically significant level below 95% -- did not demonstrate the absence of price impact), *and*

*Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 345 (D.N.J. 2018) (same), *aff'd sub*

*nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019).  No hard and fast

rule dictates a cutoff of a 5% significance level to prove price impact in a securities fraud case,

nor should one.  The Report correctly recommends that statistical significance not be evaluated

as a binary question, "with statistical significance lying at the 4.99% level but not at 5.01%

_____

[4] The Report's finding was more nuanced.  The Report concluded that Plaintiffs' expert "report
of *p*-values for all of the dates analyzed and his opinion as to whether those between .05 and .10
(5-10% statistical significance) support a finding of market efficiency or price impact may be
considered in deciding the issues presented by this motion.  However, it is apparent that the
weaker the statistical significance the less support the [expert] report provides toward the
ultimate finding."  (Dkt. No. 217 at 39-40/111).  The Report later finds "some evidence of price
impact on [the date of the October 14 SCANA press release]."  (Dkt. No. 217 at 91/111).

level." (Dkt. No. 217 at 38/111). Academic economics literature supports this proposition, *i.e.*, that scientific conclusions, business or policy decisions should not be based only on whether a *p*-value passes a specific threshold, as researchers must consider multiple contextual factors when performing data analysis:

> A conclusion does not immediately become "true" on one side of the divide and "false" on the other. . . . Pragmatic considerations often require binary, "yes-no" decisions, but this does not mean that p-values alone can ensure that a decision is correct or incorrect. The widespread use of "statistical significance" (generally interpreted as "p ≤ 0.05") as a license for making a claim of a scientific finding (or implied truth) leads to considerable distortion of the scientific process.

Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70 AM. STATISTICIAN 129 (2016); *see* Dkt. No. 194-10 ¶ 42.

Defendants also argue that the Report erred in relying on *Pirnik* to justify its departure from the 5% standard, suggesting that *Pirnik* is an "outlier," "inapposite" and "does not support abandoning the 5% standard." (Dkt. No. 220 at 6-7/16); *see* 327 F.R.D. 38. However, *Pirnik* does not abandon the 5% standard, but rather points out that while a *p*-level of 7.88% is below "the conventional statistical measure of a 95% confidence level" and "is obviously [of] less comfort than a result that is statistically significant at a confidence rate of 95%," it does not, in itself, "prove the *absence* of price impact," which is what a defendant must show to defeat the *Basic* presumption. 327 F.R.D. at 46-47. Similarly, the Report concludes that values between 5% and 10% may be considered in deciding issues presented by the class certification motion, and qualifies this conclusion by noting that "it is apparent that the weaker the statistical significance the less support the [R]eport provides toward the ultimate finding." (Dkt. No. 217 at 39-40/111).

### c. The Report's "Correctiveness" Test

Defendants attempt to rebut the *Basic* presumption by showing that certain allegedly corrective disclosures did not in fact correct an alleged misrepresentation. Defendants object to the Report on the ground that it adopted a legally erroneous test of "correctiveness," which resulted in improperly upholding four of the alleged corrective disclosures, "CDs" #3, #4, #5 and #6. This objection is overruled.

The Report found -- over Plaintiffs' objection and without the benefit of Second Circuit precedent -- that an inquiry into whether a disclosure is actually corrective is proper on a motion for class certification. Defendant does not object to this conclusion. But the Report also concluded that only "a limited analysis of an alleged disclosure as to whether it is 'corrective' is appropriate at this stage of the proceedings," (Dkt. No. 217 at 61-62/111), and that among the permissible inquiries is "whether the information in the alleged corrective disclosure relates to the same subject matter [as the misrepresentation] or is wholly unrelated." (Dkt. No. 217 at 61/111). Defendants object to the limited nature of the analysis and what they characterize as the "wholly unrelated" standard as the test of correctiveness. (Dkt. No. 220 at 7/16). Based in part on this analysis, the Report found that Defendants had not shown the lack of price impact based on CDs #1, #2 (partial), #3, #4, #5 and #6, but had shown the lack of price impact as to CD #7.

First, the Report correctly relied on reasoning from *Arkansas Teachers* to recommend that a court may appropriately consider, at the class certification stage, whether an alleged corrective disclosure actually corrected an earlier misrepresentation. In *Arkansas Teachers*, the Second Circuit held that the district court had erred in not considering defendants' price impact information at the class certification stage. 879 F.3d at 486; *see also Halliburton II*, 573 U.S. at 279-83 (holding that defendants may seek to rebut the *Basic* presumption at the class

certification stage through evidence that the misrepresentation had no price impact).  In *Arkansas Teachers*, the price impact information sought to establish that the information in the alleged corrective disclosure had no price impact because it was not new.  The court in *Arkansas Teachers* further concluded that:

> Although price impact touches on materiality, which is not an appropriate consideration at the class certification stage, it differs from materiality in a crucial respect.  Price impact refers to the effect of a misrepresentation on a stock price.  Whether a misrepresentation was reflected in the market price at the time of the transaction [--] whether it had price impact [--] is *Basic*'s fundamental premise.  It has everything to do with the issue of predominance at the class certification stage.

879 F.3d at 486 (internal quotation marks, citations and ellipses omitted).  In this case, Defendants sought to establish that alleged corrective disclosures had no price impact because they were not actually corrective.  The analysis from *Arkansas Teachers* is the same, concluding that price impact is a proper inquiry at the class certification stage.  Accordingly, the Report correctly reasoned that an inquiry into correctiveness, like newness, is appropriate at the class certification stage.

Second, the Report's conclusion that CDs #3, #4, #5 and #6 were corrective was not in error.  The Court finds that the challenged disclosures were corrective but without the need to adopt the precise articulation of a "correctiveness" test as formulated in the Report.  The case law is clear that a corrective disclosure needs to be corrective and "linked" to a specific alleged misrepresentation.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 504, 510 (2d Cir. 2010).  The analysis must focus on whether the disclosure was, in fact, corrective.  *See Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012); *see also Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 812 (2011) (holding that loss causation need not be shown at the class certification stage).

CD #3 -- CBI's July 25, 2014, 2Q:14 10-Q -- is a partial corrective disclosure because it revealed to the market that CBI had violated Generally Accepted Accounting Principles ("GAAP") in its prior Securities and Exchange Commission filings by falsely stating that there were no indicators of impaired goodwill and by not taking an impairment charge to reduce goodwill, in particular by revealing a growing disparity between cash flow and growing non-cash earnings since CBI's prior financial disclosures. The Report correctly concluded that CD #3 relates to CBI's alleged misrepresentations of the amount of goodwill on CBI's balance sheet. Defendants' arguments that the information in CD #3 was not corrective of any alleged misrepresentation and had been repeatedly disclosed are incorrect.

CD #4 -- the October 2014 SCANA press release -- is a corrective disclosure. SCANA was the parent company of CBI's counterparty on its contract for the V.C. Summer nuclear reactor project. The press release was corrective because it revealed new information to the market regarding the revised construction schedule for the V.C. Summer nuclear reactor project to reflect project delays, including a preliminary cost estimate of $1.2 billion related to the delays, SCANA's rejection of its alleged share of 55% of those costs and SCANA's statement that it had not accepted financial responsibility for any of the costs associated with the delays (thereby suggesting that CBI and its partners in the project could be responsible for those costs). Defendants' assertion that the estimate cost overrun total from CD #4 was not corrective of any alleged misrepresentation is meritless. The Report correctly concluded that CD #4 relates to alleged misrepresentations about CDI's liability for delays/cost overruns and/or fabrication defects.

CD #5 -- testimony from two witnesses before the Georgia Public Service Commission on November 21, 2014 -- is a corrective disclosure because it revealed important information

regarding developments in the construction of the Vogtle nuclear plant, specifically that there continued to be "various stop work orders" at a CBI facility manufacturing components for the nuclear plants and that Georgia Power, a subsidiary of the Southern Company, intended to hold CBI and its Consortium partners (The Shaw Group, Inc. and Westinghouse Electric Corporation) accountable for the delays. Defendants' argument that the content of CD #5 was not new or corrective is meritless. The Report correctly concluded that CD #5 relates to alleged misrepresentations about CBI's liability for delays/cost overruns, fabrication defects at the referenced CBI manufacturing facility and stop work order ("SWO")/safety issues.

Finally, CD #6 -- the publication of the Southern Company 8-K on January 29, 2015 -- is a corrective disclosure because it disclosed new information regarding further construction delays at the Vogtle nuclear plant, specifically an estimated eighteen-month delay, an estimated $720 million associated cost and Georgia Power's belief that CBI was responsible for the delay. Defendants' argument that CD #6 was "just bad news" is meritless. The Report correctly concluded that CD #6 relates to alleged misrepresentations about CBI's liability for delays and cost overruns.

### d. The Vertical and Prescience Reports

Defendants object that the Report erred in concluding that the "Vertical Report," a stock-analyst report published by Vertical Research Partners on June 11, 2014, was a corrective disclosure (CD #1). They argue that the information the Report identifies as "new" was stock-

analyst speculation and analysis of already public financial information, which cannot, as a matter of law, constitute a corrective disclosure in an efficient market.[5]

Defendants' objection is overruled.  The Report correctly finds that some of the information in the Vertical Report was new to the market, specifically the information regarding (1) questionable accounting treatment of CBI's purchase price allocation ("PPAs") for the Shaw acquisition, which could result in an overstatement of goodwill and of future revenues, and (2) related statements by CBI management to the author of the Vertical Report that "the process of marking liabilities to market creates a non-cash 'credit' for the company. . . . suggesting about $140MM of revenue could be recognized each year [in the future, and] . . . these are non-cash earnings."  (Dkt. No. 194-6 at 2/7).  This information is corrective because it relates directly to the first three sub-categories of alleged misstatements arising from GAAP violations outlined in the Report: Contracts in Process ("CIP"), Margin Fair Value Liability for Acquired Contracts ("MFVL") and Impaired Goodwill ("Goodwill") as those terms are defined in the Report.  It is also new in that the questionable accounting treatment and statements by CBI management had not been previously disclosed.

Defendants argue that the disclosure was not new, and therefore not corrective, because it was merely speculative and an interpretation of CBI's financial reporting.  They argue in effect that any third party's analysis of a company's already-public financial information cannot contribute new information to the marketplace.  This is incorrect.  "While it is generally true that in an efficient market, any information released to the public is presumed to be immediately

---

[5] This objection relates to Defendants' argument that the *Basic* presumption can be rebutted on the back-end by showing that the information contained in a disclosure is not new.  As the Report correctly finds, a court should review the "newness" of a corrective disclosure at the class certification stage.  *See Ark. Teachers Ret. Sys.*, 879 F.3d at 486.

digested and incorporated into the price of a security, it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace." *Pub. Emples. Ret. Sys. Of Miss. v. Amedisys, Inc*., 769 F.3d 313, 323 (5th Cir. 2014) (finding that a WSJ article analyzing publicly available Medicare records could plausibly constitute a corrective, and not merely confirmatory, disclosure); *see Meyer v. Greene*, 710 F.3d 1189, 1199 n.10 (11th Cir. 2013) (noting that analyst reports or short-seller opinions may constitute sufficient corrective disclosures if they "reveal to the market something previously hidden or actively concealed"); *In re Signet Jewelers Ltd. Secs. Litig.,* 2019 WL 3001084, at *17 ("[An analyst report] was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why [defendant company's] underlying business was weaker than most people realized [and therefore qualified as corrective]."); *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 412 (D. Conn. 2010) (rejecting defendants' argument that plaintiffs' expert could not show that the alleged corrective disclosure contained new information where, in part, the expert conducted analysis "of . . . public information" contained in news releases); *In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 371-72 (S.D.N.Y. 2009) (denying summary judgment where the court did "not find that no reasonable juror could conclude that the ratings downgrades disclosed no new information").

Plaintiffs' expert cites communications the day after the Vertical Report was published that confirm that the article raised new concerns about irregularities in CBI's accounting. Defendants therefore have failed to meet their burden of showing that the Vertical Report contained no new information and thus had no price impact.

Defendants rely on several cases (only one by the Second Circuit), but they are distinguishable from the instant case because of the nature of the information disclosed.  In *In re*

*Omnicom Grp., Inc. Sec. Litig.*, for example, the allegations of fraud were "focused on the loss in value of [Omnicom's] internet companies and the failure to reflect that loss on Omnicom's books," which the company accomplished primarily by means of a spin-off transaction in which the ailing subsidiaries were transferred to another company called Seneca. 597 F.3d at 504, 507-08. The Second Circuit held that two reports contained in a certain WSJ article were not corrective. The first was that a Board member and chair of the Audit Committee had resigned due to "general concerns over an aggressive accounting strategy" apart from the known Seneca transaction, plus "Omnicom's year-old failure to write-down the value of the internet companies," which had long been known to the market. *Id*. at 511-12. Second, the article reported statements of two accounting professors, "one who thought that Seneca 'raises a red flag,' and one who said '[y]ou really have to wonder where this fair value is coming from in this environment, in this area.'" *Id*. at 506-07 (alteration in original). The Second Circuit found that neither report was corrective, implying that the first provided no new information when it was widely known that Omnicom had not written down the value of the internet companies on its own books due to the Seneca transaction. The Second Circuit stated that the accounting professors held "conclusory suspicions . . . [which] added nothing to the public's knowledge that the Seneca transaction was designed to remove losses from Omnicom's books." *Id*. at 512. Here, in contrast, the accounting issues raised in the Vertical Report were specific, new and related directly to the specific accounting deficiencies alleged in the Complaint.

Defendants make similar objections with respect to the "Prescience Report," a short-seller report published by Prescience Point Research Group on June 17, 2014 (CD #2). They argue that the Prescience Report "consists entirely of speculation by a short-seller based on public information which had only two pieces of 'new' information." (Dkt. No. 220 at 12/16).

Defendants' objection is overruled here as well.  The Report correctly finds that the Prescience Report "provide[d] several new pieces of information to the market," specifically that "[s]hares of [CBI] are grossly overvalued. . . . We believe CBI will be forced into a goodwill write-down or financials restatement, either of which would trigger debt default, heightening the risk of a liquidity crisis or dilutive equity raise. . . . Based on our analysis, CBI stock is worth []$37 per share, 49% below current trading levels."  (Dkt. No. 217 at 77/111).  Further, the Report correctly identifies as new portions of the Prescience Report that highlight, for example, "the pattern of CBI's fair value adjustments . . . [which] appears to indicate they were made in response to post-acquisition events," a conclusion "supported by the existence of a litany of post-acquisition events which, we think, should have negatively impacted CBI's guidance and financial statements, but never did."  (Dkt. No. 217 at 82/111).  The Report also identifies -- as new information -- portions of the Prescience Report stating that "[the authors] arranged calls with CBI Investor Relations . . . for more clarity. . . . [and that this] contact with management confirms the core of our thesis . . . that CBI is offsetting costs, and thereby inflating its profitability, made possible by its post-acquisition adjustments to the Shaw PPA."  (Dkt. No. 217 at 82/111).  This and much of the other information in the lengthy report is specific, not previously disclosed and reveals more than speculation to the market.  Accordingly, Defendants' objections regarding the corrective nature of the Vertical and Prescience Reports are overruled.

### e.  CBI's April 23, 2015, First Quarter 10-Q

Defendants argue that the Report erred by provisionally granting certification as to a misrepresentation that allegedly had no front-end impact, and where Plaintiffs never identified any corrective disclosure related to it.  Even though the Report found that the "price-maintenance theory" applied to the misrepresentation in question, Defendants contend that "an alleged

misrepresentation cannot have price impact if it lacks both front-end and back-end impact, and it is an impossible burden on defendants to have to prove the absence of back-end impact without any allegation (as here) of a corrective disclosure."  (Dkt. No. 220 at 13/16).

Defendants' objection is overruled because Plaintiffs properly rely on a price-maintenance theory as to the misrepresentation in question.[6]  The alleged misrepresentation occurred on April 23, 2015, when CBI filed its first quarter Form 10-Q ("1:Q:15 10-Q") with the SEC, which allegedly misstated information related to goodwill and whether CBI's financial statements complied with GAAP.  The 1:Q:15 10-Q did not present entirely new information to the market, as similar statements about goodwill and compliance with GAAP dated back to 2013. Therefore the 1:Q:15 10-Q had no statistically significant front-end impact.[7]  *See Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 87 (concluding that "[p]rice maintenance fit[] the theory of plaintiffs' case," where defendants' material omissions maintained inflation in stock price and there was no reactionary price impact).  While a chart in the Report indicates that the 1:Q:15 10-Q had no back-end impact because Plaintiffs have not identified a corrective disclosure relating to it, the Report also correctly notes that on April 24, 2015, the day after the

---

[6] As the Report correctly points out, Plaintiffs can allege securities fraud through a price-inflation theory (*i.e.*, whether alleged misrepresentations artificially inflated Defendants' stock price when made), but also under a price-maintenance theory, where "[P]laintiffs allege that the misrepresentations either [1] failed to inform the market about negative information (omissions), or [2] confirmed market expectations without revealing negative information (confirmatory misrepresentations), thus maintaining . . . [D]efendant[s'] stock price at an artificially inflated level."  (Dkt. No. 217 at 50/111); *see Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018).

[7] The Report correctly notes that "only misrepresentations that confirm market expectations can properly proceed under a price maintenance theory," as "[w]hen a misrepresentation presents entirely new information to the market that it could not possibly have expected, this information cannot fairly be said to maintain inflation that is already present in the stock price."  (Dkt. No. 217 at 50/111 n.121).

18

filing, the price of CBI stock dropped and the cause of the price drop cannot be determined at the class certification stage. *See Halliburton I*, 563 U.S. at 812. Put another way, because there is an issue of fact whether this particular disclosure had a price maintenance effect, which potentially was cured the next day (or perhaps not, if the price fell for an unrelated reason), the Report correctly finds that Defendants failed to rebut the *Basic* presumption by a preponderance of the evidence as to the 1:Q:15 10-Q.

### 2. Rule 23(a) Adequacy

Finally, Defendants argue that the Report erred in concluding that the proposed Class Representatives and their counsel will fairly and adequately protect the interests of the Class under Rule 23(a). Specifically, Defendants object to the Report's finding that the fee-sharing agreement between counsel for Lead Plaintiffs ALSAR and Ironworkers was proper, despite the "behind the scenes" agreement after ALSAR and Ironworkers each advocated for appointment as sole lead plaintiff along with their counsel as sole lead counsel.

Defendants' objection is overruled. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Regarding the appointment of class counsel, the inquiry is whether they "are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *accord George v. Shamrock Saloon II LLC*, No. 17 Civ. 6663, 2020 WL 133621, at *8 (S.D.N.Y. Jan. 13, 2020). Essentially, Defendants argue that counsel's alleged dishonesty in dealing with the Special Master disqualifies them. However, the Special Master did not indicate that she was misled, pointed out that both sets of Plaintiffs and law firms appeared on the Consolidated Amended Complaint and that Pomerantz LLP appeared on filings both before and after the agreement and appeared regularly before her.

19

The fee sharing agreement itself appears to be unproblematic. Defendants cite no authority where prospective class representatives were disqualified on the basis of a fee arrangement where attorneys for each class representative agreed to work on the case 50/50 and split the fees 50/50. Further, as the Report correctly notes, this agreement complies with Local Rule 23.1, the Court's Individual Rule III.C.4 and Rule 1.5(g) of the New York Rules of Ethical Conduct. Defendants' objection is overruled and Plaintiffs' motion to appoint Plaintiffs ALSAR and Ironworkers as Class Representatives and Kahn Swick & Foti as Class Counsel is granted.

**B.      Remaining Class Certification Prerequisites**

Defendants did not object to class certification based on Rule 23's numerosity, ascertainability, commonality, typicality or superiority requirements. Of these, the Report made findings only with respect to typicality. Accordingly, the conclusion that these remaining class certification prerequisites are satisfied is reviewed below for clear error. *See* Fed. R. Civ. P. 53(f)(4); *Seggos*, 2019 WL 3557688, at *2.

**1.      Rule 23(a) Numerosity**

To establish numerosity, "the class [must be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *accord Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015). In the Second Circuit, numerosity is presumed for a class of forty or more plaintiffs. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011); *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 700 (S.D.N.Y. 2019). Plaintiffs represent that there are several thousand geographically dispersed putative class members who allegedly traded CBI stock during the relevant time period. Accordingly, Rule 23(a) numerosity is satisfied. *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700 (concluding that

numerosity was likely met where "plaintiffs represent[ed] that there [were] thousands of geographically dispersed class members who transacted in [defendant's] [b]onds").

## 2. **Rule 23(a) Commonality**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *accord Sykes*, 780 F.3d at 80. A question is common to a class if it is "capable of classwide resolution [--] which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350; *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," *Wal-Mart Stores, Inc.*, 564 U.S. at 349-50, and "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700.

Rule 23(a) commonality is satisfied because Plaintiffs allege the same injury and claims resulting common misrepresentations and omissions concerning Defendants' business. All plaintiffs were impacted by disclosures affecting equally all market participants who transacted CBI stock. *See Gruber*, 2019 WL 4439415, at *3 (concluding that plaintiffs satisfied commonality because proceeding as a class would "generate common answers to several key questions, including whether defendants engaged in deceptive conduct and omitted the disclosure of material facts, whether there was scienter, and whether insider trading occurred").

## 3. **Rule 23(a) Typicality**

Rule 23(a)(3) is satisfied by showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *accord Sykes*,

780 F.3d at 80. This standard is "not demanding," as "the claims only need to share the same essential characteristics, and need not be identical." *Gruber*, 2019 WL 4439415, at *3. A plaintiff can establish typicality when "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar*, 659 F.3d at 252; *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700.

Plaintiffs have established Rule 23(a) typicality because all potential class members were allegedly injured by the same alleged misrepresentations and omissions regarding Defendants' nuclear business, and all claim securities law violations based on the same federal statutes and nucleus of facts. *See Gruber*, 2019 WL 4439415, at *3 (concluding that plaintiffs established typicality because the class representative's claims arose from the same fraudulent scheme as the class and would make similar arguments to prove defendants' liability, regardless of "minor variations" in the fact patterns underlying individual claims).

### 4. Rule 23 Ascertainability

The Second Circuit has recognized that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable," often characterized as an "ascertainability" requirement. *See In re Petrobras Sec.*, 862 F.3d at 264. The "touchstone" of ascertainability is whether the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member. A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id*.

The Report recommends certifying a class defined as all those who purchased or otherwise acquired the common stock of Chicago Bridge & Iron Company N.V. on the NYSE during a Class Period from October 30, 2013, through and including June 23, 2015, excluding

Defendants, officers, and directors of CBI, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. This definition is sufficiently definite to determine whether any given individual or entity is a class member. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 n.6 (S.D.N.Y. 2013) (concluding that the ascertainability requirement was "easily met in the context of securities litigation where the list of shareholders is readily obtainable").

### 5. Rule 23(b) Superiority

Under Rule 23(b)(3), a plaintiff must both establish predominance and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *accord Sykes*, 780 F.3d at 81. This analysis is "explicitly comparative in nature," *In re Petrobras Sec.*, 862 F.3d at 268, requiring courts to ask whether "a class action is *superior to other available methods* for fairly and efficiently adjudicating the controversy." *Id.* (quoting Fed. R. Civ. P. 23(b)(3)). Securities cases "easily satisfy" this requirement, *Kaplan v. S.A.C. Capital Advisors, L.P*, 311 F.R.D. 373, 383 (S.D.N.Y. 2015), as "the alternatives are either no recourse for thousands of stockholders" or "a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Green*, 406 F.2d at 301; *accord Kaplan*, 311 F.R.D. at 383.

Here, given the size of the Class, certification will promote judicial efficiency by permitting claims common to all Plaintiffs to be resolved just once, rather than having individual lawsuits regarding the same alleged wrongdoing, particularly in a securities context involving thousands of stockholders. *See In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 144 (S.D.N.Y. 2019) (concluding that a securities class action was superior because "of the efficiencies of class wide adjudication").

## IV.     CONCLUSION

For the foregoing reasons, the Report is adopted except to the extent any of its reasoning is inconsistent with what is stated above, and Plaintiffs' motion is GRANTED.  It is hereby ordered that:

(1) Plaintiffs ALSAR and Ironworkers are appointed as Class Representatives to sue on behalf of a class of all those who purchased or otherwise acquired the common stock of Chicago Bridge & Iron Company N.V. on the NYSE during a Class Period from October 30, 2013, through and including June 23, 2015, excluding Defendants, officers, and directors of CBI, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

(2) Kahn Swick & Foti is appointed as Class Counsel;

(3) The parties shall confer and prepare a mutually agreeable form and manner of notice, to be filed on ECF for the Court's review by April 13, 2020.  *See* Fed. R. Civ. P. 23(c)(2)(B).  To the extent that the parties cannot agree on the form and manner of notice, the parties shall include a brief statement of their disagreement in the filing.

The Clerk of Court is respectfully directed to close the motion at Docket No. 179.

Dated: March 23, 2020
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE