**BAKER BOTTS L.L.P.**
Brian C. Kerr
30 Rockefeller Plaza
New York, NY 10112-4498
Tel: (212) 408-2543
Fax: (212) 259-2543

David D. Sterling (*pro hac vice*)
Rebeca Aizpuru Huddle (*pro hac vice*)
Amy Pharr Hefley (*pro hac vice*)
One Shell Plaza
910 Louisiana
Houston, TX 77002
Telephone: (713) 229-1946
Fax: (713) 229-7946

*Counsel for Defendants*
*Chicago Bridge & Iron Company N.V.*
*Philip Asherman, and Westley Stockton*

**GREENBERG TRAURIG, LLP**
Robert A. Horowitz
MetLife Building
200 Park Avenue
New York, NY 10166
Tel: (212) 801-2194
Fax: (212) 224-6114

James R. Leahy (*pro hac vice*)
Nicole S. Bakare (*pro hac vice*)
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Tel: (713) 374-3500
Fax: (713) 754-3305

*Counsel for Defendant*
*Ronald A. Ballschmiede*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CHICAGO BRIDGE & IRON COMPANY N.V. SECURITIES LITIGATION | **CASE NO. 1:17-CV-1580**<br><br>Hon. Lorna Schofield |

**DEFENDANTS CHICAGO BRIDGE & IRON, PHILIP ASHERMAN, RONALD BALLSCHMIEDE, AND WESTLEY STOCKTON'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.      Introduction ................................................................................................................. 1

II.     Factual Background ...................................................................................................... 3

III.    Argument ................................................................................................................... 12

      A.      CB&I's accounting opinions (CS#1, 4, 5, 8, 10, 11, 14, 16) were not false or misleading or made with scienter. .......................................................... 13

      B.      The contractual entitlement opinions (CS#10, 12, 13, 15) were not false or misleading or made with scienter. ........................................................ 20

      C.      Asherman's statement about CB&I's commitment to safety (CS#2) was not false or misleading or made with scienter. ................................................... 23

      D.      Asherman's statements about Nuclear Project milestones and progress (CS#3, 6, 7, 9) were not false or misleading or made with scienter. ................................... 24

IV.     Conclusion ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)................................................................................................12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................1

*Axar Master Fund, Ltd. v. Bedford*,
    308 F. Supp. 3d 743 (S.D.N.Y. 2018)....................................................................22

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)...................................................................................12

*Chapman v. Mueller Water Prods., Inc.*,
    2020 WL 3100243 (S.D.N.Y. June 11, 2020) .......................................................19

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012)...............................................................................13, 18

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020) ...........................................13, 18, 20

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*,
    655 F. Supp. 2d 262 (S.D.N.Y. 2009)....................................................................17

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)................................................................................................16

*Diehl v. Omega Protein Corp.*,
    339 F. Supp. 3d 153 (S.D.N.Y. 2018)....................................................................25

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)...................................................................................13

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018)....................................................................23

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015)...............................................................13, 14

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010).....................................................................................1

*In re Aceto Corp. Secs. Litig.*,
  2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019).............................................................17, 19, 23

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020).........................................................................17

*In re Express Scripts Holdings Co. Sec. Litig.*,
  773 F. App'x 9 (2d Cir. 2019) ...............................................................................19, 20, 23

*In re Gen. Elec. Sec. Litig.*,
  2020 WL 2306434 (S.D.N.Y. May 7, 2020) ...................................................................13, 16

*In re JP Morgan Chase Sec. Litig.*,
  2007 WL 950132 (S.D.N.Y. 2007).....................................................................................20

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014)..................................................................................13

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000).................................................................................19

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).....................................................................20

*In re Vivendi, SA Sec. Litig.*,
  838 F. 3d 223 (2d Cir. 2016)..........................................................................................2, 12

*In re Vivendi Universal, S.A. Secs. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011)...................................................................................2

*Lewis v. YRC Worldwide Inc.*,
  2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) .....................................................................13

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).......................................................................................2, 13, 20

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015)...............................................................................14, 22, 24, 25

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)............................................................................23, 25

*Plumbers & Steamfitters*,
  694 F. Supp. 2d at 302 .....................................................................................................19

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009)................................................................................................13

*Saleem v. Corp. Transp. Grp., Ltd.*,
   854 F.3d 131 (2d Cir. 2017).............................................................................................1

*SEC v. Price Waterhouse*,
   797 F. Supp. 1217 (S.D.N.Y.1992)................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).......................................................................................................13

*Thor Power Tool Co. v. C.I.R.*,
   439 U.S. 522 (1979).......................................................................................................13

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)....................................................................................14, 24

*Woolgar v. Kingstone Cos.*,
   2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020)....................................................19, 20, 23

## OTHER AUTHORITIES

17 C.F.R. § 240.10b-5(b) (2020) .......................................................................................12

Defendants submit this memorandum of law in support of their motion for summary judgment.[1]

## I.       INTRODUCTION

Plaintiffs' core theory, as alleged in the Consolidated Amended Complaint ("CAC"), is that CB&I's financials during the class period violated GAAP because CB&I improperly booked losses in the first year after acquiring The Shaw Group as adjustments to goodwill; failed to write down goodwill before October 2015, when CB&I sold Shaw's nuclear operations to Westinghouse Electric Company ("WEC"); and improperly booked revenue for unapproved change orders ("UCOs") and claims with respect to two nuclear projects that were part of the Shaw acquisition. However, after years of discovery—including more than 1.9 million documents and 27 fact depositions—Plaintiffs do not have the evidence to support their claim that Defendants' accounting for the Shaw acquisition violated Section 10(b) of the 1934 Act. Likewise, there is no evidence that any of the Individual Defendants believed the accounting was inaccurate, or otherwise acted with scienter in publishing the financial statements. On the contrary, the uncontroverted evidence is that:

- CB&I's financial statements were never withdrawn or restated.

- CB&I's independent auditor, Ernst & Young ("E&Y"), concluded that each of the accounting determinations in question was reasonable, issued clean audit opinions on CB&I's financial statements, and has never withdrawn any of those opinions.

- The SEC specifically examined CB&I's accounting and closed its investigation without taking any action.

- Not a single scrap of paper or snippet of testimony suggests that *anyone* at CB&I or its

---

[1] Summary judgment must be granted when the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 148 (2d Cir. 2017). The non-movant "may not rely on mere speculation or conjecture as to the true nature of the facts," nor will "mere conclusory allegations" suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

auditors thought CB&I's accounting was anything other than spot on.

Plaintiffs are left with nothing but the opinions of their accounting expert. But even he does not say CB&I's accounting for the Shaw transaction actually violated GAAP, or that any particular accounting determination was unreasonable; all he can muster is that it "appears" to him CB&I improperly applied GAAP, that CB&I should have written down goodwill sooner than it did (though he does not say when or in what amounts), and that despite the plain language of the accounting rules permitting revenue recognition on disputed claims, CB&I should not have booked revenue (again, in an amount he cannot say) because there were disputes with the owners of the nuclear projects and WEC. The "appearance" of a GAAP violation is obviously not sufficient to preclude summary judgment. And even a GAAP violation—which does not exist here—is no basis to find falsity or scienter.[2]

Tacitly acknowledging their lack of evidence for the claims they pleaded, Plaintiffs now argue this case is really about what CB&I "should have" but did not disclose about the nuclear operations it took on in the Shaw acquisition. But this new pitch has no foundation in the law. "Under the plain language of 10b-5, an 'omission' is not a violation unless plaintiffs can point to *statements* that were made misleading by the omitted facts."[3] Plaintiffs cannot do so. CB&I never separately reported financial results for the nuclear projects (or any others), nor did it have any duty to do so; instead, it appropriately reported its financial results for its four operating segments. The few statements Defendants did make about the nuclear projects were true, and Plaintiffs have no evidence they were not—let alone that any of them were made with scienter. Defendants are therefore entitled to summary judgment on falsity and scienter grounds.

---

[2] *E.g.*, *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim[.]").
[3] *In re Vivendi, SA Sec. Litig.*, 838 F. 3d 223, 241 (2d Cir. 2016) (emphasis added) (quoting with approval *In re Vivendi Universal, S.A. Secs. Litig.*, 765 F. Supp. 2d 512, 578 (S.D.N.Y. 2011)).

## II.   FACTUAL BACKGROUND

CB&I provided engineering, procurement and construction ("EPC"), maintenance, and environmental services to customers in the energy infrastructure market throughout the world.[4] In 2012, Shaw was a global provider of EPC, fabrication, remediation, and facilities management services, among others, to a diverse client base.[5] In July 2012, CB&I and Shaw agreed to a combination in which Shaw would become a wholly owned subsidiary of CB&I.[6] From CB&I's perspective, the deal was compelling because it would provide "critical mass," giving it an advantage in selling and executing work; an expanded geographic footprint; revenue and earnings stability, particularly with Shaw's Plant Services business; and an extended presence in the growing power sector.[7] The aggregate purchase price was approximately $3.3B, and the transaction closed in February 2013 after receiving approval from both companies' shareholders.[8]

*Nuclear Projects.* As a result of the combination, CB&I's backlog grew to several thousand contracts spread across CB&I's businesses worldwide.[9] Among them were two EPC agreements in which Shaw (the major contractor) and WEC (the designer and engineer) contracted as a consortium with customers to construct two nuclear power plants—one in Georgia ("Vogtle") and one in South Carolina ("V.C. Summer").[10] These were the first nuclear projects in the United States in more than 30 years, and they were building a first-of-its kind WEC AP1000 design.[11]

Shaw and WEC had entered into a Consortium Agreement ("CA") for the projects under which WEC was primarily responsible for the nuclear island engineering and equipment supply,

---

[4] CAC ¶ 30; 2/26/16 Form 10-K at 3, https://www.sec.gov/Archives/edgar/data/1027884/000102788416000357/a2015123110k.htm.
[5] Ex. 5, Acquisition of the Shaw Group by CB&I, at CB&ICo_001395779.
[6] 5/2/13 10-Q, at 11, https://www.sec.gov/Archives/edgar/data/1027884/000119312513196750/d516215d10q.htm.
[7] Ex. 5, Acquisition of the Shaw Group by CB&I, CB&ICo_001395775; Asherman Decl. ¶ 9.
[8] 5/2/13 10-Q, at 11, https://www.sec.gov/Archives/edgar/data/1027884/000119312513196750/d516215d10q.htm.
[9] *Id.* at 27-28.
[10] *Id.* at 24.
[11] Ex. 4, Domestic AP1000 Change in Estimate Evaluation, CB&ICo_000374111

and Shaw was primarily responsible for the pipe, steel, and modular fabrication and assembly and certain engineering- and construction-related activities; the consortium, in turn, had the EPCs with the owners.[12] Both EPCs provided WEC and Shaw with safeguards against the risks inherent in such first-of-a-kind projects, and the CA with WEC provided Shaw with safeguards against the risks inherent in constructing WEC's revolutionary design.[13]

Before CB&I acquired Shaw, both projects had already experienced delays and projected cost increases.[14] WEC's AP1000 design was not yet complete, and WEC had made thousands of design change proposals.[15] Disputes between the consortium and the owners had already arisen (lawsuits between the consortium and the Vogtle owners had already been filed), and Shaw had already booked significant UCO/claim revenue for the Vogtle project, along with significant "contractual entitlements"—amounts owed by WEC under the terms of CA or the owners under the EPCs.[16]

The EPCs provided that some payments would be made when the consortium achieved specific milestones.[17] WEC's constantly changing design, however, made it difficult for CB&I to predict the timing of milestones and associated payments.[18] But CB&I did hit significant milestones during the class period, including on the Vogtle project in March 2014 and the V.C. Summer project in May 2014.[19]

_Purchase Accounting_. Once the Shaw acquisition closed, GAAP business combination

---

[12] 12/21/12 Shaw Grp. Inc. 10-K, at 31, https://www.sec.gov/Archives/edgar/data/914024/000143774912013111/shaw_10ka1-083112.htm.
[13] _See_ Ex. 5, Project Jewel: Project Contract Due Diligence, CB&ICo_002101308-15; Ballschmiede Decl. ¶ 21.
[14] Stockton Decl. ¶ 4.
[15] Ex. 4, Domestic AP1000 Change in Estimate Evaluation, CB&ICo_000374115.
[16] 12/21/12 Shaw Grp. Inc. 10-K, at 31, https://www.sec.gov/Archives/edgar/data/914024/000143774912013111/shaw_10ka1-083112.htm; Stockton Decl. ¶¶ 4, 14.
[17] MSJ Ex. 2, Mullen Dep. 142-43.
[18] _Id._
[19] Ex. 7, Supervisory Board Materials Excerpt, CB&ICo_001213225, CB&ICo_001213549; Asherman Decl. ¶¶ 9, 10.

rules required CB&I to "fair value" all of Shaw's tangible and intangible assets and liabilities as of the closing date, allocate the $3.3B purchase price to those acquired assets and liabilities, and record the excess of the purchase price over the net fair values as goodwill.[20] CB&I engaged Deloitte to assist with the fair valuation exercise.[21]

As with any major transaction, CB&I did not have enough information to fair value Shaw's assets and liabilities and make a definitive purchase price allocation at closing.[22] CB&I thus disclosed in its first quarterly filing after closing a preliminary allocation that included a roughly $1.1B liability for net contracts in progress ("CIP"), which included the Nuclear Project contracts, and resulted in roughly $2.45B in goodwill.[23] CB&I disclosed that the allocation was preliminary and subject to change when additional information concerning final asset and liability valuations was obtained.[24] GAAP provides the acquirer with a "measurement period" of up to one year during which adjustments to provisional values may be made for new information obtained relating to events and circumstances existing at closing, with any such adjustments made retrospectively, as if the information were known as of closing.[25] If changes in estimates during the one-year window are determined to be due to facts and circumstances that existed at closing, then GAAP *requires* that they be accounted for on the balance sheet as a decrease in fair value with a corresponding increase in goodwill.[26]

Over the next year, CB&I gathered information about the acquired assets and liabilities, including the Nuclear Projects.[27] The size and complexity of the projects made estimating the costs

---

[20] Ex. 13, ASC 805-10-25-16.
[21] Ex. 1, Deloitte Report, CB&ICo_00481570.
[22] 5/2/13 10-Q at 12, https://www.sec.gov/Archives/edgar/data/1027884/000119312513196750/d516215d10q.htm.
[23] *Id.*
[24] *Id.*; Ex. 13, ASC 805-10-25-13 through -14.
[25] Ex. 13, ASC 805-10-25-13, ASC 805-10-25-14.
[26] Ex. 13, ASC 805-10-25-13 through -14; Ballschmiede Decl. ¶ 9; Stockton Decl.¶ 7.
[27] *See* Ex. 1, Deloitte Report, CB&ICo_00481572.

to complete them especially challenging, and it took CB&I the full measurement period to fair value them.[28] As part of that process, CB&I determined that the expected profit margins on the Nuclear Projects had fallen below what a market participant would require to complete the contracts.[29] So to fair value the contracts, GAAP required CB&I to determine what profit margin a market participant would require and book a margin fair value (or profit normalization) liability, a noncash item that would be included in revenue on a percentage of completion ("POC") basis as the projects progressed—something CB&I specifically disclosed.[30] CB&I also identified additional future costs to complete the projects, and GAAP required CB&I to assess whether those estimated cost increases were due to facts and circumstances that existed at closing (making them purchase price allocation ("PPA") adjustments to the balance sheet) or to post-closing events (making them income statement expenses during the period).[31] After a bottoms-up analysis, CB&I determined that the cost increases were not due to post-closing events but rather were driven by the fact that at closing, WEC still did not have a constructible AP1000 design that met Nuclear Regulatory Commission ("NRC") requirements, resulting in constant design changes and attendant increased costs.[32] CB&I contemporaneously documented its analysis and conclusions in accounting memoranda that were reviewed by its outside auditor, E&Y.[33]

CB&I updated its preliminary purchase price allocation each quarter during the one-year window, making PPA adjustments based on its fair value work to date.[34] As reflected in Deloitte's final report, the final allocation resulted in residual goodwill of roughly $3.3B, or the full purchase

---

[28] *Id.*; Ex. 2, Rudolph Dep. at 155-56.
[29] *See* Ex. 1, Deloitte Report at EY-CBI-001823-24; Stockton Decl. ¶ 8.
[30] *See* Ex. 1, Deloitte Report at EY-CBI-001823-24; Stockton Decl. ¶ 8.
[31] ASC 805-10-25; Stockton Decl. ¶ 9.
[32] *Id.*
[33] *See, e.g.*, Ex. 4, AP1000 Change in Estimate, CB&ICo_000374110; Ex. 2, Rudolph Dep. at 156-57.
[34]           *See*           2/27/14           Form           10-K           at           32,
https://www.sec.gov/Archives/edgar/data/1027884/000102788414000003/a2013123110k.htm.

price.[35] Importantly, however, PPA adjustments—including their retrospective nature and effects on goodwill—are contemplated by GAAP, were described in CB&I's disclosures, do not signal goodwill impairment, and were reviewed and deemed reasonable by E&Y.[36]

*Goodwill.* GAAP requires that goodwill be tested for "impairment"—the condition that exists when the carrying amount of goodwill exceeds its implied fair value—at the "reporting unit" level and provides criteria for determining reporting units.[37] Because the fair value of goodwill can be measured only as a residual and not directly, GAAP provides a methodology to determine an amount that achieves a reasonable estimate of the value of goodwill.[38] A company may first assess qualitative factors to see if a goodwill impairment test is necessary, or it can proceed directly to the two-step goodwill impairment test.[39] Step 1, used to identify potential impairment, compares a reporting unit's fair value with its carrying amount; and if the carrying value exceeds the fair value, then step 2 is performed to measure the amount of loss to be recognized (if any).[40]

GAAP requires that goodwill be tested annually and "between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount"[41]—that is, if there are indicators of impairment. GAAP provides a non-exclusive list of examples of such events and circumstances (e.g., macroeconomic conditions, industry and market considerations, and entity-specific financial performance and events) and describes the process for evaluating them.[42] Critically, "[n]one of the individual examples of events and circumstances … are intended to represent standalone events or

---

[35] Stockton Decl. ¶ 10.
[36] Ex. 13, ASC 805-10-25-13 through -14; Ex. 12, 2013 Audit Report, EY-CBI-001206; Ex. 12, Review of Valuation, EY-CBI-001688.
[37] Ex. 13, ASC 350-20-35-1; Ex. 13, ASC 350-20-35-33 to -38.
[38] Ex. 13, ASC 350-20-35-2.
[39] Ex. 13, ASC 350-20-35-3.
[40] Ex. 13, ASC 350-20-35-4, -8, -9.
[41] Ex. 13, ASC 350-20-35-28, -30.
[42] Ex. 13, ASC 350-20-35-30, -3C, -3F.

circumstances that necessarily require an entity to perform the first step of the goodwill impairment test."[43] Rather, whether there are indicators of impairment necessitating an interim goodwill impairment test depends on a company's evaluation, based on the weight of the evidence, of the significance of all identified events and circumstances in the context of determining whether it is more likely than not that the reporting unit's fair value is less than its carrying amount.[44]

CB&I's Engineering, Construction, and Maintenance division had three business units— Oil and Gas, Power, and Plant Services—and, applying the GAAP criteria, CB&I determined that each qualified as a reporting unit.[45] The Nuclear Projects, like all projects, were housed in a business unit (Power, as they had been under Shaw), and were therefore part of the Power reporting unit.[46] CB&I documented its reporting unit determinations in accounting memoranda that E&Y once again reviewed and found to be reasonable and in accordance with GAAP.[47]

CB&I conducted its annual goodwill impairment test during the fourth quarter each year and maintained the extensive testing documentation in annual notebooks.[48] As part of that process, CB&I, assisted by Deloitte, prepared a discounted cash flow ("DCF") model for each reporting unit based on management projections, estimated growth rates, and future tax rates and applied a discount-rate based WACC.[49] CB&I then compared the DCF to the net book value for each reporting unit to determine whether goodwill was impaired.[50] CB&I described its methodology in its 10-Ks, specifying the valuation method used (including operative assumptions), the reporting

---

[43] Ex. 13, ASC 350-20-35-3G.
[44] Ex. 13, ASC 350-20-35-3G.
[45] *See, e.g.*, Ex. 8, Goodwill Notebook Excerpts, at CB&ICo_000482125-26, CB&ICo_000482405-06.
[46] Stockton Decl. ¶ 11.
[47] Ex. 2, Harwell Dep. at 69-71.
[48] *See, e.g.*, Ex. 8, Goodwill Notebook Excerpts.
[49] Stockton Decl. ¶ 12; Ex. 8, Goodwill Notebook Excerpts, CB&ICo_000482405-08.
[50] Ex. 8, Goodwill Notebook Excerpts, CB&ICo_000482430.

units used, and whether their DCFs exceeded their respective net book values.[51] Throughout the class period, CB&I's goodwill impairment tests consistently showed no impairment for any reporting unit, including Power.[52] That was true even though CB&I estimated negative future cash flows from the Nuclear Projects, because those negative future cash flows were expected to be less than the positive estimated future cash flows from the rest of Power.[53]

Additionally, each quarter, CB&I , based on the weight of the evidence, the significance of all identified events and circumstances in the context of determining whether it was more likely than not that the fair value of each reporting unit was less than its carrying amount, to determine whether indicators of impairment existed.[54] As CB&I disclosed in each class-period 10-Q, after performing the relevant assessment, CB&I identified no indicators of impairment.[55]

In late October 2015 (several months after the end of the class period), CB&I announced it was selling its nuclear operations—including the Nuclear Projects—to WEC. CB&I would receive approximately $161 million upon WEC's substantial completion of the projects and milestone payments of up to $68 million for certain ongoing discrete work.[56] WEC and the owners gave CB&I a complete release, including for any future events or liabilities, providing CB&I with a clean break from projects based on WEC's first-of-its-kind design.[57]

CB&I's decision to sell the nuclear operations had nothing to do with concerns of either a

---

[51] CAC ¶ 110; 2/27/14 Form 10-K, at 17, https://www.sec.gov/Archives/edgar/data/1027884/000102788414000003/a2013123110k.htm.
[52] Ex. 8, Goodwill Notebooks Excerpts, at CB&ICo_000482430.
[53] Stockton Decl. ¶ 12.  As is common in EPC contracts, Shaw received approximately $1.2B in upfront payments from the owners of the Nuclear Projects, resulting in a large liability on the balance sheet that CB&I acquired from Shaw. Ex. 2, Ballschmiede Dep. at 82; Ballschmiede Decl. ¶ 17.;
[54] Stockton Decl. ¶ 12.
[55] *See, e.g.*, CAC ¶¶ 122, 136, 147, 170; 5/2/13 10-Q at 14, https://www.sec.gov/Archives/edgar/data/1027884/000119312513196750/d516215d10q.htm; Stockton Decl. ¶ 12.
[56] 2/26/16 Form 10-K, at 62, https://www.sec.gov/Archives/edgar/data/1027884/000102788416000357/a2015123110k.htm.
[57] *Id.*

looming goodwill impairment or an inability to collect on change orders and claims; rather, it was a business decision that CB&I made to address the fact that it was spending hundreds of millions of its own cash to fund construction of the Nuclear Projects while the owners and the Consortium debated responsibility for the delays and cost increases.[58] CB&I believed that, it had contractual rights to recover virtually for all these delays and cost increases from the owners or WEC.[59] But CB&I had no mechanism to force payment in the meantime, and the goal posts kept moving in terms of when the projects would be completed and the claims resolved.[60] Thus, when the opportunity arose to divest the nuclear operations, which were not core to CB&I's business, in exchange for full releases from the owners and WEC, CB&I determined that was the best course.[61]

CB&I ultimately took a non-cash pre-tax charge of approximately $1.5B related to the impairment of goodwill and intangible assets and a loss on net assets sold.[62] The undisputed evidence is clear: that the charge was driven *entirely* by the sale, and but for the sale, the Power reporting unit's fair value would have continued to exceed its carrying value.[63]

*UCO/Claim/Contractual Entitlement Revenue.* Under GAAP, UCOs are contract modifications that are unapproved by the customer as to scope or price, and claims are amounts in excess of contract price that the contractor seeks to recover for change orders in dispute or unapproved as to both scope and price, customer-caused delays, design or spec errors, or other causes of unanticipated additional costs.[64] GAAP expressly permits recognition of UCO/claim revenue if the amounts can be reliably estimated and recovery is probable.[65]

---

[58] Ex. 2, COO Pat Mullen Dep. 122-25.
[59] Ballschmiede Decl. ¶ 21; Asherman Decl. ¶¶ 11, 15.
[60] Asherman Decl. ¶ 15
[61] Asherman Decl. ¶ 15.
[62] CAC at 18 n.2;2/26/16 Form 10-K, at 62, https://www.sec.gov/Archives/edgar/data/1027884/000102788416000357/a2015123110k.htm.
[63] Ex. 13, Accounting Memo Excerpts, CB&ICo_001026058.
[64] Ex. 13, ASC 605-35-25-30.
[65] Ex. 13, ASC 605-35-25.

Each quarter, CB&I prepared issue tracking forms to document and support the UCO/claim revenue it booked.[66] The issue trackers summarized the nature of the UCO/claim and its current status, quantified the associated costs, analyzed the relevant revenue recognition requirements, and documented the company's conclusion as to the appropriate amount to record.[67] The issue trackers also attached legal opinions from in-house counsel or outside counsel, Peckar & Abramson ("P&A"), opining on the contractual support for the company's position.[68]

During the class period, CB&I disclosed in its quarterly filings that, like Shaw, it recognized revenue associated with UCOs/claims to the extent the related costs had been incurred, the value could be reliably estimated, and recovery was probable; and CB&I further disclosed that, like Shaw, it also included in contract price amounts contractually recoverable from its customers and consortium partner.[69] With respect to the Nuclear Projects, CB&I specifically disclosed the amount of UCO/claim revenue included in project price, and that project price also included estimated amounts recoverable from the owners under their respective EPCs ("Customer Obligation") and from WEC under the CA ("WEC Obligation").[70] CB&I cautioned, however, that the Nuclear Projects had long construction durations; the cost estimates covered costs that would be incurred over several years; the commercial matters might not be resolved in the near term; and there could be an adverse effect on CB&I's results of operations, financial performance, and cash flow if they were not resolved for the amounts recorded, if the amounts due under the Customer and WEC Obligations were not recovered, or if future cost increases were not recoverable under

---

[66] *See, e.g.*, Ex. 9, Issue Tracker Excerpts, at CB&ICo_000483346; Ex. 2, Rudolph Dep. at 104-05.
[67] *See, e.g.*, Ex. 9, Issue Tracker Excerpts at CB&ICo_000484419.
[68] *Id.* at CB&ICo_000484419.
[69] *See, e.g.*, CAC ¶ 77; 7/25/14 10-Q at 23-24,
https://www.sec.gov/Archives/edgar/data/1027884/000102788414000040/a2014063010q.htm. Contractual entitlements are neither UCOs nor claims but rather amounts owed under the terms of the existing contracts. Stockton Decl. ¶¶ 14, 15.
[70] 2/27/14 10-K, at 85-86,
https://www.sec.gov/Archives/edgar/data/1027884/000102788414000003/a2013123110k.htm.

those Obligations.[71]

### III.   ARGUMENT

Summary judgment must be granted on the Section 10(b) and 20(a) claims because there is no genuine issue of material fact that any of the 16 Challenged Statements ("CS")[72] were false or misleading or made with scienter.[73]

*Falsity*. Plaintiffs cannot survive summary judgment with claims that CB&I failed to disclose information—let alone material information—about the Nuclear Projects. The Second Circuit has squarely held that (1) "to support a finding of liability, Rule 10b-5 expressly requires an actual *statement*, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state"; (2) "[a]bsent an *actual statement*, a complete failure to make a statement—in other words, a 'pure omission,'—is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts"; and (3) "'§ 10(b) and Rule 10b-5 do *not* create an affirmative duty to disclose any and all material information,'" nor does "such duty arise[] 'merely because a reasonable investor would very much like to know.'"[74] Thus, this Court must look at each of the 16 CS and determine whether Plaintiffs have raised a genuine issue of material fact that each was an "untrue statement of material fact" or omitted "to state a material fact necessary in order to make the statement[] made, in light of the circumstances under which [it was] made, not misleading."[75]

*Scienter*. Plaintiffs also must raise a genuine issue of material fact that each CS was made

---

[71] *See, e.g.*, *id.*

[72] Judge Scheindlin's report and recommendation on class certification identifies the 16 Challenged Statements. *See* Dkt. 217 at 59-60. Defendants have attached a chart showing the contents of each and labeling them "CS#_." Ex. 11.

[73] Because summary judgment is proper on the § 10(b) claims, it is also proper on the § 20(a) claims. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

[74] *In re Vivendi*, 838 F. 3d at 239, 241 (emphasis added) (citations omitted).

[75] 17 C.F.R. § 240.10b-5(b) (2020); *see Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 487 n.2 (2013).

with scienter—that is, "a mental state embracing intent to deceive, manipulate, or defraud."[76] Neither Defendants' trading patterns nor any other evidence creates a triable issue that they were motivated to commit fraud.[77] Scienter thus requires evidence of "[c]onscious misbehavior," which "consists of deliberate, illegal behavior,"[78] or "conscious recklessness," which requires evidence that defendants' conduct was "highly unreasonable" and "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it"—"i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence."[79]

## A.   CB&I's accounting opinions (CS#1, 4, 5, 8, 10, 11, 14, 16) were not false or misleading or made with scienter.

*Falsity*. Most of the CSs were made in CB&I's quarterly SEC filings. Plaintiffs do not allege that *facts* disclosed in those filings were false; instead, Plaintiffs allege that several *statements of opinion* were false or misleading:[80]

- CB&I's statement that its financial statements were prepared in accordance with GAAP.[81]

---

[76] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quotation marks omitted); *Novak*, 216 F.3d at 306-07 (quoting 15 U.S.C. § 78u-4(b)(2)).

[77] Asherman Decl. ¶ 16; Ballschmiede Decl. ¶ 22; Stockton Decl. ¶ 21.

[78] *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 573 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

[79] *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis omitted). In this case, any attempt to prove scienter through recklessness does Plaintiffs no good because under the terms of CB&I's recently effective bankruptcy plan, Plaintiffs have released all claims against CB&I and its former officers except those involving "actual fraud." *See* Am. Order, ¶¶ 48-50 & Ex. A at 14-15, 54-55, *In re McDermott Int'l, Inc., et al.*, Case No. 20-30336 (DRJ) (Bankr. S.D. Tex. Mar. 14, 2020), ECF No. 684.

[80] *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011) ("[P]laintiff's allegations regarding goodwill do not involve misstatements or omissions of material fact, but rather a misstatement regarding Regions' opinion. Estimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact."); *accord City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 66-68 (2d Cir. 2012) (applying *Fait* to interim goodwill impairment testing); *see also In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *13 (S.D.N.Y. May 7, 2020) ("[G]oodwill balances are opinion statements."); *Lewis v. YRC Worldwide Inc.*, 2020 WL 1493915, at *15 (N.D.N.Y. Mar. 27, 2020) ("Plaintiffs have failed to allege facts plausibly suggesting that Defendants did not actually have the opinion that the financial statements were prepared in accordance with GAAP or other laws when expressed."); *see generally Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) ("It is well-settled that GAAP provisions are subject to interpretation and 'tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.'" (quoting *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979)), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

[81] CAC ¶ 103 (CS#1C); CAC ¶ 114 (CS#4B); CAC ¶ 124 (CS#7C); CAC ¶ 138 (CS#10B); CAC ¶ 149 (CS#12B); CAC ¶ 164 (CS#15B); CAC ¶ 172 (CS#16B).

- CB&I's disclosures regarding the goodwill calculated from the Shaw acquisition based on CB&I's determination of the fair value of the assets acquired and liabilities assumed (the "purchase accounting statements").[82]

- CBI&I's disclosures regarding its determinations that the goodwill attributable to its Power reporting unit was not impaired and there were no indicators of impairment necessitating interim impairment testing (the "goodwill impairment statements").[83]

- CB&I's disclosures regarding its recognition of revenue based on its estimated recoveries from UCOs, claims, and contractual recoveries related to the Nuclear Projects (the "UCO/claim revenue statements").[84]

Plaintiffs face a high bar in proving that these opinions were false or misleading. Under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, a "sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong," and "a statement of opinion is not misleading just because external facts show the opinion to be incorrect" or "an issuer knows, but fails to disclose, some fact cutting the other way."[85] Rather, for CB&I's accounting opinions to be actionable, Plaintiffs must establish that Defendants (1) did not believe them, (2) supplied supporting facts that were untrue, or (3) "omit[ted] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" that "conflict with what a reasonable investor would take from the statement itself"—that is, if the omitted facts show the issuer lacked the basis a reasonable investor would expect for the opinions.[86] Plaintiffs cannot raise a triable fact issue on any of these.

*First*, there is no evidence that the Individual Defendants, or anyone else at CB&I, did not believe the accounting statements. On the contrary, the record indisputably establishes they did.[87]

*Second*, Plaintiffs do not challenge any "supporting facts" supplied by the Individual

---

[82] CAC ¶ 112 (CS#4A).
[83] CAC ¶¶ 101, 110, 112, 121, 122, 136, 146-47, 161-162, 169-70 (CS#1B, 4A, 5B, 8A, 11A, 14A, 16A).
[84] CAC ¶ 99 (CS#1A).
[85] 575 U.S. 175, 186-89 (2015).
[86] *Id.* at 185-86, 189, 195-96; *accord Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).
[87] *See* Stockton Decl. ¶ 19; Ballschmiede Decl. ¶¶ 5, 7, 15, 16; Asherman Decl. ¶ 3.

Defendants, nor is there any evidence that they supplied any untrue supporting facts.

*Third*, there is no evidence that Defendants omitted material facts about their "inquiry into or knowledge concerning" the accounting determinations, or that any such "facts conflict[ed] with what a reasonable investor would take from the opinions themselves." On the contrary, the record establishes the basis for, and is entirely consistent with what a reasonable investor would expect about, the accounting determinations—they resulted from thorough, documented internal analyses, and they were reviewed by several outside parties with *no one* finding a GAAP violation:

- CB&I's purchase accounting, goodwill, and UCO/claim revenue determinations were the product of thoroughly documented, bottom-up exercises.[88]

- In making those determinations, CB&I relied on outside experts—Deloitte in connection with its purchase accounting and goodwill determinations, and P&A and an outside consultant, Modus, for its UCO/claim determinations.[89]

- E&Y, as CB&I's independent auditor, focused on (among other issues) CB&I's purchase accounting, including its PPA adjustments and goodwill determinations; its goodwill impairment testing and indicator of impairment determinations; and its UCO/claim revenue determinations; and E&Y determined that each of those determinations was reasonable, concurred with CB&I's conclusion that goodwill was not impaired, and issued clean audit opinions throughout the class period.[90]

- After a short-seller report attacked CB&I's purchase accounting,[91] CB&I's Audit Committee hired an outside accounting expert, Financial Reporting Advisors, to independently review CB&I's purchase accounting, and that firm concluded that it was reasonable under GAAP.[92]

- The SEC specifically investigated CB&I's purchase accounting and chose to close its investigation without recommending an enforcement action.[93]

- Goodwill was not written down, and the UCOs/claims were not written off, until CB&I

---

[88] *See, e.g.*, Ex. 4, Accounting Memo Excerpts, CB&ICo_000374110; Ex. 8, Goodwill Notebook Excerpts; Ex. 9, Issue Tracker Excerpts.

[89] *See* Ex. 1, Deloitte Report; Ex. 9, Issue Tracker Excerpts; Ex. 9, Modus Report.

[90] *See* 2/27/14 Form 10-K at 44, https://www.sec.gov/Archives/edgar/data/1027884/000102788414000003/a2013123110k.htm; 2/25/15 Form 10-K at 45, https://www.sec.gov/Archives/edgar/data/1027884/000102788415000095/a2014123110k.htm; 2/26/16 Form 10-K at 49, https://www.sec.gov/Archives/edgar/data/1027884/000102788416000357/a2015123110k.htm; Ex. 12 EY Document Excerpts.

[91] *See* CAC ¶ 129.

[92] Ex. 2, Ballschmiede Dep. 201-03.

[93] Ex. 10, SEC Termination Letter, CB&Co_002102687.

sold the nuclear operations to WEC months after the end of the class period, at which point GAAP required that charges be taken based on the sale price.[94]

- CB&I never withdrew or restated its financial statements, and E&Y never withdrew its clean audit opinions.[95]

Plaintiffs' only possible response is to rely on their accounting expert, Harris Devor, but this does not create a genuine issue of material fact.[96] First, as for the purchase accounting statements, "[g]oodwill balances are accounting estimates produced through an exercise of judgment," meaning "a wide range of goodwill values could be compliant with GAAP," and there is no evidence CB&I's goodwill calculations for the Shaw acquisition "fell outside of that permissible range."[97] Devor claimed only that CB&I's PPA adjustments "appeared" to him to have improperly applied GAAP; he admitted he neither definitely determined CB&I actually violated GAAP, nor analyzed the propriety of any particular PPA adjustment.[98]

Second, concerning the goodwill impairment statements, Devor claimed that goodwill *associated with the Nuclear Projects* was impaired, but GAAP requires that goodwill be measured and tested *at the reporting unit level*, and not at the project level.[99] Devor did not opine that CB&I violated GAAP in concluding that the appropriate reporting unit level was the Power business unit (not the Nuclear Projects),[100] nor did he opine that the Power reporting unit's goodwill should have

---

[94] Ex. 4, Accounting Memo Excerpts.

[95] Stockton Decl. ¶ 19; *see generally* SEC filings.

[96] Devor's opinions are unreliable and cannot be credited under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). They contradict GAAP and rest on what Devor himself called only a "surface analysis" of CB&I's accounting determinations. Ex. 3, 2/28/20 Devor Dep. 147.

[97] *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *14.

[98] Ex. 3, 2/28/20 Devor Dep. 146-47 ("Q: You didn't quantify any amount of purchase price adjustments that you contend were improper? There's no amount? A: That's correct. Q: And you did not quantify any specific purchase price adjustments that you contend were improper and didn't comply with GAAP? A. Well, I mean, there's certainly examples and instances that I point out in the report that I say appear to be more period expenses versus not. **But I haven't quantified it, and the analysis is a surface analysis.** Which is why, by the way, the opinion says 'appears to have improperly.'") (emphasis added).

[99] Ex. 13, ASC 350-20-35-1 ("[G]oodwill shall be tested for impairment at a level of reporting referred to as a reporting unit."); *accord* Ex. 3, 2/28/20 Devor Dep. 175-76.

[100] Ex. 3, 2/28/20 Devor Dep. 177-78 ("Q. Do you intend to opine that CB&I improperly applied GAAP in determining

been impaired before it was,[101] let alone by how much or when, which is fatal.[102] Nor is the impairment CB&I ultimately took when it sold its nuclear operations to WEC months after the class period ended evidence that CB&I's goodwill impairment statements were false.[103]

Similarly, Devor's assertion that the presence of so-called "triggering events" renders false CB&I's statements that "there were no indicators of impairment" has no foundation in GAAP. GAAP makes clear—and Devor admitted—that events and circumstances like those he identified are not *per se* indicators of impairment requiring a goodwill impairment test; rather, they *might or might not* be significant in CB&I's determining whether it was more likely than not that Power reporting unit's fair value was less than its carrying amount.[104] The undisputed record establishes that CB&I performed the requisite evaluation and concluded that the more-likely-than-not standard was *not* met (i.e., there were no indicators of impairment[105]) and E&Y agreed.[106] The mere presence of Devor's "triggering events" did not *require* Defendants to conclude that GAAP's more-likely-than-not standard had been met for the Power reporting unit, and they are not evidence that Defendants' "no indicator of impairment" statements were false. The Second Circuit made

---

what its reporting units would be? A. No…. Q. You are not opining that no reasonable accounting professional could have concluded that the power reporting unit was the appropriate reporting unit, correct? A. I don't have enough information to conclude that, which is why I don't.").

[101] Ex. 3, 2/28/20 Devor Dep. 179 ("Q. You also did not conduct your own goodwill impairment test for any of the periods at issue, correct? A. I wouldn't have the information to do that.").

[102] *See, e.g.*, *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *23 (S.D.N.Y. Apr. 2, 2020) ("[T]o sufficiently plead a violation based on a failure to take an impairment charge, the complaint must typically show, at a minimum, 'the amount by which certain assets should have been written down' and 'when the write-down[] should have occurred.'" (quoting *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 268-69 (S.D.N.Y. 2009))).

[103] *See, e.g.*, *City of Sterling Heights*, 655 F. Supp. 2d at 272 ("That Vodafone ultimately would take an impairment charge in 2006 does not in itself provide an actionable basis to claim that the failure to do so earlier was fraudulent."); *In re Aceto Corp. Secs. Litig.*, 2019 WL 3606745, at *7 (E.D.N.Y. Aug. 6, 2019) ("[P]laintiff's contention that Aceto should have impaired its goodwill and intangible assets valuation earlier than it did amounts to mere disagreement with Aceto's accounting judgment.").

[104] Ex. 13, ASC 350-20-35-3G; Ex. 3, 2/28/20 Devor Dep. 184 ("[I]n my mind, the word 'trigger' – it really means indications, potential indications."); *id.* at 188 (Q. So you're saying that these are indicators of potential impairment, not indicators of actual impairment? A. It could be both, but – Q. You have to evaluate? A. – you can't get to actual until you evaluate it.").

[105] Stockton Decl. ¶ 12.

[106] Ex. 12, EY Document Excerpts, at EY-CBI-006650.

that exact point in *City of Omaha, Nebraska Civilian Employees' Retirement System v. CBS Corp.*:

> Plaintiffs' allegations regarding the downward trajectory of CBS's overall market capitalization, declining advertising revenues for some CBS reporting units, analysts' expectations regarding the media business environment, and CBS's own anticipation of an economic slowdown may suggest that CBS expressed overly optimistic views regarding its overall business outlook. But these allegations, even viewed in combination, do not plausibly demonstrate that defendants knew, nor even had reason to know, at any specific time during this period that it was more likely than not that interim impairment testing would reveal that the goodwill of any specific reporting unit was overvalued.[107]

Third, as for the UCO/claim revenue statements, Devor did not analyze CB&I's accounting for any particular UCO/claim for which it booked revenue, despite admitting that "evaluating on a case-by-case basis" is "what an accountant would do."[108] Instead, Devor contended CB&I should have booked *no* UCO/claim revenue because of disputes with the owners and WEC. But GAAP expressly provides that "change orders *in dispute*" are treated as claims[109] and permits recognition of revenue "if it is probable that the claim will result in additional contract revenue and if the amount can be reliably estimated."[110] The undisputed evidence shows that after evaluating the correct criteria, CB&I determined that recovery of some portions of the various UCOs/claims was probable and recognized those amounts.[111] Those determinations were supported by legal opinions confirming the contractual bases for the UCOs/claims and internal and outside assessments of the

---

[107] 679 F.3d at 68.

[108] Ex. 3, 2/28/20 Devor Dep. 241-42; *id.* at 257-59 ("I think you said you haven't attempted to quantify the amount [of UCOs, claims, and contractual entitlements related to the Nuclear Projects] that you think wasn't properly recorded? A. No. Q. No, you haven't done that? A. That's correct."); *id.* at 283-84 ("Q. And you're not separately calling out a specific unapproved change order or claim that you don't think was probable? A No, because – that's correct. I wouldn't have had the knowledge to be able to make that assessment independently without knowing the precise nature of the dispute and everything else. Q. And you didn't undertake that analysis here? That wasn't part of your analysis? A. On a change-order-by-change-order basis, that's correct.").

[109] Ex. 13, ASC 605-35-25-30 (emphasis added).

[110] Ex. 13, ASC 605-35-25-31.

[111] Ex. 9, Issue Tracker Excerpts, at CB&ICo_000484418-19; Stockton Decl. ¶ 15, 19; Ex. 3, 2/28/20 Devor Dep. 255 ("Q. You are not saying that CB&I reached a conclusion that recovery was not probable; correct? You haven't seen any evidence of that? A. Not – not in the documentation; that's correct."); *see also id.* at 278-80 (discussing CB&I's documentation).

UCO/claim amounts.[112] And E&Y agreed that CB&I properly recorded these amounts in accordance with GAAP.[113] The disputes with the owners and WEC did not require CB&I to conclude that recovery was not probable even for a single dollar of the UCOs/claims, and there is no evidence that the amounts CB&I determined were probable were outside the bounds of accounting judgment.[114]

Devor's unreliable opinions do not create a triable fact issue on whether "Defendants held anything other than an 'honest belief'" in their accounting opinions,[115] particularly when courts in this District have recognized that a clean audit opinion undermines any inference that an accounting determination was wrong, much less not believed at the time.[116] Devor's contentions— that CB&I should not have concluded that certain estimated cost increases were properly characterized as PPA adjustments, should have impaired goodwill earlier than it did, and should not have determined that recovery of revenue on UCOs/claims for the Nuclear Projects was probable—at most "amount[] to mere disagreement with [CB&I's] accounting judgment," yet courts "have routinely rejected this type of allegation as a basis for securities fraud."[117]

*Scienter*. Plaintiffs come nowhere close to creating a fact issue on scienter. On summary judgment, "the issue is whether the evidence, taken as a whole, could support a finding by a reasonable juror that [each Defendant] acted with" scienter.[118] No reasonable juror could reach

---

[112] Ex. 9, Issue Tracker Excerpts, at CB&ICo_000484418-19; Ex. 9, Modus Report; Asherman Decl. ¶ 11

[113] Ex. 12, EY Document Excerpts, at EY-CBI-001203-04, EY-CBI-003863.

[114] *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019) (accounting treatment based on expectation contract would be renewed was not false or misleading despite allegations that "'renewal was increasingly unlikely' throughout the Class Period because of the 'contentious, unresolved disputes'" between the parties, where discussions were ongoing throughout class period and non-renewal did not happen until after the class period); *see also Plumbers & Steamfitters*, 694 F. Supp. 2d at 302 ("Because the 'GAAP is not [a] lucid or encyclopedic set of pre-existing rules . . . [and is] [f]ar from a single-source accounting rulebook,' reasonable disagreements and deference to business judgment is permissible." (quoting *Shalala*, 514 U.S. at 101)).

[115] *Chapman v. Mueller Water Prods., Inc.*, 2020 WL 3100243, at *15 (S.D.N.Y. June 11, 2020).

[116] *E.g.*, *Woolgar v. Kingstone Cos.*, 2020 WL 4586792, at *18 (S.D.N.Y. Aug. 10, 2020).

[117] *In re Aceto*, 2019 WL 3606745, at *7 (collecting cases).

[118] *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000).

that conclusion here. Even if Plaintiffs had procured competent expert testimony of a GAAP violation (they did not), the Second Circuit has made clear that "GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim…. Only where such allegations are *coupled with evidence of corresponding fraudulent intent* … might they be deemed sufficient."[119] As the Second Circuit has long insisted, scienter requires "some showing that Defendants 'intentionally and deliberately' refused to comply with GAAP."[120] Plaintiffs have no such evidence here.

It is undisputed that CB&I applied the proper GAAP standards in making the accounting determinations in question and that E&Y examined those determinations, concluded they were reasonable, and issued clean opinions throughout the class period.[121] This alone undermines any inference of scienter.[122] And there is zero evidence that any Defendant "intentionally and deliberately" refused to comply with GAAP.[123] Plaintiffs cannot create a fact issue as to scienter.

## B.    The contractual entitlement opinions (CS#10, 12, 13, 15) were not false or misleading or made with scienter.

---

[119] *Novak*, 216 F.3d at 309 (internal quotation marks and citations omitted) (emphasis added); *accord City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 2020 WL 1529371, at *26 (S.D.N.Y. Mar. 30, 2020) ("The Second Circuit has long applied this standard, repeatedly holding that violations of GAAP are by themselves insufficient to state scienter.") (collecting cases); *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y.1992) ("[Scienter] requires more than a misapplication of accounting principles."); *see also In re Express Scripts*, 773 F. App'x at 14-15 ("Plaintiffs cannot proceed with 'allegations of fraud by hindsight'; allegations of GAAP violations alone are not sufficient; and 'as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.'" (quoting *Novak*, 216 F.3d at 309)).

[120] *Woolgar*, 2020 WL 4586792, at *26 (plaintiffs adequately pleaded scienter where they alleged that defendants "'intentionally and deliberately' refused to follow internal accounting policies" (quoting *Novak*, 216 F.3d at 311)).

[121] Ex. 12, EY Document Excerpts.

[122] *See Woolgar*, 2020 WL 4586792, at *25-26 ("[T]he fact that Kingstone's independent auditor … [was] unable to identify any material inaccuracies . . . undermines a finding of recklessness on Defendants' part."); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012) ("[T]he fact that UBS's outside independent auditor . . . did not require a restatement of UBS's financials significantly undercuts Plaintiffs' allegations of recklessness . . . ."), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *In re JP Morgan Chase Sec. Litig.*, 2007 WL 950132, at *13 (S.D.N.Y. 2007) (fact that auditor had not required restatement demonstrates "reasonable accountants could differ as to whether [a particular accounting rule] applied to the . . . transactions—an inference that defeats plaintiffs' claims of recklessness"), *aff'd sub nom. ECA, Local 134 IBEW Jt. Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009).

[123] *Woolgar*, 2020 WL 4586792, at *26 (plaintiffs adequately pleaded scienter where they alleged that defendants "'intentionally and deliberately' refused to follow internal accounting policies" (quoting *Novak*, 216 F.3d at 311)).

Plaintiffs challenge portions of statements made by Asherman and Ballschmiede about their belief in CB&I's contractual protections from cost overruns on the Nuclear Projects:

- CS#10 (July 2014): When asked what schedule extensions meant for profitability, Asherman said, "*the profitability doesn't change*.… any schedule re-baselining or re-estimating, that just moves things to the right, and anything like that would be on the backs of new regulatory requirements.… *it doesn't really affect our profitability, I guess, and we're well protected in the contract, very prescribed, and if there are changes, I mean, the contract is very definitive in terms of who is entitled to what*."[124]

- CS#12A (Oct. 2014): Ballschmiede said "the recent extensions of schedule on our nuclear projects has resulted in an increase in total estimated cost. *CB&I recorded additional change order claims in the third quarter totaling $200 million related to the cost impact for the South Carolina nuclear project. We believe the remaining cost impacts resulting from the U.S. nuclear project extension of schedules are recoverable under our contractual arrangements.*"

- CS#12B (Oct. 2014): When asked to give an update on CB&I's efforts to resolve the cost overruns, Asherman answered that the additional cost "*relates to the additional design and scope changes on the project, the new design for the shield build in front of us, and the extension of schedule as a result of those design changes*" and stated "we've maintained that our contractual position is very strong."[125]

- CS#13 (Nov. 2014): When asked about CB&I's contractual protections, Asherman said "*we understand that there's certainly been challenges with schedule driven by regulatory changes in the design*" but "*we're very optimistic about it. Certainly, those changes can drive and will drive some impact on schedule and some cost impact.*… We have an equally strong obligation to our shareholders to make sure that we negotiate to the best advantage we can as a company, and we feel very strong that we are in a good position when we get to that point. We're not at that point. *We're at a point of building these projects, and we're very confident that they'll end as they're supposed to.*"

- CS#15 (Feb. 2015): After describing cost increases due to "additional changes in scope," Asherman said "*[i]n virtually every case, CB&I has contractual entitlement for these costs* regardless of the determination between [WEC] and the licensees on the reasons for the design changes." When asked about negotiations over Vogtle cost overruns and CB&I's potential exposure, Asherman answered, "*we have been working with all the parties to resolve changes in scope and entitlements of change orders throughout the course of the year and have actually had some very good response in getting some traction on the settlements*" and estimated CB&I's maximum liability as half of the $247M in new cost increases announced by Vogtle's owners.[126]

---

[124] CAC ¶132.
[125] CAC ¶144; Ex. 11, CS#11B.
[126] CAC ¶159; Ex. 11, CS#14.

These, too, are opinions subject to *Omnicare*,[127] yet Plaintiffs again lack the necessary evidence to avoid summary judgment. Asherman and Ballschmiede indisputably believed their opinions,[128] and there is no evidence they supplied untrue facts or omitted material facts about their inquiry into or knowledge about the contractual protections that conflicted with what a reasonable investor would take from their opinions. On the contrary, the undisputed record evidence shows that the basis for their opinions is entirely consistent with what a reasonable investor would expect. Before acquiring Shaw, CB&I retained the law firm of Cruver Robbins & Fu, LLP to analyze Shaw's Nuclear Project contracts, and Cruver opined that on Vogtle, Shaw's "potential cost overrun liability should not exceed $125 million."[129] CS#12 and 15 were further supported by updated legal opinions from P&A and accounting memoranda analyzing and documenting the accounting treatment for the new cost increases on VC Summer and Vogtle.[130]

Plaintiffs try to gin up an omission based on disputes with the owners and WEC over responsibility for the cost overruns, but no reasonable person reading the statements fairly and in context would take from them either that there were no such disputes or that Defendants were promising CB&I would recover everything it believed it was owed.[131] In fact, the entire premise of the analyst question preceding CS#12B was that liability for the cost overruns *was* disputed, which was hardly surprising given (1) CB&I's warnings every quarter that the matters "may not be resolved in the near term" and CB&I might not recover all it sought,[132] and (2) the owners'

---

[127] *See, e.g.*, *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 755 (S.D.N.Y. 2018) (statements that company "was not in breach of contract" were opinions subject to *Omnicare*), *aff'd*, 806 F. App'x 35 (2d Cir. 2020).
[128] Asherman Decl. ¶¶ 11, 12, 13, 14; Ballschmiede Decl., ¶ 20.
[129] Ex. 6, 7/9/12 Legal Opinion, at 4; *see also* Ex. 5, Dep. Ex. 892; Ex. 2, Ballschmiede Dep. 61-62; Ballschmiede Decl. ¶ 21.
[130] Ex. 6, Legal Opinion Excerpts; Ex. 4, Accounting Memo Excerpts, at CB&ICo_000383874.
[131] *See Omnicare*, 575 U.S. at 190 ("[A]n investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.").
[132] E.g., 10/23/14 10-Q at 26, https://www.sec.gov/Archives/edgar/data/1027884/000102788414000066/a2014093010q.htm; 2/25/15 10-K at 82, https://www.sec.gov/Archives/edgar/data/1027884/000102788415000095/a2014123110k.htm.

disclaimers of liability when announcing the new cost increases. CB&I had no obligation to say more.[133] And the fact that CB&I ultimately sold the nuclear operations without recovering the amounts it was owed is not evidence the contractual protections opinions were false when made.[134] The undisputed record establishes that no one at CB&I ever stopped believing in its contractual protections, even with the WEC sale[135]; and, again, Plaintiffs have no evidence of scienter.

## C.   Asherman's statement about CB&I's commitment to safety (CS#2) was not false or misleading or made with scienter.

Plaintiffs challenge the emphasized portion of Asherman's February 2014 statement:

> In addition to our financial results, I am very proud to report that we executed 145 million workhours in 2013, with one of the best safety records in our industry. With *this relentless focus and commitment to safety*, our unique business model that delivers a more complete supply chain solution for our customers, nearly $30 billion in backlog and the assurance of long term global energy demand, we expect CB&I to continue to deliver outstanding value to our shareholders.[136]

This is inactionable puffery,[137] and an opinion subject to *Omnicare*,[138] for which Plaintiffs do not have the necessary evidence to avoid summary judgment—Asherman believed what he said,[139] did not supply untrue facts, and did not omit facts about the basis for his opinion that make it

---

[133] *In re Express Scripts*, 773 F. App'x at 14 ("[Plaintiff] essentially argues that Defendants should have anticipated the outcome of the negotiations sooner or that the negotiations would deteriorate, but in the circumstances here, where the discussions were ongoing, Defendants did not have a duty to disclose more about the uncertain state of the negotiations.").

[134] *See, e.g.*, *Woolgar*, 2020 WL 4586792, at *16   (collecting cases rejecting fraud-by-hindsight theories about accounting judgments that proved wrong); *In re Aceto*, 2019 WL 3606745, at *7 ("[T]he subsequent disclosure of contrary information—even within a matter of weeks—does not necessarily render a prior statement false.").

[135] Ballschmiede Decl. ¶ 21; Stockton Decl. ¶ 15; Asherman Decl. ¶¶ 11, 15; Accounting Memos Excerpts, at CB&ICo_001026049..

[136] *See* Ex. 11.

[137] *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (statement that "Chipotle is 'committed to serving safe, high quality food to [its] customers' and that its 'food safety programs are also designed to ensure that [the Company] compl[ies] with applicable federal, state and local food safety regulations'—is inactionable puffery," noting that "Chipotle couched the[] statement[] in aspirational terms, such as the Company's 'commit[ment]' to food safety") (fourth and fifth alterations in original), *aff'd sub nom. Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 2020 WL 4644799 (2d Cir. Aug. 12, 2020).

[138] *See, e.g.*, *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 227 (S.D.N.Y. 2018) (holding statements that defendant "expect[s] revenue to grow," "see[s] topline momentum," "still expect[s]" growth, "expect[s] stronger commercial aftermarket," is "on the right track," and is "moving along exactly in line" with expectations were opinions under *Omnicare*), *aff'd sub nom. Kapitalforeningen Lægernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019).

[139] Asherman Decl. ¶ 5.

"misleading to a reasonable person reading the statement fairly and in context."[140] Plaintiffs again try an omission theory, claiming his opinion was misleading because it omitted that "the NRC had recently warned CBI about deficiencies in its 'safety culture,'" and "safety deficiencies in the nuclear division involving unsafe welds of critical components" had caused CB&I "to impose a stop-work order that was in effect at the time."[141] But no reasonable person reading the statement fairly and in context would take from it that he was even commenting on the nuclear operations at all, much less that he omitted something necessary to make his statement not misleading[142]— particularly when (1) the NRC's so-called "warning" was actually an order confirming that months *before* Asherman's statement, CB&I had *successfully resolved* issues that existed at Shaw before CB&I acquired it;[143] and (2) CB&I's stop work order affected only one location due to documentation issues, not worker safety.[144] Nor do Plaintiffs have any evidence of scienter.

**D.    Asherman's statements about Nuclear Project milestones and progress (CS#3, 6, 7, 9) were not false or misleading or made with scienter.**

Plaintiffs challenge several Asherman statements they claim omitted either the NRC's "warning" and the stop work order, or the purported GAAP violations, or both:

- CS#3 (Feb. 2014): *[T]he fabrication of modules, pipe spools and structural steel for the Vogtle and V.C. Summer nuclear power plants made good progress during the quarter*. Today, the total of 220 modules for the first units have been shipped as more of the effort transition to the construction sites.[145]

---

[140] *Tongue*, 816 F.3d at 209 (quoting *Omnicare*, 575 U.S. at 194); *see* Asherman Decl. ¶¶ 5, 6.

[141] CAC ¶¶107-08.

[142] *Tongue*, 816 F.3d at 210 ("The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" (quoting *Omnicare*, 575 U.S. at 189)); *see also id.* ("The [Supreme] Court went on to say that a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" (quoting *Omnicare*, 575 U.S. at 189)).

[143] *See* CAC ¶ 97 (citing NRC's 9/16/2013 Confirmatory Order); Confirmatory Order, at 1-2, *In re Matter of Chicago Bridge & Iron*, No. EA-12-189 (N.R.C. Sept. 16, 2013), https://www.nrc.gov/docs/ML1323/ML13233A432.pdf, (describing 2011 issues at Shaw leading to NRC's Oct. 2012 notice of violation (i.e., before CB&I's Feb. 2013 acquisition of Shaw); *id.* at 7 ("The NRC has concluded that its concerns can be resolved through effective implementation of CB&I's commitments.").

[144] *See* CAC ¶ 98 (citing CB&I's 4/17/2014 Ltr. to NRC, https://www.nrc.gov/docs/ML1411/ML14113A410.pdf); Asherman Decl. ¶ 6.

[145] CAC ¶109 (alleging omission of the weld issues and fabrication errors on modules).

Case 1:17-cv-01580-LGS   Document 253   Filed 09/04/20   Page 30 of 32

- CS#6 (Apr. 2014): ***CB&I's revenue and earnings also remain solid***.[146]

- CS#7 (Apr. 2014): ***Well, I think we made some good progress. I'm very pleased with the milestone, as I mentioned, on the main module***.[147]

- CS#9 (July 2014): ***We continued to advance major project key milestones at levels that delivered growth in revenue and income from operations***.[148]

These statements are opinions subject to *Omnicare*[149] for which Plaintiffs again lack the necessary evidence: Asherman believed his opinions,[150] there is no evidence any facts he supplied were untrue, and the purportedly omitted facts do not satisfy *Omnicare*. No reasonable investor would understand his statements "to convey facts about . . . [his] basis for holding th[ose] view[s]" that were contrary to "the real facts"[151]—particularly when the NRC's confirmatory order concerned pre-acquisition issues at Shaw that CB&I had resolved,[152] the stop work order had nothing to do with the milestones, which he accurately described,[153] and CB&I's accounting determinations were reasonable under GAAP.[154] Plaintiffs cannot make out an omission theory of *Omnicare* liability by pointing to purportedly undisclosed facts about issues unrelated to those milestones.[155] And, again, Plaintiffs have no evidence of scienter.

## IV.   CONCLUSION

For the reasons set forth above, summary judgment should be granted on all claims.

---

[146] CAC ¶116; CAC ¶ 117 (alleging omission of stop work order and purported UCO/claim revenue and purchase accounting GAAP violations).
[147] CAC ¶118; CAC ¶ 119 (alleging omission of stop work order and NRC's findings).
[148] CAC ¶130; CAC ¶ 131 (alleging omission of purported UCO/claim revenue GAAP violations).
[149] *See, e.g.*, *Omnicare*, 575 U.S. at 186-89; *Ong*, 294 F. Supp. 3d at 232.
[150] Asherman Decl. ¶¶ 7, 8, 9, 10.
[151] *Omnicare*, 575 U.S. at 188.
[152] *See supra* n.143.
[153] *See supra* 144; *see also* Asherman Decl. ¶ 6.
[154] *See, e.g.*, *supra* n.90.
[155] *See, e.g.*, *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 164 (S.D.N.Y. 2018) (rejecting "attempt to pull a duty to disclose information concerning a different topic . . . from the principle that a disclosure must be complete and accurate").

25

Dated: September 4, 2020

Respectfully submitted,

**BAKER BOTTS L.L.P.**

Brian C. Kerr
30 Rockefeller Plaza
New York, NY 10112-4498
Tel: (212) 408-2543
Fax: (212) 259-2543
brian.kerr@bakerbotts.com

By: _/s/ David D. Sterling_
    David D. Sterling (*pro hac vice*)
    Texas Bar No. 19170000
    Rebeca Aizpuru Huddle (*pro hac vice*)
    Texas Bar No. 24012197
    Amy Pharr Hefley (*pro hac vice*)
    Texas Bar No. 24046046
    One Shell Plaza
    910 Louisiana St.
    Houston, Texas 77002
    Tel: (713) 229-1946
    Fax: (713) 229-7946
    david.sterling@bakerbotts.com
    rebeca.huddle@bakerbotts.com
    amy.hefley@bakerbotts.com

**COUNSEL FOR DEFENDANTS**
**CHICAGO BRIDGE & IRON COMPANY N.V.,**
**PHILIP ASHERMAN, AND WESTLEY STOCKTON**

**GREENBERG TRAURIG, LLP**


By: */s/ James R. Leahy (by permission)*
    Robert A. Horowitz
    MetLife Building
    200 Park Avenue
    New York, NY 10166
    Tel: (212) 801-2194
    Fax: (212) 224-6114
    horowitzr@gtlaw.com

    James R. Leahy *(pro hac vice)*
    Texas Bar No. 12089500
    Nicole S. Bakare *(pro hac vice)*
    Texas Bar No. 24056017
    1000 Louisiana Street, Suite 1700
    Houston, TX 77002
    Tel: (713) 374-3500
    Fax: (713) 754-3305
    leahyj@gtlaw.com
    bakaren@gtlaw.com

    COUNSEL FOR DEFENDANT
    RONALD A. BALLSCHMIEDE