```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :     17 Civ. 1580 (LGS)
IN RE CHICAGO BRIDGE & IRON                                 :
COMPANY N.V. SECURITIES LITIGATION.                         :     OPINION AND ORDER
------------------------------------------------------------X
```

LORNA G. SCHOFIELD, District Judge:

In this consolidated securities fraud class action, Plaintiffs ALSAR Ltd. Partnership, Ironworkers Local 40, 361 and 417 Union Security Funds and Iron Workers Local 580 Joint Funds, individually and on behalf of all other persons similarly situated, bring this class action against Defendants Chicago Bridge & Iron Company N.V. ("CBI"), Philip K. Asherman, Ronald A. Ballschmiede and Westley S. Stockton, alleging Defendants' statements in relation to a corporate acquisition violated § 10(b) and § 20(a) of the Securities Exchange Act of 1934. Defendants move for summary judgment, claiming no reasonable jury could find that 16 of their challenged statements were (1) false or misleading or (2) made with scienter. For the reasons stated below, the motion is denied as to all but Defendant Asherman's statement on CBI's safety practices.

**I.     BACKGROUND**

This background summary construes disputed facts, as required, in favor of Plaintiffs, the non-moving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *accord Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017).

**A.  Factual Background**

CBI is a global engineering, procurement and construction company, which provides conceptual design, technology, engineering, procurement and other services to customers in the energy infrastructure market worldwide. At all relevant times, Defendant Asherman was CBI's Chief Executive Officer ("CEO"), Defendant Ballschmiede was its Chief Financial Officer

("CFO") and Defendant Stockton was its Chief Accounting Officer (collectively, the "Individual Defendants").

In July 2012, CBI purchased the Shaw Group ("Shaw") for approximately $3.3 billion (the "Shaw Acquisition"). The sale closed in February 2013. One of Shaw's subsidiaries was the lead contractor for the construction of nuclear power plants in Waynesboro, Georgia, and Jenkinsville, South Carolina (collectively, the "Nuclear Projects"). Both plants were to use AP1000 nuclear reactors newly developed by Westinghouse Electric Corporation ("Westinghouse"). Westinghouse and the Shaw subsidiary were parties to a Consortium Agreement whereby each was responsible for certain aspects of the Nuclear Projects. The consortium in turn contracted with the owners of the Nuclear Projects. Prior to and after CBI's acquisition of Shaw, the Nuclear Projects experienced delays and cost overruns. CBI had disputes with both Westinghouse and the owners about CBI's entitlement to payment on the resulting claims and unapproved change orders ("UCOs").

Following the Shaw acquisition, Defendants made a series of disclosures to investors between June 11, 2014, and February 4, 2015, regarding the Nuclear Projects, which lowered the price of CBI stock. In October 2015, CBI sold Shaw's nuclear operations to Westinghouse. That sale included CBI's agreement not to pursue UCOs and claims against Westinghouse.

### B. Procedural Background

Various plaintiffs filed claims that Defendants made material misrepresentations regarding losses in CBI's nuclear business, which in turn led to investor losses during the Class Period -- October 30, 2013, through June 23, 2015. The matters were consolidated into this action. Judge Scheindlin was appointed special master and recommended certifying a class of investors. Her report and recommendation was adopted and the class was certified.

The Consolidated Amended Complaint makes broad allegations of Defendants' misrepresentations, but generally alleges that Defendants manipulated the purchase price accounting and financial reporting for the nuclear business to inflate financial results, refused to write down goodwill even though they knew the business was failing, and falsely touted progress in the Nuclear Projects.  In the present motion, Defendants claim that 16 statements (the "Challenged Statements") were not false and misleading and not made with scienter:

1. CBI's Q3 2013 10-Q stated that (a) contract revenue included CBI's best estimate for recovery amounts under existing contractual disputes and CBI did not believe any pending disputes would have a material adverse effect on CBI's financial position, (b) for the nine-month period ending September 2013, no indicators of goodwill impairment existed and so CBI recorded no goodwill impairment charge and (c) CBI's Q3 interim financial statements were prepared in accordance with GAAP.

2. In CBI's Q4 2014 Earnings Release, Asherman stated CBI had "relentless focus and commitment to safety."

3. In CBI's Q4 2014 Earnings Call, Asherman stated that the Nuclear Projects made good progress during the quarter.

4. CBI's 2013 10-K stated (a) that no goodwill impairment was recorded for 2013, "as the fair value of each of the reporting units acquired in 2013 exceeded their respective net book value and the fair value of all other reporting units significantly exceeded their respective net book value" and (b) that CBI's 2013 financial statements were prepared in accordance with GAAP.

5. CBI's Q1 2014 10-Q stated that (a) revenue had increased 30% compared with the prior year period, (b) that during the three months ending March 31, 2014, no impairment of CBI's goodwill was noted or recorded for 2014 and (c) that CBI's Q1 interim financial statements were prepared in accordance with GAAP.

6. CBI's Q1 2014 Earnings Release stated that its "revenue and earnings . . . remain solid."

7. On CBI's Q1 2014 Earnings Call, Asherman stated that progress was being made on the Nuclear Projects.

8. CBI's Q2 2014 10-Q stated that (a) during the six months ending June 30, 2014, no goodwill impairment was identified or recorded and (b) that CBI's Q2 interim financial statements were prepared in accordance with GAAP.

3

9. On CBI's Q2 2014 Earnings Call, Asherman stated that CBI continued to move projects forward at levels that delivered "growth in revenue and income from operations."

10. On CBI's Q2 2014 Earnings Call, Asherman stated that extensions to the Nuclear Projects' schedules would not affect CBI's profitability.

11. CBI's Q3 2014 10-Q stated that (a) during the nine months ending September 30, 2014, no goodwill impairment was identified or recorded and (b) that CBI's Q3 interim financial statements were prepared in accordance with GAAP.

12. On CBI's Q3, 2014 Earnings Call, (a) Ballschmiede said that delays in the Nuclear Projects had caused CBI to record additional revenue from change order claims of $200 million, and that other increased costs were also recoverable under CBI's contractual arrangements, and (b) Asherman said that CBI anticipated contractual recovery from design changes and that (c) CBI's module production facility was on track to meet project deadlines.

13. At CBI's 2014 Investor Day Conference, Asherman acknowledged "challenges with schedule, driven by regulatory changes in the design," but that CBI was still "at a point of building [the nuclear] projects, and we're very confident that they'll end as they're supposed to" and that CBI expected "more economies of scale as we go forward in the job."

14. CBI's 2014 10-K stated that (a) no goodwill impairment was recorded because "the fair value of each of our reporting units exceeded their respective net book values" and (b) CBI's 2014 financial statements were prepared in accordance with GAAP.

15. On CBI's Q4 2014 Earnings Call, Asherman stated that (a) "[i]n virtually every case [involving investor concerns as to cost overruns on the Nuclear Projects], CB&I has contractual entitlement for these costs," (b) CBI had been working with all parties to resolve project issues and was getting "some traction" in settling cost disputes and (c) the outstanding liability for contract disputes was "somewhere around $247 million, which you can assume would be split in half by the two consortium partners."

16. CBI's Q1 2015 10-Q stated that (a) the fair value of each of the reporting units impacted by a CBI operating group realignment exceeded their respective net book values, and accordingly no impairment charge was necessary as a result of the realignment, and during the first quarter no indicators of goodwill impairment were identified in any reporting group and (b) CBI's Q1 interim financial statements were prepared in accordance with GAAP.

The Challenged Statements can be divided into the following general groups:

1. Statements that no indicators of goodwill impairment were identified, and thus that no goodwill impairment was recorded in CBI's periodic financial reports ("Goodwill

   Impairment Statements").

2. Statements regarding the value of assets and liabilities acquired in the Shaw Acquisition, resulting in retroactive adjustments to goodwill ("Purchase Price Accounting Statements").

3. Statements regarding revenues and liabilities based on estimated contractual recoveries for disputes related to the Nuclear Projects, including recovery for UCOs ("Claim Revenue Statements").

4. Statements that CBI's financial reports were prepared in accordance with GAAP ("GAAP Statements").

5. Asherman's and CBI's statements that the Nuclear Projects were making good progress and were on track to deliver revenue growth ("Progress Statements").

6. Asherman's statement that CBI had "relentless focus and commitment to safety" ("Safety Statement").

   C. Bankruptcy Proceeding

After this case commenced, CBI was acquired by a separate entity, which itself entered bankruptcy proceedings in the Southern District of Texas. *See In re McDermott Int'l Inc.*, No. 20-30336 (Bankr. S.D. Tex.). A Chapter 11 Plan (the "Bankruptcy Plan") became effective on June 30, 2020. Defendants were permitted to file an amended Answer raising two affirmative defenses arising from the Bankruptcy Plan: (1) that Plaintiffs' securities fraud claims against CBI are "Class 14 Interests" under the Bankruptcy Plan, which do not receive any distribution or, alternatively, that Plaintiffs' claims against CBI are subordinated by the Bankruptcy Plan pursuant to Bankruptcy Code Section 510(b) and (2) that Plaintiffs' claims against the Individual Defendants are subject to releases, except to the extent Plaintiffs claim the Individual Defendants engaged in intentional fraud. Defendants also sought declaratory relief on these defenses in the bankruptcy proceeding and sought an order requiring Plaintiffs to withdraw their claims in this proceeding. On June 23, 2021, the bankruptcy court held that (1) because Plaintiffs' claims are

Class 14 Interests and subject to Section 510(b), Plaintiffs may continue to prosecute their claims against CBI as a nominal defendant solely to recover against any available insurance proceeds and (2) Plaintiffs' claims against the Individual Defendants are barred except to the extent those claims involve allegations that the Individual Defendants' actions constituted actual fraud. The § 10(b) and Rule 10b-5 securities fraud claim is not barred as it is a claim of actual fraud requiring proof of scienter, which is discussed below. The § 20(a) claim is not barred because it also is a claim of actual fraud and requires proof "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).

## II. STANDARD

### A. Summary Judgment

Summary judgment is proper where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (quoting *Anderson*, 477 U.S. at 248 (1986)). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Victory v. Pataki*, 814 F.3d 47, 58-59 (2d Cir. 2016), *as amended* (Feb. 24, 2016). Courts must construe the evidence and draw all reasonable inferences in the non-moving party's favor. *See Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 71-72 (2d Cir. 2016). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Pippins v. KMPG, LLP*, 759 F.3d 235, 252 (2d Cir. 2014) (quoting *Anderson*, 477 U.S. at 248).

### B. Securities Fraud Under Section 10(b) and Rule 10b-5

In order to prevail on a claim of securities fraud under § 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss and (6) loss causation. *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019); *accord In Re Perrigo Company PLC Sec. Litig.*, No. 19 Civ. 70, 2021 WL 3005657, at *4 (S.D.N.Y. July 15, 2021). Only the issues of misrepresentation/omission and scienter are at issue in the present motion.

#### 1. Material Misrepresentations and Omissions

Rule 10b-5 prohibits persons from (1) making "any untrue statement of a material fact" and (2) from "omit[ting] to state a material fact necessary in order to make [ ] statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5(b). "[B]oth statements of fact and those of opinion [are] actionable when such statements would be misleading without the contextualization of material facts." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 174 (2d Cir. 2020). A statement of opinion may be challenged in two ways: (1) by showing that the "statement of opinion contained one or more embedded factual statements that can be proven false" or (2) by showing that the "statement of opinion, without providing critical context, implied facts that can be proven false." *Id.* (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 187 n.4 (2015)). The second inquiry is analyzed from the perspective of a reasonable investor, taking into account (1) the customs and practices of

the relevant industry, (2) whether the opinion was expressed in a formal statement, such as a regulatory filing, or in an off-the-cuff manner and (3) that investors understand that opinions rest on the weighing of competing facts, and thus that a single fact cutting the other way does not render an opinion false.  *Id.*  Finally, "[g]eneric, indefinite statements of corporate optimism typically are not actionable," and corporate officials need not "present an overly gloomy or cautious picture of current performance and future prospects" as reasonable investors do not "place substantial reliance on generalizations regarding a company's health or the strength of a company's product." *Id.* at 173-74.  Instead, "puffery" by corporate officials -- such as statements that performance is "encouraging" or an "improvement" -- is actionable only when the speaker "knew that the contrary was true." *Id.* at 174.

A false statement or omission is material "if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 202 (S.D.N.Y. 2020) (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010)). Materiality is an "inherently fact-specific finding," *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011), that "generally should be presented to a jury," *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 430 (S.D.N.Y. 2015) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)). *See also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (stating that at summary judgment, the "determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.").

### 2. Scienter

"A false statement was made with the requisite scienter if it was made with the intent to deceive, manipulate, or defraud." *Sec. & Exch. Comm'n v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (internal quotation marks omitted). "Scienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Id.* at 136 (internal quotation marks and alterations omitted). "[C]ourts should be 'lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'" *Gruber v. Gilbertson*, No. 16 Civ. 9727, 2021 WL 2482109, at *12 (S.D.N.Y. June 17, 2021) (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009)).

## III. DISCUSSION

### A. Statements of Opinion

Defendants argue that the Challenged Statements were statements of opinion, and thus must be evaluated under the *Omnicare* standard, which looks for (1) embedded false factual statements or (2) lack of context suggesting an untruth, evaluated from the perspective of a reasonable investor. *Abramson*, 965 F.3d at 174. "By increasing the ability of plaintiffs to plead material omissions with respect to statements of opinion as described above, *Omnicare* reduced the significance of district courts' classification of statements as those of fact or opinion." *Id.* at 176. In this case, regardless of whether the Challenged Statements are assessed as a misstatement of fact or opinion, a reasonable jury could find that all but one of them provided inadequate

9

context, with the effect of suggesting facts starkly at odds with much of the record evidence.

### B. Goodwill Statements[1]

GAAP required CBI to ascertain the fair value of all of Shaw's tangible and intangible assets and liabilities as of the closing date, allocate the $3.3 billion purchase price to them, and record the excess of purchase price over the fair value as goodwill.  GAAP requires that this goodwill figure be updated following an initial acquisition if new information about facts and circumstances that existed at the time of acquisition caused a change in the calculation of goodwill.  GAAP also requires that goodwill be tested for impairment on an annual basis and between annual tests in the event changed circumstances would reduce the fair value of a reporting business unit below that recorded in a company's accounts.

The goodwill recorded by CBI in connection with the Shaw Acquisition was $2.5 billion on February 13, 2013, and rose to approximately $3.3 billion by the end of 2013 -- roughly equal to the price CBI paid for Shaw.  Following CBI's sale of its nuclear business to Westinghouse, CBI determined that $191 million of goodwill was allocable to the Nuclear Projects.

---

[1] Plaintiffs rely in part on the reports of their experts, Harris Devor and William Purcell.  In their reply brief, Defendants raise a hearsay objection to Plaintiff's reliance on documents not in the record except that they are referenced by Plaintiff's experts.  This objection is unavailing.  First, Federal Rule of Evidence 703 permits disclosure to a jury of otherwise inadmissible documents relied upon by an expert if experts in the field would reasonably rely on those kinds of facts or data, and if their probative value outweighs any prejudicial effect.  Second, this Opinion and Order relies on the expert opinions in the record, documents in the record and CBI's public filings, which are in the record, and of which the Court in any event may take judicial notice.  *See In re Pareteum Sec. Litig.*, No. 19 Civ. 9767, 2021 WL 3540779, at *2 n.1 (S.D.N.Y. Aug. 11, 2021) (citing *In re Morgan Stanley Info. Fund Sec. Litig*, 592 F.3d 347, 354 n.5 (2d Cir. 2010)).

1. **Misrepresentation or Omission**

Plaintiffs argue that CBI organized its financial reporting units in a manner that "avoided reporting goodwill impairments during the Class Period." Defendants do not dispute that, rather than making disclosures regarding goodwill for its Nuclear unit -- which included the Shaw acquisition -- CBI made disclosures for its Power unit, of which the Nuclear unit was one component. Defendants acknowledge that this choice of reporting unit allowed CBI to avoid recording estimated negative cash flows from the Nuclear Projects in regulatory filings, so long as they were exceeded by the estimated positive cash flows from the rest of the Power unit. This in turn enabled CBI to avoid recording goodwill impairments that would have revealed significant deterioration in the Nuclear Projects.

The record shows that Defendants were aware of issues with the Nuclear Projects with potentially significant effects on the goodwill recorded for the Shaw Acquisition, including (1) delays and dysfunction on the Nuclear Projects acquired from Shaw and (2) that Shaw's nuclear build business was declining in value during the year after it was acquired. A reasonable jury evaluating this evidence could conclude that Defendants' choice of reporting unit, coupled with evidence of goodwill impairments associated with Defendants' nuclear business, hid material context about the nuclear business and its goodwill from investors and thus made the Goodwill Statements misrepresentations for purposes of Rule 10b-5.

In response, Defendants claim they were permitted to merge reporting units in this manner pursuant to GAAP. Even if true, this argument is unpersuasive. "GAAP itself recognizes that technical compliance with particular GAAP rules may lead to misleading financial statements, and imposes an overall requirement that the statements as a whole accurately reflect the financial status of the company." *United States v. Ebbers*, 458 F.3d 110, 126 (2d Cir. 2006);

*accord In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728, 2019 WL 3001084, at *14 (S.D.N.Y. July 10, 2019); *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 279 (S.D.N.Y. 2011). Defendants also argue that CBI's external auditors reviewed its disclosures and deemed them reasonable, and that the SEC closed an investigation into CBI's accounting practices after noting that it had not reached any conclusion as to the propriety of those practices. These arguments at most show that a material dispute of fact exists as to whether the Goodwill Statements were in fact misstatements and whether Defendants acted with scienter, considering the countervailing evidence that: (1) CBI reported no goodwill impairments during the Class Period despite evidence of potential impairments; (2) CBI's accounting during the Class Period increased the goodwill resulting from the Shaw Acquisition to the price CBI paid for Shaw, indicating that Shaw's other net assets had essentially no value and (3) following CBI's sale of its nuclear build business at a $1 billion loss, it significantly wrote down the goodwill associated with the Nuclear Projects. A reasonable jury evaluating this evidence could conclude that the Goodwill Statements were misleading.

        2. Scienter

A reasonable jury could find the Goodwill Statements were made with a reckless disregard for the truth. As described above, CBI elected to merge accounting for its Nuclear unit into the Power unit -- and thus avoid disclosing any goodwill impairment related to the Nuclear Projects -- despite those projects suffering from numerous business and regulatory problems. Mindful that scienter issues are best addressed by the finder of fact, Defendants are denied summary judgment on this issue.

12

### C. Purchase Price Accounting Statements

During the Class Period, Defendants made repeated adjustments to CBI's purchase price accounting for Shaw, which consisted of increasing the assumed costs to complete the Nuclear Projects, which was offset by a corresponding increase to goodwill, an asset. This accounting treatment meant that CBI did not record the estimated cost increases as expenses, which would have reduced earnings in CBI's current income statement. Plaintiffs argue this adjustment effectively allowed CBI to utilize a "cookie jar" reserve of goodwill that was used to offset costs and artificially inflate CBI's profitability during the Class Period.

#### 1. Misrepresentation or Omission

The record shows that, between the first and fourth quarter of 2013, CBI recorded purchase price adjustments ("PPAs") that reallocated the Shaw purchase price between goodwill and other assets and liabilities. Specifically, CBI revised the value of liabilities acquired in the Shaw Acquisition by recording PPAs that approximately doubled the amount of liabilities for contracts related to the Nuclear Projects, from $1.1 billion to $2.3 billion. These increased liabilities reduced the net assets (exclusive of goodwill) that CBI acquired from Shaw to close to zero, resulting in an $847 million increase to goodwill from the Shaw acquisition to a total of $3.3 billion -- approximately equal to the price CBI paid for Shaw. CBI's financial statements did not explain why the estimate of liability to complete the Nuclear Projects more than doubled from the time of the acquisition over the course of a year. By recording the increased costs associated with the contracts as PPAs rather than expenses, CBI was representing that, per the requirements of GAAP, the PPAs were made based on new information obtained about the facts and circumstances that existed at the time of the acquisition.

13

A dispute of material fact exists as to whether this representation was true.  Based on the evidence construed in favor of Plaintiffs, a reasonable jury could conclude that (1) the Nuclear Projects had negative cash flows, which could reduce income and profitability, but PPAs provided an avenue to book certain costs in a way that would not reduce income and profitability and (2) CBI's 2013 PPAs arose from new information about negative facts and circumstances that did *not* exist at the time of the acquisition.  In light of this evidence, a reasonable jury could conclude that the Purchase Price Accounting Statements and associated GAAP Statements were false and could mislead investors about (1) the current performance and outlook for the contracts related to the Nuclear Projects and (2) CBI's profitability.

In response, Defendants observe that no purchase as complex as the Shaw Acquisition is fully and accurately valued at closing, which is why GAAP permits PPAs for a period following the acquisition.  This argument does not eliminate the above factual dispute regarding whether CBI accurately stated that its PPAs were proper under purchase accounting rules.

2. **Scienter**

As with the Goodwill Statements, the Purchase Price Accounting Statements and associated GAAP Statements were made despite internal indications that they were (1) based on inaccurate or incomplete information or (2) did not adequately capture Shaw's value at the time of acquisition, but instead reflected post-acquisition activity not attributable to the claimed goodwill increase under purchase accounting rules.  A reasonable jury could find that these statements were made with a reckless disregard for the truth.  Defendants are denied summary judgment on this issue.

### D. Claim Revenue Statements

#### 1. Misrepresentation or Omission

A reasonable jury could conclude that Defendants' statements regarding expected revenue from contractual disputes -- primarily with Westinghouse and the owners of the Nuclear Projects -- misled investors. Defendants consistently represented that their best estimates of anticipated contract revenue would not create any material adverse effect on CBI's financial position, and provided specific projections of estimated unrecoverable contract revenue. At the same time, record evidence suggests that (1) CBI did not expect significant recovery from Westinghouse due to the strained nature of the relationship between the parties and the degree of cost overruns on the Nuclear Projects and (2) CBI eventually considered ceasing work, pursuing litigation against Westinghouse and transferring ownership of the Nuclear Projects due to continued nonpayment of contractual revenue. A reasonable jury evaluating this evidence could conclude that the Claim Revenue Statements, by omitting this context, suggested that recovery was far more likely than it actually was.

In response, Defendants correctly note that corporate statements need not disclose every adverse fact, and that corporate statements should not be judged with the benefit of hindsight. This argument is unpersuasive due to the stark difference between the Claim Revenue Statements and Defendants' internal assessment of the likelihood of recovering claim revenue.

#### 2. Scienter

As with the Goodwill and Purchase Price Accounting Statements, the Claim Revenue Statements were made despite internal indications that estimated contractual recoveries would be (1) much lower than projected and (2) significantly more difficult to obtain than represented. A reasonable jury could find that these statements were made with a reckless disregard for the truth,

and Defendants are denied summary judgment on this issue.

### E. GAAP Statements

Under SEC rules, "financial statements which are not prepared in accordance with GAAP are presumptively misleading or inaccurate." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) (quoting 17 C.F.R. § 210.4-01(a)(1)); *accord Perrigo*, 2021 WL 3005657, at *5. However, compliance with GAAP does not equate to no securities fraud -- statements can be false even if Defendants did not run afoul of GAAP. *Ebbers*, 458 F.3d at 126 (2d Cir. 2006); *accord In re Signet*, 2019 WL 3001084, at *14. The parties' arguments regarding the GAAP Statements largely turn on whether CBI's accounting methods in relation to the Goodwill and Purchase Price Accounting Statements were misleading by virtue of being noncompliant with GAAP. Because, as discussed above, factual issues preclude finding the Goodwill Statements were true and made without scienter regardless of whether those statements were GAAP-compliant, this Opinion and Order does not address whether Defendants complied with GAAP with respect to the Goodwill Statements. As described above, factual disputes preclude summary judgment on whether the GAAP Statements were true with regard to the Purchase Price Accounting Statements.

### F. Progress Statements

#### 1. Misrepresentation or Omission

A reasonable jury could conclude that the Progress Statements misled reasonable investors. Defendants consistently stated that the Nuclear Projects were making good progress and on track, and that delays and cost overruns would not impact CBI's revenue and profitability estimates. There is sufficient record evidence to the contrary for a reasonable jury to conclude that the Progress Statements, by omitting context regarding significant issues on the Nuclear

Projects, misled investors. As described above, the record contains evidence from which a reasonable jury could conclude that (1) there were significant delays and logistical issues on the Nuclear Projects; (2) cash flows and revenues from the Nuclear Projects were poor and (3) CBI was unlikely to recover projected cost overruns from contractual disputes. In light of those record issues, a reasonable jury could find the Progress Statements misleading.

### 2. Scienter

As with the other Challenged Statements, the stark difference between the content of the Progress Statements and the potentially contradictory record facts would permit a reasonable jury to conclude that the Progress Statements were made with reckless disregard for the truth. Defendants are denied summary judgment on this issue.

### G. Safety Statement

The Safety Statement -- that CBI had a "relentless focus and commitment to safety" -- is non-actionable puffery. Generic aspirational statements of this type are "quintessential examples" of puffery on which no reasonable investor would rely. *See, e.g.*, *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (holding that defendant's statement that it was "committed to serving safe, high quality food to [its] customers" to be puffery).

In response, Plaintiffs note that Asherman possessed information discussing safety issues with the Nuclear Projects, including letters from employees, a notice of noncompliance from the Nuclear Regulatory Commission and two consultants' assessments raising safety issues. That safety issues *existed* on the Nuclear Projects does not render Asherman's general statement regarding CBI's *focus* on safety anything other than puffery. Because no reasonable jury could find an investor would have found the Safety Statement anything but puffery, summary judgment

17

is granted to Defendants on this issue.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is **granted** as to the Safety Statement. Defendants' motion is **denied** for the remaining Challenged Statements. Defendants' motion for oral argument is **denied** as moot. The Clerk of Court is respectfully directed to close the docket entries at Numbers 252 and 292.

Dated: August 23, 2021
       New York, New York

                                                  LORNA G. SCHOFIELD
                                     UNITED STATES DISTRICT JUDGE